ORAL ARGUMENT NOT YET SCHEDULED

Nos. 12-5310, -5311

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

NATIONAL MINING ASSOCIATION, et al.,
*Plaintiffs-Appellees*,

Commonwealth of Kentucky and City of Pikeville, Kentucky,
*Intervenor Plaintiffs-Appellees*,

-v.-

BOB PERCIASEPE, Acting Administrator of the
United States Environmental Protection Agency, et al.,
*Federal Defendants-Appellants*,

Sierra Club, et al.,
*Intervenor Defendants-Appellants*.

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLUMBIA
Lead Case No. 11-cv-01220 (Hon. Reggie B. Walton)

**PROOF BRIEF OF THE UNITED STATES OF AMERICA**

Of Counsel:

GAUTAM SRINIVASAN
MICHAEL G. LEE
KARYN I. WENDELOWSKI
 Office of General Counsel
 United States Environmental
  Protection Agency

RUSSELL W. PETIT
ANN D. NAVARO
 Office of the Chief Counsel
 United States Army Corps of
  Engineers

IGNACIA S. MORENO
Assistant Attorney General

AARON P. AVILA
MICHAEL T. GRAY
CYNTHIA J. MORRIS
KENNETH C. AMADITZ
MATTHEW LITTLETON
 Attorneys, Environment & Natural
  Resources Division
 United States Department of Justice
 P.O. Box 7415
 Washington, DC 20044
 (202) 514-4010
 matthew.littleton@usdoj.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A. Parties and amici.**

Federal Defendants-Appellants are Bob Perciasepe, Acting

Administrator of the United States Environmental Protection Agency[†];

the United States Environmental Protection Agency (EPA); the United

States Army Corps of Engineers (Corps); John M. McHugh, Secretary of

the Army; and Lt. Gen. Thomas P. Bostick, United States Army Chief of

Engineers.

Intervenor Defendants-Appellants are Sierra Club, Coal River

Mountain Watch, Kentuckians for the Commonwealth, Ohio Valley

Environmental Coalition, Southern Appalachian Mountain Stewards,

Statewide Organizing for Community Empowerment, and West

Virginia Highlands Conservancy.

Plaintiffs-Appellees are the National Mining Association; the State

of West Virginia; Randy C. Huffman, in his official capacity as Cabinet

Secretary of the West Virginia Department of Environmental

---

[†]    Pursuant to Fed. R. App. P. 43(c)(2), Bob Perciasepe is hereby substituted for Lisa P. Jackson.

C-1

Protection; Kentucky Coal Association; Gorman Company, LLC; Hazard Coal Corporation; KYCOGA Company, LLC; Black Gold Sales, Inc.; and Kentucky Union Company. Intervenor Plaintiffs-Appellees are the Commonwealth of Kentucky and the City of Pikeville, Kentucky.

No amici participated in the district court, and undersigned counsel is not aware of any amici that will participate in this Court.

**B. Rulings under review.**

The Honorable Reggie B. Walton of the United States District Court for the District of Columbia issued a Memorandum Opinion and Order in this case on October 6, 2011. *Nat'l Mining Ass'n v. Jackson*, 816 F. Supp. 2d 37; Joint Appendix (JA) **[Dkts.95–96]**.** The court granted plaintiffs' motion for partial summary judgment, denied defendants' and intervenor-defendants' cross-motions for partial summary judgment, and set aside (1) an Enhanced Coordination Process between the Corps and EPA and (2) a screening procedure used to select permit applications for the Enhanced Coordination Process.

---

** In this proof brief, we cite district court docket entries using the form "**[**Dkt(s).#:page(s)**]**."

Judge Walton issued a second Memorandum Opinion and Order on July 31, 2012. *Nat'l Mining Ass'n v. Jackson*, 880 F. Supp. 2d 119; **[Dkts.166–67]**. The court granted plaintiffs' motion for partial summary judgment, denied defendants' and intervenor-defendants' cross-motions for partial summary judgment, and set aside an EPA guidance memorandum of July 21, 2011, entitled "Improving EPA Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order."

The district court entered final judgment on July 31, 2012. **[Dkt.166]**. The United States appeals from both rulings. Intervenor Defendants Sierra Club, et al., have appealed separately.

## C. Related Cases.

This case has not been before this or any other appellate court previously. Undersigned counsel is not aware of any related proceedings pending before this or any other court, as defined by Circuit Rule 28(a)(1)(C).

C-3

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS,
    AND RELATED CASES............................................................. C-1

TABLE OF AUTHORITIES ................................................................iv

GLOSSARY ........................................................................... xiv

INTRODUCTION................................................................................ 1

STATEMENT OF JURISDICTION.................................................... 2

STATEMENT OF ISSUES ................................................................. 3

STATUTES AND REGULATIONS‡..................................................... 5

STATEMENT OF FACTS AND STATEMENT OF THE CASE .......... 5

    A. Enhanced Coordination Process ...................................6

    B. Guidance Memo......................................................... 10

        1. Water quality standards...........................................11

        2. NPDES permits....................................................... 12

        3. Section 404 permits ................................................ 18

    C. District court proceedings ..........................................21

        1. Enhanced Coordination Process and screening procedure ....21

        2. Guidance Memo ..................................................... 22

SUMMARY OF ARGUMENT.......................................................... 26

---

‡    Pursuant to D.C. Cir. R. 28(a)(5), all pertinent statutes and regulations are reproduced under separate cover.

STANDARD OF REVIEW ................................................................. 30

ARGUMENT ..................................................................................... 31

I. The Enhanced Coordination Process and the screening
   procedure do not violate the Clean Water Act or the APA ........ 31

   A. The Corps and EPA can develop coordinated procedures to
      implement Section 404 of the Clean Water Act ..................... 31

   B. The Enhanced Coordination Process and the screening
      procedure do not require notice and comment ....................... 38

      1. The Enhanced Coordination Process is a procedural
         rule ..................................................................................... 39

      2. The screening procedure is a procedural rule .................. 43

II. The district court erred in vacating the Guidance Memo .......... 45

   A. The Guidance Memo is not final agency action ..................... 45

      1. Impact on EPA staff ......................................................... 46

      2. Impact on permitting authorities ..................................... 54

      3. Impact on permit applicants ............................................ 55

   B. The district court lacked jurisdiction to review the
      Guidance Memo's RPA recommendation ............................... 57

   C. EPA can prevent an NPDES permit from issuing if a State
      does not perform a reasonable potential analysis and fails
      to include appropriate permit limitations ............................. 61

   D. The Guidance Memo's conductivity benchmark is not a
      legally-binding water quality standard ................................. 67

   E. The Guidance Memo does not create a new role for EPA
      under the Surface Mining Control and Reclamation Act ...... 71

CONCLUSION ...................................................................................... 75

CERTIFICATE OF COMPLIANCE..................................................... 77

CERTIFICATE OF SERVICE ............................................................ 78

# TABLE OF AUTHORITIES

## <u>Cases</u>

*American Hospital Ass'n v. Bowen,
    834 F.2d 1037 (D.C. Cir. 1987) ............................................... 41, 42, 44

American Iron & Steel Institute v. EPA,
    115 F.3d 979 (D.C. Cir. 1997) ........................................................58

American Mining Congress v. Mine Safety & Health Administration,
    995 F.2d 1106 (D.C. Cir. 1993) .........................................................39

American Paper Institute, Inc. v. EPA,
    882 F.2d 287 (7th Cir. 1989) ............................................................56

*American Paper Institute, Inc. v. EPA,
    996 F.2d 346 (D.C. Cir. 1993) (*American Paper*) ..11, 12, 58, 63, 68, 71

Appalachian Power Co. v. EPA,
    208 F.3d 1015 (D.C. Cir. 2000) ...................................................39, 50

Arkansas v. Oklahoma,
    503 U.S. 91 (1992) ..........................................................................62

Associated Press v. FCC,
    448 F.2d 1095 (D.C. Cir. 1971) ........................................................33

Association of Businesses Advocating Tariff Equity v. Hanzlik,
    779 F.2d 697 (D.C. Cir. 1985) ...........................................................38

AT&T Co. v. EEOC,
    270 F.3d 973 (D.C. Cir. 2001) ..........................................................50

Auer v. Robbins,
    519 U.S. 452 (1997) ........................................................................30

---

\*    Authorities upon which we chiefly rely are marked with asterisks.

iv

*Aulenback, Inc. v. FHA,*
  103 F.3d 156 (D.C. Cir. 1997) .......................................... 44

*Barnhart v. Peabody Coal Co.,*
  537 U.S. 149 (2003) ....................................................... 34

*Batterton v. Marshall,*
  648 F.2d 694 (D.C. Cir. 1980) .......................................... 40

*Bennett v. Spear,*
  520 U.S. 154 (1997) ....................................................... 46

*Catawba County, North Carolina v. EPA,*
  571 F.3d 20 (D.C. Cir. 2009) ........................................... 50

*Cement Kiln Recycling Coalition v. EPA,*
  493 F.3d 207 (D.C. Cir. 2007) .......................................... 61

*Center for Auto Safety v. NHTSA,*
  452 F.3d 798 (D.C. Cir. 2006) ......................... 30, 47, 48, 55

*Chevron, U.S.A., Inc. v. NRDC, Inc.,*
  467 U.S. 837 (1984) ....................................................... 30

*Chrysler Corp. v. Brown,*
  441 U.S. 281 (1979) ....................................................... 47

*City of Ames, Iowa v. Reilly,*
  986 F.2d 253 (8th Cir. 1993) ........................................... 50

*City of San Antonio v. Civil Aeronautics Board,*
  374 F.2d 326 (D.C. Cir. 1967) .......................................... 38

*Community Nutrition Institute v. Young,*
  818 F.2d 943 (D.C. Cir. 1987) .......................................... 49

*E.I. du Pont de Nemours & Co. v. Train,*
  430 U.S. 112 (1977) ....................................................... 58

*Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Department of the Treasury,*
   638 F.3d 794 (D.C. Cir. 2011) ........................................................... 37

*\*FCC v. Pottsville Broadcasting Co.,*
   309 U.S. 134 (1940) ........................................................................... 33

*\*FCC v. Schreiber,*
   381 U.S. 279 (1965) ..................................................................... 30, 33

*Frazier v. MSPB,*
   672 F.2d 150 (D.C. Cir. 1982) ........................................................... 33

*Friends of the Earth v. EPA,*
   333 F.3d 184 (D.C. Cir. 2003) ........................................................... 59

*FTC v. Anderson,*
   631 F.2d 741 (D.C. Cir. 1979) ........................................................... 33

*FTC v. Standard Oil Co.,*
   449 U.S. 232 (1980) ........................................................................... 55

*Fund for Animals, Inc. v. U.S. Bureau of Land Management,*
   460 F.3d 13 (D.C. Cir. 2006) ............................................................. 57

*General Electric Co. v. EPA,*
   290 F.3d 377 (D.C. Cir. 2002) ............................................... 43, 53, 61

*General Electric Uranium Management Corp. v. DOE,*
   764 F.2d 896 (D.C. Cir. 1985) ........................................................... 60

*Holistic Candlers & Consumers Ass'n v. FDA,*
   664 F.3d 940 (D.C. Cir. 2012) ..................................................... 47, 50

*Horsehead Resource Development Co., Inc. v. EPA,*
   130 F.3d 1090 (D.C. Cir. 1997) ......................................................... 60

*Independent Equipment Dealers Ass'n v. EPA,*
   372 F.3d 420 (D.C. Cir. 2004) ........................................................... 49

*James V. Hurson Associates, Inc. v. Glickman,*
  229 F.3d 277 (D.C. Cir. 2000) ........................................... 39

*JEM Broadcasting Co., Inc. v. FCC,*
  22 F.3d 320 (D.C. Cir. 1994) ............................................ 40

*Montgomery Environmental Coalition v. Costle,*
  646 F.2d 568 (D.C. Cir. 1980) .......................................... 63

*\*National Ass'n of Home Builders v. Norton,*
  415 F.3d 8 (D.C. Cir. 2005) (*Home Builders*) ........................ 45, 46, 49

*National Park Hospitality Ass'n v. Department of the Interior,*
  538 U.S. 803 (2003) ..................................................... 73

*Neighborhood TV Co., Inc. v. FCC,*
  742 F.2d 629 (D.C. Cir. 1984) ....................................... 39, 42

*\*NRDC, Inc. v. EPA,*
  673 F.2d 400 (D.C. Cir. 1982) (*NRDC v. EPA I*) ................. 58, 60, 61

*\*NRDC, Inc. v. EPA,*
  859 F.2d 156 (D.C. Cir. 1988) (*NRDC v. EPA II*) ................... 62, 66

*NRDC, Inc. v. EPA,*
  16 F.3d 1395 (4th Cir. 1993) .......................................... 71

*NRDC, Inc. v. SEC,*
  606 F.2d 1031 (D.C. Cir. 1979) ........................................ 33

