<u>ORAL ARGUMENT NOT YET SCHEDULED</u>

Nos. 12-5310, 12-5311

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

NATIONAL MINING ASSOCIATION, *et al.*,
*Plaintiffs-Appellees*,

Commonwealth of Kentucky, *et al.*, *Intervenor Plaintiffs-Appellees*,

-v.-

BOB PERCIASEPE, Acting Administrator of the
United States Environmental Protection Agency, *et al.*,
*Federal Defendants-Appellants*,

Sierra Club, *et al.*, *Intervenor Defendants-Appellants.*

---

On Appeal from the United States District Court for the District of Columbia
Lead Case No. 10-cv-01220 (Hon. Reggie B. Walton)

---

**PROOF BRIEF OF ENVIRONMENTAL INTERVENOR-APPELLANTS
SIERRA CLUB, COAL RIVER MOUNTAIN WATCH, KENTUCKIANS
FOR THE COMMONWEALTH, SOUTHERN APPALACHIAN
MOUNTAIN STEWARDS, STATEWIDE ORGANIZING FOR
COMMUNITY EMPOWERMENT, OHIO VALLEY ENVIRONMENTAL
COALITION, AND WEST VIRGINIA HIGHLANDS CONSERVANCY**

---

Derek O. Teaney
APPALACHIAN MOUNTAIN
ADVOCATES
P.O. Box 507
Lewisburg, WV 24901
Telephone: (304) 793-9007
Fax: (304) 645-9008
E-mail: dteaney@appalmad.org

Emma C. Cheuse
Jennifer C. Chavez
EARTHJUSTICE
1625 Massachusetts Ave., N.W., Suite 702
Washington, D.C. 20036-2243
Telephone: (202) 667-4500
Fax: (202) 667-2356
echeuse@earthjustice.org
jchavez@earthjustice.org

*Counsel for Environmental Intervenor-
Appellants*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**(A) Parties and Amici (**all of the below listed parties participated in the district court case):

**Federal Defendants-Appellants** in No. 12-5310 include Bob Perciasepe in his official capacity, Acting Administrator, U.S. Environmental Protection Agency;[1] United States Environmental Protection Agency; John McHugh, in his official capacity, Secretary of the Army; United States Army Corps of Engineers; Thomas P. Bostick, in his official capacity, Commanding General of the U.S. Army Corps of Engineers.

**Environmental Intervenor Defendants-Appellants** in Case No. 12-5311 are Sierra Club; Coal River Mountain Watch; Kentuckians for the Commonwealth; Southern Appalachian Mountain Stewards; Statewide Organizing for Community Empowerment; Ohio Valley Environmental Coalition; and West Virginia Highlands Conservancy.

**Plaintiffs-Appellees** are National Mining Association; Randy Huffman, on behalf of the State of West Virginia and in his official capacity as Cabinet Secretary of the West Virginia Department of Environmental Protection; Kentucky

---

[1] Mr. Perciasepe is substituted for Ms. Jackson, pursuant to FED. R. APP. P. 43(c)(2).

i

Coal Association; Gorman Company, LLC; Kycoga Company, LLC; Black Gold Sales, Inc.; Hazard Coal Co.; Kentucky Union Company.

**Intervenor Plaintiffs-Appellees** are Commonwealth of Kentucky and City of Pikeville, Kentucky.

**Amici**: There were no *amici curiae* in the district court case and the undersigned counsel are not aware of any that intend to participate in this Court.

**Circuit Rule 26.1 Disclosure:** Environmental Intervenor Defendants-Appellants Sierra Club *et al.* have filed this statement below.

## (B) Rulings Under Review

This appeal involves the Order (D.D.C. ECF No. 95) and Memorandum Opinion (ECF No. 96) dated October 6, 2011, and the Order (ECF No. 166) and Memorandum Opinion (ECF No. 167) dated July 31, 2012 [Dkts. 166-67], and the final judgment entered on July 31, 2012 [Dkt. 166], issued by the Honorable Reggie B. Walton in *National Mining Association v. Jackson*, 880 F. Supp. 2d 119 (D.D.C. 2012) and *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34 (D.D.C.2011) in Civil Action No. 10-1220 (RBW) (consolidated with Nos. 11-0295, 11-0446, 11-0447 (RBW)).

The United States and Sierra Club *et al.* filed separate notices of appeal.

## (C) Related Cases

There are no related cases (other than those already consolidated).

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to FED. R. APP. P. 26.1 and D.C. Circuit Rule 26.1, Environmental Intervenor Defendants-Appellants Sierra Club *et al.* make the following disclosures:

1.     Sierra Club has no parent companies, and no publicly held company has a 10% or greater ownership interest in Sierra Club. Sierra Club, a corporation organized and existing under the laws of the State of California, is a national nonprofit organization dedicated to the protection and enjoyment of the environment.

2.     West Virginia Highlands Conservancy ("WVHC") has no parent companies, and no publicly held company has a 10% or greater ownership interest in WVHC. WVHC, a corporation organized and existing under the laws of the State of West Virginia, is a nonprofit organization which aims to protect West Virginia's land and water resources, including from the harm caused by mountaintop removal mining.

3.     Coal River Mountain Watch ("CRMW") has no parent companies, and no publicly held company has a 10% or greater ownership interest in CRMW.

iii

CRMW, a corporation organized and existing under the laws of the State of West Virginia, is a nonprofit organization whose mission is to stop the destruction of local communities and the environment by mountaintop removal mining, to improve the quality of life, and to help rebuild sustainable communities.

4.      Ohio Valley Environmental Coalition ("OVEC") has no parent companies, and no publicly held company has a 10% or greater ownership interest in OVEC. OVEC, a corporation organized and existing under the laws of the State of Ohio, is a nonprofit organization dedicated to the improvement and preservation of the environment.

5.      Kentuckians For The Commonwealth ("KFTC") has no parent companies, and no publicly held company has a 10% or greater ownership interest in KFTC. KFTC, a corporation organized and existing under the laws of the Commonwealth of Kentucky, is a nonprofit organization dedicated to promoting social, economic, and environmental justice for all Kentuckians.

6.      Southern Appalachian Mountain Stewards ("SAMS") has no parent companies, and no publicly held company has a 10% or greater ownership interest in SAMS. SAMS, a corporation organized and existing under the laws of the Commonwealth of Virginia, is a nonprofit organization working to stop the

iv

destruction of communities by surface coal mining, to improve the quality of life in the area, and to help rebuild sustainable communities.

7.     Statewide Organizing for Community Empowerment ("SOCM") has no parent companies, and no publicly held company has a 10% or greater ownership interest in SOCM. SOCM, a corporation organized and existing under the laws of the State of Tennessee, is a nonprofit organization working for environmental, social, and economic justice.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

RULE 26.1 DISCLOSURE STATEMENT........................................................... iii

TABLE OF CONTENTS...........................................................................vi

GLOSSARY OF ABBREVIATIONS .................................................... xii

STATEMENT OF JURISDICTION..................................................... xiii

STATEMENT OF ISSUES ................................................................. xiii

STATUTES AND REGULATIONS.................................................... xiii

STATEMENT OF FACTS AND STATEMENT OF THE CASE ..........................1

      A.    The Appalachian Region Needs Federal Attention to Follow the Clean Water Act and Reduce Environmental Harm..................1

      B.    Enhanced Coordination...............................................................4

      C.    EPA's Guidance Memo ...............................................................5

      D.    District Court Ruling...................................................................8

SUMMARY OF ARGUMENT .................................................................9

STANDING .............................................................................................11

STANDARD OF REVIEW .....................................................................13

ARGUMENT ..........................................................................................13

I.    EPA'S STAFF GUIDANCE ON CONDUCTIVITY AND THE REASONABLE POTENTIAL ANALYSIS IS CONSISTENT WITH THE CLEAN WATER ACT...........................................................................13

A. EPA Has Authority To Provide Guidance To Its Staff Regarding The Science On Conductivity. .................................13

B. EPA's Recommendation of a Pre-Permit Reasonable Potential Analysis Is Consistent With the Act. ........................................19

II. EPA'S PARTICIPATION IN THE INTERAGENCY REVIEW AND SCREENING PROCESS IS AUTHORIZED BY SECTION 404 OF THE CLEAN WATER ACT..........................................................................25

CONCLUSION ..................................................................................33

CERTIFICATE OF COMPLIANCE....................................................34

CERTIFICATE OF SERVICE .............................................................35

vii

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alameda Water & Sanitation Dist. v. Reilly*,
    930 F. Supp. 486 (D. Colo. 1996).......................................................................31

*Am. Iron & Steel Inst. v. EPA*,
    115 F.3d 979 (D.C. Cir. 1997)..........................................................................23

* *Am. Paper Inst. Inc. v. EPA*,
    996 F.2d 346 (D.C. Cir. 1993).............................................................15, 20, 21

*Bersani v. EPA*,
    850 F.2d 36 (2d Cir. 1988) ...............................................................................30

*Bowsher v. Synar*,
    478 U.S. 714 (1986)..........................................................................................12

*City of Alma v. U.S.*,
    744 F. Supp. 1546 (S.D. Ga. 1990) ............................................................30, 31

*Creppel v. Army Corps of Eng'rs*,
    CIV. A. No. 77-25, 1988 WL 70103 (E.D. La. June 29, 1988) ........................31

*Diamond v. Charles*,
    476 U.S. 54 (1986)............................................................................................12

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)..........................................................................................12

*FTC v. Texaco, Inc.*,
    555 F.2d 862 (D.C. Cir. 1977) (en banc)..........................................................29

*James City County v. EPA*,
    12 F.3d 1330 (4th Cir. 1993) ......................................................................27, 30

* Authorities upon which we chiefly rely are marked with asterisks.

*James v. United States*,
    550 U.S. 192 (2007).................................................................22

*Jones v. Alfred H. Mayer Co.*,
    392 U.S. 409 (1968).................................................................25

*McConnell v. FEC*,
    540 U.S. 93 (2003), *overruled on other grounds by Citizens United v.*
    *FEC*, 558 U.S. 310 (2010) ......................................................11

* *Mingo Logan v. EPA*,
    ---F.3d---, No. 12-5150,
    2013 WL 1729603 (D.C. Cir. Apr. 23, 2013) ............................6, 26, 27, 31, 32

*New Jersey v. EPA*,
    517 F.3d 574 (D.C. Cir. 2008)..................................................25

*NRDC v. EPA*,
    489 F.3d 1364 (D.C. Cir. 2007)................................................12

*OVEC v. U.S. Army Corps of Eng'rs*,
    674 F. Supp. 2d 783 (S.D. W. Va. 2009)...................................30

*W. Union Int'l v. FCC*,
    804 F.2d 1280 (D.C. Cir. 1986)................................................29

**FEDERAL STATUTES**

28 U.S.C. § 1291 ................................................................... xiii

Clean Water Act Section 101, 33 U.S.C. § 1251

    33 U.S.C. § 1251(a) ...............................................................24, 29

    33 U.S.C. § 1251(d) ...............................................................29

* Clean Water Act Section 301, 33 U.S.C. § 1311.....................7, 20, 22

    33 U.S.C. § 1311(a)-(b) .........................................................24

    33 U.S.C. § 1311(b)(1)(C) ....................................................7, 14-15, 16, 19, 20, 24

Clean Water Act Section 303, 33 U.S.C. § 1313 ........................................14, 17, 20

    33 U.S.C. § 1313(c)(4)(A)-(B) ........................................................18

* Clean Water Act Section 402, 33 U.S.C. § 1342 ........................7, 14, 17

    33 U.S.C. § 1342(b)(1)(B) ...........................................................23

    33 U.S.C. § 1342(b)(1)(C) ...........................................................23

    33 U.S.C. § 1342(c)(2) ..............................................................17

    33 U.S.C. § 1342(d) .................................................................12

    33 U.S.C. § 1342(d)(2) ........................................................5, 17, 18

* Clean Water Act Section 404, 33 U.S.C. § 1344 ........ 7, 19, 25, 26, 27, 28, 29, 30

    33 U.S.C. § 1344(b) ...............................................................4, 27

    33 U.S.C. § 1344(b)(1) ...............................................................27

    33 U.S.C. § 1344(b)-(c) ..............................................................26

    33 U.S.C. § 1344(c) ..................................... 4, 5, 6, 12, 26, 27, 28, 29, 30, 31, 32

    33 U.S.C. § 1344(q) .................................................................28

**FEDERAL RULES AND REGULATIONS**

FED. R. APP. P. 4(a)(1)(B) ................................................................ xiii

* 40 C.F.R. § 122.4(a), (d) ..............................................................20

40 C.F.R. § 122.44 ........................................................17, 23, 18

40 C.F.R. § 122.44(d) ...................................................17, 18, 20

* 40 C.F.R. § 122.44(d)(1) ............................... 7, 14, 15, 20, 22, 23, 24

* 40 C.F.R. § 122.44(d)(1)(i) ................................................15, 16, 21

40 C.F.R. § 122.44(d)(1)(ii) ................................................................21

x

40 C.F.R. § 122.44(d)(1)(iii)-(v)................................................................15, 22

* 40 C.F.R. § 122.44(d)(1)(vi).............................................15, 16, 17, 21, 22

40 C.F.R. § 122.62(a)(2).............................................................................23

* 40 C.F.R. § 123.25(a)..........................................................................20, 17

40 C.F.R. § 123.25(a)(15)...........................................................................18

* 40 C.F.R. § 123.44...................................................................................5

40 C.F.R. § 123.44(c)(8)........................................................................17, 18

40 C.F.R. § 124.5.......................................................................................23

404(b)(1) Guidelines:

40 C.F.R. Part 230.......................................................................................4

40 C.F.R. § 230.1.........................................................................................4

40 C.F.R. § 230.10(b)-(c)...........................................................................4, 8

404(c) Regulations:

40 C.F.R. §§ 231.1–231.8............................................................................6

40 C.F.R. § 231.2(e)....................................................................................4

40 C.F.R. § 231.3(a)..................................................................................30

**FEDERAL REGISTER NOTICES**

EPA, Denial or Restriction of Disposal Sites; Section 404(c) Procedures,
    44 Fed. Reg. 58,076 (Oct. 9, 1979) ............................................5, 31

EPA, Guidelines for Specification of Disposal Sites for Dredged or Fill
    Material, 45 Fed. Reg. 85,336 (Dec. 24, 1980) ..................................4

* EPA, National Pollutant Discharge Elimination System; Surface Water
    Toxics Control Program, 54 Fed. Reg. 23,868 (June 2, 1989)...............15, 16, 21

EPA, Final Determination of the Assistant Administrator for Water Pursuant
to Section 404(c) of the Clean Water Act Concerning the Spruce No. 1
Mine, Logan County, WV, 76 Fed. Reg. 3126 (Jan. 19, 2011)..........................31

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| 404(b)(1) Guidelines | 40 C.F.R. Part 230 (§§ 230.1-230.98) |
| Fed. Br. | Federal Defendants-Appellants' Opening Brief |
| Corps | U.S. Army Corps of Engineers |
| CWA or the Act | Clean Water Act |
| Dkt. | Reference to district court docket number |
| Environmental Intervenor-Appellants | Sierra Club, Coal River Mountain Watch, Kentuckians For The Commonwealth, Southern Appalachian Mountain Stewards, Statewide Organizing for Community Empowerment, Ohio Valley Environmental Coalition, and West Virginia Highlands Conservancy |
| EPA | U.S. Environmental Protection Agency |
| NPDES | National Pollution Discharge Elimination System |
| Section 301 | Clean Water Act, 33 U.S.C. § 1311 |
| Section 303 | Clean Water Act, 33 U.S.C. § 1313 |
| Section 402 | Clean Water Act, 33 U.S.C. § 1342 |
| Section 404 | Clean Water Act, 33 U.S.C. § 1344 |

xii

## STATEMENT OF JURISDICTION

Environmental Intervenor Defendants-Appellants ("Environmental Intervenor-Appellants") filed a timely notice of appeal on September 28, 2012. [Dkt. 170]; FED. R. APP. P. 4(a)(1)(B).  This Court has jurisdiction under 28 U.S.C. § 1291 as stated by Federal Defendants-Appellants.

## STATEMENT OF ISSUES

1.     Whether the U.S. Environmental Protection Agency ("EPA") may recommend its staff, in deciding whether to object to a permit, consider peer-reviewed science showing that aquatic harm results from pollution and suggesting there may be violations of existing CWA requirements.  (Federal Brief Issue 5).

2.     Whether EPA may recommend its staff, in deciding whether to object to a permit, consider whether a state has assessed the potential for proposed discharges to violate applicable state water quality standards. (Fed. Br. Issue 4.b).

3.     Whether EPA may engage in interagency coordination with the U.S. Army Corps of Engineers ("Corps") in screening and reviewing permit applications to facilitate each agency's exercise of its authority under the Clean Water Act. (Fed. Br. Issue 1).

## STATUTES AND REGULATIONS

Please see Federal Addendum and the Addendum attached.

## STATEMENT OF FACTS AND STATEMENT OF THE CASE

### A.    The Appalachian Region Needs Federal Attention to Follow the Clean Water Act and Reduce Environmental Harm.

During the last decade, waste disposal from Appalachian surface mining has caused substantial environmental harm, particularly in West Virginia and Kentucky.  As EPA observed, "[t]he environmental legacy of mining operations in the Appalachian region is far-reaching," with over 1,200 miles of Appalachian streams buried by mining waste dumps or "valley fills." [FG05443]  Appalachian surface mining, also known as mountaintop removal, has harmed an area estimated to be larger than the state of Delaware.  [*Id.*]; *see also, e.g.*, [FG001588 (comparing one individual surface mine to the city of Washington, D.C.)].  Valley fills and their resulting downstream pollution destroy aquatic life and threaten the ecological viability of local watersheds.  [FG05443].

In 2008 EPA scientists determined that 93% of evaluated streams that received pollution from Appalachian surface mines are biologically impaired due to high levels of "specific conductance," or conductivity, which can be toxic to aquatic life.  [FG002814, FG002828 (Pond 2008)].  There is dramatic evidence that conductivity has caused irreparable harm to watersheds. [FG001670-73].  Mitigation and reclamation attempts have failed to reverse the damage.  [FG001673-74 ("[T]here is no evidence that reclamation efforts altered or reduced the ions or toxic chemicals downstream of valley fills"); FG004709 ("there is no

1

empirical evidence documenting recovery"); *see also* FG002944].  As a result, vast areas of the Appalachian Mountains have become deforested, flattened wastelands, with waters unable to support healthy aquatic ecosystems and unacceptable for human use and enjoyment.  *See, e.g.*, [FG002925-31; FG004700-18; FG005442-43, 5445, 5455, 5464-65, 5483-86; ECP000032].

      For years Federal Defendants-Appellants did nothing to stop this harm.

      Finally, the growing and irrefutable evidence of environmental harm led Federal Defendants-Appellants to initiate enhanced interagency coordination on certain pending valley fill permit applications, [ECP000011-12], and led EPA to issue the 2011 Guidance for its staff, [FG005442-45].  Federal Defendants-Appellants determined these steps were necessary to "significantly reduce the harmful environmental consequences of Appalachian surface coal mining operations, while ensuring that future mining remains consistent with federal law," including the Clean Water Act ("CWA" or "the Act").  [ECP000012]; *see also* [ECP000022].  In particular, they explained that mountaintop removal mining "often stresses the natural environment and impacts the health and welfare of surrounding human communities," citing harm to streams, impacts on swimming, fishing and drinking water, and annihilation of "forest lands that sustain water quality and habitat and contribute to the Appalachian way of life."  [ECP000011].  They also noted a concern that "negative impacts are likely to further increase."

[*Id.*]

Before issuing the Guidance, EPA investigated water quality problems and published an evaluation of state permitting programs.  [FG005443, 5445-46; FG005451 & n.13 (citing FG004834-4915)].  EPA's review discovered "concerns common to the vast majority of permits reviewed that warrant immediate attention to ensure that water quality is protected," including failures to assess whether proposed discharges would cause violations of state water quality standards and failures to set effluent limitations in permits.  [FG004854, 4855-58; FG005451, 5457 (noting EPA review "identified concerns regarding the consistent application of state water quality standards relating to discharges that increase the levels of conductivity, TDS, and sulfates").].

Soon after, EPA published two major peer-reviewed studies that identified the following grave impacts of Appalachian surface mining:

> (1) springs, and ephemeral, intermittent streams, and small perennial streams are permanently lost with the removal of the mountain and from burial under fill, (2) concentrations of major chemical ions are persistently elevated downstream, (3) degraded water quality reaches levels that are acutely lethal to standard laboratory test organisms, (4) selenium (Se) concentrations are elevated, reaching concentrations that have caused toxic effects in fish and birds, and (5) macroinvertebrate and fish communities are consistently and significantly degraded.

[FG001578 (EPA mountaintop report (2011))]; *see also* [FG001301 (EPA

conductivity report (2011))].   EPA found that "[r]ecent studies, as well as the

experiences of Appalachian coalfield communities, point to new environmental

and health challenges that were largely unknown even ten years ago," [FG005443],

including a documented association between living near a mining area and

increased cancer and birth defects. *See, e.g.*, [FG004691; FG004813; FG004830].

## B.      Enhanced Coordination

In 2009, Federal Defendants-Appellants agreed to enhanced coordination for

certain pending permit applications that raised "substantial environmental

concerns."   Memorandum from EPA Administrator Lisa P. Jackson and U.S.

Army, Acting Assistant Secretary (Civil Works) Terrence "Rock" Salt, Re:

Enhanced Surface Coal Mining Pending Permit Coordination Procedures (June 11,

2009)  [ECP000020].  The agencies determined that EPA – as the expert

Administrator of the CWA with permit veto authority – would screen pending

applications in this process.  [ECP000021].  EPA screened applications using

factors derived from existing CWA regulations which govern the Corps'

permitting decisions under section 404(b), 33 U.S.C. § 1344(b), and inform EPA's

veto authority under section 404(c), 33 U.S.C. § 1344(c).  [MIR000029-30;

ECP000017-18]; EPA, Guidelines for Specification of Disposal Sites for Dredged

or Fill Material, 45 Fed. Reg. 85,336 (Dec. 24, 1980) (promulgating 40 C.F.R. Part

230) ("404(b)(1) Guidelines"); *see, e.g.*, 40 C.F.R. §§ 230.1, 230.10(b)-(c); 40

C.F.R. § 231.2(e) (defining "unacceptable adverse effect" in part based on

404(b)(1) Guidelines); EPA, Denial or Restriction of Disposal Sites; Section

404(c) Procedures, 44 Fed. Reg. 58,076, 58,076 (Oct. 9, 1979).  The agencies

agreed that the Corps would initiate the enhanced coordinated review for

individual permits when it was ready to do so; that the agencies would then

coordinate their review; and finally that each would exercise its respective

statutory authority. [ECP000023-24].

### C.    EPA's Guidance Memo

The Guidance provided information on current science and existing CWA

requirements to assist EPA staff in deciding whether to object to or veto permits as

the Act authorizes.  33 U.S.C. §§ 1342(d)(2), 1344(c); Memorandum, EPA Acting

Assistant Adm'r for Water Nancy Stoner, *et al.*, to EPA Regional Administrators,

Regions 3, 4, and 5, Subject: Improving EPA Review of Appalachian Surface Coal

Mining Operations Under the Clean Water Act, National Environmental Policy

Act, and the Environmental Justice Executive Order (July 21, 2011), [FG005449-

57; FG005466] ("Guidance").  Under section 402(d)(2), EPA may object to any

NPDES permit that allows a discharge that could cause a violation of a water

quality standard. 33 U.S.C. § 1342(d)(2); *see* 40 C.F.R. § 123.44.  Under section

404(c), EPA may veto the disposal of any fill material that would have an

"unacceptable adverse effect" on aquatic resources before or after the Corps issues

5

a permit.  33 U.S.C. § 1344(c); 40 C.F.R. §§ 231.1–231.8; *Mingo Logan v. EPA*, ---F.3d---, No. 12-5150, 2013 WL 1729603 (D.C. Cir. Apr. 23, 2013).

The 2011 Guidance contained, among other things, two important sets of recommendations to EPA staff.

