**RECORD NOS. 12-5310(L); 12-5311**

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

𝕴𝖓 𝕿𝖍𝖊

# 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

𝕱𝖔𝖗 𝕿𝖍𝖊 𝕯𝖎𝖘𝖙𝖗𝖎𝖈𝖙 𝖔𝖋 𝕮𝖔𝖑𝖚𝖒𝖇𝖎𝖆 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

## NATIONAL MINING ASSOCIATION, *et al.*,

*Plaintiffs – Appellees*,

## COMMONWEALTH OF KENTUCKY and CITY OF PIKEVILLE, KENTUCKY,

*Intervenors for Plaintiffs – Appellees*,

**v.**

## BOB PERCIASEPE, Acting Administrator of the United States Environmental Protection Agency, *et al.*,

*Defendants – Appellants,*

## SIERRA CLUB, *et al.*,

*Intervenors for Defendants – Appellants.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
LEAD CASE NO. 10-cv-01220 (Hon. Reggie B. Walton)

———————

PAGE PROOF BRIEF OF APPELLEES
NATIONAL MINING ASSOCIATION AND KENTUCKY COAL ASSOCIATION

———————

Kirsten L. Nathanson
John C. Martin
David Y. Chung
Sherrie A. Armstrong
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2500

Mindy G. Barfield
Sadhna G. True
DINSMORE & SHOHL, LLP
250 West Main Street, Suite 1400
Lexington, Kentucky 40507
(859) 425-1000

Katie Sweeney
Amanda Aspatore
NATIONAL MINING ASSOCIATION
101 Constitution Avenue, N.W.
Washington, D.C. 20001
(202) 463-2600

*Counsel for Appellee*
  *National Mining Association*

*Counsel for Appellee*
  *Kentucky Coal Association*

*Of Counsel*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**Parties and *Amici***.  ***Appellants*** in 12-5310 are Bob Perciasepe, Acting Administrator of the U.S. Environmental Protection Agency ("EPA"); EPA; John M. McHugh, Secretary of the U.S. Army; Thomas P. Bostick, Commander of the U.S. Army Corps of Engineers ("the Corps"); and the Corps. ***Appellants*** in 12-5311 are Coal River Mountain Watch; Kentuckians For The Commonwealth; Ohio Valley Environmental Coalition; Sierra Club; Southern Appalachian Mountain Stewards; Statewide Organizing For Community Empowerment; and West Virginia Highlands Conservancy.

*Appellees* in these consolidated cases are National Mining Association ("NMA"); Randy C. Huffman, Cabinet Secretary of the West Virginia Department of Environmental Protection; State of West Virginia; Kentucky Coal Association ("KCA"); Gorman Company, LLC; Kycoga Company, LLC; Black Gold Sales, Inc.; and Kentucky Union Company.

*Intervenor-Appellees* in these consolidated cases are Commonwealth of Kentucky; and City of Pikeville, Kentucky.

NMA and KCA are not aware of any other parties or *amici* at this time.

**Rulings Under Review**.  Based on the Appellants' Statements of Issues in their briefs, these appeals seek review of the October 6, 2011 Order and Memorandum Opinion, and the July 31, 2012 Order and Memorandum Opinion of

Judge Reggie B. Walton of the U.S. District Court for the District of Columbia in *National Mining Association, et al. v. Lisa Jackson, et al.*, Case No. 10-cv-1220 (consolidated with Nos. 11-cv-295; 11-cv-446; and 11-cv-447) [Dkts.95-96,166-67], and the final judgment of that court entered on July 31, 2012.[1]

**Related Cases**.  The cases under review in this consolidated appeal have not previously been before this or any other court of appeals.  All lawsuits challenging the final agency actions at issue in this case were transferred to the U.S. District Court for the District of Columbia and consolidated with the lead case (No. 10-cv-1220, filed by NMA) before Judge Walton.[2]

---

[1] Appellants did not identify the January 14, 2011 Order and Memorandum Opinion in their briefs.  That decision denied the Federal Defendants' motion to dismiss and held that the challenged agency actions were justiciable.  The decision also denied Plaintiffs' motion for a preliminary injunction.

[2] Plaintiff-Appellees Randy C. Huffman, Cabinet Secretary of the West Virginia Department of Environmental Protection, and State of West Virginia originally sued in the U.S. District Court for the Southern District of West Virginia.  *See Huffman v. EPA*, No. 10-cv-1189 (S.D. W. Va.).  Plaintiff-Appellee Kentucky Coal Association sued in the U.S. District Court for the Eastern District of Kentucky, and Intervenor-Plaintiff-Appellees Commonwealth of Kentucky and City of Pikeville intervened in that lawsuit.  *See Ky. Coal Ass'n v. EPA*, No. 10-cv-125 (E.D. Ky.).  Plaintiff-Appellees Gorman Company, LLC; Hazard Coal Corporation; Kycoga Company, LLC; Black Gold Sales, Inc.; and Kentucky Union Company also sued in the U.S. District Court for the Eastern District of Kentucky.  *See Gorman Co., LLC v. EPA*, No. 10-cv-228 (E.D. Ky.).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1,

Industry Appellees make the following disclosures:

1.    As the National Mining Association ("NMA") indicated in its disclosure

filed on November 14, 2012, NMA has no parent company, and no publicly

held company has a 10% or greater ownership interest in NMA.  NMA is a

"trade association" within the meaning of Circuit Rule 26.1(b).

2.    The Kentucky Coal Association ("KCA") has no parent company, and no

publicly held company has a 10% or greater ownership interest in KCA.

KCA is a "trade association" within the meaning of Circuit Rule 26.1(b).

*Of counsel*:
Katie Sweeney
Amanda Aspatore
NATIONAL MINING ASSOCIATION
101 Constitution Avenue, N.W.
Washington, DC 20001
(202) 463-2600

/s/ Kirsten L. Nathanson
Kirsten L. Nathanson
John C. Martin
David Y. Chung
Sherrie A. Armstrong
CROWELL & MORING LLP
1001 Pennsylvania Ave., NW
Washington, D.C.  20004
(202) 624-2500
*Counsel for National Mining Association*

Mindy G. Barfield
Sadhna G. True
DINSMORE & SHOHL, LLP
250 West Main Street
Suite 1400
Lexington, KY 40507
(859) 425-1000
*Counsel for Kentucky Coal Association*

iii

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT ....................................... iii

TABLE OF CONTENTS.........................................................................iv

TABLE OF AUTHORITIES ................................................................. vii

GLOSSARY.........................................................................................xiv

INTRODUCTION ...................................................................................1

STATEMENT OF ISSUES .....................................................................3

STATUTES AND REGULATIONS........................................................5

STATEMENT OF FACTS AND STATEMENT OF THE CASE ...........................5

    I.    Legal Framework ........................................................5

        A.    The Clean Water Act...............................................5

            1.    Section 404 Permitting .....................................6

            2.    Section 303 Water Quality Standards..............................9

            3.    Section 402 Permitting .....................................9

        B.    SMCRA...............................................................10

            1.    SMCRA's Comprehensive Regulation of Mine Activities.........................................................10

            2.    States With SMCRA Primacy Are The Exclusive Regulatory Authority .....................................12

3.    EPA's Limited Role Under SMCRA ............................13

II.    The Government's Transformation Of Environmental
Permitting For Coal Mining ....................................14

A.    Enhanced Coordination Process ..............................15

B.    EPA's Interim Guidance ..........................................19

C.    EPA's Final Guidance ..............................................21

III.    Proceedings Below ............................................................22

SUMMARY OF ARGUMENT ....................................................24

STANDARD OF REVIEW ...........................................................27

ARGUMENT ...................................................................................28

I.    The Enhanced Coordination Process And Screening Procedure
Violate The Clean Water Act And The Administrative
Procedure Act ...................................................................28

A.    The Enhanced Coordination Process And Screening
Procedure Are Contrary To The Plain Text Of Section
404 .....................................................................................29

B.    The Enhanced Coordination Process And Screening
Procedure Are Contrary To Section 404 Regulations ..............35

C.    The Enhanced Coordination Process And Screening
Procedure Are Legislative Rules Unlawfully
Promulgated Without Rulemaking ...........................................37

II.    The Final Guidance Is Contrary To SMCRA ...................41

A.    EPA Cannot Shoehorn SMCRA Into Section 404 Permits ......41

B.    EPA Cannot Insert Itself Into SMCRA Permitting..................43

CONCLUSION ....................................................................................................45

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

## TABLE OF AUTHORITITES

**Page(s)**

## CASES

*Am. Bar Ass'n v. Fed. Trade Comm'n,*
    430 F.3d 457 (D.C. Cir. 2005)..........................................................28, 33, 35

*Am. Hosp. Ass'n v. Bowen,*
    834 F.2d 1037 (D.C. Cir. 1987).....................................................38

*Am. Paper Inst. v. EPA,*
    996 F.2d 346 (D.C. Cir. 1993)........................................................9

*Am. Petroleum Inst. v. EPA,*
    216 F.3d 50 (D.C. Cir. 2000)........................................................28

*AstraZeneca Pharms. LP v. FDA,*
    713 F.3d 1134 (D.C. Cir. 2013)....................................................27

*Barnhart v. Peabody Coal Co.,*
    537 U.S. 149 (2003)....................................................................33

*Batterton v. Marshall,*
    648 F.2d 694 (D.C. Cir. 1980)......................................................38

*Chevron U.S.A., Inc. v. Natural Res. Def. Council,*
    467 U.S. 837 (1984)..........................................................27, 28, 35

*City of Chicago v. Envlt. Def. Fund,*
    511 U.S. 328 (1994)....................................................................44

*Coeur Alaska v. Se. Alaska Conservation Council,*
    557 U.S. 261 (2009)...............................................................8, 31

*EME Homer City Gen., LP v. EPA,*
    696 F.3d 7 (D.C. Cir. 2012).........................................................27