*Pacific Gas & Electric Co. v. Federal Power Commission,*
  506 F.2d 33 (D.C. Cir. 1974) .......................................... 51

*Railway Labor Executives' Ass'n v. National Mediation Board,*
  29 F.3d 655 (D.C. Cir. 1994) (en banc) ............................... 34

*Ranger v. FCC,*
  294 F.2d 240 (D.C. Cir. 1961) ......................................... 42

*Reliable Automatic Sprinkler Co., Inc. v. Consumer Product
    Safety Commission,*
    324 F.3d 726 (D.C. Cir. 2003) ...................................................... 55, 56

*SEC v. Chenery Corp.,*
    332 U.S. 194 (1947) .................................................................... 37

*Sierra Club v. Costle,*
    657 F.2d 298 (D.C. Cir. 1981) .................................................... 35, 36

*The Wilderness Society v. Norton,*
    434 F.3d 584 (D.C. Cir. 2006) .......................................................... 54

*U.S. Telecom Ass'n v. FCC,*
    400 F.3d 29 (D.C. Cir. 2003) ............................................................ 39

*United States v. Riverside Bayview Homes, Inc.,*
    474 U.S. 121 (1985) .......................................................................... 32

*United Technologies Corp. v. OSHA,*
    836 F.2d 52 (2d Cir. 1987) ............................................................... 60

*Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.,*
    435 U.S. 519 (1978) .......................................................................... 33

*Vietnam Veterans v. Secretary of the Navy,*
    843 F.2d 528 (D.C. Cir. 1988) .......................................................... 39

## **Constitutional Provisions**

U.S. Const., art. II, § 3 ............................................................................ 37

## Federal Statutes

Administrative Procedure Act (APA)

    *5 U.S.C. § 553(b)(A) ......................................................... 22, 39, 43

    5 U.S.C. § 704 ........................................................................ 23, 45

    5 U.S.C. § 706(1) ............................................................................ 42

28 U.S.C. § 1291 ................................................................................... 2

28 U.S.C. § 1331 ................................................................................... 2

Surface Mining Control and Reclamation Act (SMCRA)

    30 U.S.C. §§ 1201-1328 ............................................................... 20

    30 U.S.C. § 1202(a) ...................................................................... 72

    30 U.S.C. § 1211(c) ...................................................................... 72

    30 U.S.C. § 1253 ........................................................................... 72

    30 U.S.C. § 1253(a)(6) ................................................................. 72

    30 U.S.C. § 1292(a)(3) ................................................................. 72

    30 U.S.C. § 1292(c) ...................................................................... 72

    30 U.S.C. § 1303(a) ...................................................................... 72

Clean Water Act

    33 U.S.C. § 1251(d) ...................................................................... 32

    33 U.S.C. § 1311(a) ........................................................................ 6

    *33 U.S.C. § 1311(b)(1)(C) ........................................... 13, 18, 59, 62, 66

Clean Water Act (cont'd)

33 U.S.C. § 1313 ................................................................. 59

33 U.S.C. § 1313(a) ...................................................... 11, 63

33 U.S.C. § 1313(c) ............................................................ 63

33 U.S.C. § 1313(c)(1) ........................................................ 11

33 U.S.C. § 1313(c)(2)(A) ................................................... 11

33 U.S.C. § 1313(c)(3) ........................................................ 63

33 U.S.C. § 1313(c)(4) .............................................. 11, 63, 69

33 U.S.C. § 1314(a)(1) ........................................................ 70

33 U.S.C. § 1314(a)(1)(C) .................................................... 71

33 U.S.C. § 1341(a)(1) ........................................................ 19

33 U.S.C. § 1342(a)(1) ........................................................ 12

33 U.S.C. § 1342(b) ............................................................ 13

33 U.S.C. § 1342(d) ............................................................ 52

33 U.S.C. § 1342(d)(1) ........................................................ 13

*33 U.S.C. § 1342(d)(2) ................................... 13, 62, 65, 69

33 U.S.C. § 1342(d)(4) ................................... 14, 50, 56

33 U.S.C. § 1344(a) ................................... 6, 7, 18, 32, 40

33 U.S.C. § 1344(b) ................................................. 32, 40

*33 U.S.C. § 1344(b)(1) .......................... 9, 18, 36, 38, 74

*33 U.S.C. § 1344(c) ...................... 7, 18, 32, 35, 40, 52

Clean Water Act (cont'd)

    33 U.S.C. § 1344(q)..............................................................18, 34

    33 U.S.C. § 1361(a)....................................................................32

    33 U.S.C. § 1362(6).....................................................................6

    *33 U.S.C. § 1369(b)(1)(E)....................................................24, 57

## **Federal Rules and Regulations**

Federal Rule of Appellate Procedure 4(a)(1)(B).........................2

33 C.F.R. § 320.4(d).................................................................19

33 C.F.R. § 323.2(e)(1) ..............................................................6

33 C.F.R. § 323.6(b).................................................................18

33 C.F.R. § 336.1(c)(2)..............................................................19

40 C.F.R. § 122.2.....................................................................13

40 C.F.R. § 122.4(a)............................................................13, 63

*40 C.F.R. § 122.44(d)(1) ......................... 12, 13, 58, 62, 65, 66, 67

40 C.F.R. § 122.44(d)(1)(i)...............................................14, 65, 66

40 C.F.R. § 122.44(d)(1)(ii)..............................................64, 65, 66

40 C.F.R. § 122.44(d)(1)(iii) .......................................14, 64, 65, 66

40 C.F.R. § 122.44(d)(1)(iv) .......................................14, 64, 65, 66

40 C.F.R. § 122.44(d)(1)(v) ........................................14, 64, 65, 66

*40 C.F.R. § 122.44(d)(1)(vi) .............................. 14, 17, 59, 64, 68

40 C.F.R. § 122.44(d)(1)(vi)(B) ............................................. 71

40 C.F.R. § 122.44(d)(1)(vii) ......................................... 14, 64

40 C.F.R. § 122.62(d)(1) (1981) ......................................... 58

40 C.F.R. § 123.30 ............................................................ 56

*40 C.F.R. § 123.44(c)(7) ....................................... 14, 62, 64

*40 C.F.R. § 123.44(c)(8) ....................................... 14, 62, 64

40 C.F.R. § 123.44(e) ........................................................ 56

40 C.F.R. § 123.44(f) ........................................................ 56

40 C.F.R. § 123.44(g) ....................................................... 56

40 C.F.R. § 123.44(h) ....................................................... 56

40 C.F.R. § 123.44(h)(3) .................................................... 14

40 C.F.R. § 123.44(j) ........................................................ 13

40 C.F.R. § 124.19 ........................................................... 56

40 C.F.R. § 131.11(b)(2) .................................................... 12

40 C.F.R. pt. 230 .......................................................... 9, 18

*40 C.F.R. § 230.10(b)(1) ......................................... 12, 18, 67

*40 C.F.R. § 230.10(d) ............................................... 20, 74

40 C.F.R. §§ 230.70–230.77 ............................................... 20

40 C.F.R. § 230.73(g) ....................................................... 74

40 C.F.R. § 231.1(a) .................................................. 9, 38, 74

40 C.F.R. § 231.2(e) .................................................. 9, 38, 74

## State Statutes and Regulations

401 Ky. Admin. Regs. 10:031, § 4(1)(f) ..................................................... 12

Ohio Admin. Code 3745:1-07, tbl. 7.1 ............................................... 12, 70

W. Va. Code R. § 47-2-3.2.i ..................................................... 12

## Federal Register Notices

Environmental Protection Agency, National Pollutant Discharge
    Elimination System; Surface Water Toxics Control Program,
    54 Fed. Reg. 23,868 (June 2, 1989)...................................................... 68

Environmental Protection Agency, Guidance on Improving EPA
    Review of Appalachian Surface Coal Mining Operations under
    the Clean Water Act, National Environmental Policy Act, and
    the Environmental Justice Executive Order,
    75 Fed. Reg. 18,500 (Apr. 12, 2010).................................................... 10

Administrative Conference of the United States, Adoption of
    Recommendations,
    77 Fed. Reg. 47,800 (Aug. 10, 2012) ................................................... 36

## Miscellaneous

General Accounting Office, "Using GPRA to Address 21st Century
    Challenges," GAO-03-1166T (Sept. 18, 2003) ................................... 36

# GLOSSARY

| | |
|---|---|
| 404(b)(1) Guidelines | 40 C.F.R. pt. 230 |
| APA | Administrative Procedure Act |
| Association | Plaintiffs-Appellees the National Mining Association, et al., and Intervenor Plaintiffs-Appellees the Commonwealth of Kentucky and the City of Pikeville, Kentucky |
| Corps | United States Army Corps of Engineers |
| EC Process | Enhanced Coordination Process |
| EPA | United States Environmental Protection Agency |
| Guidance Memo | "Improving EPA Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order" (EPA memorandum of July 21, 2011) |
| JA | Joint Appendix |
| NPDES | National Pollutant Discharge Elimination System |
| RPA | Reasonable potential analysis |
| SMCRA | Surface Mining Control and Reclamation Act |

**INTRODUCTION**

This Clean Water Act case has two parts. Part I addresses whether the United States Army Corps of Engineers (Corps) and the United States Environmental Protection Agency (EPA) can coordinate their review of applications for permits under Section 404 of the Act. Under that provision, the Corps issues permits for discharging dredged or fill material into navigable waters at specified disposal sites, but EPA can prohibit or restrict the use of any particular disposal site. Despite the agencies' closely related responsibilities and the well-established principle that agencies are free to establish their own procedures, the district court ruled that the Corps and EPA cannot coordinate their review procedures absent a specific instruction from Congress. That was error. The court also erred in holding that those review procedures must undergo notice-and-comment rulemaking.

Part II of this case concerns an EPA memorandum (the Guidance Memo) that guides agency staff in their review of applications for permits under Sections 402 and 404 of the Clean Water Act. Section 402 complements Section 404 by allowing EPA and authorized States to issue permits (known as NPDES permits) for discharging pollutants

other than dredged or fill material. EPA's Guidance Memo only makes nonbinding recommendations, but the district court erroneously reviewed it under the Administrative Procedure Act (APA) as final agency action. The court compounded that error by mischaracterizing the memo's content and unduly narrowing EPA's authority to oversee NPDES permits issued by States.

The legal issues in this case are numerous and important, but they are not difficult. Fundamental principles of administrative law require this Court to reverse the district court's judgment.

## STATEMENT OF JURISDICTION

Plaintiffs-Appellees the National Mining Association, et al. (the Association) brought four consolidated lawsuits against the Corps and EPA. The district court took jurisdiction under 28 U.S.C. § 1331. On October 6, 2011, the court granted the Association summary judgment on certain claims. Joint Appendix (JA) **[Dkt.95]**. On July 31, 2012, the court granted the Association summary judgment on other claims and entered final judgment. **[Dkt.166:1]**. The United States filed a timely notice of appeal on September 27, 2012. **[Dkt.168]**; *see* Fed. R. App. P. 4(a)(1)(B). This court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

**I.**    Two issues presented by this appeal concern a temporary interagency review process for Section 404 permit applications—the Enhanced Coordination Process—and a procedure to screen applications for inclusion in that review process.

1. Congress delegated authority to both the Corps and EPA to implement Section 404 of the Clean Water Act. Are the two agencies free to develop coordinated procedures to implement the statute?

2. Are the Enhanced Coordination Process and the screening procedure exempt from the APA's notice-and-comment requirements because they are rules of agency procedure?

**II.**    The remaining issues on appeal concern EPA's Guidance Memo.

3. The Guidance Memo is a facially nonbinding document that does not alter the legal obligations of EPA staff, permitting authorities, or permit applicants. Is the memo reviewable as "final agency action"?

4. The Clean Water Act generally prohibits pollutant discharges that violate State water quality standards. The best-available science links Appalachian surface coal mining to biological impairment of State water quality, so the Guidance Memo recommends that EPA staff ask

3

States not to issue NPDES permits related to surface coal mining before analyzing whether the proposed discharges have a reasonable potential to cause or contribute to violations of State water quality standards.

> a. If the memo's recommendation is legally binding, do the courts of appeals have exclusive jurisdiction to review it?

> b. If a State refuses to perform a reasonable potential analysis and proposes an NPDES permit that lacks appropriate effluent limitations, can EPA prevent the State from issuing the permit?

5. The memo recommends that EPA staff ask the Corps and States to tailor permits related to surface coal mining so that conductivity falls within a range suggested by the best-available science. Is the memo's recommendation tantamount to a binding water quality standard?

6. The Guidance Memo asks EPA staff to promote consistency between permits issued under the Clean Water Act and the Surface Mining Control and Reclamation Act (SMCRA). The memo also asks EPA staff to recommend to the Corps that Section 404 permits require best management practices that not only minimize aquatic impacts but also relate to activities regulated under SMCRA. Do the memo's recommendations violate SMCRA?