First, EPA described a range at which conductivity pollution in streams below surface coal mines causes major significant harm to aquatic life, 300-500 microsiemens per centimeter (µS/cm). [FG005455].  Appalachian states have narrative water quality standards that require protection for aquatic life. [FG005491-93 (listing state standards)].   The science shows that elevated conductivity from mining waste causes harm to aquatic life. *See, e.g.*, [FG005483-86; FG001301, 1387].  As EPA observed, "substantial aquatic life effects have already occurred when conductivity levels reach 500 µS/cm, which suggests impairment."  [FG05455].  Streams lose a significant amount of aquatic life – including 5% of native macroinvertebrate genera – when conductivity reaches 300 µS/cm.  [*Id.*].  High conductivity has "ecosystem-scale importance," given the vital role such aquatic life plays in headwater streams, "where rivers are born." [FG004702-03, 4709 (citations omitted)]; *see also* [FG001670-73 (describing impacts on water quality, aquatic life and ecosystems)].  Further, the EPA Science Advisory Board, in performing peer review, recognized that the lower end of this range, 300 µS/cm is likely not protective enough.  [FG005455 & n.19; FG001301].

6

In the Guidance, EPA advised its staff to consider the fact that because science showed elevated conductivity harms aquatic life many state National Pollution Discharge Elimination System ("NPDES" or § 402) permits would need effluent limitations to satisfy narrative water quality standards under existing CWA requirements, *e.g.*, 33 U.S.C. § 1311(b)(1)(C) and 40 C.F.R. § 122.44(d)(1). [FG005455-58]. EPA also noted this range for its staff's consideration under § 404. [FG005471].

Second, based on its permit quality review, EPA further recommended that staff consider whether the state permitting agency had assessed the potential for proposed discharges to cause any excursion of water quality standards through a "reasonable potential analysis" under 40 C.F.R. § 122.44(d)(1). [FG005453].

In offering these recommendations, the Guidance discussed and relied on existing Clean Water Act requirements including: section 301 of the Act, which prohibits a discharge into waters without a valid permit that includes effluent limitations necessary to protect water quality, 33 U.S.C. § 1311; 40 C.F.R. § 122.44(d)(1) which implements this provision in part by requiring a pre-permit analysis of whether proposed discharges may undermine water quality; applicable state water quality standards which prohibit harm to aquatic life; and the 404(b)(1) Guidelines' requirements to prevent harm to water quality and significant

degradation of waters. *See, e.g.*, [FG005450-58, FG005491-93 (citing

Appalachian states' water quality standards); FG005466, 5469-72].

### D.    District Court Ruling

The district court set aside these actions after finding they violated the Clean

Water Act, and on grounds as described by Federal Defendants-Appellants.

## SUMMARY OF ARGUMENT

For years while surface mining expanded in the Appalachian states and mining waste disposal destroyed and contaminated waterways, Federal Defendants-Appellants EPA and the Corps failed to do their basic job under the Clean Water Act: to protect waters from environmental harm.  In the meantime, a mountain of peer-reviewed scientific research piled up, demonstrating that surface mining and its waste cause devastating harm to Appalachian watersheds.  Miles and miles of streams were buried and harmful conductivity increased in streams used as dumps for mining waste, destroying entire cohorts of the building blocks of aquatic life and impairing the health of waterways on which local communities depend.

Federal Defendants-Appellants finally realized they had to do something. The interagency review process and EPA Guidance—although they are but a pale shadow of the action needed—represented important first steps to protect waters threatened by mining waste disposal.  The district court's ruling vacating these actions should be reversed and EPA must be allowed to exercise its Clean Water Act authority.

Environmental Intervenor-Appellants focus on three issues:

1.    **Conductivity.**  EPA had authority to recommend its staff consider the scientific evidence of harm from conductivity. Unfortunately, as the record shows, EPA has not yet done what Environmental Intervenor-Appellants have urged is necessary to protect Appalachian streams: the federal promulgation of a water quality standard for conductivity.  EPA has just issued guidance to assist its staff in considering whether to block permits based on existing legal requirements and current science.  Although EPA could – and should – promulgate a federal water quality standard for conductivity in Appalachia, EPA had full authority to act more narrowly by providing scientific information on environmental harm that is relevant to EPA's permit review and objection authority.

2.    **Reasonable Potential Analysis.**  Existing Clean Water Act requirements authorize EPA's recommendation in Guidance that staff evaluate whether states have performed the analysis required to set permit limits.  A proposed discharge's potential to harm water quality and whether a permit contains effluent limitations are relevant considerations for EPA in deciding whether to object to that permit.  Any past failure to press CWA requirements was a failure of neglect that EPA could lawfully encourage its staff to end.

3.    **Enhanced Coordinated Review.**  EPA and the Corps have legal authority to coordinate their review of fill permit applications that raise serious

10

environmental concerns.  Coordinated review advances the purpose of the Act and is consistent with the roles that Congress accorded to these agencies.

In sum, the challenged policy documents reaffirmed important science and existing legal requirements to address a dire environmental problem.  This case would not exist if EPA and the Corps had decided behind closed doors to adhere to and enforce the Clean Water Act, rather than issue these documents to serve the interests of transparency and notice for the public and regulated entities.  The district court's ruling punished the agencies for informing the public regarding their plan to begin vigorously assessing the compliance of new permits with longstanding requirements designed to protect the integrity of U.S. waters.  The district court's decision must be reversed to afford affected communities the benefit of EPA's full participation in the permitting process and to protect the Appalachian environment before it is too late for the region's waterways.

## STANDING

The district court found that Environmental Intervenors have Article III standing and granted their motion to intervene.  *See* [Dkt. 20 at 2].  On appeal, the Court need not separately address Environmental Intervenor-Appellants' standing because they only raise issues also raised by Federal Defendants-Appellants, who plainly have standing.  *See, e.g.*, *McConnell v. FEC*, 540 U.S. 93, 233 (2003),

11

*overruled on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010); *Diamond v. Charles*, 476 U.S. 54, 64 (1986) ("ability to ride 'piggyback' on [state government appellant's] undoubted standing exists . . . if the [government] is . . . an appellant before the Court"); *see also Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (one appellant's standing is sufficient for jurisdiction); *NRDC v. EPA*, 489 F.3d 1364, 1370-71 (D.C. Cir. 2007) (same).

Regardless, Environmental Intervenor-Appellants have Article III standing to bring this appeal on behalf of their members who live and recreate near waterways that are protected by the challenged policy documents and threatened by mining companies' plans to dump mining waste.  Declarations (attached); *see, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181, 183 (2000).  The district court's vacatur of the Guidance and interagency coordination removed the protection these procedural documents were intended to provide for Appalachian streams and Environmental Intervenor-Appellants' members' interests in those streams, by impairing EPA's ability to use its authority to strengthen compliance with existing legal requirements, pursuant to CWA § 404(c), 33 U.S.C. § 1344(c), and § 402(d), *id.* § 1342(d), and making harm to Environmental Intervenor-Appellants' interests more likely.  *See, e.g.*, [FG005440 (describing Guidance's goal of "improving compliance" with existing

environmental requirements); FG005442-46 (describing goals of addressing environmental harm); ECP000011-12, 14 (describing interagency goal of reducing environmental harm)].  This Court could provide redress by reversing the district court and reinstating the challenged documents so EPA may exercise its authority and fulfill its responsibility to protect Appalachian waters and Environmental Intervenor-Appellants' interests in them.

## STANDARD OF REVIEW

This Court reviews the district court's ruling *de novo* as Federal Defendants-Appellants have explained.

## ARGUMENT

**I.    EPA'S STAFF GUIDANCE ON CONDUCTIVITY AND THE REASONABLE POTENTIAL ANALYSIS IS CONSISTENT WITH THE CLEAN WATER ACT.**

### A.    EPA Has Authority To Provide Guidance To Its Staff Regarding The Science On Conductivity.

EPA issued the Guidance to provide its staff with information on peer-reviewed science showing that conductivity within and above the range of 300-500 μS/cm causes harm to aquatic life in Appalachian streams receiving mining waste. [FG005444, FG005455, FG005457-58].  The district court ruled that EPA violated the CWA by recommending that its staff consider this fact.  [Doc. 167 at 27].  The court's decision rested mainly on its view that EPA's recommendation was a

13

legally binding final action and that EPA must act in this area, if at all, only "to establish water quality standards" through the section 303 process, 33 U.S.C. § 1313. [*Id.* at 26]. The district court also noted Plaintiffs-Appellees' argument that EPA had "infring[ed] on the State's role," and found the Guidance violated the Act because it "removes the reasonable potential analysis from the realm of state regulators." [*Id.* (citing Pls.' Mem. at 32); *id.* at 32]. The district court erred on both grounds.

First, the Guidance did not set a federal standard, as shown on its face and by the record, and as explained by Federal Defendants-Appellants. Fed. Br. at 68-71. EPA provided scientific information on aquatic harm caused by conductivity to assist its staff in evaluating whether permits complied with existing requirements. [FG005455, 5457]. The Court should uphold the Guidance because such scientific information is relevant to EPA's review of permit applications pursuant to section 402, 33 U.S.C. § 1342, and existing regulations, particularly 40 C.F.R. § 122.44(d)(1). [FG005450-58].

On the issue of conductivity, the district court ignored the regulation EPA relied on, 40 C.F.R. § 122.44(d)(1), that explicitly requires states to set effluent limits in permits to ensure compliance with narrative water quality standards and thereby implement the statutory directive in section 301, 33 U.S.C. §

14

1311(b)(1)(C).  [Doc. 167 at 26-27]; [FG005450, 5456].  This Court should reverse because the Guidance lawfully provided staff with recommendations for bringing EPA's review of permits into line with current science and these important existing legal requirements.  [FG005449 (stating that after staff consideration of the Guidance's recommendations, "[a]ny objection would be based on applicable requirements of the CWA and implementing regulations.").]  The authority of EPA staff to evaluate and decide whether to object to state permits is not disputed, and fully allows the Guidance's discussion of conductivity.

Specifically, to assess whether proposed pollution discharges will violate water quality standards, the regulations require state permit agencies to conduct a "reasonable potential" analysis.  40 C.F.R. § 122.44(d)(1)(i)-(vi).  As EPA explained, "[t]his language [*i.e.*, "reasonable potential"] is necessary to assure that effluent limits attain and maintain water quality standards."  EPA, National Pollutant Discharge Elimination System; Surface Water Toxics Control Program, 54 Fed. Reg. 23,868, 23,875-76 (June 2, 1989).  Whenever the potential exists for a pollutant to exceed narrative water quality standards, state permit agencies must establish effluent limits in permits to prevent an excursion from these standards in the water that will receive the discharge.  40 C.F.R. § 122.44(d)(1), (d)(1)(i), (d)(1)(vi); *Am. Paper Inst. Inc. v. EPA*, 996 F.2d 346, 350-51 (D.C. Cir. 1993).

15

"This connection is inherent in section 301(b)(1)(C) of the Clean Water Act which requires that water quality standards be achieved through effluent limitations." 54 Fed. Reg. at 23,872; *see also id.* at 23,873-76. Under 40 C.F.R. § 122.44(d)(1)(vi), states must set effluent limits on the relevant pollutant using "relevant information" (or on an indicator parameter of concern if certain conditions are met). 40 C.F.R. § 122.44(d)(1)(vi)(A)-(C). [2]

It was reasonable for EPA to recognize that scientific studies on conductivity are both pertinent to the reasonable potential analysis already required under this regulation, 40 C.F.R. § 122.44(d)(1)(i), and an example of "relevant information" in setting permit limits for a pollutant under § 122.44(d)(1)(vi) where there are applicable narrative standards. The science shows that pollutants that increase conductivity contribute to biological impairment of aquatic life downstream from surface mines, such that a permit limit is needed to comply with state narrative standards and protect affected streams. *See, e.g.*, [FG005450, FG005483-86

---

[2] Contrary to the district court's conclusion, [Dkt. 167 at 30 n.12], this regulation applies in all instances where states have narrative, not numeric standards, which is true for Plaintiffs-Appellees. 54 Fed. Reg. at 23,875 (explaining that subparagraph (vi) applies when a state has a narrative standard but "the permitting authority does not have a numeric criterion to use for deriving a water quality-based effluent limit"); [FG005491-93 (citing WV and KY state narrative (not numeric) water quality standards)]; Fed. Br. 68 n.7.

16

(citing FG001286-1561, FG001562-1714), FG001301, FG001343, FG001578-80;

FG000961A-1 to A-4].  In Appalachia, states have narrative standards that prohibit

harm to aquatic life, such as the harm caused by conductivity.  [FG005491-93]

(citing state standards).  Thus 40 C.F.R. § 122.44(d)(1)(vi), combined with EPA's

oversight authority under section 402, fully authorized EPA to provide information

on conductivity to its staff in reviewing NPDES permits' compliance with the Act.

    Second, the Guidance does not undermine state authority or otherwise

violate Section 303 or 402.  States must follow federal law and regulations "at all

times."  33 U.S.C. § 1342(c)(2); *see* 40 C.F.R. § 123.25(a).  Section 402(d)(2)

gives EPA ultimate authority to object to state permits that do not comply with the

Act and implementing regulations, including 40 C.F.R. § 122.44(d).  33 U.S.C. §

1342(d)(2); *see* 40 C.F.R. § 123.44(c)(8); *id.* § 122.4 (prohibiting issuance of a

permit that does not comply with all applicable CWA requirements or ensure

compliance with state water quality standards).  Based on the science and these

existing legal requirements, EPA would have ample authority to object to NPDES

permits that do not include conductivity limits, and it was lawful for EPA to advise

its staff of this, contrary to the district court's conclusion.

    Whatever a state permitting agency may think about conductivity, and

whether or not a state believes there is reasonable potential for it to cause

17

excursions above narrative standards, EPA may make its own independent determination and object to a state permit under Section 402(d)(2), 33 U.S.C. § 1342(d)(2). *See also* 40 C.F.R. § 123.44(c)(8) (listing bases for objections, including: "The effluent limits of a permit fail to satisfy the requirements of 40 CFR 122.44(d)."); *id.* § 123.25(a)(15) (requiring state programs to follow § 122.44 ("establishing NPDES permit conditions")). EPA may apply the current, peer-reviewed science described in the Guidance even if states refuse to do so. The Act gives EPA, not the states, the last word on the subject. And EPA's authority to object encompasses the ability to communicate with its staff about science and existing legal requirements relevant to the exercise of that authority.

If anything, by using guidance to facilitate the case-by-case permit objection decision process rather than setting a federal standard, EPA allowed states too much leeway on the issue of conductivity. Given the states' ongoing reluctance to follow existing CWA requirements, EPA should issue a federal standard under section 303(c)(4)(A) or (B), 33 U.S.C. § 1313(c)(4)(A)-(B). *See* [FG004834, FG004837-38, FG4854-55 (permit quality review)]. But the fact that EPA has not

done so casts no doubt on its decision to issue staff guidance to try to end the

neglect of longstanding legal requirements.  [FG005450-58, FG005491-93].[3]

**B.    EPA's Recommendation of a Pre-Permit Reasonable Potential Analysis Is Consistent With the Act.**

In the Guidance, EPA recommended its staff evaluate whether states had

performed the analysis of the "reasonable potential" for a discharge to cause an

excursion above state narrative standards before authorizing a permit for that

discharge. [FG005453 ("[P]ermitting authorities should not defer reasonable

potential analyses until after permit issuance.")].  The district court ruled that this

violated the Act, finding that the reasonable potential analysis could be deferred

until after permit issuance. [Doc. 167 at 32-33].

The Court should reverse.  The Clean Water Act and regulations already

require a pre-permit analysis to prevent water quality violations.  This is true, first,

because a pre-permit analysis is the only way to implement the statute's

requirement that permits contain effluent limitations ensuring compliance with

water quality standards.  CWA § 301(b)(1)(C) mandates permit limitations

"necessary to meet water quality standards . . . or required to implement any

_____

[3] The district court did not state that it was setting aside the Guidance's discussion of conductivity under section 404, 33 U.S.C. § 1344, but to the extent it did so, this Court should uphold the Guidance under section 404, as explained in Part II below.

applicable water quality standard." 33 U.S.C. § 1311(b)(1)(C). As this Court has

recognized, Congress made its intent clear "in section 301 of the CWA, that <u>all</u>

state water quality standards be enforced through meaningful limitations in

individual NPDES permits." *Am. Paper*, 996 F.2d at 351. This means narrative

standards, in addition to numeric. *Id.* at 350.

      EPA regulations contain the same requirement: no NPDES permit may be

issued without ensuring "compliance with the applicable water quality

requirements of all affected States." 40 C.F.R. § 122.4(a), (d); *see* 40 C.F.R. §

123.25(a) (applying EPA regulations to state programs). The regulations further

provide that all NPDES permits must "[a]chieve water quality standards

established under section 303 of the CWA, including State narrative criteria for

water quality." *Id.* § 122.44(d)(1). The Guidance reaffirms these same statutory

and regulatory requirements, stating: "[u]nder the CWA and its implementing

regulations, an NPDES permit must contain limits as stringent as necessary to meet

applicable water quality standards." [FG005453 (citing 33 U.S.C. § 1311(b)(1)(C);

40 C.F.R. § 122.44(d)(1))]; Fed. Br. at 66. By suggesting that states may refuse to

consider the potential for water quality violations before issuing permits, the

district court's ruling undermines these statutory and regulatory requirements.

Second, a pre-permit analysis implements the requirement that permits contain effluent limitations whenever a discharge has the "potential" to cause an excursion above a narrative water quality standard.  40 C.F.R. § 122.44(d)(1)(i), (vi).  The regulation mandates an analysis of this "potential" because if such potential exists, the state must translate the narrative standard into chemical-specific effluent limits to attain that standard.  *Id.* § 122.44(d)(1)(i)-(ii), (vi).  This regulation has applied for more than twenty years and this Court has affirmed its legality.  54 Fed. Reg. at 23,875-77; [FG003587, 3654 (EPA, Technical Support Document for Water Quality-based Toxics Control at 48 (Mar. 1991)) (cited by 2011 Guidance, [FG005453 & n.15] (explaining that states must investigate chemicals that "may be contributing to aquatic toxicity" but for which the state "has not adopted numeric criteria"))]; *Am. Paper*, 996 F.2d at 350-51.  Thus, not only must permits prevent excursions from narrative standards by setting effluent limitations, they must do so whenever a discharge creates the possibility, or "potential," for such an excursion, just as the Guidance stated. [FG005456 (citing 40 C.F.R. § 122.44(d)(1)(vi))].

Under this regulatory framework, a state cannot issue a permit without effluent limitations ensuring that the permitted discharge will comply with water quality standards.  It also cannot issue a permit that has the "potential" to cause an

21

exceedance of a narrative standard without including effluent limitations to prevent this.  The only way to meet each requirement is to perform the required analysis <u>before</u> permit issuance, because if such potential exists the permit must include chemical-specific effluent limits.

The district court erred by refusing to apply the statutory requirements of Section 301, as implemented by 40 C.F.R. § 122.44(d)(1).  In addition, it misinterpreted § 122.44(d)(1)(i)-(vi), finding that the use of the present as well as future tense suggested that a pre-permit analysis is optional. [Doc. 167 at 32].  That is not a reasonable reading of the regulation.  To ensure compliance with the CWA and applicable water quality requirements including § 122.44(d)(1), states must assess both present impacts (if any) and potential future impacts.  If states could avoid assessing a permit's future impact before issuance, this would fatally undermine the NPDES program and the water quality objectives it implements.

The regulation's use of specific terms that have a temporal focus on the future – "may be discharged," and "potential to cause" – confirms that the regulation requires an analysis of the proposed permit's impact in the future.  *See, e.g.*, *James v. United States*, 550 U.S. 192, 207 n.5 (2007) (finding that the term "potential" anticipates a "probabilistic" concept and citing "Black's Law Dictionary 1188 (7th ed.1999) (potential: "[c]apable of coming into being;

22

possible"); . . . Webster's Third New International Dictionary 1775 (1971)
(potential: "existing in possibility: having the capacity or a strong possibility for
development into a state of actuality")"). Further, "[a]s the term 'reasonable
potential' suggests, there need only be a reasonable possibility that any particular
discharge of the pollutant is contributing to the exceedance" to show an effluent
limitation is needed. *Am. Iron & Steel Inst. v. EPA*, 115 F.3d 979, 1000 (D.C. Cir.
1997) (affirming presumption of reasonable potential in EPA's Great Lakes
guidelines, where source contributed to waters in which fish-tissue standard was
exceeded).

Contrary to the district court's concern about the use of both present and
future tense, requiring state permit agencies to assess both any present impact and
any future impact before permit issuance is logical because the regulation applies
to "each NPDES permit." 40 C.F.R. § 122.44. Not all proposed permits are for
brand-new discharges. For example, issued permits can be renewed if appropriate
every five years, and may be modified in the meantime. *See, e.g.*, 33 U.S.C. §
1342(b)(1)(B) (permit terms may not exceed five years); *see also id*. §
1342(b)(1)(C) and 40 C.F.R. §§ 122.62(a)(2), 124.5 (permit modifications). In the
case of proposals to renew or modify a permit for an existing source, 40 C.F.R. §
122.44(d)(1) requires a pre-permit analysis to include an assessment of the impact

23

of any existing discharges as well as the reasonable potential of the new discharge
to cause harm.

If there were any ambiguity in existing regulatory requirements, EPA's
recommendation that its staff evaluate whether there was a pre-permit analysis is at
least reasonable as an interpretation of section 301(b)(1)(C), 33 U.S.C. §
1311(b)(1)(C), and consistent with 40 C.F.R. § 122.44(d)(1).  The regulation must
be read as implementing the core purpose of the Act: "to restore and maintain the
chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. §
1251(a), implemented through a prohibition on discharges without a valid permit
that ensures compliance with water quality standards, *id.* § 1311(a)-(b).  These
provisions would have no meaning if a state may issue a permit without first
determining whether it will weaken water quality.  Doing so would defeat the
purpose of requiring a permit before a discharge: to prevent harm to U.S. waters.

Finally, that EPA has not always objected to NPDES permits in the past
based on the lack of a reasonable potential analysis does not prevent EPA from
recognizing the need to do so now.  The record shows that "[d]ischarges from
Appalachian surface coal mining activities have been found to have a high
potential to impact aquatic life uses." [FG005450 (citing FG002814-34 (Pond
2008)); FG005464 (citing FG005166-86 (Merriam 2011)) ("[M]any surface coal

24

mining operations are proposed in watersheds already significant impacted by previous mining activities . . . .”)]. A wealth of information is now available on the “reasonable potential” for new mining waste discharges to harm water quality because of the “acutely lethal” harm similar mines have caused to aquatic life. [FG005484; FG005445]. And EPA always has authority to align its policy and practice with existing law, just as past legal evasion provides no justification for ongoing failures. *See, e.g.*, *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 437 (1968) (“The fact that the statute lay partially dormant for many years cannot be held to diminish its force today.”) (internal quotation omitted); *see also New Jersey v. EPA*, 517 F.3d 574, 583 (D.C. Cir. 2008) (“[P]revious statutory violations cannot excuse the one now before the court.”). EPA has a legal responsibility that “includes preserving the long-term chemical, physical, and biological integrity of Appalachian watersheds, and maintaining safe, clean, and abundant water for Appalachian communities” and the record as cited in EPA’s Guidance and in the facts section, above, shows a strong need for its action here. [FG005442-43].

## II. EPA’S PARTICIPATION IN THE INTERAGENCY REVIEW AND SCREENING PROCESS IS AUTHORIZED BY SECTION 404 OF THE CLEAN WATER ACT.

The district court vacated the interagency review and screening procedure after finding that EPA had “expanded its role in the issuance of Section 404

permits and . . . thus exceeded the statutory authority afforded to it by the Clean Water Act." [Doc. 96 at 11-12]. The Court should reverse this holding because the clear language of that provision, particularly section 404(c), gives EPA the ultimate authority to prevent fill discharges. No more specific authorization for this interagency process and screening procedure is required, as explained by Federal Defendants-Appellants. Fed. Br. at 33-34.

In Section 404(c) of the Clean Water Act, 33 U.S.C. § 1344(c), Congress made the explicit and careful choice to give EPA "the final say" and thus supreme authority to control discharges of fill material, even where it disagrees with the Corps on a specific permit. *Mingo*, 2013 WL 1729603 at *5. As this Court has explained, "the unambiguous language of subsection 404(c) manifests the Congress's intent to confer on EPA a broad veto power extending beyond the permit issuance." *Id.* at *4. Specifically, the Act authorizes EPA to "veto" a Corps permitting decision "whenever" EPA determines that a discharge will have an "unacceptable adverse effect," and makes all Corps § 404 permitting decisions "[s]ubject to subsection (c) of [section 404]." *Id.* at *1 (citing 33 U.S.C. § 1344(b)-(c)). When EPA issues such a veto, it prevents the Corps from issuing a permit or nullifies the relevant specifications contained in that permit, and there is "no temporal limit" on its ability to do so. *Id.* at *4, 5. Thus, Corps permit decisions

26

are "[s]ubject to" EPA's 404(c) authority at every step, from the beginning when it must follow EPA guidelines, 33 U.S.C. § 1344(b)(1), and at any time during or after the permitting process if the Corps fails to prevent an unacceptable adverse effect to aquatic resources, *id.* § 1344(c). *Mingo*, 2013 WL 1729603 at *1; *see also James City County v. EPA*, 12 F.3d 1330, 1336 (4th Cir. 1993) ("Ultimately, . . . recognizing the EPA's expertise and concentrated concern with environmental matters, Congress gave the final decision whether to permit a project to [EPA]," in a "broad grant of power.").