*\* Chief Authorities are Designated with an Asterisk.*

*HCSC-Laundry v. United States*,
    450 U.S. 1 (1981)............................................................................44

*\*In re Permanent Surface Mining Regulation Litig.*,
    653 F.2d 514 (D.C. Cir. 1981)....................................................12, 45

*James V. Hurson Assoc., Inc. v. Glickman*,
    229 F.3d 277 (D.C. Cir. 2000)..........................................................38

*Keating v. FERC*,
    927 F.2d 616 (D.C. Cir. 1991)............................................................9

*Kentuckians for the Commonwealth, Inc. v. Rivenburgh*,
    317 F.3d 425 (4th Cir. 2003) .......................................................11, 43

*Ky. Riverkeeper, Inc. v. Midkiff*,
    800 F. Supp. 2d 846 (E.D. Ky. 2011) .............................................41, 42

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986)........................................................................32

*Mingo Logan Coal Co. v. EPA*,
    714 F.3d 608 (D.C. Cir. 2013)..........................................................34

*Mobile Commc'ns Corp. of Am. v. FCC*,
    77 F.3d 1399 (D.C. Cir. 1999)..........................................................33

*\*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*,
    556 F.3d 177 (4th Cir. 2009) ..................... 1, 5, 14, 15, 16, 18, 40, 41, 42, 43

*Reeder v. FCC*,
    865 F.2d 1298 (D.C. Cir. 1989)........................................................39

*\*Ry. Labor Exec. Ass'n v. Nat'l Mediation Bd.*,
    29 F.3d 655 (D.C. Cir. 1994)....................................................32, 33, 44

*Shepherd v. Merit Sys. Prot. Bd.*,
    652 F.2d 1040 (D.C. Cir. 1981)........................................................35

*The Fertilizer Inst. v. EPA,*
　　935 F.2d 1303 (D.C. Cir. 1991)....................................................41

*Williams Gas Processing-Gulf Coast Co. v. FERC,*
　　373 F.3d 1335 (D.C. Cir. 2004)..................................................34

## **FEDERAL STATUTES**

5 U.S.C. § 553(b) ...........................................................................29

*5 U.S.C. § 706(2) ..........................................................................27

30 U.S.C. § 1201(f).........................................................................12

30 U.S.C. § 1202(f).........................................................................10

*30 U.S.C. § 1251(a) ............................................................13, 43, 44

30 U.S.C. § 1253.............................................................................41

30 U.S.C. § 1253(a) ........................................................................12

*30 U.S.C. § 1253(b) ...........................................................13, 43, 44

30 U.S.C. § 1265.............................................................................11

30 U.S.C. § 1265(b) ...................................................................11, 42

30 U.S.C. § 1265(c) ...................................................................10, 42

*30 U.S.C. § 1291(28) .................................................................10, 42

30 U.S.C. § 1292(a) ........................................................................13

30 U.S.C. § 1292(c) ........................................................................13

33 U.S.C. § 1311(b) ........................................................................10

33 U.S.C. § 1312(a) ........................................................................10

33 U.S.C. § 1313 ..................................................................................6, 9

33 U.S.C. § 1313(c) ................................................................................9

33 U.S.C. § 1342 ...........................................................................5, 10, 31

33 U.S.C. § 1342(d) ........................................................................10, 41

*33 U.S.C. § 1344 ................................. 4, 5, 6, 7, 8, 16, 23, 31, 34, 35, 43

*33 U.S.C. § 1344(a) ..................................................................6, 8, 29, 33

*33 U.S.C. § 1344(b) .........................................................6, 8, 29, 31, 34, 35

*33 U.S.C. § 1344(c) ................................. 8, 12, 30, 31, 32, 33, 34, 36, 39

*33 U.S.C. § 1344(d) ...........................................................................29

*33 U.S.C. §§ 1344(g) ..........................................................................29

*33 U.S.C. § 1344(h) ...........................................................................29

*33 U.S.C. § 1344(i) ...........................................................................29

*33 U.S.C. § 1344(j) ...........................................................................29

*33 U.S.C. § 1344(l) ...........................................................................29

*33 U.S.C. § 1344(q) ................................. 6, 7, 30, 32, 34, 35, 36

33 U.S.C. § 1361(a) ...........................................................................32

## **FEDERAL REGULATIONS**

30 C.F.R. § 780.21(h) ......................................................................11, 42

30 C.F.R. § 780.35 .........................................................................12, 42

30 C.F.R. § 785.14(b) .........................................................................42

30 C.F.R. § 816.41(d) .................................................................11, 42

30 C.F.R. § 816.71 ......................................................................11, 42

30 C.F.R. § 816.71(c) ................................................................12, 42

30 C.F.R. § 816.72 ......................................................................11, 42

30 C.F.R. § 816.73 ......................................................................11, 42

30 C.F.R. § 816.74 ...........................................................................11

30 C.F.R. § 816.111 ....................................................................11, 42

30 C.F.R. § 816.113 ....................................................................11, 42

30 C.F.R. § 816.133(c) ......................................................................42

30 C.F.R. § 816.133(d) ......................................................................42

33 C.F.R. pt. 325 ...........................................6, 16, 25, 31, 35

33 C.F.R. § 325.1(e) ..........................................................................17

33 C.F.R. § 325.2(a) ................................................................6, 7, 17

33 C.F.R. § 325.2(d) .........................................................7, 17, 36, 37

33 C.F.R. § 325.8 ...............................................................................36

40 C.F.R. § 122.44(d) .......................................................................10

40 C.F.R. § 123.44 ............................................................................10

40 C.F.R. § 131.2 .................................................................................9

40 C.F.R. § 131.3(b) ...........................................................................9

40 C.F.R. pt. 230 .........................................................................6, 29

40 C.F.R. § 230.2(c) ...................................................................................8

40 C.F.R. pt. 231 ...............................................................................8, 36

75 Fed. Reg. 18,500 (Apr. 12, 2010) ......................................................19

## **LEGISLATIVE HISTORY**

H.R. 1000, 93d Congress (1973) ............................................................44

H.R. Rep. No. 93-1072 (1974) ...............................................................44

H.R. Rep. No. 94-896 (1976) ..........................................................10, 43

## **RULES**

Fed. R. App. P. 28(i) ...............................................................................3

Fed. R. Civ. P. 56(a) .............................................................................27

## **STATE STATUTES**

W. Va. Code § 22-3-13(b) ...............................................................11, 12

## **STATE REGULATIONS**

405 Ky. Admin. Regs. 8:030 ..................................................................11

405 Ky. Admin. Regs. 16:060 ................................................................11

405 Ky. Admin. Regs. 16:130 ................................................................11

405 Ky. Admin. Regs. 16:200 ................................................................12

W. Va. Code R. § 32-2-14.7 ...................................................................11

W. Va. Code R. § 38-2-14.14 ...........................................................11, 12

W. Va. Code R. § 38-2-14.15 ..................................................................12

## <u>OTHER AUTHORITY</u>

David Fahrenthold, *Environmental Regulations to Curtail Mountaintop Mining*, Wash. Post, Apr. 2, 2010, *available at* http://www.washington post.com/wpdyn/content/article/2010/04/01/AR2010040102312.html ..................20

# GLOSSARY

| | |
|---|---|
| 404(b)(1) Guidelines | 40 C.F.R. pt. 230 |
| 404(q) Memorandum | Memorandum of Agreement Between EPA and the Corps under 33 U.S.C. § 1344(q), ECP000001-10 |
| APA | Administrative Procedure Act |
| BMPs | Best Management Practices |
| Corps | U.S. Army Corps of Engineers |
| CWA | Clean Water Act |
| Dkt. | Citation to district court docket (to be replaced by citation to the Joint Appendix)[3] |
| ECPXXXXXX | Citation to the Administrative Record for the Enhanced Coordination Process (to be replaced by citation to the Joint Appendix) |
| EC Process | Enhanced Coordination Process, ECP111120-31 |
| EPA | U.S. Environmental Protection Agency |
| Interim Guidance | Memorandum from Peter S. Silva to Regions 3, 4, and 5, "Detailed Guidance: Improving EPA's Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order" (Apr. 1, 2010), ECP003984-4014 |

---

[3] As the Government informed the Court on November 27, 2012, all parties in this case have agreed to file a deferred appendix pursuant to Federal Rule of Appellate Procedure 30(c) and Circuit Rule 30. Consequently, record references herein are to the relevant docket number or portion of the administrative record. All of those citations later will be replaced with references to the appendix. Fed. R. App. P. 30(c); Circuit Rule 30.

| | |
|---|---|
| Intervenors' Br. | Proof Brief of Environmental Intervenor-Appellants (filed on May 6, 2013) (Case No. 12-5310, Document No. 1434537) |
| FGXXXXXX | Citation to the Administrative Record for the Final Guidance (to be replaced by citation to the Joint Appendix) |
| Final Guidance | Memorandum from Nancy K. Stoner to Regions 3, 4, and 5, "Improving EPA Review of Appalachian Surface Coal Mining Operations Under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order" (July 21, 2011), FG005440-5500 |
| KCA | Kentucky Coal Association |
| MIRXXXXXX | Citation to the Administrative Record for the screening tool known as the "Multi-criteria Integrated Resource Assessment (MIRA)" (to be replaced by citation to the Joint Appendix) |
| NMA | National Mining Association |
| NPDES | National Pollutant Discharge Elimination System |
| OSM | U.S. Department of Interior, Office of Surface Mining Reclamation and Enforcement |
| SMCRA | Surface Mining Control and Reclamation Act |
| U.S. Br. | Citation to the Proof Brief of the United States of America (filed on Apr. 15, 2013) (Case No. 12-5310, Document No. 1430758) |

# INTRODUCTION

In this case, coal mining companies and two of the Appalachian states that regulate them successfully challenged a string of unprecedented federal government actions that fundamentally and unlawfully altered the regulation of Appalachian surface coal mining and brought environmental permitting to a virtual halt.