4

## STATUTES AND REGULATIONS

All pertinent statutes and regulations are reproduced in a separately-bound addendum.

## STATEMENT OF FACTS AND STATEMENT OF THE CASE

Surface coal mining poses an administrative challenge for federal regulators in the coal-laden Appalachian region.[1] EPA, the Corps, and the United States Department of the Interior oversee different activities related to surface coal mining. In 2009, those three agencies agreed on an "action plan" to coordinate their regulatory efforts and work toward mitigating the environmental damage caused by surface coal mining in Appalachia. **[ECP11–16]**. This case concerns two outcomes of the action plan: a temporary process under which the Corps and EPA coordinated their review of particular Section 404 permit applications, and a memorandum that guided EPA staff in reviewing NPDES and Section 404 permits related to Appalachian surface coal mining.

---

[1]      For purposes of this case, the "Appalachian region" includes six States: Kentucky, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia. This brief uses the term "surface coal mining" to refer to coal mining operations requiring permits under both the Clean Water Act and the Surface Mining Control and Reclamation Act.

## A.    Enhanced Coordination Process

Under Section 404 of the Clean Water Act, the Corps issues permits for discharges of dredged or fill material into navigable waters. 33 U.S.C. § 1344(a); *see also id.* § 1311(a) (prohibiting "the discharge of any pollutant" into navigable waters except in accordance with the Act). Coal companies need Section 404 permits to discharge fill material from surface mines into nearby waters. *See id.* § 1362(6) (listing "crushed rock" and "sand" as pollutants); 33 C.F.R. § 323.2(e)(1) (defining pollutants as "fill material" if the discharge raises the bottom elevation of a water body).

When the 2009 interagency action plan issued, the Corps was processing numerous Section 404 permit applications related to Appalachian surface coal mining. Many applications had been pending for more than a year. **[ECP22]** (Enhanced Coordination Process memo). In light of recent scientific research, EPA had "substantial environmental concerns" about several of the pending applications. *Id.* The public comment periods for those applications had closed, but the Corps and EPA decided that it made sense to discuss the environmental issues in a process open to permit applicants. *Id.* To facilitate those

6

discussions, maximize transparency, and avoid delaying uncontroversial permit applications, the agencies developed a temporary Enhanced Coordination (EC) Process to deal with this "unique challenge." *Id.*

The EC Process provides an opportunity for the Corps, EPA, and permit applicants to work through concerns about a limited set of Section 404 permit applications related to Appalachian surface coal mining. The EC Process begins when the Corps determines that sufficient information is available to proceed on a particular application. **[ECP23]** (EC Process memo). Corps and EPA officials then discuss the application, and "[o]ther relevant parties including state agencies, permit applicants, and involved consultants [are] encouraged to participate" in those discussions. *Id.* The coordination period typically lasts for 60 days. *Id.* Following the coordination period, the Corps decides whether it plans to issue the Section 404 permit and, if so, EPA decides whether to prohibit or restrict the specification of any fill disposal sites included in the permit application. **[ECP23–24]**; *see* 33 U.S.C. § 1344(a), (c). The EC Process does not alter the standards that either agency uses to make its decisions.

7

The Corps and EPA agreed to the EC Process in a joint memorandum. **[ECP20–24]**. The EC Process applied to pending Section 404 permit applications for which the Corps had issued a public notice by March 31, 2009 (72 days earlier), and the public comment period had already closed. **[ECP20]**. The agencies agreed that EPA would screen eligible permit applications and select those that merited further examination. **[ECP23]**.

In screening applications, EPA relied on a database tool—the Multi-criteria Integrated Resource Assessment—that the agency uses in several contexts to improve its decisionmaking. *See* **[MIR47–63]** (2002 article describing database tool). EPA used the database tool "[t]o expedite [the EC Process] and assist in making EPA's decisions efficient, consistent, and transparent." **[ECP18]** (screening procedure letter). The database tool does not make substantive judgments about permit applications. It merely compiles environmental and project-specific data, allowing agency decisionmakers to rank applications in different ways by varying the relative importance of different pieces of data. **[Dkt.107-1:72]** (EC Process Q&A).

Here, EPA opted to use data relevant to the 404(b)(1) Guidelines. [ECP17–18] (screening procedure letter). Those guidelines—developed by EPA in conjunction with the Corps—establish the substantive environmental standards under which the Corps evaluates Section 404 permit applications. 33 U.S.C. § 1344(b)(1); *see* 40 C.F.R. pt. 230. EPA also considers applicable portions of the guidelines when determining whether to prohibit or restrict discharges into a proposed disposal site. 40 C.F.R. §§ 231.1(a), 231.2(e). EPA's use of the 404(b)(1) Guidelines as part of the screening procedure does not impact either agency's ultimate evaluation of the permit applications subject to the EC Process. *See* [ECP18–19] (screening procedure letter clarifying that "any action EPA takes … will be based on the statute and regulations").

After screening the eligible permit applications, EPA advised the Corps that 79 applications raised substantial environmental concerns and would therefore benefit from the EC Process. [FG5342–44] (EPA letter to Corps). The agencies employed the EC Process until the district court invalidated it in October 2011.

**B.   Guidance Memo**

Another element of the 2009 interagency action plan was EPA's commitment to "improve and strengthen oversight and review" of Clean Water Act permits related to Appalachian surface coal mining. [ECP13]. To be transparent, EPA decided to issue a guidance document summarizing its recommendations for EPA staff reviewing NPDES and Section 404 permits from the Appalachian region. Because that guidance would be relevant to Clean Water Act permitting authorities, the regulated community, and the general public, EPA published interim guidance in April 2010 and sought public comment on it. 75 Fed. Reg. 18,500, 18,500–501 (Apr. 12, 2010); *see* [FG3984–4014] (interim guidance). After reviewing more than 60,000 comments, EPA issued a final guidance memorandum (Guidance Memo) in July 2011. [FG5440–5500].

The Guidance Memo is a detailed document meant to "clarify the roles and expectations of [EPA], in coordinating with [its] Federal and State partners, to assure more consistent, effective, and timely EPA review of Appalachian surface coal mining operations." [FG5440]. Because EPA does not issue NPDES or Section 404 permits in the

Appalachian region, the memo "is primarily directed at informing the comments provided by EPA Regions to Appalachian States and the Corps," which do issue those permits. **[FG5449]**. The Guidance Memo makes several recommendations, and the pages that follow provide legal background for the specific recommendations challenged here.

### 1. Water quality standards

The Clean Water Act assigns States the "featured role" in developing water quality standards for waters within their borders. *American Paper Inst., Inc. v. EPA*, 996 F.2d 346, 349 (D.C. Cir. 1993) (*American Paper*); *see* 33 U.S.C. § 1313(a), (c)(1). EPA develops water quality standards if a State fails to create its own standards or if a State's proposed standards do not comply with the Act's requirements. 33 U.S.C. § 1313(c)(4).

Water quality standards "consist of the designated uses of the navigable waters involved and the water quality criteria for such waters." 33 U.S.C. § 1313(c)(2)(A). Water quality criteria can be numeric or narrative. Numeric criteria are "specific numeric limitations on the concentration of a specific pollutant [or pollutant parameter] in the water." *American Paper*, 996 F.2d at 349; *see, e.g.*, **[FG12439–40]** (Ohio

11

Admin. Code 3745:1-07, tbl. 7-1 & n.(d), establishing a numeric criterion for conductivity of 2,400 microSiemens per centimeter). Narrative criteria are "more general narrative statements applicable to a wide set of pollutants." *American Paper*, 996 F.2d at 349; *see, e.g.,* **[**FG12385**]** (401 Ky. Admin. Regs. 10:031, § 4(1)(f), providing that conductivity "shall not be changed to the extent that the indigenous aquatic community is adversely affected"); **[**FG12330**]** (W. Va. Code R. § 47-2-3.2.i, stating that "no significant adverse impact to the chemical, physical, hydrologic, or biological components of aquatic ecosystems shall be allowed"). Narrative criteria are appropriate only "where numerical criteria cannot be established or to supplement numerical criteria." 40 C.F.R. § 131.11(b)(2). NPDES and Section 404 permits must ensure that any pollutant discharges will not cause or contribute to violations of numeric or narrative water quality criteria. *See id.* §§ 122.44(d)(1), 230.10(b)(1).

## 2. NPDES permits

Congress gave EPA authority to issue permits under Section 402 of the Clean Water Act for discharges of pollutants other than dredged or fill material. 33 U.S.C. § 1342(a)(1). Section 402 permits are more

commonly known as National Pollutant Discharge Elimination System (NPDES) permits. States can issue NPDES permits if authorized by EPA, but State-issued permits must also comply with the Act and its implementing regulations. *Id.* § 1342(b); 40 C.F.R. § 122.4(a). EPA has authorized all six Appalachian States to issue NPDES permits.

Before an Appalachian State can issue an NPDES permit related to surface coal mining, the State must submit a proposed permit to EPA for review.[2] 33 U.S.C. § 1342(d)(1). EPA can object to any NPDES permit that does not comply with the Clean Water Act's requirements. *Id.* § 1342(d)(2). Under Section 301 of the Act, all pollutant discharges must be limited as necessary to meet State water quality standards. *Id.* § 1311(b)(1)(C); *see also* 40 C.F.R. § 122.44(d)(1) ("[E]ach NPDES permit shall include conditions … necessary to … achieve water quality standards … including State narrative criteria for water quality."). Therefore, EPA may object to a State's proposed permit if it does not

---

[2]    In some cases, EPA reviews "draft permits" instead of "proposed permits." 40 C.F.R. § 123.44(j). Unlike proposed permits, draft permits have not yet undergone the State's notice-and-comment process. *Id.* § 122.2. The distinction is not relevant here, so this brief refers only to proposed permits.

13

contain limitations necessary to meet State water quality standards.[3]
40 C.F.R. § 123.44(c)(7)–(8).

To determine whether an NPDES permit requires additional
limitations to meet State water quality standards, the permitting
authority performs a reasonable potential analysis (RPA). An RPA
resolves the question whether a particular pollutant (or pollutant
parameter) "[is] or may be discharged at a level which will cause, have
the reasonable potential to cause, or contribute to an excursion above
any State water quality standard." 40 C.F.R. § 122.44(d)(1)(i). If a
reasonable potential exists, the NPDES permit must limit discharges of
that pollutant. *Id.* § 122.44(d)(1)(iii)-(vii). If a State has only a narrative
water quality criterion associated with the pollutant of concern, the
State permitting authority translates that narrative criterion into
numeric effluent limitations for the permit. *Id.* § 122.44(d)(1)(vi).

---

[3]     If EPA objects to a proposed NPDES permit, the State may
resubmit a modified permit to meet the objection or request that EPA
hold a public hearing. 33 U.S.C. § 1342(d)(4). If the State does neither,
authority to issue (or deny) the permit passes to EPA. *Id.*; *see* 40 C.F.R.
§ 123.44(h)(3).

Many peer-reviewed studies by EPA and outside scientists identify a causal relationship between Appalachian surface coal mining and elevated conductivity in nearby streams, as well as a causal relationship between elevated conductivity and biological impairment of those water bodies. **[FG5483–85]** (Guidance Memo); *see* **[FG4945]** (EPA's Science Advisory Board concluding that the agency "presents a convincing case for both linkages"). Conductivity—the ability to conduct an electric current—varies with the cumulative concentration of dissolved ions in a water body. **[FG1303]** (EPA report on conductivity). Those ions include pollutants like sulfates ($SO_4^{2-}$) and magnesium ($Mg^{2+}$). *Id.* In layman's terms, conductivity measures the saltiness of water. **[FG5484]** (Guidance Memo).

Because "all Appalachian States have established narrative water quality [criteria] intended to protect the biological integrity of streams," **[FG5469]**; *see* **[FG5491–93]**, but most of those States lack "numeric water quality criteria that account for the effects associated with high levels of conductivity," **[FG5454]**, the Guidance Memo recommends that State permitting authorities perform an RPA for conductivity or a similar parameter before issuing an NPDES permit, **[FG5453]**. The

15

memo's recommendation is based in part on EPA's review of many

NPDES permits that States had issued for Appalachian surface coal

mining operations. **[**FG5451**]** (Guidance Memo). "EPA's review of the

administrative records found that parameters known to be present in

the effluent, based on data submitted with the permit applications,

were often not assessed for … reasonable potential." **[**FG4856**]** (EPA

permit review). In light of those findings, the Guidance Memo reminds

EPA Regions that State permitting authorities have an obligation to

ensure that NPDES permits contain limitations for all pollutants in a

discharge that may cause or contribute to violations of State water

quality standards. **[**FG5453**]**.