As this Court has recognized, section 404(c) grants EPA "broad environmental 'backstop' authority." *Mingo*, 2013 WL 1729603 at *3. But the district court turned section 404 on its head by finding this provision instead "provides an express limitation" on EPA's authority. [Doc. 96 at 9]. It decided that, because the Corps has permitting authority, it also must have sole authority over any "responsibility involving the permitting process [that] has not been delegated to the EPA by Congress." [*Id.* at 10]. This was error. In fact, the statute makes the Corps' authority "[s]ubject to" EPA's veto authority at all times. 33 U.S.C. § 1344(b); *Mingo*, 2013 WL 1729603 at *1. Thus the grant of authority to EPA under section 404(c) includes not only the final ability to veto a permit, but also the ability to engage in coordination with the Corps as part of the investigative

27

authority needed to veto.  Rather than create a "statutory ceiling" on EPA's authority, [Doc. 96 at 10], section 404(c) fully authorizes EPA to screen permit applications and communicate with the Corps as the agencies deem appropriate before deciding whether to initiate a section 404(c) veto.

Although no further authorization for coordination is needed, section 404(c) also provides it. "Before making [a section 404(c)] determination, the Administrator shall consult with the Secretary."  33 U.S.C. § 1344(c).  Section 404 expressly contemplates consultation between EPA and the Corps "[b]efore" a veto determination.  This authority encompasses the interagency review at issue here. In addition, section 404(q) not only authorizes but requires the Corps to "enter into agreements" with EPA (and other agencies) to address the permitting process.  33 U.S.C. § 1344(q). The district court acknowledged this provision, but failed to acknowledge that it is yet another express authorization of interagency coordination.  [Doc. 96 at 10].

Federal Defendants-Appellants deemed it necessary to engage in the interagency review to assist both agencies, including EPA, to exercise their section 404 authority.  [ECP000024] ("Full and open sharing of information among the agencies is necessary for efficient review of proposed projects.").  At the end of the process, they agreed that EPA would "either (1) advise the Corps district that it

does not intend to pursue further action . . . or (2) initiate action under CWA

Section 404(c)." *Id.*; *see also* [ECP000018-000019] (noting that after EPA's

review, it may take further action such as a veto to "restrict or prohibit the use of a

site" under section 404(c)). An agency's "judgment about the best regulatory tools

to employ in a particular situation is . . . entitled to considerable deference." *W.*

*Union Int'l  v. FCC*, 804 F.2d 1280, 1292 (D.C. Cir. 1986); *cf. FTC v. Texaco,*

*Inc.*, 555 F.2d 862, 872 (D.C. Cir. 1977) (en banc) (affirming agency subpoena

authority because the "very backbone of [its] effectiveness in carrying out the

congressionally mandated duties of industry regulation is the rapid exercise of the

power to investigate") (quotation and citation omitted). Besides, it is unclear how

there could be an infringement on the Corps' section 404 authority when the Corps

itself is an integral part of the process and continues to exercise each element of its

authority granted under section 404.

  The practical consequence of the district court's ruling – that EPA may not

screen or review permit applications, or discuss them with the Corps before

deciding whether to exercise its veto power – is to revoke tools that EPA needs to

use its authority effectively and responsibly, to do its job to administer the Act,

protect clean water, and prevent unacceptable harm to aquatic resources. 33

U.S.C. §§ 1251(a), (d), 1344(c). EPA could veto, but it could not screen potential

permit applications or review potential Corps' permit decisions in order to decide whether to do so.  It would have to rely on public notice of a permit application to find out about a proposed permit or offer any comments.[4]  EPA and Corps staff could not discuss the complex records of permit applications.

EPA's past use of its veto power – meticulous and rare – only confirms the importance of careful investigation by EPA, including consultation with the Corps, to decide whether to veto.  EPA may not initiate section 404(c) action unless it has "reason to believe" this is necessary.  *See* 40 C.F.R. § 231.3(a) (also requiring EPA to evaluate available information "including any record developed under the section 404 referral process").  EPA's "decision to initiate proceedings under [section 404(c)] requires a fact-specific inquiry and evaluation of factors unique to the specific project in question."  *City of Alma v. U.S.*, 744 F. Supp. 1546, 1562 (S.D. Ga. 1990).  For the thirteen veto determinations it has issued since 1972, EPA has created comprehensive records to support its decision.[5]  This is partly

---

[4] Public notice has often been limited.  *See, e.g.*, *OVEC v. U.S. Army Corps of Eng'rs*, 674 F. Supp. 2d 783, 802, 808 (S.D. W. Va. 2009) (ruling that Corps failed to provide meaningful notice and comment on proposed § 404 fill permit for surface mining waste disposal).

[5] http://water.epa.gov/lawsregs/guidance/wetlands/404c.cfm (last visit May 5, 2013) (chronological list of Section 404(c) determinations); *see also James City County*, 12 F.3d at 1338 (affirming veto); *Bersani v. EPA*, 850 F.2d 36, 47 (2d Cir.

because, although EPA has authority to veto "whenever" it makes the required

determination, 33 U.S.C. § 1344(c); *Mingo*, 2013 WL 1729603 at *4, it is "EPA's

policy to try to resolve environmental problems before permit issuance" when

possible. 44 Fed. Reg. at 58,077. Therefore, while § 404(c) may be "regarded as a

tool of last resort," it also gives EPA a "tool of 'first resort'" at earlier stages of the

permit process, which includes the type of coordination and consultation

challenged here. *Id.* at 58,080.

The 2011 veto of waste disposal specifications for the Spruce No. 1 Mine in

West Virginia provides an example of the need for a full and careful review of the

type of permit applications in the backlog because it is similar to other proposals

selected for enhanced review due to the size of their environmental impact.[6] In

_____

1988) (upholding veto); *City of Alma*, 744 F. Supp. at 1556  (upholding veto);
*Creppel v. Army Corps of Eng'rs*, CIV. A. No. 77-25, 1988 WL 70103, at *4 (E.D.
La. June 29, 1988) (upholding veto); *see also Alameda Water & Sanitation Dist. v.
Reilly*, 930 F. Supp. 486, 493 (D. Colo. 1996) (dismissing due to lack of standing
but noting "[t]he massive administrative record" supporting veto).

[6] *See* [ECP000020, 22]; EPA, Final Determination of the Ass't Adm'r for Water
Pursuant to Section 404(c) of the Clean Water Act Concerning the Spruce No. 1
Mine, Logan County, WV at 26-90 (Jan. 13, 2011) (describing similar site
characteristics and unacceptable adverse impacts as identified in MIRA/ECP
screening process),
http://water.epa.gov/lawsregs/guidance/cwa/dredgdis/upload/Spruce_No-
_1_Mine_Final_Determination_011311_signed.pdf, notice provided at 76 Fed.
Reg. 3126, 3127 (Jan. 19, 2011).  In litigation on this determination, this Court

upholding EPA's authority to veto after permit issuance, this Court also recognized that "EPA should review the preliminary specifications *pre*-permit to determine whether discharges will have the required 'unacceptable adverse effect' . . . as it also did [for Spruce]." *Mingo*, 2013 WL 1729603 at *6 (also noting at *5, EPA's description of "extensive coordination process during which EPA can review the Corps's statement of findings/record of decision") (quoting Appellee Br. 31). The district court's approach would hamstring EPA's ability to utilize the veto power.

Finally, the Court should reverse not only because the district court's ruling harms the Executive Branch and undermines EPA's ability to do its job, Fed. Br. at 36, but also because it weakens vital protection for the environment and public interest. The permit applications covered by the interagency review and screening process are the worst of the worst – those "about which the agencies have substantial environmental concerns." [ECP000020, 22]. Communities that would be affected by the proposed permits need EPA to have full authority to protect them from unacceptable environmental harm, just as Congress intended by enacting section 404(c), 33 U.S.C. § 1344(c). *Mingo*, 2013 WL 1729603 at *3.

---

affirmed EPA's post-permit withdrawal authority and remanded the case to the district court for further proceedings. *See Mingo*, 2013 WL 1729603 at *1.

## CONCLUSION

Therefore, this Court should reverse the district court.

DATED: May 6, 2013                  Respectfully Submitted,

                                    /s/ *Emma C. Cheuse*

                                    Emma C. Cheuse
                                    Jennifer C. Chavez
                                    EARTHJUSTICE
                                    1625 Massachusetts Ave., N.W., Suite 702
                                    Washington, D.C. 20036-2243
                                    Telephone: (202) 667-4500
                                    Fax: (202) 667-2356
                                    echeuse@earthjustice.org
                                    jchavez@earthjustice.org

                                    Derek O. Teaney
                                    APPALACHIAN MOUNTAIN
                                    ADVOCATES
                                    P.O. Box 507
                                    Lewisburg, WV 24901
                                    Telephone: (304) 793-9007
                                    Fax: (304) 645-9008
                                    E-mail: dteaney@appalmad.org

                                    *Counsel for Environmental Intervenor-*
                                    *Appellants Sierra Club, Coal River*
                                    *Mountain Watch, Kentuckians For The*
                                    *Commonwealth, Ohio Valley Environmental*
                                    *Coalition, Southern Appalachian Mountain*
                                    *Stewards, Statewide Organizing for*
                                    *Community Empowerment, and West*
                                    *Virginia Highlands Conservancy*

## CERTIFICATE OF COMPLIANCE

Counsel hereby certifies that, in accordance with Federal Rules of Appellate Procedure 32(a)(7)(C), and 29(d) (and except for the portions of the brief described in FED. R. APP. P. 32(a)(7)(B)(iii)), the foregoing Environmental Intervenor-Appellants' Proof Brief contains 6,999 words, as counted by counsel's word processing system.

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman, 14-point.

DATED: May 6, 2013

/s/ *Emma C. Cheuse*
Emma C. Cheuse

34

## CERTIFICATE OF SERVICE

I hereby certify that I have served the foregoing Proof Brief of

Environmental Intervenor-Appellants Sierra Club *et al.* on all parties through the

Court's electronic case filing (ECF) system.


DATED: May 6, 2013

/s/ *Emma C. Cheuse*
Emma C. Cheuse

## STATUTORY AND REGULATORY ADDENDUM

## TABLE OF CONTENTS

REGULATIONS                                    Addendum page

40 C.F.R. § 122.62 ...................................................................................1

40 C.F.R. § 123.25 ...................................................................................5

40 C.F.R. § 124.5 .....................................................................................9

40 C.F.R. § 230.1 ...................................................................................11

40 C.F.R. § 231.1 ...................................................................................12

40 C.F.R. § 231.2 ...................................................................................13

40 C.F.R. § 231.3 ...................................................................................13

40 C.F.R. § 231.4 ...................................................................................15

40 C.F.R. § 231.5 ...................................................................................17

40 C.F.R. § 231.6 ...................................................................................18

40 C.F.R. § 231.7 ...................................................................................18

40 C.F.R. § 231.8 ...................................................................................19

# 40 C.F.R. § 122.62

§ 122.62 Modification or revocation and reissuance of permits (applicable to State programs, see § 123.25).

Effective: December 22, 2008

When the Director receives any information (for example, inspects the facility, receives information submitted by the permittee as required in the permit (see § 122.41), receives a request for modification or revocation and reissuance under § 124.5, or conducts a review of the permit file) he or she may determine whether or not one or more of the causes listed in paragraphs (a) and (b) of this section for modification or revocation and reissuance or both exist. If cause exists, the Director may modify or revoke and reissue the permit accordingly, subject to the limitations of § 124.5(c), and may request an updated application if necessary. When a permit is modified, only the conditions subject to modification are reopened. If a permit is revoked and reissued, the entire permit is reopened and subject to revision and the permit is reissued for a new term. See § 124.5(c)(2). If cause does not exist under this section or § 122.63, the Director shall not modify or revoke and reissue the permit. If a permit modification satisfies the criteria in § 122.63 for "minor modifications" the permit may be modified without a draft permit or public review. Otherwise, a draft permit must be prepared and other procedures in Part 124 (or procedures of an approved State program) followed.

(a) Causes for modification. The following are causes for modification but not revocation and reissuance of permits except when the permittee requests or agrees.

(1) Alterations. There are material and substantial alterations or additions to the permitted facility or activity (including a change or changes in the permittee's sludge use or disposal practice) which occurred after permit issuance which justify the application of permit conditions that are different or absent in the existing permit.

Note: Certain reconstruction activities may cause the new source provisions of § 122.29 to be applicable.

(2) Information. The Director has received new information. Permits may be modified during their terms for this cause only if the information was not available at the time of permit issuance (other than revised regulations, guidance, or test methods) and would have justified the application of different permit conditions at the time of issuance. For NPDES general permits (§ 122.28) this cause includes any information indicating that cumulative effects on the environment are unacceptable. For new source or new discharger NPDES permits §§ 122.21, 122.29), this cause shall include any significant information derived from effluent testing required under § 122.21(k)(5)(vi) or § 122.21(h)(4)(iii) after issuance of the permit.

(3) New regulations. The standards or regulations on which the permit was based have been changed by promulgation of amended standards or regulations or by judicial decision after the permit was issued. Permits may be modified during their terms for this cause only as follows:

(i) For promulgation of amended standards or regulations, when:

(A) The permit condition requested to be modified was based on a promulgated effluent limitation guideline, EPA approved or promulgated water quality standards, or the Secondary Treatment Regulations under Part 133; and

(B) EPA has revised, withdrawn, or modified that portion of the regulation or effluent limitation guideline on which the permit condition was based, or has approved a State action with regard to a water quality standard on which the permit condition was based; and

(C) A permittee requests modification in accordance with § 124.5 within ninety (90) days after FEDERAL REGISTER notice of the action on which the request is based.

(ii) For judicial decisions, a court of competent jurisdiction has remanded and stayed EPA promulgated regulations or effluent limitation guidelines, if the remand and stay concern that portion of the regulations or guidelines on which the permit condition was based and a request is filed by the permittee in accordance with § 124.5 within ninety (90) days of judicial remand.

(iii) For changes based upon modified State certifications of NPDES permits, see § 124.55(b).

(4) Compliance schedules. The Director determines good cause exists for modification of a compliance schedule, such as an act of God, strike, flood, or materials shortage or other events over which the permittee has little or no control and for which there is no reasonably available remedy. However, in no case may an NPDES compliance schedule be modified to extend beyond an applicable CWA statutory deadline. See also § 122.63(c) (minor modifications) and paragraph (a)(14) of this section (NPDES innovative technology).

(5) When the permittee has filed a request for a variance under CWA section 301(c), 301(g), 301(h), 301(i), 301(k), or 316(a) or for "fundamentally different factors" within the time specified in §§ 122.21 or 125.27(a).

(6) 307(a) toxics. When required to incorporate an applicable 307(a) toxic effluent standard or prohibition (see § 122.44(b) ).

(7) Reopener. When required by the "reopener" conditions in a permit, which are established in the permit under § 122.44(b) (for CWA toxic effluent limitations and Standards for sewage sludge use or disposal, see also § 122.44(c)) or 40 CFR 403.18(e) (Pretreatment program).

(8)(i) Net limits. Upon request of a permittee who qualifies for effluent limitations on a net basis under § 122.45(g).

(ii) When a discharger is no longer eligible for net limitations, as provided in § 122.45(g)(1)(ii).

(9) Pretreatment. As necessary under 40 CFR 403.8(e) (compliance schedule for development of pretreatment program).

ADD2

(10) Failure to notify. Upon failure of an approved State to notify, as required by section 402(b)(3), another State whose waters may be affected by a discharge from the approved State.

(11) Non-limited pollutants. When the level of discharge of any pollutant which is not limited in the permit exceeds the level which can be achieved by the technology-based treatment requirements appropriate to the permittee under § 125.3(c).

(12) Notification levels. To establish a "notification level" as provided in § 122.44(f).

(13) Compliance schedules. To modify a schedule of compliance to reflect the time lost during construction of an innovative or alternative facility, in the case of a POTW which has received a grant under section 202(a)(3) of CWA for 100% of the costs to modify or replace facilities constructed with a grant for innovative and alternative wastewater technology under section 202(a)(2). In no case shall the compliance schedule be modified to extend beyond an applicable CWA statutory deadline for compliance.

(14) For a small MS4, to include an effluent limitation requiring implementation of a minimum control measure or measures as specified in § 122.34(b) when:

(i) The permit does not include such measure(s) based upon the determination that another entity was responsible for implementation of the requirement(s); and

(ii) The other entity fails to implement measure(s) that satisfy the requirement(s).

(15) To correct technical mistakes, such as errors in calculation, or mistaken interpretations of law made in determining permit conditions.

(16) When the discharger has installed the treatment technology considered by the permit writer in setting effluent limitations imposed under section 402(a)(1) of the CWA and has properly operated and maintained the facilities but nevertheless has been unable to achieve those effluent limitations. In this case, the limitations in the modified permit may reflect the level of pollutant control actually achieved (but shall not be less stringent than required by a subsequently promulgated effluent limitations guideline).

(17) Nutrient Management Plans. The incorporation of the terms of a CAFO's nutrient management plan into the terms and conditions of a general permit when a CAFO obtains coverage under a general permit in accordance with §§ 122.23(h) and 122.28 is not a cause for modification pursuant to the requirements of this section.

(18) Land application plans. When required by a permit condition to incorporate a land application plan for beneficial reuse of sewage sludge, to revise an existing land application plan, or to add a land application plan.

(b) Causes for modification or revocation and reissuance. The following are causes to modify or, alternatively, revoke and reissue a permit:

(1) Cause exists for termination under § 122.64, and the Director determines that modification or revocation and reissuance is appropriate.

ADD3

(2) The Director has received notification (as required in the permit, see § 122.41(l)(3) ) of a proposed transfer of the permit. A permit also may be modified to reflect a transfer after the effective date of an automatic transfer (§ 122.61(b) ) but will not be revoked and reissued after the effective date of the transfer except upon the request of the new permittee.

Current through April 25, 2013; 78 FR 24362.

# 40 C.F.R. § 123.25

§ 123.25 Requirements for permitting.
Effective: July 17, 2006

(a) All State Programs under this part must have legal authority to implement each of the following provisions and must be administered in conformance with each, except that States are not precluded from omitting or modifying any provisions to impose more stringent requirements:

(1) § 122.4--(Prohibitions):

(2) § 122.5(a) and (b)--(Effect of permit);

(3) § 122.7(b)and(c)--(Confidential information);

(4) § 122.21 (a)-(b), (c)(2), (e)-(k), (m)-(p), (q), and (r)--(Application for a permit);

(5) § 122.22--(Signatories);

(6) § 122.23--(Concentrated animal feeding operations);

(7) § 122.24--(Concentrated aquatic animal production facilities);

(8) § 122.25--(Aquaculture projects);

(9) § 122.26--(Storm water discharges);

(10) § 122.27--(Silviculture);

(11) § 122.28--(General permits), *Provided* that States which do not seek to implement the general permit program under § 122.28 need not do so.

(12) Section 122.41(a)(1) and (b) through (n)--(Applicable permit conditions) (Indian Tribes can satisfy enforcement authority requirements under § 123.34);

(13) § 122.42--(Conditions applicable to specified categories of permits);

(14) § 122.43--(Establishing permit conditions);

(15) § 122.44--(Establishing NPDES permit conditions);

(16) § 122.45--(Calculating permit conditions);

(17) § 122.46--(Duration);

(18) § 122.47(a)--(Schedules of compliance);

(19) § 122.48--(Monitoring requirements);

(20) § 122.50--(Disposal into wells);

(21) § 122.61--(Permit transfer);

(22) § 122.62--(Permit modification);

(23) § 122.64--(Permit termination);

(24) § 124.3(a)--(Application for a permit);

(25) § 124.5(a), (c), (d), and (f)--(Modification of permits);

(26) § 124.6(a), (c), (d), and (e)--(Draft permit);

(27) § 124.8--(Fact sheets);

(28) § 124.10(a)(1)(ii), (a)(1)(iii), (a)(1)(v), (b), (c), (d), and (e)--(Public notice);

(29) § 124.11--(Public comments and requests for hearings);

(30) § 124.12(a)--(Public hearings); and

(31) § 124.17(a) and (c)--(Response to comments);

(32) § 124.56--(Fact sheets);

(33) § 124.57(a)--(Public notice);

(34) § 124.59--(Comments from government agencies);

(35) § 124.62--(Decision on variances);

(36) Subparts A, B, D, H, I, J, and N of part 125 of this chapter;

(37) 40 CFR parts 129, 133, and subchapter N;

(38) For a Great Lakes State or Tribe (as defined in 40 CFR 132.2), 40 CFR part 132 (NPDES permitting implementation procedures only);

(39) § 122.30 (What are the objectives of the storm water regulations for small MS4s?);

(40) § 122.31 (For Indian Tribes only) (As a Tribe, what is my role under the NPDES storm water program?);

(41) § 122.32 (As an operator of a small MS4, am I regulated under the NPDES storm water program?);

(42) § 122.33 (If I am an operator of a regulated small MS4, how do I apply for an NPDES permit? When do I have to apply?);

(43) § 122.34 (As an operator of a regulated small MS4, what will my NPDES MS4 storm water permit require?);

(44) § 122.35 (As an operator of a regulated small MS4, may I share the responsibility to implement the minimum control measures with other entities?);

(45) § 122.36 (As an operator of a regulated small MS4, what happens if I don't comply with

the application or permit requirements in §§ 122.33 through 122.35?); and

(46) For states that wish to receive electronic documents, 40 CFR Part 3--(Electronic reporting).

Note: Except for paragraph (a)(46) of this section, States need not implement provisions identical to the above listed provisions. Implemented provisions must, however, establish requirements at least as stringent as the corresponding listed provisions. While States may impose more stringent requirements, they may not make one requirement more lenient as a tradeoff for making another requirement more stringent; for example, by requiring that public hearings be held prior to issuing any permit while reducing the amount of advance notice of such a hearing.

State programs may, if they have adequate legal authority, implement any of the provisions of Parts 122 and 124. See, for example, § 122.5(d) (continuation of permits) and § 124.4 (consolidation of permit processing).
For example, a State may impose more stringent requirements in an NPDES program by omitting the upset provision of § 122.41 or by requiring more prompt notice of an upset.

(b) State NPDES programs shall have an approved continuing planning process under 40 CFR 130.5 and shall assure that the approved planning process is at all times consistent with the CWA.

(c) State NPDES programs shall ensure that any board or body which approves all or portions of permits shall not include as a member any person who receives, or has during the previous 2 years received, a significant portion of income directly or indirectly from permit holders or applicants for a permit.

(1) For the purposes of this paragraph:

(i) "Board or body" includes any individual, including the Director, who has or shares authority to approve all or portions of permits either in the first instance, as modified or reissued, or on appeal.

(ii) "Significant portion of income" means 10 percent or more of gross personal income for a calendar year, except that it means 50 percent or more of gross personal income for a calendar year if the recipient is over 60 years of age and is receiving that portion under retirement, pension, or similar arrangement.

(iii) "Permit holders or applicants for a permit" does not include any department or agency of a State government, such as a Department of Parks or a Department of Fish and Wildlife.

(iv) "Income" includes retirement benefits, consultant fees, and stock dividends.

(2) For the purposes of paragraph (c) of this section, income is not received "directly or indirectly from permit holders or applicants for a permit" when it is derived from mutual fund payments, or from other diversified investments for which the recipient does not know the identity of the primary sources of income.

**Credits**

ADD7

[50 FR 6941, Feb. 19, 1985; 50 FR 7912, Feb. 27, 1985; 54 FR 18784, May 2, 1989; 55 FR 48075, Nov. 16, 1990; 58 FR 9414, Feb. 19, 1993; 58 FR 67981, Dec. 22, 1993; 60 FR 15386, March 23, 1995; 63 FR 45122, Aug. 24, 1998; 64 FR 42470, Aug. 4, 1999; 64 FR 43426, Aug. 10, 1999; 64 FR 68849, Dec. 8, 1999; 65 FR 30909, May 15, 2000; 66 FR 65338, Dec. 18, 2001; 69 FR 41682, July 9, 2004; 70 FR 59888, Oct. 13, 2005; 71 FR 35040, June 16, 2006]

SOURCE: 45 FR 33456, May 19, 1980, as amended at 48 FR 14178, Apr. 1, 1983, unless otherwise noted.