Shortly after the launch of the current Administration in 2009, the U.S. Court of Appeals for the Fourth Circuit resolved long-pending litigation that cleared the way for the Corps to issue a large volume of backlogged Clean Water Act Section 404 permits for Appalachian coal mining.[4]  Rather than resume timely processing and issuance of those permits under existing regulations, the federal Government instead invented a new illegal permitting system led by EPA to superimpose the new Administration's policy preferences on the regulatory process. That new system sentenced permits on the brink of issuance to a perplexing purgatory with no guarantee that they would receive timely attention and where they would be subject to novel procedures and new substantive requirements.  The Government did so without regard to Congress's allocation of permitting authority or to codified regulations and without even attempting notice-and-comment

---

[4] *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.* ("*OVEC*"), 556 F.3d 177 (4th Cir. 2009).

rulemaking. Because this extraordinary system violated both the Clean Water Act and the Administrative Procedure Act, the district court struck it down.

The Government's actions did not stop there. EPA also issued a lengthy "guidance" document—first in "interim" form in April 2010 and then in "final" form in July 2011—that reshaped virtually all environmental permitting for Appalachian surface coal mining. Though both versions of the document were papered with caveats disclaiming any binding effect, EPA's implementation proved otherwise, significantly subverting state authority and expanding EPA's intrusion into surface coal mining beyond its limited statutory reach. The district court properly set aside the "guidance" document under the Administrative Procedure Act as exceeding EPA's authority under the Clean Water Act and the Surface Mining Control and Reclamation Act.

The Government blithely attempts to downplay the significance of these changes to the regulatory framework by claiming that the agencies were merely coordinating their review and exercising their authority to establish their own procedures. But the Government's view—that virtually any amount of change to EPA's role is permissible under the guise of coordination so long as the Corps technically remains the issuer or denier of permits (eventually)—runs headlong into the well-defined limits that Congress placed on EPA's Section 404 authority, as well as this Court's precedent.

2

Additionally, the Government attempts to characterize the challenged "guidance" document in this case as containing only "recommendations" from EPA Headquarters that subordinate EPA regions, state regulators, and regulated entities were free to disregard. The district court saw through that decoy and properly applied principles of administrative law to conclude that the Government had unlawfully changed the requirements for the environmental permitting of surface coal mining and had improperly exceeded EPA's delegated statutory authority. The Government's suggestion that the approximately sixty-page, single spaced "guidance" document carries little meaning with no legal consequence is, quite simply, incredible.

This Court should thus affirm the judgment below.

## STATEMENT OF ISSUES

I.      This response brief, filed by NMA and KCA,[5] addresses both issues concerning the new system for Section 404 permits—comprised of the Enhanced Coordination Process ("EC Process") and the screening procedure EPA used to divert permit applications to that process.

---

[5] NMA and KCA do not address all of the issues in this appeal. Rather, in accordance with Federal Rule of Appellate Procedure 28(i) and this Court's Handbook of Practice and Internal Procedures (at 37), Appellees seek to avoid filing duplicative briefs by dividing the issues between them. Industry Appellees hereby endorse and incorporate by reference all arguments presented in the State Appellees' brief.

1.      Under Clean Water Act ("CWA") Section 404, Congress gave sole

permitting authority to the Corps, while giving EPA a limited, clearly bounded

supporting role in the permitting process.  May the two agencies nevertheless

create a new set of procedures and requirements, which enlarge EPA's role beyond

those limits and which conflict with existing regulations, based on (i) the agencies'

claimed inherent authority to fashion rules of procedure and (ii) the absence of an

explicit statutory prohibition on this particular manner of "coordination?"

2.      Must federal agencies follow the notice-and-comment requirements of

the Administrative Procedure Act ("APA") when creating new procedures and

requirements that conflict with codified regulations governing CWA permitting,

create a new role for EPA within that permitting process that is not contemplated

under existing laws, and alter the substantive criteria for making decisions on

permit applications?

II.     This brief also addresses one of the issues relating to EPA's Final Guidance:

Under the Surface Mining Control and Reclamation Act ("SMCRA"), a statute

created to govern the environmental regulation of coal mining, aspects of surface

mine design and operation that are located at an elevation above the watershed

(*e.g.*, that are "upland" from any waters) are the exclusive province of the SMCRA

permitting authority, which often is, as in the present case, a state with a federally

approved regulatory program.  Congress greatly limited EPA's authority under

SMCRA, allowing EPA only to provide initial concurrence on certain aspects of programmatic regulations and state programs, after which time EPA has no role. Does the "guidance" document violate the APA and SMCRA by allowing EPA to intrude on the SMCRA regulatory regime and to usurp the states' authority?

## STATUTES AND REGULATIONS

All pertinent statutes and regulations are reproduced in a separate addendum, with materials reproduced by Appellants incorporated by reference.

## STATEMENT OF FACTS AND STATEMENT OF THE CASE

Coal mining is governed by a carefully constructed statutory and regulatory regime involving various federal and state agencies.[6]  That regime is summarized below in Part I of this Statement.  Part II then discusses how the Government dramatically retooled that regime through a series of agency memoranda and guidance documents.

**I.      Legal Framework.**

**A.      The Clean Water Act.**

Surface coal mining operations generally require two types of CWA permits: (i) Section 404 (33 U.S.C. § 1344) permits issued by the Corps authorizing the discharge of dredged and fill material into navigable waters; and, (ii) Section 402 (33 U.S.C. § 1342) permits issued by states with delegated permitting programs

---

[6] For a discussion of that regime and some of the techniques associated with surface mining in Appalachia, *see OVEC*, 556 F.3d 177.

that govern discharges of all other pollutants.  Both types of permits must conform

to applicable water quality standards, which states have the primary role in

establishing under Section 303 (33 U.S.C. § 1313).

1.    Section 404 Permitting.

The Corps is the sole issuer of CWA Section 404 permits.  33 U.S.C.

§ 1344(a); 33 C.F.R. § 325.2(a).  In reviewing Section 404 permit applications, the

Corps follows statutory and regulatory review procedures that, among other things,

prescribe timelines to minimize delays in permitting.  *See*, *e.g.*, 33 U.S.C. § 1344;

33 C.F.R. pt. 325.  The Act requires the Corps to apply guidelines that set forth

substantive environmental standards (the "404(b)(1) Guidelines," codified at 40

C.F.R. pt. 230) when making decisions on permits.  33 U.S.C. § 1344(b).  Section

404(q) of the Act also requires the Corps to enter into agreements with appropriate

federal agencies to assure that, "to the maximum extent practicable," a decision on

an application will be made within 90 days of when the Corps publishes notice of

the application.  33 U.S.C. § 1344(q).

The Corps' regulations implementing Section 404 reflect Congress's goal of

minimizing delays in permitting.  Upon receiving a permit application, the Corps

has 15 days to determine that the application is complete and issue a public notice

or to notify the applicant of any missing information.  33 C.F.R. § 325.2(a)(2); *see*

*also* 33 U.S.C. § 1344(a).  After publishing notice, the Corps receives and

considers comments.  By regulation, the comment period should not exceed 30 days unless the Corps finds that a 30-day extension is warranted.  Altogether, the comment period should not exceed 60 days unless the applicant itself seeks further extension.  33 C.F.R. § 325.2(a)(3), (d)(2); ECP000005.  The Corps must generally issue a decision within 60 days of receiving a complete application, unless it determines that one of six exceptions applies: (i) a decision is precluded as a matter of law or required procedures, (ii) the case must be referred to a higher authority, (iii) the comment period is extended, (iv) the applicant does not timely submit information or comments, (v) the applicant requests the suspension of processing, or (vi) information needed to process the application cannot reasonably be obtained within the 60-day period.  33 C.F.R. § 325.2(d)(3).

In 1992, the Corps and EPA entered into the statutorily mandated agreement under Section 404(q) (the "404(q) Memorandum").  That memorandum confirms that the Corps is the responsible permitting authority under Section 404, tasked with determining whether a permit should be issued and whether the project complies with the 404(b)(1) Guidelines.  ECP000001-10.  The 404(q) Memorandum also provides, upon EPA's recommendation, for the elevation (i.e., additional review) of individual permitting decisions.  *Id.*  Elevation is governed by specified time frames, and EPA must explain in writing why it believes the proposed discharge "*will* have a substantial and unacceptable impact on aquatic

7

resources of national importance." *Id.* The ultimate permit decision nevertheless rests with the Corps. *Id.*

Congress authorized EPA to participate in Section 404 permitting to some degree, but EPA cannot exercise authority given to the Corps. *See* 33 U.S.C. § 1344; *Coeur Alaska v. Se. Alaska Conservation Council*, 557 U.S. 261, 273-74 (2009). In contrast to EPA's pervasive authority everywhere else in the Act, Congress narrowly limited EPA's involvement in Section 404. For example, the Act requires that EPA work with the Corps to develop the 404(b)(1) Guidelines[7] for the Corps' use in reviewing permit applications. 33 U.S.C. § 1344(b); *Coeur Alaska*, 557 U.S. at 274. EPA also has authority on an individual, site-specific basis to prevent the Corps from specifying disposal sites for the discharge of dredged or fill material if it determines, after notice and comment, that such discharges at those sites "will have an unacceptable adverse effect" on certain resources.[8] 33 U.S.C. § 1344(c). Regulations setting forth detailed procedures governing EPA's exercise of its Section 404(c) authority are codified at 40 C.F.R. part 231.

---

[7] The "basic application, meaning, or intent" of those guidelines may not be modified absent APA rulemaking. 40 C.F.R. § 230.2(c).

[8] EPA also may comment during the comment period for a particular application just like any other agency or member of the public. 33 U.S.C. § 1344(a).