Based on a substantial and growing body of peer-reviewed

scientific research, the Guidance Memo predicts that "in many cases,

the available science will indicate that there is a reasonable potential

for [surface coal mining] discharges to cause or contribute to" a violation

of Appalachian States' narrative water quality criteria related to

biological integrity. **[**FG5455**]**. Where available information indicates

that a reasonable potential exists, the Guidance Memo asks EPA

Regions to encourage State permitting authorities to include conditions

in NPDES permits so that conductivity levels "are generally not above 300–500 µS/cm [microSiemens per centimeter]." **[FG5457]**. The memo explains that EPA derived that benchmark from the best-available science linking elevated conductivity to biological impairment of Appalachian streams. **[FG5485]**.

The Guidance Memo stresses that its conductivity benchmark is only "one option" that NPDES permitting authorities can choose from when translating State narrative water quality criteria into numeric effluent limitations. **[FG5455]**. Under existing regulations, permitting authorities may use any "scientifically defensible, transparent, and protective approach," **[FG5457]**, including "a numeric effluent limitation for parameters other than conductivity," **[FG5458]**. *See* 40 C.F.R. § 122.44(d)(1)(vi). And even when a State permitting authority chooses to impose a numeric effluent limitation for conductivity in an NPDES permit, the Guidance Memo recognizes that "site-specific conditions" may support a limitation different from the memo's recommended benchmark. **[FG5455]**; *see also* **[FG5457]**.

17

### 3. Section 404 permits

In the Appalachian States, the Corps issues Section 404 permits for discharging dredged or fill material into navigable waters. 33 U.S.C. § 1344(a). EPA also plays an important role in implementing the Section 404 program. In conjunction with the Corps, EPA developed the 404(b)(1) Guidelines, the substantive regulatory criteria that govern the Corps' evaluation of Section 404 permit applications. *Id.* § 1344(b)(1); *see* 40 C.F.R. pt. 230. Congress also authorized EPA to prevent the specification of any fill disposal site after consultation with the Corps. 33 U.S.C. § 1344(c). The Corps cannot issue a permit for the site if EPA exercises that authority. 33 C.F.R. § 323.6(b). Given their intertwined responsibilities, the Corps and EPA must work in tandem to implement the Section 404 program. *See, e.g.*, 33 U.S.C. § 1344(q) (directing the two agencies to enter into an agreement to minimize paperwork, delay, and duplication of effort); **[**FG3012–21**]** (text of that agreement).

Under the Clean Water Act and the 404(b)(1) Guidelines, discharges authorized by Section 404 permits cannot cause or contribute to violations of State water quality standards. 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. § 230.10(b)(1). States certify that proposed

discharges satisfy that requirement. 33 U.S.C. § 1341(a)(1). But even when a State so certifies, the Corps has an independent obligation to ensure that a permit is adequately protective if EPA "advises of other water quality aspects to be taken into consideration." 33 C.F.R. § 320.4(d); *see also id.* § 336.1(c)(2). Thus, EPA plays a critical role in ensuring that Section 404 permits include conditions necessary to meet State water quality standards. *See* **[FG5470]** (Guidance Memo).

The Guidance Memo provides recommendations to EPA staff "on how to interpret [404(b)(1) Guidelines] provisions in the context of Appalachian surface coal mining," so that the agency can be more consistent and transparent in its comments to the Corps. **[FG5468]**. The memo focuses EPA staff on particular provisions of the guidelines that are likely to be implicated by permits related to Appalachian surface coal mining. **[FG5467]**. Because the 404(b)(1) Guidelines require pollutant discharges to comply with State water quality standards, the Guidance Memo asks EPA Regions to "consider on a site-specific basis recommending permit conditions requiring adaptive management actions … that would be triggered when conductivity … reaches or

19

trends toward levels that may cause downstream [waters] to exceed appropriate science-based conductivity benchmarks." **[FG5472]**.

The 404(b)(1) Guidelines also require permittees to take steps to minimize the adverse impacts of discharges on the aquatic ecosystem. 40 C.F.R. § 230.10(d). Specifically, subpart H of the guidelines identifies possible permit conditions related to the location of the discharge, the design of the discharge, and the method of dispersion. *Id.* §§ 230.70–.77. The Guidance Memo recommends that, "where appropriate," EPA staff ask the Corps to incorporate some of those conditions into Section 404 permits as "best management practices." **[FG5494–95]**; *see also* **[FG5473–75]**. The memo emphasizes, however, that "flexibility … is available when making recommendations to the Corps." **[FG5468]**. Even if EPA Regions recommend the practices discussed in the Guidance Memo, their suggestions are not binding on the Corps. *Id.*

In addition to minimizing impacts on the aquatic ecosystem, the best management practices just described may also relate to activities regulated under the Surface Mining Control and Reclamation Act (SMCRA), 30 U.S.C. §§ 1201-1328. Therefore, consistent with the 2009 interagency action plan, **[ECP12]** (action plan), the Guidance Memo

20

encourages EPA staff to work with SMCRA authorities to promote consistency between Clean Water Act and SMCRA permits, **[**FG5469, FG5475**]**.

## C.   **District court proceedings**

In 2010, the National Mining Association challenged the Enhanced Coordination Process, the screening procedure, and EPA's interim guidance document under the APA. The Association moved for a preliminary injunction, and the United States moved to dismiss the case for lack of jurisdiction and failure to state a claim. The district court denied both motions, **[**Dkts.31–32**]**, and then consolidated the Association's lawsuit with three others brought by a mix of industry groups and States, **[**Dkt.45**]**. The court bifurcated briefing so that the EC Process and the screening procedure were considered before EPA's guidance.

### 1.  **Enhanced Coordination Process and screening procedure**

The district court set aside the EC Process and the screening procedure on October 6, 2011, after holding that those procedures violate the Clean Water Act and the APA. **[**Dkts.95–96**]**. The court concluded that Congress limited EPA's involvement in the Section 404

program to those substantive roles expressly stated in the Clean Water Act. **[Dkt.96:9–12]**. Because Congress did not explicitly authorize the Corps and EPA to coordinate their review of Section 404 permit applications, the court ruled that both the EC Process and the screening procedure exceeded EPA's Clean Water Act authority. *Id.*

The district court separately held that the EC Process and the screening procedure must undergo notice and comment because they are substantive rules. **[Dkt.96:12–18]**; *see* 5 U.S.C. § 553(b)(A). The court decided that the EC Process must be substantive, not procedural, because it exceeds EPA's statutory authority. **[Dkt.96:18]**. The court also reasoned that the screening procedure is substantive because it "removed the task of applying the 404(b)(1) guidelines to pending permits from the Corps and bestowed it upon the EPA." **[Dkt.96:16]**. The court granted partial summary judgment to the Association and set aside the EC Process and the screening procedure.

### 2.  Guidance Memo

Meanwhile, EPA had issued the Guidance Memo, which superseded the interim guidance challenged by the Association. **[Dkt.86]** (notice to district court). The plaintiffs amended their

complaints and the parties cross-moved for summary judgment on several claims related to the Guidance Memo. On July 31, 2012, the court granted the Association partial summary judgment on those claims. **[Dkts.166–67]**.

The district court first held that the Guidance Memo is "final agency action" reviewable under the APA because it legally obligates EPA Regions to demand compliance with the memo's recommendations. **[Dkt.167:10–18]**; *see* 5 U.S.C. § 704. In support, the court cited a few instances in which EPA commented on or objected to Clean Water Act permits on the basis of the same legal authority and best-available science that underlie the Guidance Memo's recommendations. **[Dkt.167:14–15]**. The court dismissed as boilerplate the memo's repeated statements that it is nonbinding. **[Dkt.167:13]**. Instead, the court emphasized that EPA regions are expected to consider the Guidance Memo's recommendations when reviewing permits. **[Dkt.167:13–14]**. For similar reasons, the court ruled that the Association had standing to challenge the memo and that the case was ripe for review. **[Dkt.167:20–22]**.

23

During its finality discussion, the district court held that the Guidance Memo requires State permitting authorities to perform a reasonable potential analysis (RPA) for conductivity or a similar parameter before issuing an NPDES permit related to Appalachian surface coal mining. **[**Dkt.167:14–15**]**. The memo bases its RPA recommendation on Section 301 of the Clean Water Act, **[**FG5453**]**, and the courts of appeals have exclusive jurisdiction to review EPA's promulgation of NPDES permit limitations under Section 301, *see* 33 U.S.C. § 1369(b)(1)(E). The district court decided, however, that it could review the Guidance Memo's RPA recommendation because an RPA "does not set specific limits and mandate their inclusion in all [NPDES] permits," and EPA cannot "promulgate" an NPDES permit requirement without publishing it in the Federal Register. **[**Dkt.167:19**]**.

After resolving the jurisdictional issue, the district court held that EPA can never require a State permitting authority to perform an RPA before issuing an NPDES permit. **[**Dkt.167:28–33**]**. The court framed the dispute as "whether the [Act] and its implementing regulations … require that the [RPA] be conducted prior to the state's issuance of [an

NPDES] permit." **[Dkt.167:30]**. Finding no explicit requirement in EPA's regulations, the court held that EPA lacks statutory authority to object when a State does not perform an RPA, even if the best-available science indicates that discharges under a proposed permit may have a reasonable potential to cause or contribute to a violation of a State water quality standard. **[Dkt.167:33]**. The court also found that the Guidance Memo "removes the [RPA] from the realm of state regulators" by expressing EPA's views on the best-available science linking surface coal mining to biological impairment of Appalachian streams. **[Dkt.167:32]**.

The district court also addressed the Guidance Memo's recommended conductivity benchmark (300–500 µS/cm). The court cited a few instances where EPA asked permitting authorities to consider the benchmark as one option when imposing effluent limitations (for NPDES permits) or special permit conditions (for Section 404 permits). Based on those examples, the court ruled that the Guidance Memo effectively established a binding numeric water quality criterion for conductivity in the Appalachian region, above and beyond States'

existing narrative criteria related to biological integrity. **[**Dkt.167:26–27**]**.

Finally, the district court held that the Guidance Memo exceeded EPA's authority under SMCRA. **[**Dkt.167:24–26**]**. According to the court, it is "beyond EPA's purview" to recommend that its staff ask the Corps to include best management practices in Section 404 permits if those practices are also relevant to permits issued under SMCRA. **[**Dkt.167:25**]**. The court held that EPA exceeded its legal authority in the Guidance Memo by suggesting those best management practices to EPA Regions and by recommending that Regions promote consistency between Clean Water Act and SMCRA permits. *Id.*

Having set aside the EC process, the screening procedure, and the Guidance Memo, the district court entered final judgment for the Association. **[**Dkt.166:1**]**. The United States and intervenor environmental groups separately appealed.

## SUMMARY OF ARGUMENT

This Court should uphold the EC Process, the screening procedure, and the Guidance Memo. The EC Process and the screening procedure do not violate the Clean Water Act, nor do those procedures need to

undergo notice and comment. The Guidance Memo is not final agency action reviewable under the APA, but even if the memo's contested recommendations are reviewable here, they do not exceed EPA's legal authority.

1. a. The EC Process and the screening procedure do not violate the Clean Water Act. The Corps and EPA share responsibility for implementing Section 404 of the Act. Absent express statutory constraints, those agencies have authority to manage their administrative dockets by coordinating procedures. The district court erred by disregarding that bedrock principle of administrative law.

b. The EC Process and the screening procedure are procedural rules exempt from the APA's notice-and-comment requirements. The EC Process provides an opportunity for the Corps and EPA to discuss specific Section 404 permit applications with each other and with permit applicants. The screening procedure is an internal procedure that focuses limited agency resources on particular applications. Both are procedural rules because they do not alter the substantive criteria that the agencies use to make decisions.

2. a. The Guidance Memo is not final agency action because it does not alter the legal obligations of EPA staff, permitting authorities, or permit applicants. EPA Regions have discretion not to respond to proposed NPDES and Section 404 permits, and even when the Regions do respond, they have discretion to depart from the Guidance Memo's recommendations. For similar reasons, the memo does not alter the legal obligations of permitting authorities or permit applicants.

b. Even if the Guidance Memo's reasonable potential analysis (RPA) recommendation were mandatory, the district court could not review it. The Clean Water Act gives the courts of appeals exclusive jurisdiction to review EPA's establishment of procedural requirements for NPDES permits. The memo's RPA recommendation (if legally binding) is such a requirement.

c. Even if the Guidance Memo's RPA recommendation were mandatory and reviewable by the district court, this Court should uphold it. Under the Clean Water Act, pollutant discharges authorized by NPDES permits cannot cause or contribute to violations of State water quality standards. The best-available science ties Appalachian surface coal mining to elevated conductivity, and it also ties elevated

conductivity to biological impairment of Appalachian streams. Against that backdrop, when a State refuses to perform an RPA for conductivity or a related pollutant parameter, the State may have failed to ensure that its NPDES permit includes limitations required by the Act. In that case, EPA has express statutory authority to prevent the State from issuing a deficient permit.

   d. The Guidance Memo does not establish a water quality standard for conductivity. The memo's conductivity benchmark only provides one option for permitting authorities to consider when translating Appalachian States' narrative water quality criteria into effluent limitations (for NPDES permits) or special permit conditions (for Section 404 permits). Nothing in the record suggests that EPA's conductivity benchmark functions as a new water quality criterion that supplements or supplants States' existing narrative criteria.

   e. Lastly, the Guidance Memo does not exceed EPA's legal authority by making recommendations on issues relevant to both the Clean Water Act and SMCRA. Based on the 404(b)(1) Guidelines, the memo asks EPA staff to encourage the inclusion in Section 404 permits of best management practices that minimize aquatic impacts. Those

practices may also relate to activities regulated by SMCRA. In addition, the memo asks EPA staff to promote consistency between Clean Water Act and SMCRA permits. The Guidance Memo's suggestions do not purport to give EPA a new role under SMCRA, nor did the agency assert such a role after the memo issued.