AUTHORITY: Clean Water Act, 33 U.S.C. 1251 et seq.

Current through April 25, 2013; 78 FR 24362.

# 40 C.F.R. § 124.5

§ 124.5 Modification, revocation and reissuance, or termination of permits.
Effective: October 11, 2005

(a) (Applicable to State programs, see §§ 123.25 (NPDES), 145.11 (UIC), 233.26(404), and 271.14 (RCRA) ). Permits (other than PSD permits) may be modified, revoked and reissued, or terminated either at the request of any interested person (including the permittee) or upon the Director's initiative. However, permits may only be modified, revoked and reissued, or terminated for the reasons specified in §§ 122.62 or 122.64 (NPDES), 144.39 or 144.40 (UIC), 233.14 or 233.15(404), and 270.41 or 270.43 (RCRA). All requests shall be in writing and shall contain facts or reasons supporting the request.

(b) If the Director decides the request is not justified, he or she shall send the requester a brief written response giving a reason for the decision. Denials of requests for modification, revocation and reissuance, or termination are not subject to public notice, comment, or hearings. Denials by the Regional Administrator may be informally appealed to the Environmental Appeals Board by a letter briefly setting forth the relevant facts. The Environmental Appeals Board may direct the Regional Administrator to begin modification, revocation and reissuance, or termination proceedings under paragraph (c) of this section. The appeal shall be considered denied if the Environmental Appeals Board takes no action on the letter within 60 days after receiving it. This informal appeal is, under 5 U.S.C. 704, a prerequisite to seeking judicial review of EPA action in denying a request for modification, revocation and reissuance, or termination.

(c) (Applicable to State programs, see 40 CFR 123.25 (NPDES), 145.11 (UIC), 233.26 (404), and 271.14 (RCRA)).

(1) If the Director tentatively decides to modify or revoke and reissue a permit under 40 CFR 122.62 (NPDES), 144.39 (UIC), 233.14 (404), or 270.41 (other than § 270.41(b)(3)) or § 270.42(c) (RCRA), he or she shall prepare a draft permit under § 124.6 incorporating the proposed changes. The Director may request additional information and, in the case of a modified permit, may require the submission of an updated application. In the case of revoked and reissued permits, other than under 40 CFR 270.41(b)(3), the Director shall require the submission of a new application. In the case of revoked and reissued permits under 40 CFR 270.41(b)(3), the Director and the permittee shall comply with the appropriate requirements in 40 CFR part 124, subpart G for RCRA standardized permits.

(2) In a permit modification under this section, only those conditions to be modified shall be reopened when a new draft permit is prepared. All other aspects of the existing permit shall remain in effect for the duration of the unmodified permit. When a permit is revoked and reissued under this section, the entire permit is reopened just as if the permit had expired and was being reissued. During any revocation and reissuance proceeding the permittee shall comply with all conditions of the existing permit until a new final permit is reissued.

(3) "Minor modifications" as defined in §§ 122.63 (NPDES), 144.41 (UIC), and 233.16(404), and "Classes 1 and 2 modifications" as defined in § 270.42(a) and (b) (RCRA) are not subject to the requirements of this section.

ADD9

(d) (Applicable to State programs, see §§ 123.25 (NPDES) of this chapter, 145.11 (UIC) of this chapter, and 271.14 (RCRA) of this chapter).

(1) If the Director tentatively decides to terminate: A permit under § 144.40 (UIC) of this chapter, a permit under §§ 122.64(a) (NPDES) of this chapter or 270.43 (RCRA) of this chapter (for EPA–issued NPDES permits, only at the request of the permittee), or a permit under § 122.64(b) (NPDES) of this chapter where the permittee objects, he or she shall issue a notice of intent to terminate. A notice of intent to terminate is a type of draft permit which follows the same procedures as any draft permit prepared under § 124.6 of this chapter.

(2) For EPA–issued NPDES or RCRA permits, if the Director tentatively decides to terminate a permit under § 122.64(a) (NPDES) of this chapter, other than at the request of the permittee, or decides to conduct a hearing under section 3008 of RCRA in connection with the termination of a RCRA permit, he or she shall prepare a complaint under 40 CFR 22.13 and 22.44 of this chapter. Such termination of NPDES and RCRA permits shall be subject to the procedures of part 22 of this chapter.

(3) In the case of EPA–issued permits, a notice of intent to terminate or a complaint shall not be issued if the Regional Administrator and the permittee agree to termination in the course of transferring permit responsibility to an approved State under §§ 123.24(b)(1) (NPDES) of this chapter, 145.25(b)(1) (UIC) of this chapter, 271.8(b)(6) (RCRA) of this chapter, or 501.14(b)(1) (sludge) of this chapter. In addition, termination of an NPDES permit for cause pursuant to § 122.64 of this chapter may be accomplished by providing written notice to the permittee, unless the permittee objects.

(e) When EPA is the permitting authority, all draft permits (including notices of intent to terminate) prepared under this section shall be based on the administrative record as defined in § 124.9.

(f) (Applicable to State programs, see § 233.26(404) ). Any request by the permittee for modification to an existing 404 permit (other than a request for a minor modification as defined in § 233.16(404) ) shall be treated as a permit application and shall be processed in accordance with all requirements of § 124.3.

(g)(1) (Reserved for PSD Modification Provisions)

(2) PSD permits may be terminated only by rescission under § 52.21(w) or by automatic expiration under § 52.21(r). Applications for rescission shall be processed under § 52.21(w) and are not subject to this part.

Current through April 25, 2013; 78 FR 24362.

# 40 C.F.R. § 230.1

### § 230.1 Purpose and policy.

(a) The purpose of these Guidelines is to restore and maintain the chemical, physical, and biological integrity of waters of the United States through the control of discharges of dredged or fill material.

(b) Congress has expressed a number of policies in the Clean Water Act. These Guidelines are intended to be consistent with and to implement those policies.

(c) Fundamental to these Guidelines is the precept that dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern.

(d) From a national perspective, the degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts covered by these Guidelines. The guiding principle should be that degradation or destruction of special sites may represent an irreversible loss of valuable aquatic resources.

SOURCE: 45 FR 85344, Dec. 24, 1980, unless otherwise noted.

AUTHORITY: Secs. 404(b) and 501(a) of the Clean Water Act of 1977, (33 U.S.C. § 1344(b) and § 1361(a)).

Current through April 25, 2013; 78 FR 24362.

## 40 C.F.R. § 231.1

### § 231.1 Purpose and scope.

(a) The Regulations of this part include the procedures to be followed by the Environmental Protection agency in prohibiting or withdrawing the specification, or denying, restricting, or withdrawing the use for specification, of any defined area as a disposal site for dredged or fill material pursuant to section 404(c) of the Clean Water Act ("CWA"), 33 U.S.C. 1344(c). The U.S. Army Corps of Engineers or a state with a 404 program which has been approved under section 404(h) may grant permits specifying disposal sites for dredged or fill material by determining that the section 404(b)(1) Guidelines (40 CFR Part 230) allow specification of a particular site to receive dredged or fill material. The Corps may also grant permits by determining that the discharge of dredged or fill material is necessary under the economic impact provision of section 404(b)(2). Under section 404(c), the Administrator may exercise a veto over the specification by the U.S. Army Corps of Engineers or by a state of a site for the discharge of dredged or fill material. The Administrator may also prohibit the specification of a site under section 404(c) with regard to any existing or potential disposal site before a permit application has been submitted to or approved by the Corps or a state. The Administrator is authorized to prohibit or otherwise restrict a site whenever he determines that the discharge of dredged or fill material is having or will have an "unacceptable adverse effect" on municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas), wildlife, or recreational areas. In making this determination, the Administrator will take into account all information available to him, including any written determination of compliance with the section 404(b)(1) Guidelines made in 40 CFR Part 230, and will consult with the Chief of Engineers or with the state.

(b) These regulations establish procedures for the following steps:

  (1) The Regional Administrator's proposed determinations to prohibit or withdraw the specification of a defined area as a disposal site, or to deny, restrict or withdraw the use of any defined area for the discharge of any particular dredged or fill material;

  (2) The Regional Administrator's recommendation to the Administrator for determination as to the specification of a defined area as a disposal site.

  (3) The Administrator's final determination to affirm, modify or rescind the recommended determination after consultation with the Chief of Engineers or with the state.

(c) Applicability: The regulations set forth in this part are applicable whenever the Administrator is considering whether the specification of any defined area as a disposal site should be prohibited, denied, restricted, or withdrawn. These regulations apply to all existing, proposed or potential disposal sites for discharges of dredged or fill material into waters of the United States, as defined in 40 CFR 230.2.

SOURCE: 44 FR 58082, Oct. 9, 1979, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1344(c).

Current through April 25, 2013; 78 FR 24362.

# 40 C.F.R. § 231.2

## § 231.2 Definitions

For the purposes of this part, the definitions of terms in 40 CFR 230.2 shall apply. In addition, the term:

(a) Withdraw specification means to remove from designation any area already specified as a disposal site by the U.S. Army Corps of Engineers or by a state which has assumed the section 404 program, or any portion of such area.

(b) Prohibit specification means to prevent the designation of an area as a present or future disposal site.

(c) Deny or restrict the use of any defined area for specification is to deny or restrict the use of any area for the present or future discharge of any dredged or fill material.

(d) Person means an individual, corporation, partnership, association, Federal agency, state, municipality, or commission, or political subdivision of a state, or any interstate body.

(e) Unacceptable adverse effect means impact on an aquatic or wetland ecosystem which is likely to result in significant degradation of municipal water supplies (including surface or ground water) or significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas. In evaluating the unacceptability of such impacts, consideration should be given to the relevant portions of the section 404(b)(1) guidelines (40 CFR part 230).

(f) State means any state agency administering a 404 program which has been approved under section 404(h).

SOURCE: 44 FR 58082, Oct. 9, 1979, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1344(c).

Current through April 25, 2013; 78 FR 24362.

# 40 C.F.R. § 231.3

## § 231.3 Procedures for proposed determinations.

(a) If the Regional Administrator has reason to believe after evaluating the information available to him, including any record developed under the section 404 referral process specified in 33 CFR 323.5(b), that an "unacceptable adverse effect" could result from the specification or use for

specification of a defined area for the disposal of dredged or fill material, he may initiate the following actions:

(1) The Regional Administrator will notify the District Engineer or the state, if the site is covered by an approved state program, the owner of record of the site, and the applicant, if any, in writing that the Regional Administrator intends to issue a public notice of a proposed determination to prohibit or withdraw the specification, or to deny, restrict or withdraw the use for specification, whichever the case may be, of any defined area as a disposal site.

(2) If within 15 days of receipt of the Regional Administrator's notice under paragraph (a)(1) of this section, it has not been demonstrated to the satisfaction of the Regional Administrator that no unacceptable adverse effect(s) will occur or the District Engineer or state does not notify the Regional Administrator of his intent to take corrective action to prevent an unacceptable adverse effect satisfactory to the Regional Administrator, the Regional Administrator shall publish notice of a proposed determination in accordance with the procedures of this section. Where the Regional Administrator has notified the District Engineer under paragraph (a)(1) of this section that he is considering exercising section 404(c) authority with respect to a particular disposal site for which a permit application is pending but for which no permit has been issued, the District Engineer, in accordance with 33 CFR 325.8, shall not issue the permit until final action is taken under this part.

Comment: In cases involving a proposed disposal site for which a permit application is pending, it is anticipated that the procedures of the section 404 referral process will normally be exhausted prior to any final decision of whether to initiate a 404(c) proceeding.

(b) Public notice of every proposed determination and notice of all public hearings shall be given by the Regional Administrator. Every public notice shall contain, at a minimum:

(1) An announcement that the Regional Administrator has proposed a determination to prohibit or withdraw specification, or to deny, restrict, or withdraw the use for specification, of an area as a disposal site, including a summary of the facts on which the proposed determination is based;

(2) The location of the existing, proposed or potential disposal site, and a summary of its characteristics;

(3) A summary of information concerning the nature of the proposed discharge, where applicable;

(4) The identity of the permit applicant, if any;

(5) A brief description of the right to, and procedures for requesting, a public hearing; and

(6) The address and telephone number of the office where interested persons may obtain additional information, including copies of the proposed determination; and

(7) Such additional statements, representations, or information as the Regional Administrator considers necessary or proper.

(c) In addition to the information required under paragraph (b) of this section, public notice of a public hearing held under § 231.4 shall contain the following information:

(1) Reference to the date of public notice of the proposed determination;

(2) Date, time and place of the hearing; and

(3) A brief description of the nature and purpose of the hearing including the applicable rules and procedures.

(d) The following procedures for giving public notice of the proposed determination or of a public hearing shall be followed:

(1) Publication at least once in a daily or weekly newspaper of general circulation in the area in which the defined area is located. In addition the Regional Administrator may (i) post a copy of the notice at the principal office of the municipality in which the defined area is located, or if the defined area is not located near a sizeable community, at the principal office of the political subdivision (State, county or local, whichever is appropriate) with general jurisdiction over the area in which the disposal site is located, and (ii) post a copy of the notice at the United States Post Office serving that area.

(2) A copy of the notice shall be mailed to the owner of record of the site, to the permit applicant or permit holder, if any, to the U.S. Fish and Wildlife Service, National Marine Fisheries Service and any other interested Federal and State water pollution control and resource agencies, and to any person who has filed a written request with the Regional Administrator to receive copies of notices relating to section 404(c) determinations;

(3) A copy of the notice shall be mailed to the appropriate District and Division Engineer(s) and state;

(4) The notice will also be published in the Federal Register.

SOURCE: 44 FR 58082, Oct. 9, 1979, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1344(c).

Current through April 25, 2013; 78 FR 24362.


# 40 C.F.R. § 231.4

## § 231.4 Public comments and hearings.


(a) The Regional Administrator shall provide a comment period of not less than 30 or more than 60 days following the date of public notice of the proposed determination. During this period any interested persons may submit written comments on the proposed determination. Comments should be directed to whether the proposed determination should become the final determination and corrective action that could be taken to reduce the adverse impact of the discharge. All such

comments shall be considered by the Regional Administrator or his designee in preparing his recommended determination in § 231.5.

(b) Where the Regional Administrator finds a significant degree of public interest in a proposed determination or that it would be otherwise in the public interest to hold a hearing, or if an affected landowner or permit applicant or holder requests a hearing, he or his designee shall hold a public hearing. Public notice of that hearing shall be given as specified in § 231.3(c). No hearing may be held prior to 21 days after the date of the public notice. The hearing may be scheduled either by the Regional Administrator at his own initiative, or in response to a request received during the comment period provided for in paragraph (a) of this section. If no public hearing is held the Regional Administrator shall notify any persons who requested a hearing of the reasons for that decision. Where practicable, hearings shall be conducted in the vicinity of the affected site.

(c) Hearings held under this section shall be conducted by the Regional Administrator, or his designee, in an orderly and expeditious manner. A record of the proceeding shall be made by either tape recording or verbatim transcript.

(d) Any person may appear at the hearing and submit oral or written statements and data and may be represented by counsel or other authorized representative. Any person may present written statements for the hearing file prior to the time the hearing file is closed to public submissions, and may present proposed findings and recommendations. The Regional Administrator or his designee shall afford the participants an opportunity for rebuttal.

(e) The Regional Administrator, or his designee, shall have discretion to establish reasonable limits on the nature, amount or form of presentation of documentary material and oral presentations. No cross examination of any hearing participant shall be permitted, although the Regional Administrator, or his designee, may make appropriate inquiries of any such participant.

(f) The Regional Administrator or his designee shall allow a reasonable time not to exceed 15 days after the close of the public hearing for submission of written comments. After such time has expired, unless such period is extended by the Regional Administrator or his designee for good cause, the hearing file shall be closed to additional public written comments.

(g) No later than the time a public notice of proposed determination is issued, a Record Clerk shall be designated with responsibility for maintaining the administrative record identified in § 231.5(e). Copying of any documents in the record shall be permitted under appropriate arrangements to prevent their loss. The charge for such copies shall be in accordance with the written schedule contained in Part 2 of this chapter.

SOURCE: 44 FR 58082, Oct. 9, 1979, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1344(c).

Current through April 25, 2013; 78 FR 24362.

# 40 C.F.R. § 231.5

## § 231.5 Recommended determination.

(a) The Regional Administrator or his designee shall, within 30 days after the conclusion of the public hearing (but not before the end of the comment period), or, if no hearing is held, within 15 days after the expiration of the comment period on the public notice of the proposed determination, either withdraw the proposed determination or prepare a recommended determination to prohibit or withdraw specification, or to deny, restrict, or withdraw the use for specification, of the disposal site because the discharge of dredged or fill material at such site would be likely to have an unacceptable adverse effect.

(b) Where a recommended determination is prepared, the Regional Administrator or his designee shall promptly forward the recommended determination and administrative record to the Administrator for review, with a copy of the recommended determination to the Assistant Administrator for Water and Waste Management.

(c) Where the Regional Administrator, or his designee, decides to withdraw the proposed determination, he shall promptly notify the Administrator by mail, with a copy to the Assistant Administrator for Water and Waste Management, who shall have 10 days from receipt of such notice to notify the Regional Administrator of his intent to review such withdrawal. Copies of the notification shall be sent to all persons who commented on the proposed determination or participated at the hearing. Such persons may submit timely written recommendations concerning review.

    (1) If the Administrator does not notify him, the Regional Administrator shall give notice at the withdrawal of the proposed determination as provided in § 231.3(d). Such notice shall constitute final agency action.

    (2) If the Administrator does decide to review, the Regional Administrator or his designee shall forward the administrative record to the Administrator for a final determination under § 231.6. Where there is review of a withdrawal of proposed determination or review of a recommended determination under § 231.6, final agency action does not occur until the Administrator makes a final determination.

(d) Any recommended determination under paragraph (b) of this section shall include the following:

    (1) A summary of the unacceptable adverse effects that could occur from use of the disposal site for the proposed discharge;

    (2) Recommendations regarding a final determination to prohibit, deny, restrict, or withdraw, which shall confirm or modify the proposed determination, with a statement of reasons.

(e) The administrative record shall consist of the following:

    (1) A copy of the proposed determination, public notice, written comments on the public notice and written submissions in the hearing file;

ADD17

(2) A transcript or recording of the public hearing, where a hearing was held;

(3) The recommended determination;

(4) Where possible a copy of the record of the Corps or the state pertaining to the site in question;

(5) Any other information considered by the Regional Administrator or his designee.

SOURCE: 44 FR 58082, Oct. 9, 1979, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1344(c).

Current through April 25, 2013; 78 FR 24362.

# 40 C.F.R. § 231.6

§ 231.6 Administrator's final determinations.

After reviewing the recommendations of the Regional Administrator or his designee, the Administrator shall within 30 days of receipt of the recommendations and administrative record initiate consultation with the Chief of Engineers, the owner of record, and, where applicable, the State and the applicant, if any. They shall have 15 days to notify the Administrator of their intent to take corrective action to prevent an unacceptable adverse effect(s), satisfactory to the Administrator. Within 60 days of receipt of the recommendations and record, the Administrator shall make a final determination affirming, modifying, or rescinding the recommended determination. The final determination shall describe the satisfactory corrective action, if any, make findings, and state the reasons for the final determination. Notice of such final determination shall be published as provided in § 231.3, and shall be given to all persons who participated in the public hearing. Notice of the Administrator's final determination shall also be published in the Federal Register. For purposes of judicial review, a final determination constitutes final agency action under section 404(c) of the Act.

SOURCE: 44 FR 58082, Oct. 9, 1979, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1344(c).

Current through April 25, 2013; 78 FR 24362.

# 40 C.F.R. § 231.7

§ 231.7 Emergency procedure.

Where a permit has already been issued, and the Administrator has reason to believe that a

discharge under the permit presents an imminent danger of irreparable harm to municipal water supplies, shellfish beds and fishery areas (including spawning and breeding areas) wildlife, or recreational areas, and that the public health, interest, or safety requires, the Administrator may ask the Chief of Engineers to suspend the permit under 33 CFR 325.7, or the state, pending completion of proceedings under Part 231. The Administrator may also take appropriate action as authorized under section 504 of the Clean Water Act. If a permit is suspended, the Administrator and Regional Administrator (or his designee) may, where appropriate, shorten the times allowed by these regulations to take particular actions.

SOURCE: 44 FR 58082, Oct. 9, 1979, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1344(c).

Current through April 25, 2013; 78 FR 24362.

## 40 C.F.R. § 231.8

### § 231.8 Extension of time.

The Administrator or the Regional Administrator may, upon a showing of good cause, extend the time requirements in these regulations. Notice of any such extension shall be published in the Federal Register and, as appropriate, through other forms of notice.

SOURCE: 44 FR 58082, Oct. 9, 1979, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1344(c).

Current through April 25, 2013; 78 FR 24362.

<u>DECLARATIONS</u>

TABLE OF CONTENTS

Declarations submitted to the District Court:

Vivian Stockman ................................................................................................. 1

James Tawney ................................................................................................... 13

Cindy Rank ....................................................................................................... 16

Debbie Jarrell .................................................................................................... 20

Ed Hopkins ....................................................................................................... 24

Joey Shadowen ................................................................................................. 30

Lane Boldman ................................................................................................... 34

Steve Boyce ...................................................................................................... 39

Ricky Handshoe ................................................................................................ 43

Jane Branham .................................................................................................... 46

Bob Mullins ...................................................................................................... 50

Cathie Bird ........................................................................................................ 54

Vickie Terry ...................................................................................................... 58

Margaret Janes .................................................................................................. 61


Additional declarations (2013):

Ricky Handshoe ................................................................................................ 64

Robert Patrick ................................................................................................... 68

Timothy Guilfoile ............................................................................................. 71

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
NATIONAL MINING ASSOCIATION,              )
                                          )
          Plaintiff,                      )
                                          )
          v.                              )          No. 1:10-cv-01220-RBW
                                          )
LISA JACKSON, ADMINISTRATOR,              )
U.S. ENVIRONMENTAL PROTECTION             )
AGENCY, et al.,                           )
                                          )
          Defendants,                     )
                                          )
          and                             )
                                          )
SIERRA CLUB, WEST VIRGINIA                )
HIGHLANDS CONSERVANCY,                    )
COAL RIVER MOUNTAIN WATCH,                )
OHIO VALLEY ENVIRONMENTAL                 )
COALITION, KENTUCKIANS FOR                )
THE COMMONWEALTH,                         )
SOUTHERN APPALACHIAN                      )
MOUNTAIN STEWARDS,                        )
STATEWIDE ORGANIZING FOR                  )
COMMUNITY EMPOWERMENT,                    )
                                          )
          Movants.                        )
_____)


**Exhibit 1**

**Declaration of Vivian Stockman**

D1

**DECLARATION OF VIVIAN STOCKMAN,**
Project Coordinator for Ohio Valley Environmental Coalition and
Member of West Virginia Highlands Conservancy, and Coal River Mountain Watch

I, Vivian Stockman, state and affirm as follows:

1.      I have personal knowledge of the matters set forth in this declaration.  I offer this declaration in support of the intervention of the Ohio Valley Environmental Coalition, and the other groups listed, as defendants in the National Mining Association's lawsuit against the U.S. Environmental Protection Agency (EPA), U.S. Army Corps of Engineers (Corps) and other government officials (in which that association challenges the policy documents issued by the EPA and the Corps in connection with their review of Clean Water Act permit applications associated with surface coal mining projects in Appalachia).

2.      I have been a resident of Spencer in Roane County, WV, for 20 years.

3.      I am project coordinator for the Huntington, W. Va.-based nonprofit organization, Ohio Valley Environmental Coalition ("OVEC"). I have served in this capacity or in a similar leadership capacity in this organization for 10 years.  From this experience, I have personal knowledge of the interests and activities of OVEC.  I have been a member of OVEC for 15 years.  OVEC, with approximately 1500 members, has a mission to organize and maintain a diverse grassroots organization dedicated to the improvement and preservation of the environment through education, grassroots organizing and coalition building, leadership development, and media outreach.

4.      I have been a member of Coal River Mountain Watch ("CRMW") for at least 5 years. CRMW has a mission to establish social, economic, and environmental justice in the southern

D2

coalfields of West Virginia, to keep communities intact, and to improve the quality of life in these communities.