2.    Section 303 Water Quality Standards.

States have the primary responsibility for establishing water quality standards under CWA Section 303.  *See* 33 U.S.C. § 1313; *Keating v. FERC*, 927 F.2d 616, 622 (D.C. Cir. 1991).  Water quality standards consist of designated uses (*e.g.*, recreation, irrigation, navigation) and water quality criteria (narrative or numeric limits on pollutants necessary to meet designated uses).  *See* 33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. §§ 131.2, 131.3(b).

Congress gave EPA a secondary role under Section 303:  EPA reviews new or revised state water quality standards to determine whether they satisfy the Act's requirements.  33 U.S.C. § 1313(c)(3).  If so, EPA approves the standard within 60 days.  *Id.*  Otherwise, EPA must tell the state what changes are necessary to comply with the Act.  *Id.*  EPA may "step in and promulgate water quality standards itself only in limited circumstances:" if (i) EPA has determined that the standard does not comply with the Act and the state refuses to make necessary changes,  or (ii) a state does not act and EPA determines that a new or revised standard is necessary.  *Am. Paper Inst., Inc. v. EPA*, 996 F.2d 346, 349 (D.C. Cir. 1993).

3.    Section 402 Permitting.

To ensure attainment and compliance with water quality standards, the Act's system of cooperative federalism also allows states to assume primary

9

administration and enforcement of CWA Section 402 permits for discharges of

pollutants other than dredged or fill material.  33 U.S.C. §§ 1311(b)(2), 1342.

Once EPA approves a state program,[9] the state issues permits, and EPA has limited

oversight authority.[10]  States can impose numeric or narrative effluent limits in

Section 402 permits to protect water quality.  *Id.* § 1312(a); 40 C.F.R. § 122.44(d).

### B.    SMCRA.

SMCRA "strike[s] a balance between protection of the environment . . . and

the Nation's need for coal as an essential source of energy."  30 U.S.C. § 1202(f).

When enacting SMCRA, Congress recognized that the CWA "does not contain the

statutory authority for the establishment of standards and regulations requiring

comprehensive preplanning and designing for appropriate mine operating and

reclamation procedures[;]" thus, SMCRA was "necessary to provide the needed

authority and regulatory framework to minimize the adverse environmental effects

of coal mining."  H.R. Rep. No. 94-896, at 92-93 (1976).

### 1.    SMCRA's Comprehensive Regulation of Mine Activities.

SMCRA explicitly authorizes mountaintop removal activities and valley fills.

*See* 30 U.S.C. § 1291(28); *see also id.* § 1265(c)(2).  "[I]t is beyond dispute that

---

[9] Both states party to this case, West Virginia and Kentucky, have delegated Section 402 permit programs.

[10] EPA may object to a state's issuance of a Section 402 permit in certain instances, and may ultimately assume the authority to issue a permit if a state does not respond adequately to the objection.  *See* 33 U.S.C. § 1342(d); 40 C.F.R. § 123.44.

SMCRA recognizes the possibility of placing excess spoil material [from mountaintop mining and valley fills] in waters of the United States." *Kentuckians for the Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425, 443 (4th Cir. 2003).

Such activities are subject to numerous environmental performance standards, such as requiring mine operators to restore the approximate original contour of the land.  30 U.S.C. § 1265(b)(2)-(3), (10).  Operators also must reclaim lands after ceasing mining operations, establishing diverse, effective, and permanent vegetative cover on affected areas.  *Id.* § 1265(b)(19).  Altogether, SMCRA enumerates 25 general environmental standards that apply to mining operations, in addition to other standards that apply in specific circumstances.  *See generally* 30 U.S.C. § 1265.

Federal and state regulations impose even more detailed requirements.  For example, disposal of excess spoil must conform to specific requirements if the mining operations involve valley fills.  *See* 30 C.F.R. §§ 816.71-816.74; W. Va. Code § 22-3-13(b)(22); W. Va. Code R. § 38-2-14.14; 405 Ky. Admin. Regs. 16:130.  Mine operators must handle earth materials and conduct operations in accordance with an approved hydrologic reclamation plan.  30 C.F.R. §§ 780.21(h), 816.41(d)(2); W. Va. Code § 22-3-13(b)(10); W. Va. Code R. § 32-2-14.7; 405 Ky. Admin. Regs. 16:060, § 6; 405 Ky. Admin. Regs. 8:030, § 12.  They must also meet extensive revegetation requirements.  30 C.F.R. §§ 816.111, 816.113; *see*

*also* W. Va. Code § 22-3-13(b)(19)-(20); W. Va. Code R. §§ 38-2-14.14.a.6, 14.15.f; 405 Ky. Admin. Regs. 16:200, §§ 1, 2, 3.  And valley fills must be constructed in accordance with plans that demonstrate that the operation has been designed to minimize to the extent possible the volume of excess spoil generated and that demonstrate that the designed maximum cumulative volume of all proposed fills is no larger than needed.  30 C.F.R. §§ 780.35, 816.71(c); W. Va. Code R. § 38-2-14.15.

> ### 2.     States With SMCRA Primacy Are The Exclusive Regulatory Authority.

Congress intended the states to have primary regulatory authority over surface coal mining and reclamation operations.  *See* 30 U.S.C. § 1201(f).  States with approved SMCRA programs (like West Virginia and Kentucky) have "exclusive jurisdiction over the regulation of surface coal mining and reclamation operations" on non-Federal lands.  *Id.* § 1253(a).  The state "decides whether a permittee's techniques for avoiding environmental degradation are sufficient" and "exercises front-line supervision, and the Secretary [of the Interior] will not intervene unless its discretion is abused."  *In re Permanent Surface Mining Regulation Litig.* ("*PSMRL*"), 653 F.2d 514, 519, 523 (D.C. Cir. 1981) (*en banc*).  The state "is the sole issuer of permits," and unlike under Section 404(c), *no* federal agency has any veto authority.  *Id.* at 519 & n.7.

### 3.    EPA's Limited Role Under SMCRA.

Congress substantially limited EPA's role under SMCRA.  Nothing in SMCRA "shall be construed as superseding, amending, modifying, or repealing" the CWA or other laws, 30 U.S.C. § 1292(a), and EPA's involvement is only programmatic to ensure consistency with the laws that EPA administers (*i.e.*, it does not extend to individual permit decisions).  Specifically, SMCRA requires that the Secretary of the Interior obtain EPA's concurrence on any regulations promulgated by the Secretary that relate to air or water quality standards established under the Clean Air Act or the CWA.  *See id.* § 1251(a).  Second, the U.S. Department of Interior's Office of Surface Mining Reclamation and Enforcement ("OSM") may not approve any state program until it has solicited and publicly disclosed EPA's views and has obtained EPA's concurrence with respect to any aspects of a state program that relate to air or water quality standards established under the Clean Air Act or the CWA.  *See id.* § 1253(b).  Congress urged EPA to cooperate with OSM "[t]o the greatest extent practicable" in carrying out these responsibilities.  *Id.* § 1292(c).

Congress did not, however, envision EPA involvement in the formulation or review of SMCRA permit conditions.  Nor does EPA's responsibility to regulate air and water quality under the Clean Air Act and the CWA open the door for EPA to get involved past the limits imposed on it by Congress.  Instead, because

"Congress clearly contemplated that the regulation of the disposal of excess spoil and the creation of valley fills fall under the SMCRA rubric," the regulation of the upland effects of surface coal mining (*e.g.*, coal mining activities and effects located above waterbodies) is left to the "exclusive jurisdiction" of the SMCRA permitting authority and does not lie with EPA.  *OVEC*, 556 F.3d at 195.

## II.     The Government's Transformation Of Environmental Permitting For Coal Mining.

In early 2009, the Fourth Circuit issued a decision that shook the core of the new Administration's policy goals for Appalachian coal mining.  That case, which began in 2005 as a challenge to various proposed Section 404 permits for coal mining in West Virginia, created a large backlog of dozens of applications for Appalachian mining permits as the Corps awaited the results of judicial review. The Corps ultimately prevailed in *OVEC*, leaving it free to process those permit applications under its longstanding regulations.  *See id.* at 177; *see also* ECP000022; Dkt.26-1:2-3; Dkt.10-11:1-3 (describing permits held in abeyance during *OVEC*).[11]  Potentially faced with a sudden flood of newly issued permits for Appalachian coal mining operations (indeed, the Corps was poised to issue more permits in 2009 than it had during the entire prior Administration), the new

---

[11] The record before the district court included numerous declarations describing the implementation of the challenged agency actions.  The Government filed multiple motions to strike declarations and other material.  The declarations cited herein either were not the target of those motions or were deemed to be properly before the court.

Administration quickly mobilized to halt their issuance by creating a new regulatory regime that anointed EPA as gatekeeper and diverted permits to a new "enhanced" review process with new substantive review criteria—all in disregard of the existing statutory and regulatory framework and all without rulemaking.

### A.      Enhanced Coordination Process.

The Government formally announced the creation of the EC Process and screening procedure through two immediately effective memoranda, dated June 11, 2009, posted on EPA's website without notice-and-comment rulemaking. *See* ECP000017-19; ECP000020-31. The memoranda unequivocally declared that the new process "will apply" and that 108 pending Section 404 permit applications from six Appalachian states, including West Virginia and Kentucky, "will be subject to review in accordance with these procedures." ECP0000020; ECP0000023. Those permits were ready to be issued after *OVEC*—the designated public comment period had ended and EPA already had been given an opportunity to comment along with the public. *See* U.S. Br. 6.