## STANDARD OF REVIEW

This Court reviews summary judgment rulings *de novo*. *Center for Auto Safety v. NHTSA*, 452 F.3d 798, 805 (D.C. Cir. 2006). When reviewing agency procedures, courts are limited to ensuring consistency with governing statutes and the Constitution. *FCC v. Schreiber*, 381 U.S. 279, 291 (1965). Where a statute is ambiguous, courts defer to an administering agency's permissible interpretation. *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842–43 (1984). And where a regulation is ambiguous, courts defer to an agency's construction unless it is clearly erroneous or inconsistent with the regulation. *Auer v. Robbins*, 519 U.S. 452, 461 (1997).

## ARGUMENT

I.  **THE ENHANCED COORDINATION PROCESS AND THE SCREENING PROCEDURE DO NOT VIOLATE THE CLEAN WATER ACT OR THE APA.**

The district court set aside the EC Process and the screening procedure on two grounds. First, the court held that the Corps and EPA lack statutory authority to develop coordinated review procedures for Section 404 permit applications. **[**Dkt.96:6–12**]**. Second, the court held that the EC Process and the screening procedure must undergo notice and comment. **[**Dkt.96:12–18**]**. This Court should reverse.  Agencies do not need express statutory authority to develop coordinated procedures to manage their administrative dockets, and those procedures are expressly exempt from the APA's notice-and-comment requirements.

A.  **The Corps and EPA can develop coordinated procedures to implement Section 404 of the Clean Water Act.**

The Corps and EPA have statutory authority to develop the EC Process and decide which applications should undergo that process. Agencies are free to fashion whatever procedures they deem necessary to carry out their statutory responsibilities, so long as those procedures are consistent with minimum statutory and constitutional due process

31

requirements. The district court erred by disregarding that fundamental principle.

The Corps and EPA are both responsible for implementing Section 404 of the Clean Water Act. On the one hand, the Corps specifies disposal sites for fill material and issues permits for discharges into those sites. 33 U.S.C. § 1344(a)–(b). The Corps solicits public input (including input from EPA) before issuing permits. *Id.* § 1344(a). On the other hand, EPA establishes the substantive environmental criteria that the Corps uses to specify disposal sites, and EPA can prohibit or restrict the specification of any site if disposal would have an unacceptable adverse environmental effect. *Id.* § 1344(b)–(c). EPA consults with the Corps when carrying out those responsibilities. *Id.* Congress authorized both agencies to develop rules to perform their respective Section 404 duties. *See id.* § 1251(d) (granting EPA authority to administer the Act "[e]xcept as otherwise expressly provided"); *id.* § 1361(a) (empowering EPA "to prescribe such regulations as are necessary to carry out [its] functions" under the Act); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131 (1985) (according *Chevron* deference to Corps regulations implementing Section 404).

Concomitant with the agencies' substantive authority is the authority to develop procedures to implement Section 404. Like all agencies, the Corps and EPA are "free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." *FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134, 143 (1940); *accord Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.*, 435 U.S. 519, 544 (1978) (describing that principle as a "very basic tenet of administrative law"). Consequently, in the procedural realm, courts ask not whether Congress expressly authorized an agency to develop a particular procedure, but only whether that procedure is consistent with minimum statutory and constitutional due process requirements. *See FCC v. Schreiber*, 381 U.S. at 291; *FTC v. Anderson*, 631 F.2d 741, 746 (D.C. Cir. 1979). When complex and difficult issues arise, agencies have "breathing room" to fashion additional procedures that allow them to study a problem further before making a final decision. *Frazier v. MSPB*, 672 F.2d 150, 163–64 (D.C. Cir. 1982); *see NRDC, Inc. v. SEC*, 606 F.2d 1031, 1057 (D.C. Cir. 1979); *Associated Press v. FCC*, 448 F.2d 1095, 1106 (D.C. Cir. 1971).

33

Accordingly, the district court erred in this case by relying on the maxim *expressio unius est exclusio alterius*—"the expression of one thing is the exclusion of another." The court incorrectly viewed the substantive roles that Congress assigned to EPA in Section 404 as a "statutory ceiling" on the types of procedures that the Corps and EPA can use to discharge their respective Section 404 responsibilities. **[Dkt.96:10]**; *see Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (explaining that the *expressio unius* maxim "has force only when the items expressed are members of an 'associated group or series'") (citation omitted). The power to institute rules of procedure is part and parcel of Congress's grant of substantive rulemaking authority, so the *expressio unius* canon is inapplicable to questions of agency procedure. *Cf. Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 666 n.6 (D.C. Cir. 1994) (en banc) (recognizing that certain delegations of authority can "fairly be implied") (emphasis omitted).

The district court also noted Congress's instruction that the Corps and EPA enter into an interagency agreement to "minimize, to the maximum extent practicable, duplication, needless paperwork, and delays in the issuance of permits." 33 U.S.C. § 1344(q); **[Dkt.96:10]**. But

34

the fact that Congress directed the Corps and EPA to coordinate in one respect does not suggest that the two agencies lack authority to coordinate further. If anything, Congress's instruction reflects its realization that the Corps and EPA must work together to successfully implement the Section 404 program. Congress is presumed to be aware that agencies may need to coordinate in ways that cannot be foreseen when a statute is enacted. *See Sierra Club v. Costle*, 657 F.2d 298, 405 (D.C. Cir. 1981).

The district court took issue with EPA's "involvement" in the Section 404 permit review process because the Corps has authority to issue permits. **[**Dkt.96:10**]**. But given EPA's own statutory role under Section 404, it makes perfect sense for the agency to be involved in the permit review process. In carrying out its statutory responsibilities, EPA evaluates permit applications to determine whether to prevent the specification of proposed disposal sites, and EPA must consult with the Corps before exercising that authority. 33 U.S.C. § 1344(c). Thus, EPA's involvement in the permit review process is designed to inform the agency's own statutory decisionmaking. And to the extent that EPA provides comments to the Corps on how to apply the 404(b)(1)

Guidelines, EPA is well-positioned to do so as the principal author of those guidelines. *Id.* § 1344(b)(1). EPA's involvement in the permit review process in no way displaces the Corps' authority to assess permit applications and issue Section 404 permits.

At bottom, this lawsuit attempts to stovepipe the decisionmaking of two agencies that share responsibility for implementing a single regulatory program. Were it generally adopted, the district court's holding—that agencies cannot coordinate absent express statutory authorization—would be crippling. "Virtually all of the results that the federal government strives to achieve require the concerted and coordinated efforts of two or more agencies." General Accounting Office, "Using GPRA to Address 21st Century Challenges," GAO-03-1166T, at 10 (Sept. 18, 2003) (statement of Comptroller General David M. Walker). Congress often delegates fragmented authority to multiple agencies, and in those instances, lack of coordination is a significant impediment to efficient, effective agency decisionmaking. *See* 77 Fed. Reg. 47,800, 47,810–12 (Aug. 10, 2012) (Administrative Conference of the United States urging agencies to coordinate whenever Congress delegates fragmented authority); *Sierra Club*, 657 F.2d at 406 ("Our

form of government simply could not function effectively or rationally if key executive policymakers were isolated from each other and from the Chief Executive."). Requiring express congressional authorization to coordinate—even on purely procedural matters—"would make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise." *SEC v. Chenery Corp.*, 332 U.S. 194, 202–203 (1947); *cf. Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of the Treasury*, 638 F.3d 794, 803 (D.C. Cir. 2011) (suggesting that a "rule that would deter one executive agency from consulting another about matters of shared concern" might violate the Take Care Clause, U.S. Const., art. II, § 3).

In the absence of a clear statement to the contrary, agencies are free to carry out their delegated responsibilities by coordinating their procedures. Thus, the Corps and EPA acted within their Clean Water Act authority when developing the EC Process.

The screening procedure is also lawful. Having agreed to the EC Process, the Corps and EPA needed to determine which permit applications would undergo that process. First, the agencies decided that EPA would develop and implement the screening procedure.

37

[ECP20] (EC Process memo). Next, EPA chose the criteria for screening applications. [ECP17–18] (screening procedure letter). In making both decisions, the agencies drew on their inherent authority "to order their own proceedings and control their own dockets." *Ass'n of Businesses Advocating Tariff Equity v. Hanzlik*, 779 F.2d 697, 701 (D.C. Cir. 1985).

If this Court has any role in reviewing the screening procedure, it is to ensure that the screening criteria rationally relate to the purpose of the EC Process. *See City of San Antonio v. Civil Aeronautics Bd.*, 374 F.2d 326, 329–30 (D.C. Cir. 1967). They do. EPA screened applications based on data related to applicable provisions of the 404(b)(1) Guidelines. [ECP17–18] (screening procedure letter). Those guidelines are relevant to the permit review process because the Corps and EPA consider them when exercising their respective authorities under Section 404. *See* 33 U.S.C. § 1344(b)(1); 40 C.F.R. §§ 231.1(a), 231.2(e). Like the EC Process, the screening procedure is a valid exercise of agency authority that this Court should uphold.

## B.    The Enhanced Coordination Process and the screening procedure do not require notice and comment.

The EC Process and the screening procedure do not require notice and comment because they are "rules of agency organization, procedure,

or practice."[4] 5 U.S.C. § 553(b)(A). Contrary to the district court's holding, the EC Process and the screening procedure are purely procedural rules because they do not alter the substantive criteria that the Corps and EPA use to make decisions under Section 404 of the Clean Water Act. *See James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 280–82 (D.C. Cir. 2000) (classifying procedural rules as those that do not alter substantive standards); *Neighborhood TV Co., Inc. v. FCC*, 742 F.2d 629, 637 (D.C. Cir. 1984) (explaining that procedural rules do not affect the "interests ultimately at stake in the agency proceeding").

## 1. The Enhanced Coordination Process is a procedural rule.

The EC Process provides the Corps and EPA with an opportunity to review pending Section 404 permit applications and discuss difficult

---

[4]    The district court improperly relied on authority addressing other exemptions to the APA's notice-and-comment requirement. **[**Dkt.96:12, 16–18**]** (citing *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29 (D.C. Cir. 2003); *Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000); and *American Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106 (D.C. Cir. 1993)). Unlike some other exemptions, the procedural rule exemption applies even when the procedure in question is legally binding. *See Vietnam Veterans v. Sec'y of the Navy*, 843 F.2d 528, 538 (D.C. Cir. 1988).

environmental issues with each other, with permit applicants, and with State agencies that regulate other aspects of surface coal mining. By creating an additional opportunity for engagement with the Corps and EPA, the EC Process may "alter the manner in which the parties present themselves or their viewpoints to the agency." *Batterton v. Marshall*, 648 F.2d 694, 707 (D.C. Cir. 1980). But that is typical of procedural rules exempt from notice-and-comment requirements. *See JEM Broadcasting Co., Inc. v. FCC*, 22 F.3d 320, 326–27 (D.C. Cir. 1994).

The EC Process has no substantive effect on the balance of agency authority that Congress struck in Section 404. The Corps reviews applications to determine whether to issue permits specifying disposal sites for discharging fill material into navigable waters. 33 U.S.C. § 1344(a)–(b); *see* **[ECP23]** (EC Process memo explaining that the Corps may "choose to issue a permit after the conclusion of the coordination period"). EPA reviews the same applications to provide comments to the Corps and to determine whether to prohibit or restrict the specification of any disposal sites proposed by the applicant. 33 U.S.C. § 1344(c); *see* **[ECP24]** (EC Process memo explaining that EPA may "initiate action

40

under … Section 404(c)" following the coordination period). The EC

Process does not reallocate statutory authority or alter the criteria that

the Corps and EPA use to make decisions.

The impacts of the EC Process on permit applicants do not suffice

to transform this procedural rule into a substantive rule requiring

notice and comment. The EC Process may expose problems with a

particular permit application that prompt the Corps to condition or

deny the permit or prompt EPA to prevent the specification of a

particular disposal site. But those possibilities do not make the EC

Process substantive. The Corps and EPA still base their decisions solely

on statutory and regulatory criteria, and no permit applicant has a

legitimate interest in avoiding closer scrutiny of its application. *See*

*American Hospital Ass'n v. Bowen*, 834 F.2d 1037, 1051 (D.C. Cir.