5.     I have been a member of the West Virginia Highlands Conservancy for a number of years.  The Conservancy is a nonprofit membership organization located in West Virginia and for the past three decades has been a leader in citizen efforts to protect West Virginia's land and water resources from the effects of illegal coal mining.

6.     I have and will continue to frequently travel throughout the coal mining areas of southern West Virginia, particularly the areas of Lincoln, Logan, Mingo, Boone, Raleigh, and Kanawha Counties.  I enjoy the natural beauty of these Counties, including their mountains, lush forests (home to birds and so much other life), rivers, and streams.  I enjoy engaging in outdoor activities along West Virginia's streams such as hiking, nature observation, wading, bird watching, and especially nature photography.

7.     These activities are vital to my emotional and spiritual well-being. As a child, my grandfather, a native West Virginian with Cherokee ancestry, introduced me to the beauty of the woods and streams. I don't know if it was because of him, or just in my "nature," but since I was a little kid, I have had a fascination with turtles, salamanders, crawdads, frogs, and other critters I find in or near streams.

8.     Birds, too, have given me hours of joy.  I just don't feel right without frequent contact with woods and streams. Such contact soothes me, and keeps me in touch with childlike-wonder, which in turn keeps me happy. Such contact also inspires me artistically. My college studies involved my two main loves— nature and writing—I have a degree in environmental communications. I used to be able to identify and recite the Latin names of many species of trees, herbs, and birds, but that knowledge has waned as my college days recede. Still, my

D3

enjoyment of looking for and observing plants and wildlife has increased, as I give up needing to name all things, and instead just observe and "be" in nature.  Whenever I take a walk, I look for the tiny things. I'm always excited to see salamanders, or tadpoles, or even animal signs such as scat and tracks.

9.      In addition, part of my job includes evaluation of the environment and I am directed to take time in and keep a strong connection to nature in order to be more effective in my work.

10.     Seeing – and even just thinking about – West Virginia's lush and biologically diverse landscape and the changing seasons is emotionally and spiritually satisfying to me when I travel and recreate in these areas, and is an important part of the quality of my life.  During my frequent travels in the State, I have observed the adverse impacts of surface mine sites, including deforestation, valley fills, soil erosion, and stream sedimentation.  I am profoundly disturbed by the impacts that I have observed. They reduce my enjoyment of the natural environment. The destruction I observe reduces my hope for humanity and sometimes makes me despair. I fear for our future when some humans can justify such destruction in the name of "cheap" energy. I worry that some of the places I have visited and will continue to visit will become inaccessible or too polluted to visit because of the surface mining activity.

11.     I understand that several of the applications for Clean Water Act section 404 permits currently undergoing coordinated interagency review by the U.S. Environmental Protection Agency and U.S. Army Corps of Engineers are for mines that would operate in the watershed of Cabin Creek of the Kanawha River.  These mines include Coyote Coal Company's Joe's Creek Surface Mine (LRH-2008-00805), and Wildcat Coal Company's Surface Mine #2 (LRH-2006-02033), which would both impact Coal Fork of Cabin Creek of the upper Kanawha River.  I

D4

further understand that at least one additional application for a Clean Water Act section 404 permit for a mine in this watershed, Alex Energy Inc.'s Republic #1 Surface Mine (LRH-2003-00238), is under review by the agencies.  I have visited and recreated in the area that will be impacted by these mines, and I will return to the area at least three times a year for the foreseeable future in order to attempt to enjoy the streams and to document the changes.  If the EPA and Army Corps are not allowed to conduct their coordinated review, or if the permit applications are approved without being required to consider appropriate scientific information about impacts or put required environmental protections in place, my ability to use and enjoy the affected waters and surrounding area will be significantly impaired.

12.    On February 2, 2006 and July 18, 2003, I visited the headwaters of Cabin Creek – a tributary of the Kanawha River – by car.  During my trips I took the main county road to Decota and then traveled through Carbon until a gate across the road stopped my progress.  I also drove from Decota past Wevaco until a gate at the Notomine Mine blocked the road.

13.    In addition, on October 10, 2004, I drove to Decota and then Wevaco.

14.    During my various trips, I stopped to take pictures along the way.  At the bridge at Decota I took a picture of the two headwater tributaries of Cabin Creek coming together.  One tributary appeared to be clear water and the streambed looked okay.  The other tributary was tainted with reddish-orange sediment and I knew that mining had taken its toll.  I also took other pictures.

15.    Also during my trips, I enjoyed the forests and listening to the birds and seeing small game.  But then I saw a valley fill that was being built close to the road and I was upset by all the destruction that was being done to the streams and the wildlife.  The pollution and destruction caused by mining in the area gives me a profound sense of loss.  I will visit these streams in the

D5

future, at least three times a year, despite my worry that my enjoyment of the sights and sounds of nature will decrease if the destruction and pollution continues to increase.

16.     Since 2000, approximately three times a year, I drive from Charleston to Kayford Mountain.  During my trips I take County Road 79 off the interstate and travel along Cabin Creek.  I occasionally get out of my car and look at and enjoy the water and the wildlife.  I then travel past Leewood, and continue to Kayford Mountain.  I frequently visit this area and will continue to visit the area at least three times a year. I will continue to attempt to enjoy the streams and woods, and I will certainly attempt to document changes I observe, despite the emotional pain from those changes that I expect to feel, an expectation set up by the experiences I have gone through as mountaintop removal has continued to devastate the regions I visit.

17.     I participated in the 1999 "Walk for the Mountains," walking approximately six miles along the lower reaches of Cabin Creek.  As I walked I enjoyed the stream, forest and wildlife.  I am concerned that the operations at the Coyote Coal and Wildcat Coal mines will pollute Cabin Creek and harm the small creatures that are so important to me.

18.     I also understand that among the applications for Clean Water Act section 404 permits currently undergoing coordinated review by the U.S. Environmental Protection Agency and U.S. Army Corps of Engineers are applications for mines that would operate in the watershed of Huff Creek of the Guyandotte River.  These mines include Paynter Branch Mining's Paynter Branch South Surface Mine (LRH-2006-00760), which would impact Paynter Branch, Elk Trace Branch, and Gap Branch of Huff Creek of the Guyandotte River, and Eastern Associated Coal's Huff Creek Surface Mine (LRH-2008-00562), which would impact Castle Branch, Beartree Branch, and Sycamore Branch of Huff Creek of the Guyandotte River.  I have

D6

visited and recreated in the area that will be impacted by these mines, and intend to return to the area to visit and recreate in the future. If the EPA and Army Corps are not allowed to conduct their coordinated review, or if the permit applications are approved without being required to consider appropriate scientific information about impacts or put required environmental protections in place, my ability to use and enjoy the affected waters and surrounding area will be significantly impaired.

19.     I have driven along Rt. 10 in the area of these mining operations along Huff Creek and downstream at least once a year for the past 10 years. I will visit this stream in the future, at least three times a year, despite my worry that my enjoyment of the sights and sounds of nature will decrease if the destruction and pollution continues to increase.

20.     I have driven up Paynter Branch and taken pictures. The area near the mouth of Paynter Branch is very pretty but as I watch the stream I am very concerned about the pollution from the mines upstream. I will visit this stream in the future, at least three times a year, despite my worry that my enjoyment of the sights and sounds of nature will decrease if the destruction and pollution continues to increase.

21.     I have also spent time along Huff Creek near the church near Cyclone. There are some mining operations above the stream in this location. I have taken photos of the stream in this area and am very concerned about the harm selenium and other pollution from the mines is doing. My understanding is that selenium is a silent killer and even though you can't see it in the water, fish and water fowl can be greatly harmed. I will visit this stream in the future, at least three times a year, despite my worry that my enjoyment of the sights and sounds of nature will decrease if the destruction and pollution continues to increase.

D7

22.     I have also spent time along Huff Creek one to two miles east of Cyclone and driven along Highway 10 in this area. I will visit this stream in the future, at least three times a year, despite my worry that my enjoyment of the sights and sounds of nature will decrease if the destruction and pollution continues to increase.

23.     While I will return in the future, my visits to Cabin Creek and Huff Creek and their tributaries are substantially less enjoyable as a result of the environmental degradation already present and will be further harmed in the future because of the additional mining that is planned. As more and more mines are started, the holes in the forest canopy become greater and the landscape changes and pollution become more disturbing to me.

24.     I am hyper-aware of runoff problems in the coalfields and their connection to mountaintop removal and massive strip mines because of my constant vigilance of mountaintop-removal-related news and my frequent interaction with coalfield residents.  It is extremely upsetting to know that when there is a rainstorm folks in the coalfields have to deal with the increased pollution and flow run off can bring.  Common sense and my experience of seeing this problem in action tells me that a devegetated, mountain-scalped, valley-filled landscape doesn't absorb rain runoff the way a lush temperate forest does.

25.     For the waters and areas I've described here, I have a personal interest and need to protect the health of the waters, wildlife and other natural resources that the listed permits would destroy and harm. If the EPA and Army Corps are not able fully to conduct their coordinated review of these permit applications, or if the permit decisions are made without a full review of the environmental impacts and all necessary environmental protections in place, my ability to use and enjoy these affected waters and surrounding areas will be significantly impaired.  I am

D8

looking to the two agencies to perform a careful review together of all impacts and to consider

all of the scientific and legal requirements at issue here, including the important research and

findings that EPA has discussed in policy documents like its April 2010 staff guidance.  I believe

that the interagency process the agencies are doing and EPA's careful review of proposed permit

applications have a greater chance than in the past of finally safeguarding our vital natural

resources in these areas.  Still, I intend to continue taking all appropriate action I can to help

make sure that we don't lose these special waters.  That includes supporting the organizations

listed above in intervening to oppose any efforts by the mining industry to interfere in the

agencies' important process.  It is also important to me to gain access to the information about

impacts that the agencies are gathering, including the type of information that EPA's guidance

has recognized is important to meet existing legal requirements, so that I can use this information

to protect my own interests in the waters and natural areas in West Virginia that I have a

connection to.

26.    Since it was founded in 1987, OVEC has worked to address environmental problems

affecting the communities of West Virginia, including the need to address the harm of

mountaintop removal mining caused to our waters, mountains, communities and other resources.

This has included advocating at the state and federal level for policy changes.  It also has

included filing comments on many permit applications in the past and under review now to

protect OVEC's members who live around the state of West Virginia from the harm of

mountaintop removal mining.  OVEC has brought cases against the U.S. Army Corps of

Engineers to challenge and try to prevent the loss to be caused by harmful section 404 permits.

OVEC is also involved in active litigation against the Corps now.  OVEC also has in the past

brought and has a continued interest in bringing citizen suits, when necessary to fulfill its

D9

mission and protect its members' interests, against EPA and other entities to enforce the Clean

Water Act and water quality requirements. OVEC has advocated with EPA to address impacts,

including by submitting a petition asking for EPA to address the environmental justice impacts

of mountaintop removal mining. With other Appalachian community groups, OVEC also

submitted comments on the June 11, 2009 Memorandum of Understanding and the interagency

review process, urging the agencies to follow the law and the science on mountaintop removal

mining and related water quality harm. OVEC also is highly active locally in community

education and outreach to explain and try to reduce the harm of mountaintop removal mining.

27.     OVEC has committed significant time and resources to these activities in the past and

has concrete plans to continue to do so to try to save mountains and waterways from irreversible

harm. This is what our members want and is central to OVEC's mission. To do our job, OVEC

needs the type of information that we anticipate coming from an effective interagency process

that actually considers the impacts of pending permit applications, such as the type of

information that EPA's guidance has recognized is important to meet existing legal

requirements. OVEC intends to use this type of information about permit applications to make

decisions about how best to expend its resources on advocacy, litigation, and public education.

OVEC also intends to continue to inform its members about the impacts specific permit

applications are likely to have on issues like local drinking water quality, recreational

opportunities, and their enjoyment of our mountains and waterways, through observation,

fishing, walking, hiking and day-to-day living in our mountain communities.

28.     On behalf of OVEC, with other staff, volunteers and members, I keep abreast of the

interagency permit review process and policy documents issued by the Corps and EPA. I believe

D10

that if any individual permit applications are issued that do not comply with existing legal requirements then OVEC will continue to need to expend more resources including by engaging in new advocacy or bringing new litigation to try to prevent waste dumping into waters from new permits.

29.     In my position with OVEC, I speak regularly with other members who share my personal connection to and love of the waters and mountains in West Virginia, although they may live near or enjoy different waters than the ones I have a personal connection with.  Based on my knowledge of our membership, I believe that other OVEC members also face harm to their interests, as I do, if the interagency process does not happen effectively and if more flawed permit decisions are made.  It is part of OVEC's mission to help represent and protect the interests of these and all other members in the special waters and environment of our state.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 12th day of Oct 2010.


Vivian Stockman

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
NATIONAL MINING ASSOCIATION,      )
                                                    )
                    Plaintiff,                      )
                                                    )
                    v.                              )        No. 1:10-cv-01220-RBW
                                                    )
LISA JACKSON, ADMINISTRATOR,       )
U.S. ENVIRONMENTAL PROTECTION    )
AGENCY, et al.,                               )
                                                    )
                    Defendants,                   )
                                                    )
            and                                     )
                                                    )
SIERRA CLUB, WEST VIRGINIA          )
HIGHLANDS CONSERVANCY,               )
COAL RIVER MOUNTAIN WATCH,         )
OHIO VALLEY ENVIRONMENTAL         )
COALITION, KENTUCKIANS FOR          )
THE COMMONWEALTH,                     )
SOUTHERN APPALACHIAN               )
MOUNTAIN STEWARDS,                     )
STATEWIDE ORGANIZING FOR            )
COMMUNITY EMPOWERMENT,            )
                                                    )
                    Movants.                       )
_____)

**Exhibit 2**

**Declaration of James Tawney**

D13

**AFFIDAVIT OF JAMES TAWNEY**

I, James Tawney, state and affirm as follows:

1. I was born in Spencer, West Virginia and raised in Clay County, West Virginia. I currently live in Nicholas County, West Virginia about 15 minutes from Peters Creek in the Gauley River Watershed. I have spent most of my life in Clay and Nicholas Counties. As a kid I extensively travelled the area with family members and when working. In my adult years, my wife and I frequently travel around the Gauley River Watershed.

2. I have been a member of the West Virginia Highlands Conservancy since April of 2007. The Conservancy is a nonprofit membership organization located in West Virginia and for the past three decades has been a leader in citizen efforts to protect West Virginia's land and water resources from the effects of illegal coal mining.

3. I have been a member of Ohio Valley Environmental Coalition ("OVEC") for over a year. OVEC has a mission to organize and maintain a diverse grassroots organization dedicated to the improvement and preservation of the environment through education, grassroots organizing and coalition building, leadership development, and media outreach.

4. I understand that several of the applications for Clean Water Act section 404 permits currently undergoing coordinated interagency review by the U.S. Environmental Protection Agency and U.S. Army Corps of Engineers as part of the Enhanced Coordination Process are for mines that would operate in the Gauley River watershed. These mines include Alex Energy Inc.'s Federal Surface Mine (LRH-2007-00182) which would impact Twentymile Creek of the Gauley River, and Lonestar Surface Mine (LRH-2007-00285) which would impact Peters Creek of the Gauley River, as well as Atlantic Leasco's Muddlety Surface Mine No. 1 (LRH-2007-00134) which would impact Muddlety Creek of the Gauley River. I have visited and recreated in the area that will be impacted by these proposals, and intend to return to the area to visit and recreate in the future. If the EPA and Army Corps are not allowed to conduct their coordinated review, or if the permit applications are approved without being required to consider appropriate impacts or put required additional environmental protections in place, my ability to use and enjoy the affected waters will be significantly impaired.

5. I have fished a stretch of Peters Creek approximately three miles downstream from Jones Branch, and approximately two and a half miles downstream from Jerry Fork, approximately twenty five times. This is a beautiful area and I intend to go back and fish there in the future, but am concerned about the stream destruction and pollution from the proposed Alex Energy mines and other mining operations, including sediment and chemicals harming the fish and other aquatic life. At some point I may not be able to catch fish here anymore and this is very upsetting. When I do catch fish I don't eat them because of health concerns and fear of pollution. If the mining companies like Alex Energy are required to minimize their impacts and avoid polluting all the water, maybe this area can recover and it will be safe to eat the fish again.

6. I also drive by Peters Creek and the mouths of Jones Branch and Jerry Fork nearly every day. When I drive by I look at the creek and am concerned about water quality and pollution and all the mining in the area. The way I look at it is there is no way they could do all that damage to the watershed and not impact the crawdads, lizards and fish. There are so many

D14

different mining companies discharging into Peters Creek, it is depressing to think about all the pollution that is happening, particularly from surface mines like the proposed Alex Energy mines.

7. I also fish in the Gauley River just downstream from the mouth of Peters Creek at Peters Junction. This is about 6 or 7 miles downstream of Jones Branch and 5 or 6 miles downstream of Jerry Fork. I have fished in this location approximately 30 times in my life. I intend to return to this area and fish again in the future but am concerned about the impacts to the fishery from the pollution from the mining companies like Alex Energy upstream. When I do catch fish in this area I no longer eat the fish because of health concerns about the effects of the mining upstream of the area. I know things will even get worse if someone doesn't do something to limit the pollution coming from the mining companies and enforce limits on pollution. If the mining companies like Alex Energy are required to minimize their impacts and avoid polluting all the water, maybe this area can recover and it will be safe to eat the fish again.

8. I also have a particular interest in and concern for the Twentymile Creek watershed. I have driven along the entire length of Twentymile Creek several times when I was younger and the roads were not blocked. I also used to drive up Twentymile near Vaughan everyday to pick up a co-worker for work. As I have driven along Twentymile Creek I think about the fish and other aquatic life and waterfowl that live in the Creek and I am very angry to know that the pollution from surface mining will harm the fish and other living things in the stream.

9. There is a swimming hole in Twentymile Creek approximately 2.5 miles upstream of Vaughan. I used to swim there and would like to again in the future but I am concerned that it isn't safe because of the pollution from the mines. The swimming hole is in a beautiful area and it is sad to think it is being harmed by pollution coming from the mines upstream. In my most recent trip to Twentymile in October 2010, I walked the creek and fished. I only saw a few minnows and some creek chubs, and the further up the creek I went closer to the mines, there was no evidence of fish and the stream bottom looked unhealthy. I intend to continue my visits to Twentymile Creek in the future, but am saddened by the harm to the ecosystem caused by the surface mining.

10. I have driven along Muddlety Creek many times. When I drive by I look at the creek and am concerned about water quality and pollution and all the mining in the area. I am concerned for the small fish and aquatic life in the Creek that the pollution from the mines is harming them. There are so many different mining companies discharging into Muddlety Creek, it is depressing to think about all the pollution that is happening, particularly from surface mines like the proposed Atlantic Leasco mine.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 7th day of _October_ 2010.

James Tawney

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NATIONAL MINING ASSOCIATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:10-cv-01220-RBW |
| | ) | |
| LISA JACKSON, ADMINISTRATOR, | ) | |
| U.S. ENVIRONMENTAL PROTECTION | ) | |
| AGENCY, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SIERRA CLUB, WEST VIRGINIA | ) | |
| HIGHLANDS CONSERVANCY, | ) | |
| COAL RIVER MOUNTAIN WATCH, | ) | |
| OHIO VALLEY ENVIRONMENTAL | ) | |
| COALITION, KENTUCKIANS FOR | ) | |
| THE COMMONWEALTH, | ) | |
| SOUTHERN APPALACHIAN | ) | |
| MOUNTAIN STEWARDS, | ) | |
| STATEWIDE ORGANIZING FOR | ) | |
| COMMUNITY EMPOWERMENT, | ) | |
| | ) | |
| Movants. | ) | |

**Exhibit 3**

**Declaration of Cindy Rank**

D16

## DECLARATION OF CINDY RANK

1.      My name is Cindy Rank.  I have personal knowledge of the matters set forth in this declaration.

2.      I submit this declaration in support of the West Virginia Highlands Conservancy's motion to intervene as a defendant in the National Mining Association's lawsuit challenging the policy documents issued by the United States Environmental Protection Agency (EPA) and the United States Army Corps of Engineers (Corps) in connection with their review of Clean Water Act permit applications associated with surface coal mining projects in Appalachia.

3.      I have been a member of the West Virginia Highlands Conservancy ("WVHC") since 1979.  I was President from October 1988 to 1994, and currently serve on the Board of Directors.  Since 1994, I have also served as Chair of the WVHC Mining Committee.  As such, I have extensive personal knowledge of the interests and activities of the West Virginia Highlands Conservancy.

4.      The West Virginia Highlands Conservancy, Inc. is a nonprofit organization incorporated in West Virginia.  It has approximately 1,700 members.  It works for the conservation and wise management of West Virginia's natural resources, and is one of West Virginia's oldest environmental activist organizations.   The West Virginia Highlands Conservancy is dedicated to protecting clean air, clean water, forests, streams, mountains, and the health and welfare of the people that live here.

5.      The West Virginia Highlands Conservancy continues to work in vigorous opposition to coal mining by mountaintop removal, including the filing of lawsuits that challenge this method of resource extraction based on violations of the Clean Water Act

and the Surface Mining Control and Reclamation Act. In 1998, West Virginia Highlands Conservancy played a key role in convincing the United States Environmental Protection Agency to conduct the first ever Environmental Impact Study ("EIS") on the effects of mountaintop removal mining and valley fills, especially as that practice impacts the long term health of our water resources.

6.      The interests of the West Virginia Highlands Conservancy and its members will be adversely affected if the National Mining Association secures the requested declaratory and injunctive relief enjoining implementation of, and vacating, the June 11, 2009 Enhanced Coordination Process Memoranda and the April 1, 2010 Detailed Guidance Memorandum. For example, West Virginia Highlands Conservancy's members have interests in waters and lands that will be directly impacted by surface mines that have applications for Clean Water Act section 404 permits currently subject to the Enhanced Coordination Process and other applicable policy documents. These interests will be adversely affected if these applications are approved without receiving the benefit of EPA's input and expertise.

7.      For example, West Virginia Highlands Conservancy member James Tawney has an interest in the Gauley River watershed in Nicholas and Clay Counties, including the areas in and around Peters Creek and Twentymile Creek. This interest will be injured should the application for the Alex Energy, Inc. Federal Surface Mine (LRH-2007-00182) and Lonestar Surface Mine (LRH-2007-00285) be approved without being subject to the EPA and Army Corps coordinated review, or without ensuring that it includes legally required environmental protections.

8.      I too have on several occasions visited the Gauley River watershed in

Nicholas and Clay Counties including the areas in and around Peters Creek and Twentymile Creek. Mine discharges into those streams are of particular concern because of their proximity to the Gauley River National Recreation Area (NRA). Peters Creek flows directly into the Gauley and the NRA at Peters Junction, a popular access point for rafters, canoe and kayak users as well as other water enthusiasts. Concern for these waters and the recreational uses of the river prompted the West Virginia Highlands Conservancy and me as Chair of the Mining Committee to support the nomination and eventual listing of the Gauley River as one of American Rivers ten "Most Endangered Rivers" for 2010. Without EPA and Army Corps coordinated review of permits in this area, or without ensuring that legally required environmental protections are incorporated we fear more harm will come to the Gauley and the popular National Recreation Area. I will continue to visit the Gauley River area as will other members of the West Virginia Highlands Conservancy. I personally enjoy the beauty of the area, the sights and sounds of both the small streams and the larger river and taking pictures to extend the experience when I'm not there in person.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on October ___, 2010.

_____
Cindy Rank

D19

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| NATIONAL MINING ASSOCIATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:10-cv-01220-RBW |
| ) | |
| LISA JACKSON, ADMINISTRATOR, ) | |
| U.S. ENVIRONMENTAL PROTECTION ) | |
| AGENCY, et al., ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| SIERRA CLUB, WEST VIRGINIA ) | |
| HIGHLANDS CONSERVANCY, ) | |
| COAL RIVER MOUNTAIN WATCH, ) | |
| OHIO VALLEY ENVIRONMENTAL ) | |
| COALITION, KENTUCKIANS FOR ) | |
| THE COMMONWEALTH, ) | |
| SOUTHERN APPALACHIAN ) | |
| MOUNTAIN STEWARDS, ) | |
| STATEWIDE ORGANIZING FOR ) | |
| COMMUNITY EMPOWERMENT, ) | |
| ) | |
| Movants. ) | |
| _____) | |

**Exhibit 4**

**Declaration of Debbie Jarrell**

D20

## DECLARATION OF DEBRA L. JARRELL of Coal River Mountain Watch

I, Debra L. Jarrell state and affirm as follows:

1.    I have personal knowledge of the matters set forth in this declaration. I submit this declaration in support of the intervention of the Coal River Mountain Watch as a defendant in the National Mining Association's lawsuit against the U.S. Environmental Protection Agency, U.S. Army Corps of Engineers and other government officials, in which it challenges the policy documents issued by the United States Environmental Protection Agency (EPA) and the United States Army Corps of Engineers (Corps) in connection with their review of Clean Water Act permit applications associated with surface coal mining projects in Appalachia.