EPA's screening procedure was the first step in the new EC process. *See* ECP000017-19. Despite the Corps' role as the issuer of Section 404 permits, EPA arrogated to itself the development and application of the screening procedure, the Multi-criteria Integrated Resource Assessment. *See* ECP000017 ("EPA has given thought to how *we intend* to conduct the review of the . . . pending permit

applications subject to [the EC Process], and I am writing to provide you with a summary of the regulations and key factual considerations that will form the basis of *our identification* of pending permit applications that will require further coordination between EPA and the Corps." (emphasis added)); *see also* ECP00022-23; MIR000275-301.  In screening permit applications, EPA unilaterally applied the 404(b)(1) Guidelines and dictated to the Corps which permits must be diverted from the Corps' ordinary review process.  And EPA did so outside of the authorized context of:  commenting on a particular permit application during the designated comment period, requesting elevation of a particular permit, or exercising its Section 404(c) authority with respect to a particular permit.  On September 30, 2009, EPA proclaimed that it had used its screening procedure to reroute all 79 of the then-pending Section 404 permit applications with valley fills[12] from the Corps' 33 C.F.R. part 325 review process to the EC Process.  *See* Dkt.26-1:5.

Upon diverting applicants to the new EC Process, those applicants faced an *ad hoc* review wholly divorced from the codified process created under Section 404, the Corps' regulations, and the 404(q) Memorandum.  The following graphic illustrates how the EC Process had changed Section 404 permitting as of August 10, 2010 (with the codified regulatory process illustrated on the left, in blue):

---

[12] That list was culled from the 108 permit applications in the queue after the *OVEC* decision.  Dkt.26-1:4-5, 19-20.

16



*See* Dkt.26-1:22.

The EC Process added a *minimum* of an additional 60 days of "coordination" to the normal permitting process.  *See* ECP000023.  That 60-day period could be extended by 15 days at EPA or the Corps' request *or by an undefined amount of time* "by mutual agreement among the agencies."  ECP000023-24.  Moreover, nothing required that the new coordination period even begin in a timely fashion.  *See* ECP000023; Dkt.26-1:5 ("*No time limit* has been established for coordination that occurs prior to the start of the 60-day review process" (emphasis added)).  At the end of the EC Process, if the issues identified by EPA were resolved, the permit could move back to the Corps for technical processing and incorporation of new terms and conditions dictated by EPA.  ECP000023-24.  If EPA's concerns remained unresolved, EPA could then *initiate* Section 404(c) procedures.  *Id.*

Permit applicants diverted to the EC Process faced not only significant delays and regulatory uncertainty, but also additional substantive demands.  *See*, *e.g.*, Dkt.16-2:2-5 (describing application on which EPA had not commented during the comment period but which EPA nevertheless diverted to the EC Process, where it had languished for a year at time of declaration); Dkt.10-45:2-4 (describing how the EPA Administrator inserted a numeric conductivity limit into the Section 404 permit and how the EC Process led to at least a year of additional delay); Dkt.16-1:4 (noting that EPA was insisting upon conductivity limits despite the fact that the State's Section 402 permit did not include conductivity limits).

18

### B.      EPA's Interim Guidance.

The next step in the new regime, as promised in a third June 11, 2009

memoranda, ECP000013, came on April 1, 2010, when EPA headquarters issued a

thirty-one-page, single-spaced Interim Guidance document to EPA Regions 3, 4,

and 5 that ostensibly sought to clarify EPA's role in the environmental permitting

of coal mining for both Section 404 and Section 402 permits.  *See* 75 Fed. Reg.

18,500 (Apr. 12, 2010); FG003984-4014.  EPA declared the "guidance" to be

immediately effective, but also invited public comment.  *See id.*  Although the

Interim Guidance contained a number of disclaimers on its nonbinding nature, it

nevertheless contained a number of statements that, on their face, *mandated* new

requirements.  More important than the language in the document, however, was

EPA's implementation of the document vis-à-vis state regulators and regulated

entities.

For example, the Interim Guidance established a new numeric water quality

limit for conductivity—water's ability to conduct electricity—by directing EPA

regions to work with state permitting authorities to "ensure that the [Section 402]

permit includes conditions that protect against conductivity levels exceeding 500

µS/cm" and to "object to the issuance of [a] proposed permit" if it fails to comply

with the Interim Guidance's interpretation of the CWA.  FG003991; FG003995.

Then-Administrator Lisa Jackson proudly declared that "no, or very few, valley

19

fills [] are going to meet this standard" for conductivity. *See* David Fahrenthold, *Environmental Regulations to Curtail Mountaintop Mining*, Wash. Post, Apr. 2, 2010, http://www.washingtonpost.com/wp-dyn/content/article/2010/04/01/ AR2010040102312.html; *see also* Dkt.137-1:12 (state regulator concurring that "[v]ery few (if any)" operations "could comply with conductivity limits of 500 µS/cm"). Administrator Jackson's statement at the time conveyed EPA's hope to eliminate mountaintop removal and valley fills, even though Congress expressly allowed those mining techniques. *See supra* 10-12.

The EPA Regions delivered on Administrator Jackson's words, thereafter insisting upon the inclusion of the Interim Guidance's numeric conductivity limit in permits. *See* Dkt.10-24:2-8 (describing the Corps' imposition of "special conditions" that required the operator to satisfy the 500 µS/cm conductivity standard "based on comments made by the USEPA" and subject to "USEPA's participation and approval"); Dkt.10-45:2-4 (discussing EPA's insistence on including its conductivity standard as a condition for a pending Section 404 permit under EC Process review); Dkt.10-11:6-7 (same); Dkt.16-7:2,6 (explaining how the Interim Guidance "effectively announced a new water conductivity standard of 500 µS/cm that is applicable to both Section 402 and 404 permits," and how "EPA staff noted [to Virginia regulators] . . . that they would not approve any permits that would result in a conductivity level of greater than 500 µS/cm.").

20

### C.     EPA's Final Guidance.

On July 21, 2011, the very day its summary judgment brief in defense of the Interim Guidance was due in this case, EPA replaced the Interim Guidance with the Final Guidance. FG005440-5500. Like the Interim Guidance, the Final Guidance purports merely to "clarify the roles and expectations of [EPA] . . . in coordinating with [its] Federal and State partners, to assure more consistent, effective, and timely review of Appalachian surface coal mining operations." FG005440. To a much greater degree than its predecessor, the Final Guidance is brimming with disclaimers and equivocal language seeking to express that the sixty-one, single-spaced pages contain only nonbinding recommendations. *See*, *e.g.*, FG005440-42.

Despite EPA's careful drafting efforts, the Final Guidance picked up exactly where the Interim Guidance left off in stonewalling Appalachian coal mining permits. The Final Guidance claims to be limited to addressing EPA's authority under the CWA and the National Environmental Policy Act ("NEPA"), yet it also discusses issues of mine design and operation that are reserved to states (or OSM) by SMCRA. *See* FG005466-75 (asserting that alternative mining methods and other aspects of mine design should be considered in determining compliance with the 404(b)(1) Guidelines); FG005469 (touting certain "improved practices"); FG005473 (rejecting many of industry's mine design best management practices

21

("BMPs") as "unproven in their effectiveness to protect water quality and to prevent significant degradation").

Moreover, although Congress excluded EPA from SMCRA permitting, *see supra* 12-14, the Final Guidance instructs EPA regional employees "to work with OSM or the State SMCRA agency to encourage them to incorporate appropriate BMPs into the applicable SMCRA permit."  FG005475; *see also* FG005494-95; Dkt.137-1:18-19; Dkt.137-2:6-8.

Like the Interim Guidance, EPA's Final Guidance continued to emphasize a focus on conductivity limits when making permitting decisions.  *See*, *e.g.*, FG005444; FG005454-55; FG005457; FG005460 n.27; FG005483-86.  Despite couching the discussions in the Final Guidance as mere "recommendations," EPA's binding implementation of the Final Guidance mirrors that of the Interim Guidance.  *See*, *e.g.*, FG005491-93; Dkt.137-1:12-21; Dkt.137-2:5-6; Dkt.137-3:4-5.

## III.    Proceedings Below.

NMA sued EPA and the Corps on July 20, 2010, challenging the EC Process, screening procedure, and the Interim Guidance.  On January 14, 2011, the district court denied the Government's motion to dismiss, holding that all three challenged actions were final agency actions that were ripe for review and for which NMA had standing to challenge.  Dkt.32.  The court rejected the Government's

jurisdictional challenges and other arguments for dismissal, emphasizing, in particular, that "it is clear . . . that the EPA has implemented a change in the permitting process" and that "a reworking of the permitting process gives rise to legal consequences for companies that must obtain those permits to operate." Dkt.32:11.

In the second phase of the case below,[13] the district court vacated the EC Process and screening procedure after concluding that both actions are contrary to the plain language of CWA Section 404 and are legislative rules that should have undergone notice-and-comment rulemaking. Dkts.95-96. The court examined the text of Section 404 and found that Congress plainly designated the Corps as "the principal player" and assigned EPA "discrete functions" within the regulatory scheme. Dkt.96:10-11. It thus rejected the Government's suggestion that Section 404 merely "prescribe[s] a statutory minimum" role for EPA in permitting. *Id.* at 11. The court also held that issuance of the EC Process and screening procedure without notice and comment violated the APA because those actions "'effectively amend' the Section 404 permitting process by conferring additional reviewing authority on the EPA—authority that the statute reserves for the Corps." Dkt.96:18. The court rejected the Government's contention that the documents are procedural rules exempt from notice and comment, emphasizing that "the fact that

---

[13] After the additional Appellees sued in other jurisdictions, those cases were transferred and consolidated with NMA's case.

the [screening procedure] removed the task of applying the 404(b)(1) guidelines to pending permits from the Corps and bestowed it upon the EPA signifies a substantive, rather than a procedural, change to the permitting framework." Dkt.96:16.

In the third and final phase of the case below, the district court vacated the Final Guidance under the APA upon concluding that it is contrary to the CWA and SMCRA. Dkts.166-67. The court rejected the Government's litany of jurisdictional and prudential arguments, holding, *inter alia*, that the Final Guidance was final agency action. Dkt.167:10-18. Unconvinced by the Government's proclamations that the Final Guidance is a nonbinding policy statement, the court concluded that the guidance was being treated as binding and "has had the practical effect of changing the obligations of the state permitting authorities." Dkt.167:17. On the merits, the court held that EPA had "overstepped its statutory authority under the CWA and the SMCRA, and infringed on the authority afforded state regulators by those statutes." Dkt.167:33.