1987).

Another possible impact of the EC Process is increased delay,

which may occur in some cases despite the aim of the EC Process to

expedite the application review process as a whole. A particular

applicant's interest in administrative expediency, however, does not

convert an interim procedural rule into a substantive rule requiring

notice and comment. *See Neighborhood TV*, 742 F.2d at 637 (characterizing rule shuffling queue for licenses as procedural). Indeed, this Court has applied the procedural rule exemption in the face of results harsher than potential administrative delay. *See Ranger v. FCC*, 294 F.2d 240, 243–44 (D.C. Cir. 1961) (timing rule caused party to lose broadcasting license). Notably, the plaintiffs have not availed themselves of the appropriate remedy for unreasonable delay: a suit to compel the Corps to act on their permit applications. *See* 5 U.S.C. § 706(1).

The EC process is a temporary, targeted procedural rule designed to address the "unique challenge" of resolving "substantial environmental concerns" with a defined list of Section 404 permit applications. **[ECP22]** (EC Process memo). In those circumstances, "the policies promoted by public participation in rulemaking are outweighed by the countervailing considerations of effectiveness, efficiency, expedition, and reduction in expense." *American Hospital*, 834 F.2d at 1045. It would be particularly incongruous to require notice and comment in this instance, given that the EC Process itself provides permit applicants with an opportunity to participate in administrative

decisionmaking. This Court should hold that the APA's procedural rule exemption applies to the EC Process.

### 2. The screening procedure is a procedural rule.

The screening procedure is also a procedural rule exempt from notice and comment.[5] Like the EC Process, the screening procedure does not amend the substantive criteria that the Corps and EPA use to evaluate Section 404 permit applications. When screening applications, EPA considers several factors "to determine which permit applications require further coordination between EPA and the Corps." **[ECP18]** (screening procedure letter). But those factors do not alter the criteria that EPA employs when it later decides whether to invoke its authority to prohibit or restrict the specification of fill disposal sites. **[ECP19]** (screening procedure letter noting that EPA continues to base decisions "on the statute and regulations"). Nor do the screening procedure factors affect the Corps' analysis of permit applications under the

---

[5]     The screening procedure does not require notice and comment for another reason. It is a policy statement that does not "bin[d] private parties or the agency itself with the 'force of law.'" *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002); *see* 5 U.S.C. § 553(b)(A). We do not press that argument here because the screening procedure fits comfortably within the APA's procedural rule exemption.

43

404(b)(1) Guidelines. The district court clearly erred in finding that the screening procedure "removed the task of applying the 404(b)(1) [G]uidelines to pending permits from the Corps and bestowed it upon the EPA." **[**Dkt.96:16**]**.

The screening procedure is a purely internal mechanism through which EPA selects certain permit applications for further review. EPA's selection of an application for the EC Process does not "encod[e] a substantive value judgment" as to the application's ultimate merit. *American Hospital*, 834 F.2d at 1047. Instead, the screening procedure focuses the agencies' limited resources on those applications that are most in need of further discussion. Notice and comment are not required for procedures that guide agencies in allocating their investigative resources. *See Aulenback, Inc. v. FHA*, 103 F.3d 156, 168–69 (D.C. Cir. 1997) (agency guidelines for identifying motor carriers likely to pose danger to public safety); *American Hospital*, 834 F.2d at 1049–52 (agency directives focusing investigative scrutiny on certain hospitals). The screening procedure, like the EC Process, does not require notice and comment.

The EC Process and the screening procedure do not violate the Clean Water Act or the APA. This Court should reverse the district court's judgment and uphold those procedures.

## II.    THE DISTRICT COURT ERRED IN VACATING THE GUIDANCE MEMO.

EPA's Guidance Memo is not reviewable under the APA because it is not final agency action. Even if the memo is reviewable, the Association's challenge to one of its recommendations must be brought directly in the courts of appeals. And in any event, none of the Guidance Memo's contested recommendations exceed EPA's legal authority. Therefore, this Court should reinstate the memo.

## A.    The Guidance Memo is not final agency action.

The district court reviewed the Guidance Memo under the general review provisions of the APA, which allow for review of "final agency action." 5 U.S.C. § 704. Final agency action both "consummat[es]" the agency's decisionmaking process and works a "certain change in the legal obligations of a party." *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 13, 15 (D.C. Cir. 2005) (*Home Builders*). The contested portions of the Guidance Memo do not work a certain change in the legal

obligations of EPA staff, permitting authorities, or permit applicants. Thus, the memo is not final agency action subject to review.

### 1. Impact on EPA staff

Agency action may be final and reviewable if it "alter[s] the legal regime to which the action agency is subject." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). The Guidance Memo, however, does not alter the legal regime to which EPA Regions are subject when they review NPDES and Section 404 permit applications related to Appalachian surface coal mining. The agency's characterization and implementation of the memo bear out that conclusion.

While not dispositive, the Guidance Memo's characterization of its impact on EPA staff "is entitled to respect in a finality analysis." *Home Builders*, 415 F.3d at 14. The memo repeatedly states that it does not change the legal obligations of agency staff. *E.g.*, **[FG5440]** ("This memorandum does not impose any legally binding requirements …."); **[FG5442]** ("It does not impose legally or practically binding requirements on EPA …."). The memo explains that "EPA will consider the recommendations in this guidance, along with other relevant factors, when reviewing [Clean Water Act] permits." **[FG5449]**. In other

words, the memo's recommendations "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979). The Guidance Memo's recommendations are not final agency action; they are "general policy statements with no legal force." *Center for Auto Safety*, 452 F.3d at 808.

The Guidance Memo uses permissive language when making the recommendations contested here. *E.g.*, **[FG5453]** ("[P]ermitting authorities *should not* defer [RPAs] until after permit issuance."); **[FG5457]** ("EPA *recommends* that States *consider* a conductivity level of 300 µS/cm."); **[FG5472]** ("Regions *should consider … recommending* permit conditions requiring adaptive management actions to protect against elevated conductivity."); **[FG5474]** ("Regions *should recommend* to the Corps that applicants *be encouraged* to sequence fills to minimize water quality impacts.") (all emphases added). "The use of language such as 'recommend,' 'may,' 'should,' and 'can' is intended to describe agency policies and recommendations," not legal requirements. **[FG5448]** (Guidance Memo); *see Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012). The memo is clear: its

recommendations "d[o] not represent the only acceptable permitting approaches" that EPA Regions can suggest to States and the Corps. **[FG5441]**; *see also* **[FG5458]** ("States may choose to implement their narrative standards consistent with [existing laws] through a numeric effluent limitation for parameters other than conductivity."); **[FG5468]** ("Some Section 404 permits have conditions establishing conductivity triggers at background levels [that exceed the memo's benchmark].").

The Guidance Memo does employ mandatory language when describing well-established statutory and regulatory requirements. *E.g.*, **[FG5453]** ("NPDES permit[s] *must* contain limits as stringent as necessary to meet applicable water quality standards."); **[FG5469]** ("[T]he 404(b)(1) Guidelines include an independent *requirement* that Section 404 permits address possible threats to water quality.") (both emphases added). Recitation of the existing legal regime, however, does not make the Guidance Memo final agency action. *See Center for Auto Safety*, 452 F.3d at 808. The memo also summarizes the best-available science linking surface coal mining to biological impairment of Appalachian streams. **[FG5443–45]**. But that summary is "purely

informational" and "[c]ompel[s] no one to do anything." *Independent Equipment Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004).

In addition to examining an agency's own characterization of its action, this Court also looks to how the agency has implemented the action in practice. *Home Builders*, 415 F.3d at 15. Here, the record reveals that the Guidance Memo "genuinely leaves the agency and its decisionmakers free to exercise discretion." *Community Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987). EPA Regions retain discretion not to respond to NPDES and Section 404 permits, and when they do respond, they retain discretion to depart from the memo's recommendations. Thus, the memo does not alter the legal obligations of agency staff.

EPA Regions have discretion not to act in response to NPDES and Section 404 permits that run afoul of the memo's recommendations. For NPDES permits, EPA Regions can object to a proposed permit, voice concerns about the permit through comments (thereby allowing a State to issue the permit as proposed), or do nothing. For Section 404 permits, EPA Regions can prohibit or restrict the specification of a proposed disposal site, voice concerns about the permit through comments

(thereby allowing the Corps to issue the permit as proposed), or do nothing. The Guidance Memo preserves EPA Regions' discretion not to act. In other words, the memo does not articulate "a position EPA officials in the field are bound to apply." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000); *see AT&T Co. v. EEOC*, 270 F.3d 973, 975–76 (D.C. Cir. 2001) (deeming "Letter of Determination" to be non-final because it preserved agency's discretion not to sue plaintiff).

The district court did not identify a single example where EPA took a final agency action based on the considerations that underlie the Guidance Memo's recommendations.[6] *See Catawba County, N.C. v. EPA*, 571 F.3d 20, 34 (D.C. Cir. 2009) (declaring guidance memo nonbinding where EPA "did not impose 'adverse consequences,' notwithstanding the states' failure to address the factors listed in the [memo]"). By contrast, there are several examples in the record where

---

[6]    Comment letters communicate EPA's position on permit applications, but they are only advisory, like the agency "warning letters" that this Court does not consider to be final agency actions. *See Holistic Candlers*, 664 F.3d at 944. Objections to proposed NPDES permits are not final because they contemplate further administrative action. *See* 33 U.S.C. § 1342(d)(4); *City of Ames, Iowa v. Reilly*, 986 F.2d 253, 256 (8th Cir. 1993).

EPA staff allowed permits to issue even though the permits did not comport with the Guidance Memo's recommendations. *E.g.*, [Dkt.159-1:12–16] (comment letter noting that proposed permit did not limit or include an RPA for conductivity); [Dkt.159-2:55–57] (comment letter noting that proposed permit did not limit conductivity).

In those cases where EPA Regions commented on or objected to particular NPDES and Section 404 permits in a manner consistent with the Guidance Memo's recommendations, the agency based its comments and objections on the requirements of the Clean Water Act and its implementing regulations, just as if the Guidance Memo did not exist. *See Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974). The district court cited instances where EPA Regions objected to some NPDES permits that omitted RPAs for pollutants related to State narrative water quality criteria. [Dkt.167:14]. But EPA had objected on the same ground before the Guidance Memo issued. *E.g.*, [FG13415] (December 2009 objection letter asking State permitting authority to perform an RPA). The court also cited an EPA comment letter suggesting that the Corps use conductivity as a trigger for an adaptive management plan. [Dkt.167:14]. But EPA had made the

same suggestion before the Guidance Memo issued. *E.g.*, **[FG12899]** (March 2010 comment letter stating that "[c]onsistent with recommendations EPA has made for other projects, we recommend that trigger values … be 300 µS/cm and … 500 µS/cm."). EPA's authority to demand compliance with the Clean Water Act and its regulations does not derive from the Guidance Memo's recommendations; it derives from the agency's preexisting legal authority.

To be sure, the Guidance Memo encourages EPA Regions to more closely scrutinize permits related to Appalachian surface coal mining. But that is a change in policy, not a change in law. The Clean Water Act gives EPA discretion to act in response to NPDES and Section 404 permits that do not comply with the Act's terms. 33 U.S.C. §§ 1342(d), 1344(c). EPA may have exercised that authority more sparingly before the Guidance Memo issued, but discretionary authority is not lost through ossification. The memo merely asks EPA staff to consider using powers that Congress granted to the agency decades ago. The Guidance Memo's request does not change EPA's legal obligations.

Even when EPA Regions decide to respond to a prospective NPDES or Section 404 permit, they retain discretion to depart from the

Guidance Memo's recommendations. Certainly, EPA staff are expected to give the memo "appropriate consideration." **[**FG5441**]** (Guidance Memo). But that is true of any guidance document. The relevant point is that EPA Regions are not obligated to follow the memo's recommendations. For example, one EPA comment letter for an NPDES permit recommended that West Virginia's permitting authority develop a numeric criterion for sulfates (not conductivity) to implement the State's narrative water quality criterion. **[**Dkt.159-2:53–54**]**. Without objection from EPA, West Virginia issued the permit with no conductivity limitation. **[**Dkt.165:2**]**. An EPA objection to another NPDES permit recommended a numeric conductivity limit of 250– 500 µS/cm (more stringent than the Guidance Memo's benchmark) based on a watershed-specific academic study. **[**Dkt.159-2:33**]** (citing **[**FG5166–86**]**). Those are just two of the many examples demonstrating that EPA Regions remain "open to considering approaches other than those prescribed" in the Guidance Memo. *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 384 (D.C. Cir. 2002).

In short, the Guidance Memo "is exactly what it appears to be, a guidance manual for [EPA] managers and staff that does not create

enforceable regulations or modify existing legal rights." *The Wilderness Soc'y v. Norton*, 434 F.3d 584, 596–97 (D.C. Cir. 2006). It is not final agency action.