2.    I have been a resident of Rock Creek in Raleigh County, WV, for 51 years.

3.    I am Assistant Director for the nonprofit organization, Coal River Mountain Watch (CRMW), based in Whitesville, WV.  I have personal knowledge of the interests and activities of CRMW. I have been a member of CRMW for 5 years.

4.    Coal River Mountain Watch is a grassroots organization begun in 1998 in response to the fear and frustration of people living near or downstream from huge mountaintop removal sites. We include volunteers and members working to organize the residents of southern West Virginia to fight for social, economic, and environmental justice and against the terrible harm caused by mountaintop removal mining.  The mission of Coal River Mountain Watch is to stop the destruction of our communities and environment by mountaintop removal mining, to improve the quality of life in our area and to help rebuild sustainable communities.

5.    CRMW currently has 385 members in West Virginia.

6.    CRMW has been active and is still in federal court to challenge a number of

harmful U.S. Army Corps of Engineers permits for valley fills. We also have led and continue to engage in community advocacy and organizing against a sludge dam and preparation plant associated with a large mine near Marsh Fork Elementary School.

7. CRMW, with other local groups, filed comments in 2009 on the Corps and EPA interagency permit review process and the Joint Memorandum of Understanding for section 404 permit review and we have urged the agencies to do their job as the law requires. We also have submitted numerous petitions explaining the grave need to enforce the Clean Water Act in Appalachia at each stage of the potential permit process and beyond, and to consider and prevent the particular impact that mountaintop removal mining has had and continues to have in certain watersheds and areas of southern West Virginia. With other local groups, we also have filed comments on pending permit applications urging both the Corps and EPA to take all necessary action to protect the environment of West Virginia from harmful mining waste, including by preventing harm to the communities living downstream from proposed surface mine operations.

8. The members of CRMW care about the well-being of the waters and resources of our unique Appalachian region, especially in southern West Virginia. We need the EPA and Corps to be able to communicate with one another and to take every necessary step to protect our waters, about all permit applications. We are monitoring the permit review process and seeking information about the impact of mountaintop removal mining generally and individual potential permit applications on our local communities. We plan to use information about this permit review process and local proposed permit applications in our efforts here in West Virginia and beyond to work toward our basic mission every day to inform the public about the destruction of mountain streams and engage in advocacy to protect our vital community waterways.

9.   CRMW is also closely following the interagency review process. If effective decisions do not come out of that process for the streams and mountains near our members' homes and communities in West Virginia then we will likely need to spend more time and energy and resources to save our waters and prevent harmful environmental impacts. One measure we would likely consider would be the need to spend more time and energy to bring the types of cases like those we have brought in the past against the Corps when we believe it has violated the law. The less well the agencies do their job, the harder we have to work to protect our streams and mountains here.

10.   Here at CRMW, I talk often with people who are members and volunteers who have a deep, personal link to our waters and who can't stand more destruction of waters by harmful waste dumping from mountaintop removal mining. It is important to CRMW to keep working to protect these waters and to help people in our community take action on behalf of the waters near where they live, fish, and that they and their families have enjoyed for generations.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on this _12th_ day of _October_ 2010.

_Debra L. Jarrell_
Debra L. Jarrell

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                              )
NATIONAL MINING ASSOCIATION,   )
                                              )
                    Plaintiff,                 )
                                              )
                    v.                         )          No. 1:10-cv-01220-RBW
                                              )
LISA JACKSON, ADMINISTRATOR,   )
U.S. ENVIRONMENTAL PROTECTION )
AGENCY, et al.,                           )
                                              )
                    Defendants,             )
                                              )
          and                                )
                                              )
SIERRA CLUB, WEST VIRGINIA        )
HIGHLANDS CONSERVANCY,           )
COAL RIVER MOUNTAIN WATCH,      )
OHIO VALLEY ENVIRONMENTAL       )
COALITION, KENTUCKIANS FOR        )
THE COMMONWEALTH,                   )
SOUTHERN APPALACHIAN             )
MOUNTAIN STEWARDS,                   )
STATEWIDE ORGANIZING FOR          )
COMMUNITY EMPOWERMENT,          )
                                              )
                    Movants.                )
_____)

**Exhibit 5**

**Declaration of Ed Hopkins**

D24

**DECLARATION OF ED HOPKINS**
**Submitted in Support of the Sierra Club**

1.      My name is Ed Hopkins.  I have personal knowledge of the matters set forth in this declaration.

2.      I submit this declaration in support of the Sierra Club's motion to intervene as a defendant in the National Mining Association's lawsuit challenging the policy documents issued by the United States Environmental Protection Agency (EPA) and the United States Army Corps of Engineers (Corps) in connection with their review of Clean Water Act permit applications associated with surface coal mining projects in Appalachia.

3.      I am currently the Senior Washington, D.C. Director for the Sierra Club.  I have worked in this position or in a very similar capacity for Sierra Club for approximately 12 years. As such, I have extensive personal knowledge of the interests and activities of the Sierra Club.

4.      Sierra Club is a nonprofit corporation incorporated in California, with more than 620,000 members and supporters nationwide. The Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.  The Sierra Club's concerns encompass the exploration, enjoyment and protection of surface waters in Kentucky, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia.  The Sierra Club has more than 69,500 members in the states affected by the policy documents issued by the United States Environmental Protection Agency and Army Corps of Engineers that are the subject of the claims asserted by the National Mining Association in this action.

D25

5.      The Sierra Club has more than 5,000 members in Kentucky, 17,000 members in Ohio, 24,000 members in Pennsylvania, 6,500 members in Tennessee, 15,000 members in Virginia, and more than 2,000 members in West Virginia. In each of the above states, Sierra Club is monitoring numerous Clean Water Act section 404 permit applications for surface mining operations that are currently under interagency review and expects that additional new permit applications will be submitted in the near future. Sierra Club also has tracked and continues to monitor the impacts of each of the final permit decisions that the Corps has issued in 2009 and 2010 in the above states, as well as the proposed veto determination that EPA has published for one permit in West Virginia.

6.      Sierra Club has long worked to oppose mountaintop removal mining and other destructive forms of surface mining in Appalachia.  The Sierra Club has participated in at least fifteen state, federal, or administrative actions challenging the issuance of permits for surface mines under the Clean Water Act or surface mining laws, or seeking to enforce the conditions in those permits.  These legal actions include several lawsuits against the Corps for its issuance of legally inadequate permits under section 404 of the Clean Water Act.  The Sierra Club has also submitted detailed comments to the Army Corps on at least thirteen applications for section 404 permits for surface mines in Kentucky.

7.      Sierra Club has also participated in actions challenging federal regulations relevant to surface mining in Appalachia, including a recent challenge to the George W. Bush administration's revisions to the Stream Buffer Zone rule (promulgated by the Office of Surface Mining, U.S. Department of Interior, with concurrence by EPA).  The Sierra Club has submitted detailed comments on proposed agency actions relating to surface mining in Appalachia, including comments on the Army Corps' proposal to suspend or repeal Nationwide Permit 21

D26

and the Office of Surface Mining, Reclamation, and Enforcement's proposed oversight improvement actions for surface mining operations. The Sierra Club has also submitted petitions to the EPA and the federal Office of Surface Mining, Reclamation, and Enforcement requesting that those agencies withdraw the authority delegated to states to implement and enforce the Clean Water Act and Surface Mining Control and Reclamation Act as pertains to surface mining operations due to the states' failure to fulfill Clean Water Act requirements.

8.     The Sierra Club also submitted comments on the June 11, 2009 Memorandum of Understanding and permit review process, urging the agencies to fully adhere to the requirements of the Clean Water Act. The comments submitted further urged the agencies to take conductivity and other water quality indicators into account when reviewing permit applications.

9.     In order to better protect the interests of its members, the Sierra Club has expended its own funds to commission or publicize relevant scientific studies in those instances where EPA and the Corps have failed to conduct their own scientifically adequate research into the potential effects of proposed permits. Sierra Club has current plans to continue to expend resources to conduct or publish such research, particularly if permit applicants and the agencies continue to fail to provide complete information on environmental impacts, including information on the presence and impacts of elevated conductivity, the sufficiency of proposed stream mitigation, and other information discussed as relevant in the April Guidance. Sierra Club is committed to ensuring that these forms of information are available to the public in order to both protect its interests and those of its members through legal challenges to permits and enforcement of permits, as well as to educate the public about the environmental harms caused by mountaintop removal mining and valley fills.

10.     The interests of the Sierra Club and its members will be adversely affected if the

3

D27

National Mining Association secures the requested declaratory and injunctive relief enjoining implementation of, and vacating, both the June 11, 2009 Enhanced Coordination Process Memoranda and the April 1, 2010 Guidance Memorandum. Even more importantly, the Club and its members will be harmed if the Plaintiff receives the requested relief of enjoining EPA from participating in the permit review process at all before it has initiated a section 404(c) veto, or if the Plaintiff receives the requested relief of an order compelling the Corps to issue permit decisions according to a specific timeline. For example, Sierra Club's members have interests in waters and lands that will be directly impacted by surface mines that have applications for Clean Water Act section 404 permits currently subject to the Enhanced Coordination Process and other applicable policy documents. These interests will be adversely affected if these applications are approved without receiving the benefit of EPA's input and expertise. The current interagency process for reviewing permit applications, including the consideration of information from relevant scientific studies and data, is designed to ensure that the agencies fully consider all potential environmental impacts, including impacts that would directly injure Sierra Club's members' interests in waters and natural resources, before reaching any final permit decision.

11.      If the permit applications under review were issued without adequate scientific and environmental review, as provided for by the Detailed Guidance, Sierra Club will investigate and will likely need to expend further time and resources in commenting on, advocating against, and eventually litigating, the harmful permits.

12.      As an example, Sierra Club member Lane Boldman has submitted a declaration demonstrating her interest in the Enterprise Mining Company mine in Knott County, KY (LRL-2008-654); and the Leeco, Inc. Stacy Branch Surface Mine in Perry County, KY (LRL-2007-217). Sierra Club member Joey Shadowen has also submitted a declaration demonstrating his

D28

interest in proposed Enterprise Mining Company mine in Knott County, KY (LRL-2008-654);

the Frasure Creek Mining Company mine in Magoffin County, KY (LRL-2007-1206); and the

Leeco, Inc. Stacy Branch Surface Mine in Perry County, KY (LRL-2007-217).  It is a core part

of the Sierra Club's mission to represent and protect these members' interest, and that of similar

members, which will be injured should the applications for the Enterprise, Leeco, and Frasure

Creek mines be issued without appropriate environmental review by the Corps and EPA,

including review of the scientific impacts discussed in the April Guidance, and without all

legally required environmental protections (or the denial or veto of the permit).  Sierra Club

believes that these members serve as examples of numerous additional members in the

Appalachian region who are likely to be affected by this case, if the NMA were to succeed.

    13.    Sierra Club believes it is likely to have members with particular interests in lands

and waters affected by numerous additional permits. For instance, Sierra Club has submitted

comments on applications for at least thirteen permits for proposed mining operations in

Kentucky that are on the ECP list.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 12, 2010.

_Ed Hopkins_

_____

Ed Hopkins

D29

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| _____ | ) | |
| NATIONAL MINING ASSOCIATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:10-cv-01220-RBW |
| | ) | |
| LISA JACKSON, ADMINISTRATOR, | ) | |
| U.S. ENVIRONMENTAL PROTECTION | ) | |
| AGENCY, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SIERRA CLUB, WEST VIRGINIA | ) | |
| HIGHLANDS CONSERVANCY, | ) | |
| COAL RIVER MOUNTAIN WATCH, | ) | |
| OHIO VALLEY ENVIRONMENTAL | ) | |
| COALITION, KENTUCKIANS FOR | ) | |
| THE COMMONWEALTH, | ) | |
| SOUTHERN APPALACHIAN | ) | |
| MOUNTAIN STEWARDS, | ) | |
| STATEWIDE ORGANIZING FOR | ) | |
| COMMUNITY EMPOWERMENT, | ) | |
| | ) | |
| Movants. | ) | |
| _____ | ) | |

**Exhibit 6**

**Declaration of Joey Shadowen**

D30

I, Jooy Shadowen, state and affirm as follows:

1.      I live at 114 Woodford Dr., Lexington, KY 40504. I have lived at this address for the past ten years.

2.      I joined the Sierra Club in 1992 and have held several leadership positions over the years. I currently serve as the chair of the Cumberland chapter and as the Midwest regional representative on the Inner City Outings National steering committee.

3.      I am concerned about mountaintop removal mining issues and am aware of the practice's many detrimental impacts on the environment. I have learned about mining activities from going to various mine sites. I have also educated myself by reading national media and environmental magazines and by having conversations with friends.

4.      Mountaintop removal mining and other forms of coal strip mining have impacted my life in many ways. I love to go backpacking and hiking across eastern and southern Kentucky. When planning a trip I have to be careful to avoid mining areas, as it would be unsafe to hike across or to get water from the area around mine sites. I would not drink water from a stream or other water body that drains from a mountaintop removal site because I am aware that mountaintop removal mines leach selenium and other toxic chemicals into the water. Mountaintop removal mining also destroys the scenic beauty of a given area and discourages me from wanting to visit.

5.      I understand that several of the applications for Clean Water Act section 404 permits currently undergoing coordinated review by the U.S. Environmental Protection Agency (EPA) and the U.S. Army Corps of Engineers (Army Corps) as part of the Enhanced Coordination Process are for mines that would operate in eastern Kentucky. I have visited the areas and watersheds near some of these proposed mines, and intend to return to visit these areas in the future. In particular, I have been to the areas nearby the proposed Enterprise Mining Company mine in Knott County (LRL-2008-654); the Frasure Creek Mining Company mine in Magoffin County (LRL-2007-1206); and the Leeco, Inc. Stacy Branch Surface Mine along Stacy Branch in Perry County (LRL-2007-217). If the EPA and Army Corps are not allowed to conduct their coordinated review, or if the permit applications are approved without review of the scientific impacts or the need to put all required environmental protections in place, my ability to use and enjoy the affected waters will be significantly impaired.

6.      In each of these areas, I am concerned that mining will damage the natural surroundings. I am particularly disturbed about the proposed Enterprise and Leeco mine sites, because they are very close to Carr Creek Lake, which is nice for fishing and hunting and I am concerned that debris from the mining will damage the lake. Near the Frasure Creek mine, my wife and I went up Brushy Fork and saw many beautiful trees. I would like to recreate in these areas, and I intend to return in the future, but I would not

D31

USCA Case #12-5310      Document #1434537      Filed: 05/06/2013      Page 102 of 142

return if I knew that mountaintop removal mining had been allowed to occur at any of them.

6.      I have visited waterways in the areas of the three proposed mines. Near the proposed Enterprise mine, I hiked along the Stillhouse Branch and the Reynolds Branch, which flows into Troublesome Branch. The water quality of the Reynolds Branch seemed to be ok, but I am concerned that this water quality will degrade if mountaintop removal mining at the Enterprise mine site is allowed to occur without the benefit of additional EPA guidance and review, and without additional environmental protections put in place. Similarly, I have visited waterways in the area of the Frasure Creek mine. I went along the Sulphur Spring Branch and Sycamore Branch, which flow into Brushy Fork Creek then into the Licking River. Water quality in the area seemed to be ok, but I noticed that there was already mining activity in the area, and I am concerned that water quality of the area will degrade if mountaintop removal mining at the Frasure Creek mine site is allowed to occur without the benefit of additional EPA guidance and review, and without additional environmental protections put in place. Additionally, near the Leeco mine I walked along Stacey Branch and some tributaries, and was also along Carr Fork. I walked up a four-wheel drive road along a creek branch that drains into Carr Fork. The tributary was a nice little creek and I spent some time in the water taking photographs. Water appearance seemed to be acceptable now, but I am concerned that this water quality will degrade if mountaintop removal mining at the Leeco mine site is allowed to occur without the benefit of additional EPA guidance and review, and without additional environmental protections put in place. I hope to return to these areas in the future, but I would not return, and certainly would not go into the creeks, if the proposed mountaintop removal mining operations are allowed to proceed without the benefit of additional environmental review .

7.      I have hiked areas such as those near the proposed Enterprise, Frasure Creek and Leeco mines for most of my life, from when I was a Boy Scout until now.

8.      Coal mining has already interfered with my recreational activities. Many of the regions I hike around have already been impaired due to mining and are quite different from areas I have hiked in that are better protected from mining impacts. I have seen strip coal mining degrade trails, pollute waters, and destroy the surrounding scenic beauty. I am very concerned that future coal mining will adversely affect my ability to enjoy, hike and lead trips in some of the remaining areas that have not yet been touched by mining.

9.      If the U.S. Environmental Protection Agency and the U.S. Army Corps of Engineers were allowed to continue their enhanced, coordinated review of applications for Clean Water Act section 404 fill permits for surface mines, and were allowed to continue to provide information and guidance to Kentucky regulators on the issuance of Clean Water Act discharge permits for surface mines like the Enterprise, Frasure Creek or Leeco mines, I believe it would allow me to continue recreating in the area and be able to have greater confidence in the water I was drinking. I also believe it would be safer as

D32

USCA Case #12-5310      Document #1434537      Filed: 05/06/2013      Page 103 of 142

I would be less concerned about flash floods and mudslides. I also would have less concern about mine waste and holding ponds contaminating my water.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct. Executed on this __8__ day of __Oct__ 2010.

Joey Shadowen

D33

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| NATIONAL MINING ASSOCIATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:10-cv-01220-RBW |
| | ) | |
| LISA JACKSON, ADMINISTRATOR, | ) | |
| U.S. ENVIRONMENTAL PROTECTION | ) | |
| AGENCY, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SIERRA CLUB, WEST VIRGINIA | ) | |
| HIGHLANDS CONSERVANCY, | ) | |
| COAL RIVER MOUNTAIN WATCH, | ) | |
| OHIO VALLEY ENVIRONMENTAL | ) | |
| COALITION, KENTUCKIANS FOR | ) | |
| THE COMMONWEALTH, | ) | |
| SOUTHERN APPALACHIAN | ) | |
| MOUNTAIN STEWARDS, | ) | |
| STATEWIDE ORGANIZING FOR | ) | |
| COMMUNITY EMPOWERMENT, | ) | |
| | ) | |
| Movants. | ) | |

---

**Exhibit 7**

**Declaration of Lane Boldman**

D34

## DECLARATION OF LANE BOLDMAN

I, Lane Boldman, state and affirm as follows:

1.      I live at 114 Woodford Dr., Lexington KY, 40504. I have lived at this address for the past 10 years.

2.      I joined the Sierra Club in 1993 and I have held various leadership positions in the Club over the years including: Outings leader, backpacking instructor, Lexington Group Chair, Cumberland (Kentucky) Chapter Chair, Chair of the Council of Sierra Club Leaders and my current position as a member of the National Sierra Club Board of Directors.

3.      I understand that several of the applications for Clean Water Act section 404 permits currently undergoing coordinated review by the U.S. Environmental Protection Agency (EPA) and U.S. Army Corps of Engineers (Army Corps) as part of the Enhanced Coordination Process are for mines that would operate in eastern Kentucky.  I have visited the areas and watersheds near some of these proposed mines, and intend to return to visit these areas in the future. These mines include: an Enterprise Mining Company mine in Knott County (LRL-2008-654); and the Leeco, Inc. Stacy Branch Surface Mine along Stacy Branch in Perry County (LRL-2007-217). If the EPA and Army Corps are not allowed to conduct their coordinated review, or if the permit applications are approved without an appropriate look at the current science or the inclusion of required  environmental protections, my ability to use and enjoy the affected waters will be significantly impaired.

4.      I have been to several mining sites in my lifetime. I first saw the impacts of underground and strip mining through my years of hiking in the Big South Fork National Recreational Area in Kentucky, which had been a previously mined region. In that area, I'd seen many examples of destructive impacts to land and the resulting acid mine runoff into watersheds. Years later, I also became familiar with mountaintop removal mining through my visits to various areas in West Virginia and in eastern Kentucky. In addition to mountain top removal mining, I am also familiar with other mining techniques such as longwall mining and highwall mining.  Through my pursuits as a backcountry hiker, I am very aware of the environmental impacts that different types of mining can cause because I have seen many land and ecosystem impacts first-hand, have read many articles on the topic, and have also read many environmental impact statements.

5.      Mountaintop removal coal mining and other forms of strip mining have seriously impacted my way of life in that I have seen where mining impacts have severely degraded my recreational opportunities throughout eastern Kentucky. I am forced to be much more cautious now on where I choose to recreate due to the amount of mining activity in the areas that I have previously enjoyed exploring. I am also very cautious about where I find my water sources for backcountry travel because

1

I have seen where many mine operations have degraded the streams, particularly because of the amount of dust and debris mountaintop mining creates. In addition, I have seen many retention ponds on mine sites that appear to be leaking. This concerns me greatly as a backcountry hiker in that I often get my water supply from local creeks and am now concerned about the quality of the water. I love to photograph wild plants and trees, and am now running into a lot of invasive plants that were introduced through hydroseeding at the mountaintop mine sites in the vicinity of where I choose to recreate. If the Enterprise or Perry Leeco mines are approved, I will have even fewer areas to recreate in.

6.    I am a backpacker and backcountry hiker. I also am a photographer and take nature photos for both professional and recreational purposes. Additionally, I canoe and swim. Hiking allows me to explore and to photograph the wilderness and the unique mixed-mesophytic forests and wildlife of the Cumberland plateau and surrounding areas of eastern Kentucky. I am continually exploring the region to find new places to hike and to take pictures. The amount of mining in this region is severely impacting my ability to safely recreate in these areas. I often climb to the tops of mountains in order to gain access to great vistas so that I can photograph them, only to find that some of the mountains in view have been leveled, which has ruined any opportunity of photographing a decent vista of the mountain range. I want to be able to take pictures of the entire vista in a region without having to avoid highly visible MTR and stripped sites in the view. Mining has changed the features and topography of areas so that they no longer match the maps, which is a danger to me as I rely on these maps for orienteering and I often go to sites that are remote. As an outings leader for the Sierra Club, I am expected to have a thorough knowledge of backcountry areas and it is necessary to become familiar with backroads and alternate routes in and around areas where I may lead a hike, so it is important for me to become familiar with the many small roads, tributaries, and other landmarks in the region. I rely on landmarks such as mountains and streams to keep from getting lost in the backcountry and often find they have been altered or buried. It is much more difficult and dangerous to explore areas where the creeks are contaminated by mine waste and sediment, and the landmarks do not match what are on public maps. For this reason, among others, I do not like to explore or lead trips in areas that have experienced mountaintop removal mining. And, as earlier mentioned, I am dependent on good clean water sources while I am out in these regions and I do not trust the water quality around these sites.

7.    I recently visited the areas nearby the proposed Enterprise Mining Company mine in Knott County, and the proposed Leeco, Inc. Stacy Branch mine in Perry County. I was in all of these areas to look for new hiking sites, to learn more about mining effects, to take photographs and to learn more about the ecosystems in the region.

8.    In the vicinity of the Enterprise Mine in Knott County, I noticed that the fills in this area are close to homes, so I am concerned about the impact the mine will

D36

have on folks in the region. Near the proposed Enterprise mine, I traveled along Reynolds Branch, which flows into Troublesome Branch. The water quality of the Reynolds Branch seemed to be ok, but I am concerned that this water quality will degrade if mountaintop removal mining at the Enterprise mine site is allowed to occur without the benefit of additional EPA guidance and review, and without additional environmental protections put in place.  After another hike in the region, I also stopped by the area near the proposed Leeco mine along Stacy Branch. I walked along Stacy Branch and some tributaries, and was also along Carr Fork. I walked up a four-wheel drive road along a creek branch that drains into Carr Fork. The tributary was a nice little creek and I spent a little time in the water there taking photographs. Water appearance seemed to be ok, but I am concerned that this water quality will degrade if mountaintop removal mining at the Leeco mine site is allowed to occur without the benefit of additional EPA guidance and review, and without additional environmental protections put in place.  I thought that even though the area had fairly young trees, it still had nice hardwoods and a couple of interesting creeks. I would like to recreate in all of these areas, and I intend to return in the future, but I would not return if I knew that mountaintop removal mining had been allowed to occur at the Enterprise or Leeco mine sites without the benefit of additional environmental review.