This appeal followed.

## SUMMARY OF ARGUMENT

This Court should affirm the district court's judgment setting aside the EC Process and screening procedure as contrary to the plain language of Section 404 and as unlawfully promulgated legislative rules that did not undergo notice-and-

24

comment rulemaking.  This Court should also affirm the district court's holding that the Final Guidance violates the APA and SMCRA.

I. A.  The EC Process and screening procedure unlawfully rewrite EPA's Section 404 authority.  The Corps is the sole issuer of Section 404 permits, and Congress carefully defined and limited EPA's role under that section.  That role leaves no room for EPA to superimpose the EC Process and screening procedure under the guise of fostering additional "coordination" between the Corps and EPA.  Though EPA has some authority under Section 404, it is not plenary.  Thus, the Government cannot rely on the agencies' general authority to develop their own procedures or on the lack of an express withholding of authority from Congress to justify the EC Process and screening procedure.

I. B.  The EC Process and screening procedure are contrary to the Corps' longstanding regulations governing Section 404 permitting (33 C.F.R. pt. 325).  Those regulations establish particular time frames and procedures for the Corps' review of permit applications and only contemplate departures from those time frames in specified circumstances, to be applied on a permit-by-permit basis.  The EC Process, which includes a "pre-coordination" period of undefined duration, is incompatible with these existing regulations.  The new screening procedure is likewise contrary to those regulations, as it transforms EPA into the sole gatekeeper responsible for screening permit applications and deciding whether the

25

Corps may continue reviewing them under existing regulations or whether the applicants must instead be rerouted to the purgatorial EC Process.

I. C.  The Government issued the EC Process and screening procedure without notice-and-comment rulemaking in violation of the APA.  Those documents effectively amended existing regulations governing Section 404 permitting, created new substantive requirements for mine permits, and established a new role for EPA in the permitting process well beyond what Congress intended. The Government wrongly contends that the EC Process and screening procedure fall within the APA's procedural rule exception.  That exception only applies to an agency's *internal* rules of procedure and does not exempt from notice and comment rules that either:  (1) attempt to change how Congress divided authority between two agencies; or (2) allow one agency to override another's existing regulations.  Nor does it apply where, as here, the so-called procedural rules changed the substantive criteria applicable to Section 404 permitting decisions.

II.  The Final Guidance exceeds EPA's statutory authority under SMCRA. In crafting that law, Congress assigned exclusive regulatory jurisdiction over upland environmental issues to the states (or to OSM if a state lacks an approved program).  Congress greatly restricted EPA's involvement under SMCRA, allowing EPA to provide its concurrence on certain aspects of programmatic regulations and of state programs prior to their approval by OSM.  After EPA

26

provides such concurrence, it has no role to play under SMCRA.  EPA ignored

those well-defined boundaries by attempting, through the Final Guidance, to

regulate upland activities in Section 404 permits and to usurp the states' authority

by inserting itself into the SMCRA permitting process.

## STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  This Court reviews the district court's grant of summary

judgment and its jurisdictional rulings *de novo* and applies the same standard in

reviewing agency action under the APA as if the case had been brought on direct

appeal.  *AstraZeneca Pharms. LP v. FDA*, 713 F.3d 1134, 1138-39 (D.C. Cir.

2013).  Accordingly, the Court will review challenged agency actions to determine

whether they are arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law.  5 U.S.C. § 706(2)(A).  An agency violates the APA when it

attempts to evade notice and comment requirements under the guise of interpreting

a rule, and when it acts outside of its statutory authority.  *See generally EME*

*Homer City Generation*, *LP v. EPA*, 696 F.3d 7 (D.C. Cir. 2012).

When reviewing an agency's interpretation of its authority, if a statute

reflects that Congress has directly addressed the question at issue, the Court "must

give effect to the unambiguously expressed intent of Congress."  *Chevron U.S.A.,*

*Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).  "[W]hether

there is [a statutory] ambiguity, is for the court [to decide], and we owe the agency

no deference on the existence of ambiguity."  *Am. Bar Ass'n v. FTC*, 430 F.3d 457,

468 (D.C. Cir. 2005).  If the Court determines that the statute is silent or

ambiguous, the Court then must determine whether the agency's answer is based

on a permissible statutory construction.  *Chevron*, 467 U.S. at 843.  Even if an

agency's interpretation of a statute survives analysis under *Chevron*, it can

nevertheless be invalidated as arbitrary and capricious.  *See Am. Petroleum Inst. v.

EPA*, 216 F.3d 50, 57-58 (D.C. Cir. 2000).

## **ARGUMENT**

**I.    The Enhanced Coordination Process And Screening Procedure Violate
        The Clean Water Act And The Administrative Procedure Act.**

According to the Government, this Court can easily uphold the EC Process

and screening procedure because agencies are free to "consult" whenever and

however they like.  In the Government's view, virtually any degree of change to

EPA's involvement in Section 404 permitting is immaterial because "it makes

perfect sense" for EPA to be involved.  U.S. Br. 35.  In other words, agencies

could reallocate any statutory division of authority in the name of "coordination."

Such a view is irreconcilable with the CWA and this Court's precedents.  The EC

Process and screening procedure fundamentally changed Section 404 permitting,

procedurally and substantively, by unlawfully expanding EPA's role in permitting

and altering the criteria applicable to permit decisions.  As such, they violate the

CWA and they are not "rules of agency organization, procedure, or practice"

exempt from the APA's notice-and-comment requirements.  5 U.S.C.

§ 553(b)(3)(A).

### A.    The Enhanced Coordination Process And Screening Procedure Are Contrary To The Plain Text Of Section 404.

Although EPA generally has broad authority to administer the CWA,

Congress carefully limited and defined EPA's role within Section 404 permitting,

where the "Secretary" of the Army, "acting through the [Corps] Chief of

Engineers[,]" is the sole issuer of permits.  *See* 33 U.S.C. § 1344(a), (d).  The EC

Process and screening procedure unlawfully expanded EPA's role.  Thus, the

district court properly vacated those actions as contrary to the statutory text.

Congress authorized EPA to perform a number of tasks, at a programmatic

level, with respect to Section 404 permitting.  EPA is responsible for developing

the 404(b)(1) Guidelines "in conjunction with the Secretary [of the Army]"

*for the Corps to apply* during permitting.  33 U.S.C. § 1344(b); *see also* 40

C.F.R. pt. 230.  Second, EPA has authority to determine whether states may

administer their own Section 404 permitting programs, 33 U.S.C. § 1344(g)-(j),

and EPA is required to "promulgate regulations establishing categories of

discharges which . . . shall not be subject to" permitting under approved state

programs, *id.* § 1344(l).

29

Congress also directed EPA and the Corps to "enter into [an] agreement [] . . . to minimize, to the maximum extent practicable, duplication, needless paperwork, and delays in the issuance of permits under this section." *Id.* § 1344(q). The statute requires that the agreement "assure that, to the maximum extent practicable, a [Section 404 permitting] decision . . . will be made not later than the ninetieth day after" the Corps publishes notice of receipt of the permit application. *Id.* The agencies memorialized their 404(q) agreement in 1992, which in pertinent part, provides that, for individual permit applications: (i) EPA will submit comments on a particular application within the Corps' designated comment period, ECP000002; (ii) the Corps may ask for additional EPA comments after the close of the comment period for the purpose of clarifying matters or obtaining information relevant to a specific permit decision, ECP000005; and, (iii) EPA and the Corps may elevate individual permit decisions, but they must follow specific procedures, do so only sparingly, and must explain in writing "why there will be substantial and unacceptable impacts to aquatic resources of national importance," ECP000005-6.

With individual permit applications, EPA may also, pursuant to Section 404(c), "prohibit the specification . . . of any defined area as a disposal site" if it determines that a proposed discharge "*will* have an unacceptable adverse effect" on

30

certain resources, but only "after notice and opportunity for public hearings" and after "consult[ation] with the Secretary."  33 U.S.C. § 1344(c) (emphasis added).

Thus, under the preexisting statutory and regulatory regime, EPA was a commenter with the ultimate authority to object to a particular disposal site—on a case-by-case basis if it makes a particular finding of impact and follows specified procedures.  Through the launch of the EC Process, EPA dramatically altered Congress's careful division of authority between EPA and the Corps and exceeded the limits that Congress placed on EPA's involvement in individual permitting decisions.  Additionally, with the screening procedure, EPA arrogated to itself the exclusive ability to decide whether dozens of permit applications may be processed by the Corps under longstanding regulations (33 C.F.R. pt. 325) or instead placed into a "coordination" process of indefinite duration.  In so screening, EPA unilaterally applies the 404(b)(1) Guidelines in contravention of Congress's direction that the Corps alone apply those guidelines during the permitting process. *See* 33 U.S.C. § 1344(b); *see also Coeur Alaska*, 557 U.S. at 273 (Section 402 "forbids the EPA from exercising permitting authority that is 'provided [to the Corps] in' § 404").  Moreover, the EC Process allows EPA to hold permit applications hostage, taking as many bites at the apple as it wants, without following any of the requirements governing EPA involvement in the permitting

31

process under Section 404(c) or the 404(q) memorandum.  This unprecedented expansion of EPA's authority is unlawful.

The Government's justification that agencies possess inherent authority to fashion rules of procedure fails badly.  *See* U.S. Br. 32-34.  First, the Government relies on 33 U.S.C. § 1361(a), which authorizes EPA "to prescribe such *regulations* as are necessary to carry out [its] functions."  (Emphasis added.)  Putting aside the issue of whether EPA could issue *regulations* that govern *the Corps*' permitting process, § 1361(a) surely does not justify the issuance of *memoranda*, without notice and comment, that run contrary to the Corps' duly promulgated regulations.