### 2. Impact on permitting authorities

Because EPA Regions need not act in response to prospective NPDES and Section 404 permits, and when they do act, they need not follow the Guidance Memo's recommendations, it follows *a fortiori* that the memo does not alter the legal obligations of Clean Water Act permitting authorities. The memo repeatedly states that its recommendations are not legally binding on permitting authorities. *E.g.*, **[FG5441]** ("This guidance is not intended to direct the activities of any other Federal, State or local agency or limit the exercise of their legal authority."); **[FG5468]** ("[Recommendations] are not legally or practically binding on the Corps' determinations of whether a particular project complies with the [404(b)(1) Guidelines]."). EPA Regions may ask the Corps and State permitting authorities to follow the Guidance Memo's recommendations, but those other agencies make independent decisions about appropriate permit conditions. Permitting authorities are free to adopt EPA Regions' recommendations, adapt them to

54

"case-specific" circumstances, or employ other approaches that comply with the Clean Water Act. **[FG5457]** (Guidance Memo).

In some instances, the Corps and State permitting authorities may choose to adopt EPA's suggestions in whole or in part. State permitting authorities may fear that EPA Regions will use their authority to object to more NPDES permits if States do not adopt their recommendations. "But [EPA's] request for voluntary compliance clearly has no legally binding effect," even though "there may be practical consequences." *Reliable Automatic Sprinkler Co., Inc. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003); *accord Center for Auto Safety*, 452 F.3d at 811. States that do not follow EPA's suggestions may also need to respond to more comments and objection letters. That burden, however, "is different in kind and legal effect from the burdens attending … final agency action." *FTC v. Standard Oil Co.*, 449 U.S. 232, 242 (1980).

### 3.  Impact on permit applicants

We have established that the Guidance Memo's recommendations do not legally bind EPA staff or Clean Water Act permitting authorities. Nor do those recommendations alter permit applicants' legal

obligations. The Guidance Memo itself makes that clear. *E.g.*, **[**FG5442**]**

("It does not impose legally or practically binding requirements on …

the regulated community."). The district court did not point to any

examples where a permit was denied because of the considerations that

underlie the memo's recommendations. EPA has objected to some

NPDES permits, but "the agency has not yet taken the steps required

under the statutory and regulatory scheme for its actions to have any

legal consequences." *Reliable Automatic Sprinkler*, 324 F.3d at 732; *see*

33 U.S.C. § 1342(d)(4); 40 C.F.R. § 123.44(e)–(h).

Permit applicants are free to seek judicial review after a permit is

conditioned or denied in a specific setting:

> If states heed the suggestions to the detriment of [an
> applicant], review is possible in state court…. If states
> propose a course of action inconsistent with [EPA's] wishes …
> and a permit is turned down, modified, or rescinded, review
> will be available in state or federal court. That review, on a
> full record, will disclose the EPA's final position, as applied to
> the [permit] in question.

*American Paper Inst., Inc. v. EPA*, 882 F.2d 287, 289 (7th Cir. 1989); *see*

40 C.F.R. §§ 123.30, 124.19. But the APA does not provide for judicial

review of prospective permit conditions in the abstract. *See Fund for*

56

*Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18–22 (D.C. Cir. 2006).

Because the Guidance Memo does not change the legal obligations of EPA staff, permitting authorities, or permit applicants, it is not final agency action reviewable under the APA.  If this Court agrees, it need go no further.

**B.    The district court lacked jurisdiction to review the Guidance Memo's RPA recommendation.**

As just explained, EPA's Guidance Memo does not impose any mandatory requirements. But if this Court concludes that the memo's reasonable potential analysis (RPA) recommendation is legally binding, it should dismiss the Association's challenge to that recommendation because the district court could not review it. Section 509(b)(1)(E) of the Clean Water Act confers exclusive jurisdiction on the courts of appeals to review EPA actions "promulgating any effluent limitation or other limitation under" Section 301 of the Clean Water Act. 33 U.S.C. § 1369(b)(1)(E). If the Guidance Memo's RPA recommendation is legally binding, then it is covered by that direct review provision.

In *Natural Resources Defense Council, Inc. v. EPA*, this Court directly reviewed EPA regulations that instituted "procedures for

57

issuing or denying NPDES permits." 673 F.2d 400, 402 (D.C. Cir. 1982)

(*NRDC v. EPA I*). One of those regulations required permits to "include

conditions meeting … any requirements … necessary to … [a]chieve

water quality standards." 40 C.F.R. § 122.62(d)(1) (1981) (predecessor of

40 C.F.R. § 122.44(d)(1)). Giving Section 509(b)(1)(E) "a practical rather

than a cramped construction," the Court held that NPDES procedural

requirements are reviewable directly in the courts of appeals. *NRDC v.

EPA I*, 673 F.2d at 405; *see also E.I. du Pont de Nemours & Co. v. Train*,

430 U.S. 112, 136 (1977) (decrying "the truly perverse situation in

which the court of appeals would review numerous individual actions

issuing or denying permits … but would have no power of direct review

of the basic regulations governing those individual actions"); *contra*

**[**Dkt.167:19**]** (district court limiting Section 509(b)(1)(E)'s reach to

requirements that "prescribe certain effluent limitations"). Since that

decision, this Court has repeatedly exercised Section 509(b)(1)(E)

jurisdiction over challenges to RPA regulations. *See American Iron &

Steel Inst. v. EPA*, 115 F.3d 979, 999–1001 (D.C. Cir. 1997) (reviewing

RPA requirements for States in the Great Lakes System); *American

Paper,* 996 F.2d at 350–53 (reviewing procedures under 40 C.F.R.

58

§ 122.44(d)(1)(vi) for translating reasonable potential findings into NPDES permit limitations).

Any "effluent limitation or other limitation" stemming from a finding of reasonable potential is imposed "under" Section 301 of the Act, one of the provisions listed in Section 509(b)(1)(E)'s jurisdictional grant. Section 301 requires permits to incorporate limitations "necessary to meet [State] water quality standards." 33 U.S.C. § 1311(b)(1)(C). To be sure, the resultant permit limitations are derived from water quality standards established under Section 303 of the Act, 33 U.S.C. § 1313, which is not a provision listed in Section 509(b)(1)(E). But the NPDES permit limitations themselves are mandated by Section 301. This is not a case where EPA instituted or approved a specific water quality standard or other restriction under Section 303. *Compare Friends of the Earth v. EPA*, 333 F.3d 184 (D.C. Cir. 2003) (refusing to directly review total maximum daily loads for turbidity and dissolved oxygen in a particular watershed). Instead, the RPA is a generic procedural device that represents the first step in translating existing water quality standards (required under Section 303) into new NPDES permit limitations (required under Section 301).

59

EPA based its RPA recommendation on Section 301, and the agency recommended the RPA to help ensure that NPDES permits comply with Section 301. **[FG5453]** (Guidance Memo). If the memo's recommendation were legally binding, it would be a requirement instituted "under" Section 301. *See NRDC v. EPA I*, 673 F.2d at 405 n.15. Any ambiguity on that score should be resolved in favor of direct review in the courts of appeals. *See Gen. Elec. Uranium Mgmt. Corp. v. DOE*, 764 F.2d 896, 903 (D.C. Cir. 1985).

The district court also held that the Guidance Memo's RPA recommendation was not "promulgated" because it was not published in the Federal Register. **[Dkt.167:19]**. This Court, however, does not universally equate promulgation with Federal Register publication. In particular, an agency may "promulgate" a requirement by "'mak[ing] … public the terms' of a rule or law." *United Techs. Corp. v. OSHA*, 836 F.2d 52, 54 (2d Cir. 1987) (citation omitted) (quoted in *Horsehead Res. Dev't Co., Inc. v. EPA*, 130 F.3d 1090, 1093 (D.C. Cir. 1997)). If the courts of appeals must directly review an NPDES procedural requirement instituted as a published regulation under Section 509(b)(1)(E), they must also directly review an identical legal

requirement instituted through guidance after notice and comment. *See*
*Gen. Elec. Co. v. EPA*, 290 F.3d at 381–85 (reviewing unpublished
agency guidance under a statute authorizing direct review of the
"promulgation of a rule"); *see generally NRDC v. EPA I*, 673 F.2d at 405.

The Association cannot have it both ways: either the Guidance
Memo's RPA recommendation is not final agency action reviewable
under the APA, or the recommendation is an NPDES procedural
requirement reviewable only in the courts of appeals. *See Cement Kiln*
*Recycling Coal. v. EPA*, 493 F.3d 207, 226 (D.C. Cir. 2007). Either way,
the district court could not hear the Association's claim.

**C.    EPA can prevent an NPDES permit from issuing if a State
does not perform a reasonable potential analysis and fails
to include appropriate permit limitations.**

We contend that the Guidance Memo does not impose an RPA
requirement, but that if it does, that requirement is reviewable only in
the courts of appeals. If this Court disagrees with both of our
arguments, it should uphold any such requirement. The Clean Water
Act gives EPA authority to object to an NPDES permit for failure to
include limitations necessary to meet State water quality standards.
When a State permitting authority ignores the best-available science

and refuses to perform an RPA before issuing an NPDES permit for

Appalachian surface coal mining, the permit may not contain adequate

effluent limitations, in which case EPA can object.

EPA has broad authority to oversee NPDES permit programs

administered by States. *See Arkansas v. Oklahoma*, 503 U.S. 91, 105

(1992). In particular, EPA can object to any proposed permit that lacks

limitations necessary to meet State water quality standards. 33 U.S.C.

§§ 1311(b)(1)(C), 1342(d)(2). To determine whether proposed permits

require additional limitations to meet water quality standards, the

State permitting authority performs an RPA. 40 C.F.R. § 122.44(d)(1).

Without an RPA, a State may have failed to ensure that a permit

"include[s] conditions … necessary to … achieve water quality

standards." *Id.* In that case, EPA can prevent the deficient NPDES

permit from issuing. *Id.* § 123.44(c)(7)–(8); *see also NRDC, Inc. v. EPA*,

859 F.2d 156, 186 (D.C. Cir. 1988) (*NRDC v. EPA II*) (recognizing that

EPA can object to permits that, in "the Administrator's best

professional judgment," do not comply with the Act).

By rejecting EPA's reasonable interpretation of its statutory and

regulatory authority, the district court undermined EPA's ability to

ensure compliance with water quality standards mandated by the Clean Water Act. The Act requires States to establish and update standards for water quality within State borders. 33 U.S.C. § 1313(a), (c). EPA can veto any water quality standard that does not comply with the Act's minimum requirements. *Id.* § 1313(c)(3)–(4). But "the water quality standards by themselves have no effect on pollution; the rubber hits the road when the state-created standards are used as the basis for specific effluent limitations in NPDES permits." *American Paper*, 996 F.2d at 350. Put another way, a State's water quality standards may be stellar as written, but that means nothing if the permitting authority fails to impose permit limitations necessary to meet those standards.

This is where the RPA comes in. The RPA requires States to take their own water quality standards into account before issuing NPDES permits. *See* 40 C.F.R. § 122.4(a) ("No permit may be issued … [w]hen the conditions of the permit do not provide for compliance with applicable requirements of [the Act]."); *Montgomery Envtl. Coal. v. Costle*, 646 F.2d 568, 575 (D.C. Cir. 1980) (noting that State water quality standards "must be respected in the drafting of the permit"). EPA can object to a State permitting authority's deficient RPA or the

manner in which a State translates a finding of reasonable potential into an NPDES permit limitation. *See* 40 C.F.R. § 122.44(d)(1)(ii)–(vii); *id.* § 123.44(c)(8) (authorizing EPA to object to permits that do not comply with 40 C.F.R. § 122.44(d)). If EPA could not also object when a State refused (in the face of substantial available information) to perform an RPA in the first place, State permitting authorities could evade the requirements of the Act by simply ignoring the impact of a proposed discharge on water quality. If a State refuses to perform an RPA and the permit lacks limitations necessary to meet State water quality standards, EPA must be able to stop the State from issuing the deficient permit. *See id.* § 123.44(c)(7)–(8).

There may be instances in which a State permitting authority does not have sufficient information to assess reasonable potential before issuing an NPDES permit. *See* **[FG3657]** (EPA technical support document). But a State can make that determination only after examining "all available information." *Id.*; *see* **[FG5453]** (Guidance Memo noting that permitting authorities should assess "all valid representative qualitative and quantitative information regarding the effluent and receiving water"). The Guidance Memo summarizes a

substantial and growing body of scientific research that EPA finds

relevant to whether Appalachian surface coal mining operations have a

reasonable potential to cause or contribute to violations of State

narrative water quality criteria. **[FG5483–86]**. State permitting

authorities may dispute the relevance of EPA's best-available science to

a particular NPDES permit, or they may supply other relevant

information that points to a different conclusion. Given the science

summarized in the Guidance Memo, however, it may be "outside the

guidelines and requirements" of the Act and EPA's regulations for a

State to issue an NPDES permit related to Appalachian surface coal

mining before analyzing whether additional permit limitations are

needed to meet State water quality standards. 33 U.S.C. § 1342(d)(2);

*see* 40 C.F.R. § 122.44(d)(1).