10.    Coal mining has already interfered with my recreational activities. I am concerned for my safety in several ways with regard to the blasting and also with coal mining trucks carrying overweight loads down the narrow roads where I recreate. But, in addition, the mud and silt that is stirred up by mining operations has a tendency to erode land in areas where I have hiked, and caused excessive mud. Also it creates dust on plants that I am trying to photograph, and, again, creates a concern for the quality of the water that I recreate in. I am concerned that if the Enterprise and Leeco mines and other similar mountaintop removal mines are allowed to proceed without the benefit of additional EPA guidance and review, and without additional environmental protections put in place, there will be more blasting, more overloaded trucks, and more erosion, and that as a result I will not be able to continue recreating in these beautiful areas I love.

11.    I am very concerned that future coal mining will adversely affect my ability to enjoy these recreational activities. Many of the regions I hike around have already been impaired due to mining and are quite different from areas I have hiked in that are better protected from mining impacts. In particular, I am concerned about how close the Enterprise mine is to established recreational areas such as the Carr Fork Lake Wildlife Management Area. I do not see how wildlife can be maintained in a healthy population with this kind of activity so close by. I have been to other areas that have been mined in this manner and have not seen any wildlife after mining has occurred.  The Perry Leeco mine site is near several small towns and houses, and I am concerned that the mining here will disrupt the wells and water supplies for people in this region. I have already met several people in other areas where their wells have been affected by this type of mining.

3

D37

12.     If the U.S. Environmental Protection Agency and the U.S. Army Corps of Engineers were allowed to continue their enhanced, coordinated review of applications for Clean Water Act section 404 fill permits for surface mines, and were allowed to continue to provide information and guidance to Kentucky regulators on the issuance of Clean Water Act discharge permits for surface mines like the Enterprise and Perry Leeco mines, I believe it would allow me to continue recreating in the area and be able to have greater confidence in the water I was drinking. I also believe it would be safer as I would be less concerned about flash floods and mudslides. I also would have less concern about mine waste and holding ponds contaminating my water.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.  Executed on this ___8th___ day of _____October_____ 2010.

_____
Lane Boldman

D38

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| NATIONAL MINING ASSOCIATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:10-cv-01220-RBW |
| | ) | |
| LISA JACKSON, ADMINISTRATOR, | ) | |
| U.S. ENVIRONMENTAL PROTECTION | ) | |
| AGENCY, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SIERRA CLUB, WEST VIRGINIA | ) | |
| HIGHLANDS CONSERVANCY, | ) | |
| COAL RIVER MOUNTAIN WATCH, | ) | |
| OHIO VALLEY ENVIRONMENTAL | ) | |
| COALITION, KENTUCKIANS FOR | ) | |
| THE COMMONWEALTH, | ) | |
| SOUTHERN APPALACHIAN | ) | |
| MOUNTAIN STEWARDS, | ) | |
| STATEWIDE ORGANIZING FOR | ) | |
| COMMUNITY EMPOWERMENT, | ) | |
| | ) | |
| Movants. | ) | |

_____)

**Exhibit 8**

**Declaration of Steve Boyce**

D39

# DECLARATION OF STEVE BOYCE
## Submitted in Support of Kentuckians For The Commonwealth

1.  My name is Steve Boyce.  I have personal knowledge of the matters set forth in this declaration.

2.  I submit this declaration as part of Kentuckians For The Commonwealth's motion to intervene as a defendant in the National Mining Association's lawsuit challenging the policy documents issued by the United States Environmental Protection Agency (EPA) and the United States Army Corps of Engineers (Corps) in connection with their review of Clean Water Act permit applications associated with surface coal mining projects in Appalachia.

3.  I have been a member of Kentuckians For The Commonwealth ("KFTC") since 1995.  I currently serve as State Chairperson of the organization.  I have worked in this position or in a very similar capacity for KFTC for approximately 4 years.  As such, I have extensive personal knowledge of the interests and activities of Kentuckians For The Commonwealth.

4.  Kentuckians For The Commonwealth is a nonprofit membership corporation which is organized under the laws of the Commonwealth of Kentucky, has its main office in London, Laurel County, Kentucky, and has approximately 6,500 members statewide. KFTC's purposes include promoting social, economic, and environmental justice for all Kentuckians, such as by addressing problems of land and mineral use and ownership, and through the participation of citizens in promoting democratic institutions.

5.  Kentuckians For The Commonwealth continues to work in vigorous opposition to coal mining by mountaintop removal, including the filing of lawsuits that

challenge this method of resource extraction based on violations of the Clean Water Act and the Surface Mining Control and Reclamation Act. KFTC has also submitted detailed comments on proposed agency actions relating to surface mining in Appalachia, including comments on the Office of Surface Mining, Reclamation, and Enforcement's proposed oversight improvement actions for surface mining operations.

6.     The interests of Kentuckians For The Commonwealth and its members will be adversely affected if the National Mining Association secures the requested declaratory and injunctive relief enjoining implementation of, and vacating, both the June 11, 2009 Enhanced Coordination Process Memoranda and the April 1, 2010 Detailed Guidance Memorandum. For example, KFTC's members have interests in waters and lands that will be directly impacted by surface mines that have applications for Clean Water Act section 404 permits currently subject to the Enhanced Coordination Process (ECP) and other applicable policy documents. There are at least nineteen Clean Water Act section 404 permit applications for surface mining operations awaiting or currently undergoing ECP review in Kentucky, and additional permit applications are pending or expected in the near future. The interests of KFTC and its members will be adversely affected if these applications are approved without receiving the benefit of EPA's input and expertise.

7.     For example, KFTC member Ricky Handshoe has an interest in the Big Sandy River watershed in Floyd County, including the areas in and around Peters Saltlick Fork. This interest will be injured should the application for the Miller Brothers Mining Coal Mine (LRL-2007-01131) be approved without being subject to the EPA and Army Corps coordinated review, or without the permit applicant being required to put

USCA Case #12-5310     Document #1434537     Filed: 05/06/2013     Page 112 of 142

additional environmental protections in place.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 11, 2010.

Steve Boyce

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                   )

NATIONAL MINING ASSOCIATION,   )
                                   )

          Plaintiff,         )
                                   )

           v.           )     No. 1:10-cv-01220-RBW
                                   )

LISA JACKSON, ADMINISTRATOR,   )
U.S. ENVIRONMENTAL PROTECTION  )
AGENCY, et al.,                   )
                                   )

          Defendants,      )
                                   )

     and           )
                                   )

SIERRA CLUB, WEST VIRGINIA    )
HIGHLANDS CONSERVANCY,     )
COAL RIVER MOUNTAIN WATCH,   )
OHIO VALLEY ENVIRONMENTAL   )
COALITION, KENTUCKIANS FOR    )
THE COMMONWEALTH,         )
SOUTHERN APPALACHIAN       )
MOUNTAIN STEWARDS,        )
STATEWIDE ORGANIZING FOR    )
COMMUNITY EMPOWERMENT,   )
                                   )

          Movants.        )
_____)

**Exhibit 9**

**Declaration of Ricky Handshoe**

# DECLARATION OF RICKY L. HANDSHOE

I, Ricky L. Handshoe, state and affirm as follows:

1.      I live at 3901 Raccoon Road, Hueysville, KY 41640, on Saltlick Fork, in Floyd County. I have lived in this area, where there are headwaters of the Big Sandy, Kentucky, and Licking Rivers, my whole life. My family has been here for over 200 years. My grandmother was the postmistress of the first post office at Handshoe, Kentucky, and the operator of the country store. My parents and my sister live in Handshoe. From our homes we see mountains that have been destroyed by mountaintop removal (MTR) mining.

2.      I am a member of Kentuckians for the Commonwealth (KFTC) and the Sierra Club.

3.      I understand that several of the applications for Clean Water Act section 404 permits currently undergoing coordinated review for mines that would operate in eastern Kentucky. I have reviewed documents and maps submitted by Miller Brothers Mining, Inc. to the U.S. Army Corps of Engineers for a Clean Water Act section 404 permit for a new mine on the mountain behind my home. These documents make it clear that my home would be seriously affected by the proposed mine. I live approximately 300-400 feet from the mine boundary of the proposed Miller Brothers Coal Mine (now owned by International Resource Partners, LP—"IRP") in Floyd County on Saltlick Fork (LRL-2007-01131). The hollow-fill and sediment pond on Saltlick would be within sight of my home. If the EPA and Army Corps are not allowed to conduct their coordinated review, or if the permit applications are approved without being required to put necessary environmental protections in place, my ability to use and enjoy my property will be significantly impaired.

4.      I am also involved in water testing for conductivity levels of local streams. Since April 2010, I have tested Raccoon Creek, which runs into Saltlick Fork, and other area streams to determine their conductivity levels. Some of the conductivity levels I've measured have exceeded the limit my meter will measure (1500 µS/cm). I further understand that EPA issued guidance earlier this year to states and EPA regions indicating that science shows that conductivity levels above 500 µS/cm are likely to be associated with adverse impacts to stream life, and recognizing that this is relevant scientific information. I believe that if EPA is not allowed to make these kinds of science-based recommendations to regulators who write and review NPDES permits, my ability to use and enjoy the waters around my home will be significantly impaired.

5.      There are already nine hollow-fills and sediment ponds in the Saltlick drainage and I worry about the impact of adding additional structures. I have filed complaints with the state about permit violations in the existing mines. One of the ponds is leaking several gallons of water a day. If it or one of the others were to breach, my nephew's home would be swept away.

6.      When I moved to Saltlick several years ago, I intended to build a new

D44

house. Mountaintop removal blasting has deferred that dream. Blasting associated with the mining cracked the mobile home I first lived in. I moved into a new mobile home and blasting will probably crack that one too. I built a garage, and blasting damaged it as well. State inspectors agreed that the damages were caused by blasting, but said there was nothing they could to do about it since my property is within the company's permit limits. With the proposed new mines, it would be more of the same.

7.      I was raised in this county and have spent over 47 years in this area. Our streams used to run clear. They were full of fish. Now they are dewatered and dead. I am a hunter, hiker, and fisherman. Mining has destroyed a great deal of wildlife habitat and many fishing holes that I remember recreating in as a youth. The creek that still runs through my property feeds my garden and many forest animals rely on it. I delight in watching the wildlife drink from and wade in the creek. The recreational and aesthetic value I obtain from the creek would be ruined by the proposed mining operations. I am gravely concerned that my creek will become contaminated by runoff of sediment and other pollutants from the proposed valley fills and ponds. I am also worried that stream burial will diminish the amount of water flow in my creek, which would further increase the toxicity of mining pollutants.

8.      Miller Brothers/IRP has submitted a Mitigation Plan for this permit. It has been my experience with mining in this region that mitigation and reclamation are frauds. The companies cannot restore the woods as they were because there is no topsoil left. Thirty years ago, strip miners saved the topsoil and placed it back on the site. Now through MTR and other radical strip mining practices, the companies dump the topsoil in the creek, seed lespedeza (a non-native legume), heavily fertilize it, and make hay for five years until they get their bonds back. Then the companies let the area turn to bare rock. I understand that EPA's review of applications for section 404 permits has involved increased scrutiny on these kinds of mitigation plans, based on the most recent scientific studies on mitigation. I am very concerned that the Miller Brothers' proposed mining will result in the same scorched earth if EPA is not allowed to closely review its section 404 permit application, including its mitigation plans.

9.      There is one mountain left around me and Miller Brothers/IRP wants to take it down. I believe that if the U.S. Environmental Protection Agency and the U.S. Army Corps of Engineers were allowed to continue their enhanced, coordinated review of applications for Clean Water Act section 404 fill permits for surface mines, and were allowed to continue to provide information and guidance to Kentucky regulators on the issuance of Clean Water Act discharge permits for surface mines like the Miller Brothers' mine, the mining would be less harmful to my ability to use and enjoy my property. I also believe it would be safer as I would be less concerned about blasting and about mine waste contaminating my water.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct. Executed on this   7   day of   10   2010.

*Ricky L. Handshoe*
Ricky L. Handshoe

D45

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| _____ ) | | |
| NATIONAL MINING ASSOCIATION, ) | | |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| v. ) | No. 1:10-cv-01220-RBW | |
| ) | | |
| LISA JACKSON, ADMINISTRATOR, ) | | |
| U.S. ENVIRONMENTAL PROTECTION ) | | |
| AGENCY, et al., ) | | |
| ) | | |
| Defendants, ) | | |
| ) | | |
| and ) | | |
| ) | | |
| SIERRA CLUB, WEST VIRGINIA ) | | |
| HIGHLANDS CONSERVANCY, ) | | |
| COAL RIVER MOUNTAIN WATCH, ) | | |
| OHIO VALLEY ENVIRONMENTAL ) | | |
| COALITION, KENTUCKIANS FOR ) | | |
| THE COMMONWEALTH, ) | | |
| SOUTHERN APPALACHIAN ) | | |
| MOUNTAIN STEWARDS, ) | | |
| STATEWIDE ORGANIZING FOR ) | | |
| COMMUNITY EMPOWERMENT, ) | | |
| ) | | |
| Movants. ) | | |
| _____) | | |

**Exhibit 10**

**Declaration of Jane Branham**

D46

# DECLARATION OF JANE BRANHAM
## Submitted in Support of the Southern Appalachian Mountain Stewards

1.     My name is Jane Branham. I have personal knowledge of the matters set forth in this declaration.

2.     I submit this declaration as part of the Southern Appalachian Mountain Stewards' motion to intervene as a defendant in the National Mining Association's lawsuit challenging the policy documents issued by the United States Environmental Protection Agency (EPA) and the United States Army Corps of Engineers (Corp) in connection with their review of Clean Water Act permit applications associated with surface coal mining projects in Appalachia.

3.     I am currently the Vice-President of the Southern Appalachian Mountain Stewards ("SAMS"). I have served in this position or in a very similar capacity for Southern Appalachian Mountain Stewards for approximately 1 year. As such, I have extensive personal knowledge of the interests and activities of the Southern Appalachian Mountain Stewards.

4.     The Southern Appalachian Mountain Stewards is a non-profit association incorporated in Virginia, with its office in Appalachia, Virginia. It is an organization of concerned community members in southwestern Virginia who are working to stop the destruction of their communities by surface coal mining, to improve the quality of life in their area, and to help rebuild sustainable communities.

5.     The Southern Appalachian Mountain Stewards continues to work in vigorous opposition to coal mining by mountaintop removal, including the filing of lawsuits that challenge this method of resource extraction based on violations of the

Clean Water Act and the Surface Mining Control and Reclamation Act.

6.    The Southern Appalachian Mountain Stewards has also participated in actions challenging federal regulations relevant to surface mining in Appalachia, including a recent challenge to the George W. Bush administration's revisions to the Stream Buffer Zone rule (promulgated by the Office of Surface Mining, U.S. Department of Interior, with concurrence by EPA). SAMS has submitted detailed comments on proposed agency actions relating to surface mining in Appalachia, including comments on the Office of Surface Mining, Reclamation, and Enforcement's proposed oversight improvement actions for surface mining operations.

7.    The interests of the Southern Appalachian Mountain Stewards and its members will be adversely affected if the National Mining Association secures the requested declaratory and injunctive relief enjoining implementation of, and vacating, both the June 11, 2009 Enhanced Coordination Process Memoranda and the April 1, 2010 Detailed Guidance Memorandum. For example, Southern Appalachian Mountain Stewards' members have interests in waters and lands that will be directly impacted by surface mines whose applications for Clean Water Act section 404 permits will be subject to EPA review. These mines include the Ison Rock Ridge mine whose section 404 permit authorization under NWP 21 was recently suspended, but which is expected to apply for an individual section 404 permit in the very near future. The Southern Appalachian Mountain Stewards have previously brought legal challenges to Clean Water Act NPDES discharge permits and Surface Mining Control and Reclamation Act permits for the Ison Rock mine. These permits have not yet been issued, and will benefit from the application of EPA guidance and EPA review. The interests of Southern

D48

Appalachian Mountain Stewards and its members will be adversely affected if these applications are approved without receiving the benefit of EPA's input and expertise.

8.    For example, Southern Appalachian Mountain Stewards member Bob Mullins has an interest in the proposed Ison Rock Ridge mine in Wise County. This interest will be injured should the application for the Ison Rock Ridge mine be approved without being subject to the EPA and Army Corps coordinated review, or without the permit applicant being required to put additional environmental protections in place.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 12, 2010.

Jane Branham

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| NATIONAL MINING ASSOCIATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:10-cv-01220-RBW |
| ) | |
| LISA JACKSON, ADMINISTRATOR, ) | |
| U.S. ENVIRONMENTAL PROTECTION ) | |
| AGENCY, et al., ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| SIERRA CLUB, WEST VIRGINIA ) | |
| HIGHLANDS CONSERVANCY, ) | |
| COAL RIVER MOUNTAIN WATCH, ) | |
| OHIO VALLEY ENVIRONMENTAL ) | |
| COALITION, KENTUCKIANS FOR ) | |
| THE COMMONWEALTH, ) | |
| SOUTHERN APPALACHIAN ) | |
| MOUNTAIN STEWARDS, ) | |
| STATEWIDE ORGANIZING FOR ) | |
| COMMUNITY EMPOWERMENT, ) | |
| ) | |
| Movants. ) | |
| _____ ) | |

**Exhibit 11**

**Declaration of Bob Mullins**

D50

## DECLARATION OF BOB MULLINS

I, Bob Mullins, state, affirm and have personal knowledge of the following matters:

1. I live at 1934 Derby Road, Appalachia, VA, and have lived at this address for 37 years, and I grew up on the Appalachia area.

2. I have been a member of Southern Appalachian Mountain Stewards (SAMS) for over 3 years and am current on my dues. I am also a former SAMS board member.

3. For more than 30 years, I worked as an underground coal miner in the deep mines to support my family. I believe that mountain top removal mining, as opposed to deep mining, completely destroys everything in sight.

4. My property adjoins the proposed permitted area of the A&G Coal Corp.'s "Ison Rock Ridge" surface mine, which has previously received the following permit application numbers: Army Corps of Engineers Permit No. NAQ-2007-1351 and DMME permit application No. 1003841.

5. I believe that any necessary Clean Water Act permits for the Ison Rock mine would benefit greatly from review by the U.S. Environmental Protection Agency (EPA) and the application of the most up-to-date scientific information available.

6. I am concerned that should the Ison Rock mining operations occur, my property will be damaged and my family's health and safety will be put at risk.

7. My greatest concern is that the mine's boundary would be only 300 feet from my property There are several large trees in that area, probably about 6-8 pine and poplar trees. I fear that with mining so close to the large trees and their root systems, there is a significant danger that the trees could later fall down on my house. If a tree of that size fell onto my house, it would cut my house in half and would kill anyone inside. I am concerned that my wife and I would be in great danger.

8. I also have serious concerns about how the proposed mining activities would impact my water. Removing the mountain for at Ison Rock Ridge would bury the streams and put new pollutants into the water, which are already burdened to some degree by the other mining operations in the area. I fear that additional mining at Ison Rock Ridge could make the water completely undrinkable and unusable.

9. I am concerned that boulders and rock from blasting and other mining activities could inflict damage or harm to my family and/or property. I've heard recent blasting several miles away from another project and it was disturbing. If blasting were to occur only 300 feet from my home, I am worried the foundation of my house would be severely damaged.

10. I am also worried that dust from the proposed mine will threaten my health, safety and quality of life. The coal trucks that use roads near my house already kick up a lot of dust, and the sweeper that is supposed to alleviate the dust problems only kicks up more dust. If the proposed Ison Rock mine went into production, I fear that the dust problems would worsen to the point where I wouldn't be able to sit outside because there would be even more coal trucks on the road.

11. Before logging in preparation for the proposed Ison Rock Ridge mine occurred near my property, my home was in a very beautiful and peaceful location and I enjoyed looking up at the beauty of the mountains, including Ison Rock Ridge. There used to be lots of hardwood trees, including red and white oaks and poplar trees. I am concerned that should mining operations occur, my home will no longer be in a peaceful or beautiful place and that I might as well move away from here. The trees that were logged will grow back, but surface mining would change the scenery forever. If Ison Rock Ridge were destroyed by surface mining, I would not be able to look up at the mountains, and I would not feel I lived in a peaceful and beautiful place.

2

12. I have gone on record before with similar statements opposing A&G Coal Corp.'s Ison Rock Ridge surface mine at the DMME headquarters in Big Stone Gap, VA, and before the U.S. Environmental Protection Agency (EPA) in Washington D.C.

13. If the U.S. Environmental Protection Agency and the U.S. Army Corps of Engineers were allowed to continue their coordinated review of Clean Water Act permits for surface mines, and were allowed to continue to provide information and guidance to Virginia regulators on the issuance of such Clean Water Act permits for surface mines like the Ison Rock Ridge mine, I

believe it would be safer to live in the area as I would be less concerned about my water quality, trees, dust and blasting.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct. Executed on this _12th_ day of _Oct_, 2010.

_Robert L. Mullins_
Bob Mullins

3

D53

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

NATIONAL MINING ASSOCIATION,          )
                                       )
              Plaintiff,               )
                                       )
      v.                               )          No. 1:10-cv-01220-RBW
                                       )
LISA JACKSON, ADMINISTRATOR,           )
U.S. ENVIRONMENTAL PROTECTION          )
AGENCY, et al.,                        )
                                       )
              Defendants,              )
                                       )
      and                              )
                                       )
SIERRA CLUB, WEST VIRGINIA             )
HIGHLANDS CONSERVANCY,                 )
COAL RIVER MOUNTAIN WATCH,             )
OHIO VALLEY ENVIRONMENTAL              )
COALITION, KENTUCKIANS FOR             )
THE COMMONWEALTH,                      )
SOUTHERN APPALACHIAN                   )
MOUNTAIN STEWARDS,                     )
STATEWIDE ORGANIZING FOR               )
COMMUNITY EMPOWERMENT,                 )
                                       )
              Movants.                 )
_____)


**Exhibit 12**

**Declaration of Cathie Bird**

## DECLARATION OF CATHIE BIRD
**Submitted in Support of Statewide Organizing for Community eMpowerment**

1.      My name is Cathie Bird.  I have personal knowledge of the matters set forth in this declaration.

2.      I submit this declaration as part of Statewide Organizing for Community eMpowerment's motion to intervene as a defendant in the National Mining Association's lawsuit challenging the policy documents issued by the United States Environmental Protection Agency (EPA) and the United States Army Corps of Engineers (Corp) in connection with their review of Clean Water Act permit applications associated with surface coal mining projects in Appalachia.

3.      I have been a member of Statewide Organizing for Community eMpowerment ("SOCM") since 2003.  I currently serve as Chair of the Energy, Ecology and Environmental Justice Committee and have been in this or a similar position since 2006.  As such, I have extensive personal knowledge of the interests and activities of Statewide Organizing for Community eMpowerment.

4.      Statewide Organizing for Community eMpowerment (formerly "Save Our Cumberland Mountains") is a thirty-eight year-old grassroots citizens' organization with more than two thousand members in Tennessee working for environmental, social, and economic justice. SOCM grew out of the coalfields in East Tennessee and is dedicated to giving its members a voice in the quality of life in their communities. Many of SOCM's members live, work, and recreate in areas impacted by surface coal mining.

5.      Statewide Organizing for Community eMpowerment continues to work in vigorous opposition to coal mining by mountaintop removal, including the filing of

lawsuits that challenge this method of resource extraction based on violations of the Clean Water Act.

6.      Statewide Organizing for Community eMpowerment has also participated in actions challenging federal regulations relevant to surface mining in Appalachia, including a recent challenge to the George W. Bush administration's revisions to the Stream Buffer Zone rule (promulgated by the Office of Surface Mining, U.S. Department of Interior, with concurrence by EPA). SOCM has submitted detailed comments on proposed agency actions relating to surface mining in Appalachia, including comments on the Office of Surface Mining, Reclamation, and Enforcement's proposed oversight improvement actions for surface mining operations.

7.      The interests of Statewide Organizing for Community eMpowerment and its members will be adversely affected if the National Mining Association secures the requested declaratory and injunctive relief enjoining implementation of, and vacating, both the June 11, 2009 Enhanced Coordination Process Memoranda and the April 1, 2010 Detailed Guidance Memorandum. For example, Statewide Organizing for Community eMpowerment's members have interests in waters and lands that will be directly impacted by surface mines that have applications for Clean Water Act section 404 permits with EPA and Army Corps review pending, and by permits for discharges from surface mines subject to EPA's other applicable policy documents. The interests of SOCM and its members will be adversely affected if these applications are approved without receiving the benefit of EPA's input and expertise.