But, second, even if "[t]he power to institute rules of procedure is part and parcel of Congress's grant of substantive rulemaking authority," U.S. Br. 34, an agency is powerless to make new rules that override *another agency's* existing rules or that attempt to reassign authority (*e.g.*, application of 404(b)(1) Guidelines) that Congress specifically delegated to *another agency.  See*, *e.g.*, *Ry. Labor Exec. Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 670 (D.C. Cir. 1994) (*en banc*) (agency does not "possess[] *plenary* authority to act within a given area simply because Congress has endowed it with *some* authority to act in that area").  It is axiomatic that EPA "literally has no power to act . . . unless and until Congress confers power upon it," *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986), and

this Court has long refused to "'*presume* a delegation of power' [to an agency] absen[t] . . . 'an express *withholding*' of such power." *Am. Bar Ass'n*, 430 F.3d at 468 (quoting *Ry. Labor Exec. Ass'n*, 29 F.3d at 671).[14]

The Government also defends the EC Process and screening procedure on the ground that "it makes perfect sense for [EPA] to be involved in the permit review process." U.S. Br. 35. Undoubtedly, Congress envisioned a role for EPA in Section 404 permitting, *e.g.*, commenting on proposed permits and exercising its 404(c) authority. *See* 33 U.S.C. § 1344(a), (c). That role, however, does not encompass the wholesale diversion of dozens of permits from the established regulatory process or EPA's application of the 404(b)(1) Guidelines to "screen" which permits will be diverted.

At bottom, the Government avoids the plain language of the statute (and the Corps' regulations) and instead distracts this Court with overstated policy concerns about the inability to coordinate. *See* U.S. Br. 36-37. Coordination between the

---

[14] The Government contends that the district court erred in supposedly "relying" on the *expressio unius* canon, which allows a court to infer meaning from silence—*i.e.*, that Congress purposefully omitted from the statute something not listed among a grouping of other items associated with each other. *See* U.S. Br. 34 (citing *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003)). But the district court did not invoke that canon. Instead, the court performed "a careful exegesis of the entire statutory context," *Mobile Commc'ns Corp. of Am. v. FCC*, 77 F.3d 1399, 1406 (D.C. Cir. 1996), identified powers assigned to the Corps under the Act, compared them to those powers EPA was attempting to exercise, and held that EPA could not override or usurp powers that Congress had already given to another agency.

Corps and EPA is not in jeopardy. Indeed, the statute expressly directs coordination in certain circumstances. *See*, *e.g.*, 33 U.S.C. § 1344(b), (c), (q). But neither those provisions, nor the fact that EPA and the Corps each have authority under Section 404, allow the agencies to ignore the requirements of the APA or substitute their own division of authority for Congress's. Nor did the agencies invoke *any* of the CWA coordinating provisions when establishing the EC Process and screening procedure. *See Williams Gas Processing-Gulf Coast Co. v. FERC*, 373 F.3d 1335, 1345 (D.C. Cir. 2004) ("It is axiomatic that we may uphold agency orders based only on reasoning that is fairly stated by the agency in the order under review[.]").

Intervenors, for their part, argue that Section 404(c) alone authorizes the EC Process and screening procedure. *See* Intervenors' Br. 26-32. But neither of the memoranda establishing the EC Process and screening procedure invoke Section 404(c) as the basis for those actions; thus, this explanation fails outright. *See Williams Gas*, 373 F.3d at 1345.[15]

---

[15] Intervenors' reliance on this Court's recent decision in *Mingo Logan Coal Co. v. EPA*, 714 F.3d 608 (D.C. Cir. 2013), is misplaced. *See* Intervenors' Br. 31-32. While this Court did reference EPA's ability to review permits before making a final Section 404(c) determination under the extensive procedures set forth in EPA's regulations, that case does not validate the creation of an entirely new extra-regulatory review process independent of existing regulations governing EPA's exercise of Section 404(c) authority.

Thus, this Court should affirm the district court's holding that the EC Process and screening procedure are contrary to the plain text of Section 404. Alternatively, if this Court finds that Section 404 is ambiguous, it should nevertheless affirm the district court's holding on *Chevron* step two grounds for "[a]ll the reasons set forth above." *Am. Bar Ass'n*, 430 F.3d at 471. Allowing EPA to unilaterally apply the 404(b)(1) Guidelines and to subject dozens of permit applications to an *ad hoc* procedure of unbounded duration would be arbitrary and capricious and inconsistent with Congress's designation of the Corps as the sole permitting authority, responsible for applying the 404(b)(1) Guidelines, as well as with Congress's decision to limit EPA to undertaking specific tasks. 33 U.S.C. § 1344(b). Moreover, it would (and did) frustrate Congress's directive to minimize duplication and delay and for the Corps to render permit decisions within ninety days, if practicable. *See id.* § 1344(q).

## B.   The Enhanced Coordination Process And Screening Procedure Are Contrary To Section 404 Regulations.

Not only do the EC Process and screening procedure unlawfully expand EPA's authority beyond the plain text of Section 404, they are contrary to the Corps' decades-old permitting regulations (33 C.F.R. pt. 325). *Cf. Shepherd v. Merit Sys. Prot. Bd.*, 652 F.2d 1040, 1043 (D.C. Cir. 1981) ("[W]e must overturn agency action and interpretation inconsistent with the regulations and statutes themselves."). The Corps' regulations meticulously detail time frames and

35

procedures that govern the Corps' review of permit applications and issuance of permits. *See*, *e.g.*, 33 C.F.R. § 325.2(d)(1) (public notice of permit application within 15 days); *id.* § 325.2(d)(2) (establishing 30-day public comment period, but allowing the Corps to extend by additional 30 days); *id.* § 325.2(d)(3) (providing for the Corps' decision "on all applications not later than 60 days after receipt of a complete application" unless one of six exceptions applies); *id.* § 325.8 (allowing for elevation of individual permit). Those regulatory time frames are not merely procedural but are material to meeting Congress's directive that permit decisions be made "to the maximum extent practicable . . . not later than the ninetieth day" after the Corps publishes notice of the permit application. 33 U.S.C. § 1344(q).

In addition, the statutorily mandated 404(q) Memorandum outlines specific procedures governing the elevation of individual permit applications to higher authorities, which requires, among other things, a written EPA opinion explaining "why there *will* be substantial and unacceptable impacts to [an] aquatic resource of national importance . . . [and] how the agency determination was made, . . . based on site specific information[.]" ECP000007. Finally, EPA's regulations governing the Agency's exercise of authority under Section 404(c) set forth comparably detailed time frames and specific procedures. *See* 40 C.F.R. pt. 231.

The EC Process and the screening procedure are incompatible with these regulations. Specifically, the screening procedure allows EPA, not the Corps, to

apply the 404(b)(1) Guidelines to determine whether permits must be processed using the new EC Process or whether the Corps may continue reviewing those applications under its regulations.  Nothing in the Corps' regulations (or the 404(b)(1) Guidelines themselves) authorizes their use in this manner.  Nor do the Corps' regulations allow for the programmatic displacement of 79 permits to the EC Process, which, among other things, includes a purgatorial "pre-coordination" period of unlimited duration (and no procedures).  *See* ECP000023; Dkt.26-1:5. Although the Corps' regulations provide for exceptions to their specified time frames, applied by the Corps on a permit-specific basis, *see* 33 C.F.R. § 325.2(d)(3), the agencies did not invoke any of those exceptions when they established the EC Process.  Nor has EPA invoked, let alone met, the requirements of any of the procedures set forth in the 404(q) Memorandum or its regulations governing Section 404(c) determinations.

The EC Process and screening procedure unlawfully displace the Corps' existing regulations and the district court properly set them aside.

**C.    The Enhanced Coordination Process And Screening Procedure Are Legislative Rules Unlawfully Promulgated Without Rulemaking.**

The Government unconvincingly insists that the EC Process and screening procedure are procedural rules that do not require notice-and-comment rulemaking. *See* U.S. Br. 38-45.  The procedural rule exception to the APA's notice and

comment requirements must be "narrowly construed and only reluctantly countenanced." *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044-45 (D.C. Cir. 1987).  It "cannot apply . . . where the agency action trenches on substantial private rights and interests" such as, *e.g.*, "when applicants for food stamps are subject to modified approval procedures," *Batterton v. Marshall*, 648 F.2d 694, 708 (D.C. Cir. 1980) (citation omitted), or when a new Section 404 permitting process affects the exercise of property rights in a mineral estate.

The EC Process and screening procedure do not fall within this narrow exception for internal rules of procedure.  It has no applicability to agency actions that effectively enhance the authority of one agency and diminish the authority of another.  The Government's cited cases are therefore inapposite:  not one involved an attempt to redistribute authority that Congress carefully divided between two agencies.  One of those cases, in particular, in holding that a rule was merely procedural, substantially relied on the fact that the rule did "not change the agency personnel who [would] be responsible for reviewing proposed labels." *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 282 (D.C. Cir. 2000).  Here, by contrast, the EC Process and screening procedure bestowing EPA with new decisionmaking authority not only change the responsible "agency personnel" but effectively change *the agency itself*.  EPA now applies the 404(b)(1) Guidelines to

decide which permit applicants are subjected to extra-regulatory, and potentially dispositive, procedures.

The Government nevertheless suggests that because the Corps ultimately determines whether to issue permits and EPA ultimately determines whether to prohibit the specification of disposal sites under Section 404(c), there has been no "reallocat[ion] [of] statutory authority." U.S. Br. 40-41. Under this simplistic view, any amount of EPA interference in the permitting process is permissible so long as it is the Corps that technically grants or denies permits (eventually). But that cannot be the case. There is simply no room in the regulatory framework for EPA to screen and divert large numbers of permits, as it can (and did) under the EC Process and screening procedure. That the existing regime allows for EPA scrutiny at specified entry points pursuant to defined procedures does not make it lawful to add new layers of potentially outcome-determinative review without notice-and-comment and without regard to Congress's division of authority between EPA and the Corps.