The district court observed that nothing in 40 C.F.R.

§ 122.44(d)(1)(i)–(v) requires State permitting authorities to perform an

RPA before a permit issues. **[Dkt.167:30–32]**. Those subparagraphs

explain what an RPA is, 40 C.F.R. § 122.44(d)(1)(i), how to conduct it,

*id.* § 122.44(d)(1)(ii), and how to translate reasonable potential findings

into permit limitations, *id.* § 122.44(d)(1)(iii)–(v). *See* **[FG5450]**

65

(Guidance Memo noting that "EPA regulations further describe the process for determining the need for such [NPDES permit limitations] and, if needed, for deriving them"). That same regulation, however, also reiterates the Clean Water Act's requirement that NPDES permits "shall include conditions meeting … any requirements … necessary to … [a]chieve water quality standards." 40 C.F.R. § 122.44(d)(1); *see* 33 U.S.C. § 1311(b)(1)(C). That statutory and regulatory requirement—not 40 C.F.R. § 122.44(d)(1)(i)–(v)—is the basis for the Guidance Memo's recommendation. **[FG5453]** (Guidance Memo). The district court's misdirected ruling undermines the goal of the Clean Water Act by forcing EPA to "stand helplessly aside" while States "approve permits that plainly violate" the Act. *NRDC v. EPA II*, 859 F.2d at 186.

In sum, even if the Guidance Memo's RPA recommendation is construed as a legal requirement reviewable by the district court, this Court should uphold it as a reasonable way for EPA to implement the Clean Water Act's mandate that NPDES permits protect State water quality.

**D.    The Guidance Memo's conductivity benchmark is not a legally-binding water quality standard.**

Every NPDES and Section 404 permit must comply with water quality standards issued under Section 303 of the Clean Water Act. *See* 40 C.F.R. §§ 122.44(d)(1), 230.10(b)(1). The district court held that the Guidance Memo impermissibly establishes a water quality standard limiting conductivity in Appalachian streams to 300–500 µS/cm. **[**Dkt.167:26–27**]**. Both the memo's text and its implementation, however, demonstrate that it does not establish a mandatory water quality standard.

Before issuing the Guidance Memo, EPA thoroughly studied the best-available science linking elevated conductivity to biological impairment of Appalachian streams. **[**FG1288–1347**]** (EPA conductivity report); **[**FG5484–86**]** (Guidance Memo). Based on that research and the agency's expertise, EPA explained in the Guidance Memo that a permit condition limiting conductivity to 300–500 µS/cm is "one option that would generally be an appropriately protective and scientifically defensible approach" for bringing Clean Water Act permits into compliance with Appalachian States' existing narrative water quality criteria. **[**FG5455**]**.

67

The Guidance Memo emphasizes, however, that its benchmark is not an independent numeric water quality criterion that supplements or supplants States' existing narrative criteria related to biological integrity. **[FG5449]** ("EPA is not establishing a water quality standard."). As the district court acknowledged, the memo "does not set specific limits and mandate their inclusion in all [NPDES] permits." **[Dkt.167:19]**. Instead, the Guidance Memo's conductivity benchmark is only one possible "numeric interpretation" of existing narrative criteria. **[FG5457]** (Guidance Memo); *see* 40 C.F.R. § 122.44(d)(1)(vi) (providing NPDES permitting authorities with several options for deriving numeric effluent limitations from narrative water quality criteria).[7] "[A]lternative approaches may be appropriate based on site-specific information, other best-available science, and the Clean Water Act." **[FG5449]**; *see also* **[FG5457]** ("[A]pplication of narrative water quality criteria in a permit is a case-specific determination.").

---

[7]     The district court incorrectly held 40 C.F.R. § 122.44(d)(1)(vi) inapplicable if a State has developed a narrative water quality criterion. **[Dkt.167:30 n.12]** (referencing counsel's statement at **[**Guidance Memo Tr.81**]**). To the contrary, that subparagraph applies *only* when a State has established a narrative criterion. *See* 54 Fed. Reg. 23,868, 23,875–77 (June 2, 1989); *American Paper*, 996 F.2d at 351.

EPA Regions took the Guidance Memo at its word and treated the conductivity benchmark as an optional recommendation. In some cases, EPA staff asked permitting authorities to consider 300–500 µS/cm as an effluent limitation (for NPDES permits) or a trigger for an adaptive management plan (for Section 404 permits). *E.g.*, **[**Dkt.122-8:8, Dkt.137-2:45–46**]**. But the district court erred in equating EPA's permit-specific preferences with a legally-binding water quality standard. Under the court's logic, EPA would seemingly establish a water quality standard every time that it objected to an NPDES permit. *See* 33 U.S.C. § 1342(d)(2) (requiring objections to describe the "conditions which such permit would include if it were issued by [EPA]"). That cannot be so. *See id.* § 1313(c)(4) (requiring water quality standards to be published).

In any event, EPA Regions sometimes departed from the Guidance Memo's conductivity benchmark. *E.g.*, **[**FG1277–83, FG1876–77**]** (letters supporting Corps' issuance of Section 404 permits without conductivity triggers). If the benchmark were legally binding, alternative approaches would be unlawful. More generally, EPA did not invalidate State approaches that formally depart from the conductivity

benchmark. Ohio has a numeric water quality criterion for conductivity (2,400 µS/cm) that is far more lenient than the Guidance Memo's benchmark. **[**FG12439–40**]** (Ohio Admin. Code 3745:1-07, tbl. 7-1 & n.(d)). West Virginia has formally rejected conductivity as an adequate proxy for that State's narrative water quality criterion for biological integrity. **[**Dkt.107-2:56**]**. Yet the record includes examples where EPA staff did not impose adverse consequences, notwithstanding those States' failure to impose the Guidance Memo's benchmark. *See, e.g.*, **[**FG2113**]** (comment letter recommending 2,400 µS/cm adaptive management plan trigger for Section 404 permit in Ohio); **[**Dkt.159-2:56**]** (comment letter recommending "a specific limit on conductivity *or an appropriate surrogate parameter*" for a West Virginia NPDES permit) (emphasis added).

In some respects, the Guidance Memo's conductivity benchmark resembles a recommended water quality criterion issued under Section 304 of the Act (though we do not concede that the benchmark is such a criterion). Section 304 directs EPA to issue nonbinding criteria that States may use to establish their own water quality standards. 33 U.S.C. § 1314(a)(1). Section 304 criteria (like the Guidance Memo's

benchmark) are based on "the latest scientific knowledge" related to "the effects of pollutants on biological community diversity, productivity, and stability." *Id.* § 1314(a)(1)(C). As with the memo's benchmark, permitting authorities have the option to use Section 304 criteria "on a case-by-case basis" to translate narrative criteria into NPDES permit limitations. 40 C.F.R. § 122.44(d)(1)(vi)(B); *see American Paper*, 996 F.2d at 352. Like the memo's benchmark, however, Section 304 criteria are not legally binding water quality criteria. *See NRDC, Inc. v. EPA*, 16 F.3d 1395, 1407–08 (4th Cir. 1993) (holding Section 304 criteria unreviewable because they lack legal effect).

The Guidance Memo states that its recommended conductivity benchmark is not a mandatory water quality standard, and EPA Regions did not treat it like one. The district court's holding to the contrary should be reversed.

**E.    The Guidance Memo does not create a new role for EPA under the Surface Mining Control and Reclamation Act.**

Finally, the district court erroneously held that the Guidance Memo violates the Surface Mining Control and Reclamation Act (SMCRA). **[Dkt.167:24–26]**. The memo does not purport to give EPA

new authority under SMCRA, nor does the record show that the agency ever asserted such authority. The court's ruling should be reversed.

SMCRA "establish[es] a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." 30 U.S.C. § 1202(a). The United States Department of the Interior administers SMCRA and sets minimum federal standards for surface coal mines. *Id.* § 1211(c). But States may administer their own SMCRA programs (with oversight from Interior), and most Appalachian States do so. *See id.* § 1253. SMCRA does not affect coal companies' obligations under the Clean Water Act. *Id.* § 1292(a)(3) ("Nothing in this chapter shall be construed as superseding, amending, modifying, or repealing … [the Clean Water Act] …."). Because the two statutes overlap, however, Congress directed Clean Water Act and SMCRA authorities to work together. *Id.* §§ 1253(a)(6), 1292(c), 1303(a). The 2009 interagency action plan on Appalachian surface coal mining also urges greater coordination between Clean Water Act and SMCRA authorities. **[ECP12]**.

The Guidance Memo makes a general suggestion to EPA staff to coordinate with other Clean Water Act and SMCRA authorities:

> Regions should work closely with the Corps, [Interior], State SMCRA agencies, and mine operators to promote the incorporation of … improved practices at the initial stages of mine design to increase consistency between SMCRA and [Clean Water Act] permits. More effective coordination among regulatory agencies and mining operators will help to assure permit decisions are more consistent, timely, and effective in reducing mining-related environmental and water quality impacts.

[FG5469]; *see also* [FG5475] ("Regions are encouraged to work with [Interior] or the State SMCRA agency to encourage them to incorporate appropriate [best management practices] into the applicable SMCRA permit."). Apart from those hortatory statements, the Guidance Memo is virtually silent about SMCRA.

The district court concluded that the Guidance Memo's statements about SMCRA "impermissibly interjected [EPA] into the SMCRA permitting process." [Dkt.167:26]. The memo does no such thing. Any statements in the Guidance Memo about SMCRA do nothing more than inform the public of EPA's views on a statute that it does not administer. *See Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 809 (2003). SMCRA authorities are free to work with EPA to improve consistency between Clean Water Act and SMCRA permits, but the Guidance Memo does not require EPA or other agencies to take any

particular action. The district court did not cite any examples where an EPA Region even commented on a SMCRA permit.

The Guidance Memo recommends that EPA staff ask the Corps to incorporate certain best management practices into Section 404 permits. **[FG5473–75, FG5494–95]** (Guidance Memo). Those recommendations are grounded in the 404(b)(1) Guidelines, which the Corps and EPA use when exercising their respective Section 404 authorities. 33 U.S.C. § 1344(b)(1); 40 C.F.R. §§ 231.1(a), 231.2(e). Under the guidelines, "no discharge of dredged or fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. § 230.10(d). Those "appropriate and practicable steps" may relate to the location and design of the proposed discharge of fill material, as well as the method of dispersion. *See, e.g.*, *id.* § 230.73(g) ("The effects of a discharge can be minimized by the manner in which it is dispersed, such as … [s]etting limitations on the amount of material to be discharged per unit of time or volume of receiving water.").

In addition to minimizing impacts on the aquatic ecosystem, some of the Guidance Memo's recommended best management practices for Section 404 permits may also relate to activities regulated under SMCRA. But Clean Water Act permit conditions do not encroach on SMCRA regulators' authority to establish conditions for SMCRA permits. In any event, if the Association believes that some of the best management practices suggested in the Guidance Memo are unlawful, it must challenge the Corps' inclusion of those practices in a particular Section 404 permit.

The Guidance Memo does not purport to create a new role for EPA under SMCRA, nor has the agency acted as though it has such a role. The district court's holding to the contrary should be reversed, and the memo should be upheld.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's judgment and uphold the EC Process, the screening procedure, and the Guidance Memo.

Respectfully submitted,

75

*/s/ Matthew Littleton*
MATTHEW LITTLETON
 Attorney, Appellate Section
 Environment & Natural Resources Division
 United States Department of Justice
 P.O. Box 7415
 Washington, DC 20044
 Tel: (202) 514-4010
 Fax: (202) 353-1873
 matthew.littleton@usdoj.gov

April 15, 2013
90-1-18-13234

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. Excepting the portions of the brief described in Fed. R. App. P. 32(a)(7)(B)(iii), the brief contains 13,962 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). The brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2007 in Century Schoolbook, 14-point.

_/s/ Matthew Littleton_
MATTHEW LITTLETON
 Attorney, Appellate Section
 Environment & Natural Resources Division
 United States Department of Justice
 P.O. Box 7415
 Washington, DC 20044
 Tel: (202) 514-4010
 Fax: (202) 353-1873
 matthew.littleton@usdoj.gov

April 15, 2013

77

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2013, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Some participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

The following participant is not a registered CM/ECF user. I have served this participant with a copy of the foregoing by first-class mail, postage prepaid:

F. William Hardt III
Frost Brown Todd LLC
250 West Main Street, Suite 2800
Lexington, KY  40507

*/s/ Matthew Littleton*
MATTHEW LITTLETON
Attorney, Appellate Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7415
Washington, DC 20044
Tel: (202) 514-4010
Fax: (202) 353-1873
matthew.littleton@usdoj.gov