9.      For example, Statewide Organizing for Community eMpowerment member Vickie Terry has an interest in the White Oak and Tackett Creek watersheds on

the border of Claiborne and Campbell Counties, and the Clear Fork of the Cumberland

River. This interest will be injured should the applications for the White Oak Surface

Mine #1 (SMCRA permit no. 3215), Tackett Creek No. 2 (SMCRA no. 3222R9), and

Apollo Fuel's mine on Clear Fork (SMCRA permit no.3192) be approved without being

subject to the EPA and Army Corps coordinated review, or without the permit applicant

being required to put required environmental protections in place.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October __/2__, 2010.

_Cathie Bird_

Cathie Bird

D57

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
NATIONAL MINING ASSOCIATION,     )
                                                    )
                        Plaintiff,              )
                                                    )
            v.                                      )          No. 1:10-cv-01220-RBW
                                                    )
LISA JACKSON, ADMINISTRATOR,    )
U.S. ENVIRONMENTAL PROTECTION  )
AGENCY, et al.,                             )
                                                    )
                        Defendants,         )
                                                    )
            and                                   )
                                                    )
SIERRA CLUB, WEST VIRGINIA       )
HIGHLANDS CONSERVANCY,            )
COAL RIVER MOUNTAIN WATCH,     )
OHIO VALLEY ENVIRONMENTAL       )
COALITION, KENTUCKIANS FOR       )
THE COMMONWEALTH,                    )
SOUTHERN APPALACHIAN              )
MOUNTAIN STEWARDS,                   )
STATEWIDE ORGANIZING FOR         )
COMMUNITY EMPOWERMENT,          )
                                                    )
                        Movants.             )
_____)

**Exhibit 13**

**Declaration of Vickie Terry**

## DECLARATION OF VICKIE TERRY

I, Vickie Terry, state, affirm and have personal knowledge of the following matters:

1. I am a citizen of the United States and a resident of the northeastern part of Campbell County, Tennessee. I currently live at 201 Rose Lane, Clairfield, Tennessee, 37715, which is on the border of Campbell and Claiborne counties. I have lived in Clairfield for 12 years.

2. I am a member of Save Our Cumberland Mountains (SOCM) and have been for approximately the past two years.

3. I have heard that there are several mines proposed near my house, including: one by Apollo Fuels on the Clear Fork of the Cumberland River in Claiborne County (SMCRA permit no.3192); one by DRC Coal, the White Oak Surface Mine #1, on the White Oak and Tackett Creek watersheds on the border of Campbell and Claiborne counties (SMCRA permit no. 3215); and one by Kopper Glo Fuel, Inc, Tackett Creek No. 2 mine which would impact the tributaries of the Tackett Creek (SMCRA no. 3222R9). My property is located just a few miles from these proposed mines.

4. I believe that any necessary Clean Water Act permits for these proposed mines would benefit greatly from review by the U.S. Environmental Protection Agency (EPA) and the application of the most up-to-date scientific information available.

5. There are existing mines in the area and I fear that additional mining so close to my house will negatively impact my water quality, air quality, and will destroy the beautiful mountains near my home. I have a bench on which I could sit out and enjoy the scenic beauty and wildlife of the mountains above my home. Now I'm watching these beautiful mountains in the area get destroyed, flattened, over the last couple of years and it is heartbreaking.

6. I fear for the safety of the water that I drink, and the water that my family drinks. I have a daughter and a few grandbabies that live closer to the existing mining and their water is orange and their clothing has to be bleached because the water it is washed in makes it look dirty otherwise. They have to buy bottled water to drink because they are afraid of the pollutants found in their tap water. Additional mining closer to my home might make my water undrinkable like theirs.

7. I am concerned enough about my water that I have participated in testing nearby streams for conductivity levels. I've tested water on the Lower Fork of the Cumberland River and on Davis Creek for conductivity and have found levels in excess of 700 µS/cm, which I understand to be high and associated with negative impacts to stream life. Right now, I'm afraid to eat fish in the nearby creeks because they have sores on them so I'll just release them rather than eating them.

D59

8.  I am also troubled that since moving to this area of Tennessee after living in Ohio, I now suffer from respiratory problems, and so does the rest of my family. We've had ailments like asthma and bronchitis and COPD.

9.  The additional mining  also increases the traffic of heavy trucks on the road a few miles from my house and the dust they kick up. There are no tarps over the coal and the trucks are overloaded. One can't even call to complain because there are no license plates or other markings to identify the trucks. This kind of dust aggravates my respiratory problems, and I fear my respiratory problems could worsen if mining were to occur closer to my home.

10. Mining, and the associated clear cutting of trees, has also forced wildlife to move out into the open. I now see bears in the middle of the road, and they get into our neighbor's trash sometimes. I am worried that additional mining will only worsen this problem.

11. I have made similar statements opposing mining in the area and supporting better water quality at meetings or hearings before the Army Corps of Engineers and other agencies including two with Joe Pizarchik.

12.  If the U.S. Environmental Protection Agency and the U.S. Army Corps of Engineers were allowed to continue their coordinated review of Clean Water Act permits for surface mines, and were allowed to continue to provide information and guidance to Tennessee regulators on the issuance of such Clean Water Act permits for surface mines like the proposed Apollo Fuels mine on the Clear Fork of the Cumberland River in Claiborne County the White Oak Surface Mine #1, and the Tackett Creek No. 2, I would be less concerned about my water and air quality, dust, and blasting.


I declare this under penalty of perjury that the foregoing is true and correct.

This __12th___  day of October, 2010.


_____/S/_____
Vickie Terry

D60

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                        )
NATIONAL MINING ASSOCIATION,    )
                                                        )
              Plaintiff,                            )
                                                        )
              v.                                      )        No. 1:10-cv-01220-RBW
                                                        )
LISA JACKSON, ADMINISTRATOR,   )
U.S. ENVIRONMENTAL PROTECTION )
AGENCY, et al.,                              )
                                                        )
              Defendants,                       )
                                                        )
         and                                        )
                                                        )
SIERRA CLUB, WEST VIRGINIA        )
HIGHLANDS CONSERVANCY,            )
COAL RIVER MOUNTAIN WATCH,     )
OHIO VALLEY ENVIRONMENTAL     )
COALITION, KENTUCKIANS FOR       )
THE COMMONWEALTH,                   )
SOUTHERN APPALACHIAN              )
MOUNTAIN STEWARDS,                   )
STATEWIDE ORGANIZING FOR         )
COMMUNITY EMPOWERMENT,          )
                                                        )
              Movants.                            )
_____)

**Exhibit 14**

**Declaration of Margaret Janes**

D61

## DECLARATION OF MARGARET JANES

I, Margaret Janes, state and affirm as follows:

1.  Since 2001, I have been a Senior Policy Analyst at the Appalachian Center for the Economy and the Environment, a non-profit organization, located in Lewisburg, West Virginia. The Appalachian Center is a regional law and policy organization. The Center works together with individual citizens and grassroots citizens' groups to clarify, analyze and act on the environmental and economic issues that affect our communities.
2.  Part of my job is to research and write comments on pending Section 404 permit applications for which public notice has been provided by the Louisville, Huntington, Norfolk, and Nashville Corps Districts for proposed dredge and fill operations seeking to place surface mining waste in streams in the central Appalachian region.
3.  Over the past six to seven years, I have written and submitted numerous comments on behalf of local environmental nonprofit organizations that are working in central Appalachia and are interested in local watersheds and permit applications.
4.  I have collaborated with and submitted comments on behalf of Sierra Club, West Virginia Highlands Conservancy, Ohio Valley Environmental Coalition, and Coal River Mountain Watch on numerous applications for proposed discharges in West Virginia and Kentucky, for which public notice has been provided and which are under interagency review, including most now listed on the Environmental Protection Agency's Enhanced Coordination Procedures website at http://water.epa.gov/lawsregs/guidance/wetlands/mining-projects.cfm (as of October 7, 2010), such as the following twenty-seven:

| USACE Permit Application No. | Applicant | Proposed Project Name | County | State |
|---|---|---|---|---|
| LRH-2006-02033 | Wildcat | #2 Surface | Kanawha | WV |
| LRH-2008-00491 | CONSOL of Energy | Buffalo Mt. Surface Mine | Mingo | WV |
| LRL-2006-01296 | Clintwood Elkhorn | Clintwood Elkhorn | Pike | KY |
| LRH-2005-00217 | Bluestone | Contour Auger 1 | Wyoming | WV |
| LRH-2007-00182 | Alex Energy, Inc. | Federal Surface Mine | Nicholas | WV |
| LRH-2008-00562 | Eastern Associated Coals[1] | Huff Creek Surface Mine | Wyoming / Logan | WV |
| LRH-2006-00100 | ICG Eastern, LLC | Jenny Creek Surface Mine | Mingo | WV |
| LRH-2007-00285 | Alex Energy, Inc. | Lonestar Surface Mine | Nicholas | WV |
| LRH-2007-00286 | Pioneer Fuel | MT5B | Raleigh | WV |
| LRH-2007-00134 | Atlantic Leasco | Muddlety Surface Mine No. 1 | Nicholas | WV |
| LRH-2006-00760 | Paynter Branch Mining | Paynter Branch South Surface Mine | Wyoming | WV |
| LRL-2007-00193 | Premier Elkhorn Coal | Premier Elkhorn Coal | Pike | KY |
| LRL-2007-00594 | Premier Elkhorn Coal | Premier Elkhorn Coal | Pike | KY |
| LRH-2008-01098 | Frasure Creek Mining | Spring Fork Surface Mine No. 2 | Mingo | WV |

---

[1] Note comments were submitted on Eastern Associated Coal's Huff Creek Surface Mine, however, the permit numbers are different.

| LRL-2007-00217 | Leeco, Inc. | Stacy Branch Surface Mine | Perry | KY |
| LRH-2005-01115 | Green Valley Coal Company | Blue Branch Refuse | Nicholas | WV |
| LRL-2007-00867 | CAM Mining | CAM Mining | Pike | KY |
| LRL-2007-01504 | CAM Mining | CAM Mining | Pike | KY |
| LRL-2005-00851 | Cheyenne Resources | Cheyenne Resources | Letcher | KY |
| LRL-2008-00226 | Czar Coal | Czar Coal | Martin | KY |
| LRL-2008-00654 | Enterprise Mining | Enterprise Mining | Knott | KY |
| LRL-2007-01026 | Frasure Creek Mining | Frasure Creek Mining | Floyd | KY |
| LRL-2007-01206 | Frasure Creek Mining | Frasure Creek Mining | Magoffin | KY |
| LRL-2007-01230 | ICG Knott Co. | ICG Knott Co. | Knott | KY |
| LRL-2008-00525 | Middle Fork Dev. | Middle Fork Dev. | Magoffin | KY |
| LRL-2007-01131 | Miller Bros. Coal | Miller Bros. Coal | Floyd | KY |
| LRH-2006-828-TUG | Mid Vol Coal Sales | Paradise Surface Mine | McDowell | WV |

5.  I have also submitted comments on numerous other section 404 permit applications for surface mining operations that have been announced to the public in West Virginia, Kentucky, Tennessee, and Virginia on behalf of these groups, including some that the Corps has issued since 2009.

6.  I intend to continue monitoring all proposed 404 permit applications for which there is public notice and to continue reviewing and assisting locally concerned organizations with research, comments and related activities.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 8th day of October 2010.

Margaret Janes

D63

# DECLARATION OF RICKY L. HANDSHOE

1. I am a member of Kentuckians for the Commonwealth (KFTC) and the Sierra Club. I have been a member of KFTC for about eight years. I have been a member of the Sierra Club for about six years.

2. I am 52 years old and I own and maintain a home in Hueysville, KY. Raccoon Branch and one of its tributaries flow across my property. I grew up in the valley around Raccoon Branch and Saltlick Creek. My family has been here for over 200 years. I have lived in the valley for most of my life. In December of 2012, I was forced to temporarily leave my home of 52 years due to my concern about the health and safety effects of severe ground and water contamination. This contamination was caused by mountaintop removal mining in the area. Although it is financially difficult, I now maintain a separate residence in Bowling Green, KY. I visit my Hueysville home about every three weeks, and I intend to return and live there permanently as soon as I feel that it is safe to do so. When I go back to Hueysville, I work to maintain my home and property. I also regularly visit with family and friends in the area, including my father, who lives about a half mile away from my home.

3. I am aware that the United States Environmental Protection Agency and Corps of Engineers agreed to coordinate their review of Section 404 permit applications for mountaintop removal mining. I am also aware that EPA has issued science-based guidance on water quality and unsafe levels of conductivity in streams affected by mountaintop removal mining. I am further aware that a court has prohibited the agencies from engaging in coordinated review and the EPA from using its guidance.

4. There are two pending permit applications for the Raccoon Branch Surface Mine, a proposed coal mine that would be very close to my home. The company Laurel Mountain Resources, LLC has applied for a Section 404 permit (LRL-2007-01224) and a Section 402 permit (KY0108715, AI 78345). The Section 404 permit application is on the agencies' coordinated review list. Rigorous scientific review of these

D64

permit proposals is necessary to protect my family and me from the harmful effects of mountaintop removal mining.

5. My home is between the two entrances to the proposed mine, both of which are off Raccoon Road. The north entrance is about a half mile away, and the south entrance is about 9/10 of a mile away. Additionally, the boundary for the proposed mine is about 500 feet from my property.

6. The operators of the Raccoon Branch Surface Mine plan to discharge mining waste into Raccoon Branch, Salyers Branch, and Saltlick Creek. These discharges would have a significant impact on me. My home is about 300 feet from Raccoon Branch and about three feet from one of its tributaries. Salyers Branch is approximately half a mile behind my home. Raccoon Branch and Salyers Branch both connect to Saltlick Creek. They converge about a mile from my home. From there, Saltlick Creek connects to Beaver Creek, which then connects to the Big Sandy River. I am concerned that runoff from the Raccoon Branch Surface Mine and stream burial associated with it will pollute the waters near my home. I fish in Saltlick Creek, a mile or two downstream from the proposed mine about five or six times a year. I also hunt in the valley near Saltlick Creek, also about a mile or two downstream from the proposed mine, about four to six times a year. I am concerned that contamination from the Raccoon Branch Surface Mine would make fish living in the water and wildlife drinking the water unsafe to eat. I am also concerned that the impacts of the proposed mine, including its pollution, would kill wildlife or cause them to leave, so that there are fewer animals and fish that I can enjoy.

7. I have seen the impacts that other, similar mines have had on the streams near my home. Shortly after mountaintop removal came to the area, I noticed that the streams had an orange tint. I have seen streams that looked like orange juice, not water. I also noticed foam and a powdery white substance in the water. I had never before seen such pollution in my many years as a resident of the area. I am concerned that the Raccoon Branch Surface Mine would exacerbate this pollution, causing

D65

conditions to be even worse than what I have seen in the past and harming my ability to continue to enjoy being at my home and hunting and fishing near the mine and affected streams.

8. I am concerned that trucks going into the proposed mine will cause me to breathe dirt and dust at and near my home, and I do not want to face the potential health impacts of breathing this pollution. I have already had to seek medical attention for conditions that I believe are related to stress and exposure to the impacts of other mines, including rashes, dizziness, confusion, and fatigue. When my 21-year-old daughter's hair began to fall out, we finally decided to temporarily leave our home. I am concerned that if the Raccoon Branch permits are approved as proposed, it will never be safe for my daughter and me to return home for good.

9. Mountaintop removal mining occurred directly behind my home in 2010 and 2011. This mining caused a land slide behind my home to worsen. It used to be 350-400 feet from my home, and it is now just 200 feet from my home. I am concerned that if the Raccoon Branch Surface Mine permits are approved, the slide will worsen and damage or destroy my home. Past mountaintop removal mining has also caused structural damage to my home. State inspectors agreed that blasting associated with mining behind my home caused this damage. I am concerned that blasting associated with the Raccoon Branch Surface Mine would cause further damage.

10. If EPA is not allowed to thoroughly review the Raccoon Branch Surface Mine permit applications, my family and I will not get protection that we need from the negative impacts of mountaintop removal mining. The Corps and the state have not protected us from the harm caused by similar mines, and I need EPA to be able to exercise its full authority under the Clean Water Act to protect my family and me and the streams near my home from the Raccoon Branch Surface Mine permits. I cannot feel safe in my home or continue to hunt and fish in the area unless EPA scrutinizes these permits and ensures that the Raccoon Branch Surface Mine will not cause further harm here, including water quality problems.

3

D66

I declare under penalty of perjury that the foregoing is true and correct.
Executed on this __2__ day of __May__ , 2013.


_Ricky L Handshoe_
Ricky L. Handshoe

4

D67

## DECLARATION OF ROBERT PATRICK

1. I am a member of the Southern Appalachian Mountain Stewards (SAMS) and have been for about two years.

2. I am 65 years old and live in Appalachia, VA. I've lived here in my current home since 1995.

3. I am aware that the United States Environmental Protection Agency (or EPA) and the United States Army Corps of Engineers set up a coordinated process for reviewing certain potential Clean Water Act permits for surface mining. I am also aware that EPA gave guidance to its staff to consider whether new permits for mountaintop removal mining would increase the amount of conductivity in streams to unsafe levels. I understand that a court has blocked both of these efforts as part of a lawsuit in process.

4. There is a proposed discharge permit (VA 1003841) for the dumping of mining waste under section 402 of the Clean Water Act from a mine that would be on Ison Rock Ridge, which is very close to my home in Wise County. It would also harm streams and wildlife near my home.

5. The proposed Ison Rock Ridge mine would be less than half a mile from my home, which is off North Inman. I expect that I would be able to see it out of my window. A stream, known as Looney Creek, runs about 20 to 30 feet behind my home. From permit documents, I am aware that this is one of the streams that would be affected by the proposed mine. It runs down to Appalachia, VA, where it connects with Pigeon Creek. From there, Pigeon Creek runs into the South Fork Powell River near Big Stone Gap, VA.

6. I regularly gather wild, edible plants in an area around Ison Rock Ridge, usually within a mile of my home. In the summer, I gather these plants at least once a week, including near the stream behind my home that the proposed mine would affect. There are already mines in the area,

1

including one on the other side of my home from the proposed mine. These mines have caused pollution in the area where I gather wild greens, and I am concerned that the Ison Rock Ridge mine would cause more pollution, reduce the number of healthy plants nearby for me to gather and enjoy, and even make it unsafe to eat them.

7. I am also concerned about the health effects of breathing in dust and dirt from the Ison Rock Ridge mine. I have noticed dust from the existing mine inside and around my home. I am concerned that the Ison Rock Ridge mine would increase the amount of dust and dirt I have to breathe in and that this increase would cause health problems for me.

8. The area surrounding my home is scenic. My girlfriend and I frequently visit the area around my home and Ison Rock Ridge to enjoy its natural beauty and wildlife. There are old cemeteries up there that we check on and try to help maintain when needed. If the permit is approved, as proposed, I am concerned that this will destroy the beauty of the natural ridge area that we now can see, and prevent us from being able to enjoy it. I am also concerned that, as proposed, the Ison Rock Ridge mine would cause more contamination of the stream behind my home and other nearby streams, and that this contamination would kill off wildlife or cause them to go elsewhere, which would make it impossible for us to continue to enjoy seeing them.

9. I am also concerned that the Ison Rock Ridge mine will cause damage to my home. There have already been major rock slides in my area, and I believe that having mines on both sides of my house would make my home less safe.

10. I am concerned that EPA is not currently being allowed to use its full legal power to protect the streams and natural areas of Ison Rock Ridge near my home from the proposed mine. I need the protection that a full review by EPA would offer so I can feel safe and secure and continue to enjoy living in my home. I also need to know that the water which feeds the plants I eat is safe. I am concerned that I will not be able to continue

2

to enjoy seeing the natural beauty of the ridge, streams, and wildlife near my home without this protection. If EPA is not allowed to use its full Clean Water Act authority to consider and to take action to lessen the harm posed by the Ison Rock Ridge mine, including from conductivity, this will reduce protection for my ability to enjoy the streams, natural areas and wildlife near me, and to feel safe in my own home.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _1_ day of _May_, 2013.

Robert Patrick

3

D70

## DECLARATION OF TIMOTHY GUILFOILE

1. I am currently a member of the Sierra Club and the Ohio Valley Environmental Coalition. I have been a member of the Sierra Club for about twelve years and also volunteer regularly with Sierra Club. I have been a member of the Ohio Valley Environmental Coalition for about five years. From 2005 to February, 2013 I worked for Sierra Club's Water Sentinels Program, before retiring in March, 2013. This is a volunteer-based program that involves training citizens in water quality monitoring throughout the United States.

2. I live in Edgewood, KY. I am sixty-two years old. I spent most of my professional career as a clinician and then the administrator of Cincinnati Children's Hospital Medical Center. I was born and raised in Northern Kentucky, and moved to Cincinnati, Ohio in 1974 where I raised two children with my wife. I moved back to Northern Kentucky, specifically Edgewood, Kentucky about 7 years ago.

3. I am aware that the United States Environmental Protection Agency and the United States Army Corps of Engineers agreed to engage in a coordinated process for reviewing Clean Water Act permits. I am also aware that the EPA has issued guidance to protect water quality in Appalachian communities from impacts of mountaintop mining.

4. A pending Section 404 permit application (LRH-2005-00934) from Premier Elkhorn for the U/T Old Beefhide Branch mine, a proposed coal mine in Letcher County, Kentucky, is on the agencies' coordination list. I am aware that streams that would be affected by this permit are U/T Old Beefhide Branch of Beefhide Creek of Shelby Creek of Levisa Fork of Big Sandy River, and waters downstream. I visit local streams in this area and fish them regularly. I want to continue to visit these streams, but I am concerned that I will not be able to do so if they are not protected. Because of a court decision, EPA and the Corps cannot coordinate their review of this permit and EPA cannot use its guidance. I am concerned that if EPA and the Corps cannot take these steps to protect the streams affected by the U/T Old Beefhide mine, I will not be able to continue to use and enjoy them.

5. Although I live 3 hours away from the proposed U/T Old Beefhide mine, I am an avid outdoorsman, and for the past 3 years I have spent about one week a month fishing, hiking, enjoying the scenery and wildlife and testing the quality of the waters in southeastern Kentucky. I have fished the Levisa Fork, Beefhide Creek, Shelby Creek and Fishtrap Lake and these streams, rivers and lake will be the receiving waters of runoff from the proposed mine. I plan on returning to the area to fish these waters in

1

D71

the future, twice each spring and twice each fall, but I am concerned that runoff from the mine will destroy the biological integrity of the streams and therefore will have a devastating effect on macroinvertebrates and fish.

6.  I have been visiting the area that this mine would affect for 3 1/2 years.  In just that short amount of time, I have noticed an increase in mining activity and pollution. Because of my concern about the presence of heavy metals in the water, I test the area streams for conductivity while I hike.  I have found the conductivity levels to be disturbingly high in the watershed.  I am concerned that if EPA and the Corps do not consider science on safe levels of conductivity, and if EPA does not have the ability to fully review the permit application and related materials, then the proposed U/T Old Beefhide mine will make conductivity levels in this watershed even higher and more harmful.  I am also concerned that if the permit is issued as applied for, and conductivity levels increase, I will not be able to continue to fish in these streams or enjoy visiting and hiking in this area at all.

7.  I am concerned about the impact that blasting associated with the proposed U/T Old Beefhide mine would have on my recreational use of the area.  Because I am not a permanent resident of the area, I do not receive important notices about scheduled blasting.  As a result, I do not know when or where it might happen.  I have been within a mile of blasting before.  It shakes the ground and significantly interferes with my enjoyment of nature.  It also causes particulate matter to be discharged into the air.  As a respiratory health specialist, I have seen first-hand the impacts of exposure to such particulates.  I am concerned that blasting associated with the U/T Old Beefhide mine could force me to breathe harmful particulate matter.

8.  If EPA and the Corps are not allowed to engage in the review process they agreed on and if EPA cannot use its guidance, the streams I use for recreational enjoyment will be less protected from the harmful impacts of mountaintop removal mining.  I need the protection of coordinated review and science-guided decision-making in order to continue to enjoy the areas and streams surrounding the proposed U/T Old Beefhide mine.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 3rd day of May, 2013.

_____
Timothy Guilfoile

2

D72