In any event, the EC Process and screening procedure are not procedural rules because they did, in fact, alter the substantive criteria applicable to Section 404 permit decisions. *See Reeder v. FCC*, 865 F.2d 1298, 1305 (D.C. Cir. 1989) ("[T]he APA's procedural rule exception is to be construed very narrowly, and it does not apply where the agency encodes a substantive value judgment." (internal

quotation marks omitted)).  The screening procedure allows EPA to scrutinize, among other things, mine design, mine efficiency, and approximate original contour.  *See* MIR000009-10.  But those aspects of mining are the exclusive province of SMCRA permitting authorities and are not part of the evaluation of Section 404 permit applications.  *See OVEC*, 556 F.3d at 193, 195-98; *see also supra* 10-14.

Similarly, EPA used the EC Process to demand that applicants agree to additional requirements like conductivity limits.  *See* Dkt.10-45:3-4 (detailing how the EC Process "has resulted in the imposition of substantive requirements and permit conditions that are unlawful and unworkable" such as a numeric conductivity limit that "is not based on any peer-reviewed scientific study or on a water quality standard or criterion that was properly adopted by the State of Kentucky or any other governing body"); *see also e.g.*, Dkt.16-1:4; Dkt.26-1:8,33.

The EC Process and screening procedure did not merely reshuffle an individual agency's resources.  They changed both the procedure and substantive standards applicable to Section 404 permitting, and shifted authority and process

between two agencies.  Consequently, this Court should affirm the district court's

holding that they were unlawfully issued without notice and comment.[16]

## II.     The Final Guidance Is Contrary To SMCRA.

The Final Guidance created a new role for EPA under SMCRA, as the

district court properly recognized.  EPA intruded into the states' and OSM's

regulatory authority by attempting to (1) shoehorn SMCRA BMPs for mine project

design as well as other upland environmental impact avoidance and minimization

measures into Section 404 permits, *see* FG005466-67; FG005494-95; and (2)

assert authority over SMCRA permitting, despite having no authority to review or

veto SMCRA permits or otherwise dictate mine design under the CWA or SMCRA,

*see* FG005469; FG005475.

### A.     EPA Cannot Shoehorn SMCRA Into Section 404 Permits.

In the Final Guidance, EPA interprets its CWA authority (and by extension

the Corps') to extend to regulating mining practices upland of any waters.  *See*, *e.g.*,

FG005467; FG005475; FG005494-95.  But those practices are the exclusive

province of the SMCRA permitting authority (states or OSM), *not* EPA or any

other federal agency.  *See OVEC*, 556 F.3d at 195; *see also* 30 U.S.C. § 1253; *Ky.

Riverkeeper, Inc. v. Midkiff*, 800 F. Supp. 2d 846, 853-54 (E.D. Ky. 2011), *rev'd*

---

[16] Even if this Court finds that the EC Process and screening procedure are exempt
from APA notice-and-comment rulemaking, it should nevertheless affirm the
judgment setting them aside as contrary to the CWA.  *See The Fertilizer Inst. v.
EPA*, 935 F.2d 1303, 1307-09 (D.C. Cir. 1991).

*on other grounds sub nom by Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402 (6th

Cir. 2013).  Under Section 404, the Corps and EPA's jurisdiction "is limited to the

narrow issue of the filling of jurisdictional waters."  *OVEC*, 556 F.3d at 195.

Upland aspects of mine design and planning go beyond that "narrow issue" and as

such do not fall under the Corps' Section 404 jurisdiction, or, consequently, EPA's.

*Id.* at 195, 197.

EPA's attempt to regulate upland activities under the guise of ensuring

compliance with the Section 404(b)(1) Guidelines is therefore unlawful.  Those

matters are regulated under SMCRA, *not* the CWA.  *See*, *e.g.*, 30 U.S.C.

§ 1265(b)(3) (approximate original contour); *id.* § 1265(b)(19) and 30 C.F.R.

§§ 816.111, 816.113 (revegetation); 30 C.F.R. §§ 780.21(h), 816.41(d)(2)

(hydrologic reclamation plans); *id.* §§ 780.35, 816.71(c) (design of mine to

minimize excess spoil); *id.* § 816.71 (materials transportation, compaction, and

drainage control); *id.* §§ 816.72, 816.73 (valley fill and durable rock fill

requirements); *id.* § 816.133(c), (d) (requirements for variance from approximate

original contour and criteria for alternative post-mining land use).  Moreover,

EPA's "suggestion" to "leav[e] high ratio (overburden to coal extraction) areas" in

the Final Guidance, FG005494, is tantamount to an attempt to prohibit

mountaintop removal mining techniques, which SMCRA expressly sanctions, 30

U.S.C. § 1265(b)(22)(D), (c)(2); *id.* § 1291(28); 30 C.F.R. § 785.14(b) (authorizing

the removal of entire coal seams and all of the overburden); *Kentuckians for the Commonwealth*, 317 F.3d at 443.

Nothing in the CWA gives EPA the ability to assert authority over these matters, as it would render the SMCRA permitting authority's regulation of these matters "at best duplicative, and, at worst, meaningless." *OVEC*, 556 F.3d at 196. Indeed, Congress enacted SMCRA to fill the gaps left under the CWA, which "does not contain the statutory authority for the establishment of standards and regulations requiring comprehensive preplanning and designing for appropriate mine planning and reclamation procedures[.]" H.R. Rep. No. 94-896, at 92-96 (1976). Congress also carefully restricted EPA's involvement in the SMCRA regulatory regime, 30 U.S.C. §§ 1251(a), 1253(b), and EPA cannot evade those restrictions under the guise of interpreting the Section 404(b)(1) Guidelines (which it has no authority to apply in any event under Section 404's plain language, *see* 6 *supra*).

## B. EPA Cannot Insert Itself Into SMCRA Permitting.

The Final Guidance also unlawfully attempts to insert EPA into SMCRA permitting by instructing that "Regions [] work closely with the Corps, OSM, State SMCRA agencies, and mine operators to promote the incorporation of [BMPs] at the initial stages of mine design to increase consistency between SMCRA and

43

CWA permits."  FG005469; *see also* FG005475.  Nothing in SMCRA allows this

intrusion, as the district court properly recognized.  *See* Dkt.167:24.

Congress could have easily required EPA's concurrence on or review of

individual SMCRA permits, or even granted EPA permitting authority, but it did

not.[17]  It limited EPA to merely providing concurrence at a programmatic level—

namely, OSM's issuance of regulations and approval of state programs.  *See* 30

U.S.C. §§ 1251(a), 1253(b).  EPA must honor Congress' choice.  *City of Chicago v.*

*Envtl. Def. Fund*, 511 U.S. 328, 338 (1994).  EPA cannot infer that it has some sort

of role in SMCRA permitting merely because it has a defined role in other aspects

of the regulatory scheme for mining operations.  *See Ry. Labor Exec. Ass'n*, 29

F.3d at 670 ("categorically reject[ing]" the view that an agency "possesses *plenary*

authority to act within a given area simply because Congress has endowed it with

*some* authority to act in that area").

The requirement in SMCRA that agencies "cooperate" must be viewed in

light of what Congress specifically authorized those agencies to do under the Act.

*Cf. HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981).  EPA cannot arrogate a

role in permitting unto itself under the guise of cooperation.  Because even OSM,

the lead federal agency under SMCRA, cannot dictate permit conditions once a

---

[17] In fact, Congress debated (and rejected) proposals to make EPA the primary
regulatory and permitting authority for surface coal mining operations.  H.R. Rep.
No. 93-1072, at 172 (1974) (Conf. Rep.); *see also* H.R. 1000, 93d Cong. §§ 3, 7,
102, 103 (1973).

state like West Virginia or Kentucky assumes primacy, *PSMRL*, 653 F.2d at 519

n.7, it logically follows that EPA certainly cannot do so.  EPA's efforts to inject

itself into SMCRA beyond its statutory boundaries are not appropriate and the

district court's vacatur must be upheld.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the district court's judgment should be affirmed.

Respectfully submitted,

/s/ Kirsten L. Nathanson

*Of counsel*:                                              Kirsten L. Nathanson
Katie Sweeney                                          John C. Martin
Amanda Aspatore                                      David Y. Chung
NATIONAL MINING ASSOCIATION          Sherrie A. Armstrong
101 Constitution Avenue, N.W.             CROWELL & MORING LLP
Washington, DC 20001                         1001 Pennsylvania Ave., NW
(202) 463-2600                                       Washington, D.C.  20004
                                                                (202) 624-2500
                                                                *Counsel for National Mining*
                                                                *Association*

                                                                Mindy G. Barfield
                                                                Sadhna G. True
                                                                DINSMORE & SHOHL, LLP
                                                                250 West Main Street
                                                                Suite 1400
                                                                Lexington, KY 40507
                                                                (859) 425-1000
                                                                *Counsel for Kentucky Coal*
                                                                *Association*

JUNE 24, 2013

45

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Federal Rule
      Appellate Procedure 28.1(e)(2) or 32(a)(7)(B) because:

      [ X ] this brief contains [*9,989*] words, excluding the parts of the brief
      exempted by Fed. R. App. P. 32(a)(7)(B)(iii) based on a Microsoft word
      count and a hand count of the words in the graphic, *or*

      [    ] this brief uses a monospaced typeface and contains [*state the number
      of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P.
      32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P.
      32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

      [ X ] this brief has been prepared in a proportionally spaced typeface using
      [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

      [    ] this brief has been prepared in a monospaced typeface using [*state
      name and version of word processing program*] with [*state number of
      characters per inch and name of type style*].


Dated: June 24, 2013                  /s/ Kirsten L. Nathanson
                                      *Counsel for National Mining Association*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 24th day of June, 2012, I caused this Page Proof Brief of Appellees to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ Kirsten L. Nathanson
*Counsel for National Mining Association*