RECORD NOS. 12-5310(L); 12-5311

[ORAL ARGUMENT NOT YET SCHEDULED]

In The

# United States Court Of Appeals
## For The D.C. Circuit

**NATIONAL MINING ASSOCIATION,** *et al.*,
*Plaintiffs – Appellees,*

**COMMONWEALTH OF KENTUCKY and
CITY OF PIKEVILLE, KENTUCKY,**
*Intervenors for Plaintiffs – Appellees,*

v.

**BOB PERCIASEPE, Acting Administrator of the
United States Environmental Protection Agency,** *et al.*,
*Defendants – Appellants,*

**SIERRA CLUB,** *et al.*,
*Intervenors for Defendants – Appellants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**Lead Case No. 10-cv-01220 (Hon. Reggie B. Walton)**

_____

**FINAL CORRECTED BRIEF OF APPELLEES
RANDY C. HUFFMAN, CABINET SECRETARY OF THE
WEST VIRGINIA DEPARTMENT OF ENVIRONMENTAL PROTECTION;
STATE OF WEST VIRGINIA; COMMONWEALTH OF KENTUCKY;
and CITY OF PIKEVILLE, KENTUCKY**

_____

| | | | |
|---|---|---|---|
| **Benjamin L. Bailey** | **Patrick Morrisey** | **Mary Stephens** | **Mindy G. Barfield** |
| **Michael B. Hissam** | *Attorney General* | OFFICE OF | **Sadhna G. True** |
| BAILEY & GLASSER LLP | **Elbert Lin** | GENERAL COUNSEL | DINSMORE & SHOHL, LLP |
| **209 Capitol Street** | *Solicitor General* | **200 Fair Oaks Lane** | **250 West Main Street** |
| **Charleston, WV 25301** | OFFICE OF THE | **First Floor** | **Suite 1400** |
| **(304) 345-6555** | ATTORNEY GENERAL | **Frankfort, KY 40601** | **Lexington, KY 40507** |
| | **1900 Kanawha Blvd., E.** | **(502) 564-3410** | **(859) 425-1000** |
| | **Room 26-E** | | |
| | **Charleston, WV 25305** | | |
| | **(304) 558-2021** | | |
| | | | |
| *Counsel for Randy Huffman* | *Counsel for Randy Huffman* | *Counsel for Commonwealth* | *Counsel for City of Pikeville* |
| *and State of West Virginia* | *and State of West Virginia* | *of Kentucky Energy and* | |
| | | *Environment Cabinet* | |

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**Parties and *Amici*.**  *Appellants* in these consolidated cases are Gina McCarthy, Administrator of the U.S. Environmental Protection Agency ("EPA"); EPA; John McHugh, Secretary of the U.S. Army; Thomas B. Bostick, Commander of the U.S. Army Corps of Engineers ("the Corps"); the Corps; Coal River Mountain Watch; Kentuckians for the Commonwealth; Ohio Valley Environmental Coalition; Sierra Club; Southern Appalachian Mountain Stewards; Statewide Organizing for Community Empowerment; and West Virginia Highlands Conservancy.

*Appellees* in these consolidated cases are National Mining Association ("NMA"); Randy C. Huffman, Cabinet Secretary of the West Virginia Department of Environmental Protection, and the State of West Virginia (collectively, "West Virginia"); Kentucky Coal Association ("KCA"); Gorman Company, LLC; Kycoga Company, LLC; Black Gold Sales, Inc.; and Kentucky Union Company.

*Intervenor-Appellees* in these consolidated cases are Commonwealth of Kentucky; and City of Pikeville, Kentucky ("City of Pikeville").

West Virginia, the Commonwealth of Kentucky, and the City of Pikeville are not aware of any other parties or *amici* at this time.

**Rulings under Review.**  Based on the issues stated by the Appellants, these appeals seek review of the Memorandum Opinion and Order entered October 6,

i

2011, as well as the Memorandum Opinion and Order entered July 31, 2012, by

Judge Reggie B. Walton of the U.S. District Court for the District of Columbia in

*National Mining Association, et al. v. Lisa Jackson, et al.*, Case No. 10-cv-1220

(consolidated with Nos. 11-cv-295; 11-cv-446; and 11-cv-447), Joint Appendix

(JA) 66–85, 94–129, together with the final judgment of that court entered on July

31, 2012.

     **Related Cases.**  The cases under review in this consolidated appeal have not

previously been before this or any other court of appeals.  All lawsuits challenging

the final agency actions at issue in this case were transferred to the U.S. District

Court for the District of Columbia and consolidated with the lead case (No. 10-cv-

1220) before Judge Walton.[1]

---

[1] West Virginia originally filed suit in the U.S. District Court for the Southern District of West Virginia.  *See Huffman v. EPA*, No. 10-cv-1189 (S.D. W. Va.). The KCA sued in the U.S. District Court for the Eastern District of Kentucky, and the Commonwealth of Kentucky and the City of Pikeville intervened in that lawsuit.  *See Ky. Coal Ass'n v. EPA*, No. 10-cv-125 (E.D. Ky.).  Plaintiff-Appellees Gorman Company, LLC; Hazard Coal Corporation; Kycoga Company, LLC; Black Gold Sales, Inc.; and Kentucky Union Company also sued in the U.S. District Court for the Eastern District of Kentucky.  *See Gorman Co., LLC v. EPA*, No. 10-cv-228 (E.D. Ky.).

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF CONTENTS .......................................................................... iii

TABLE OF AUTHORITIES ..................................................................... v

GLOSSARY ...............................................................................................xi

INTRODUCTION ......................................................................................1

STATEMENT OF ISSUES .........................................................................2

STATUTES AND REGULATIONS ...........................................................3

STATEMENT OF FACTS AND STATEMENT OF THE CASE ...........4

SUMMARY OF ARGUMENT ...................................................................9

ARGUMENT .............................................................................................11

    STANDARD OF REVIEW ..............................................................11

    DISCUSSION OF THE ISSUES ....................................................12

        I.    THE FINAL GUIDANCE EXCEEDED EPA'S AUTHORITY UNDER THE CLEAN WATER ACT BY ESTABLISHING A NEW *DE FACTO* WATER QUALITY STANDARD ........................................12

        II.    EPA EXCEEDED ITS AUTHORITY IN THE FINAL GUIDANCE BY DICTATING THE TIMING OF THE REASONABLE POTENTIAL ANALYSIS ............................16

        III.    EPA'S FINAL GUIDANCE REPRESENTS FINAL AGENCY ACTION .................................................................20

A.  EPA's Final Guidance represented a binding
change to the Clean Water Act permitting
regulations .......................................................................22

B.  EPA's Final Guidance represented a binding
change to the SMCRA regulatory scheme ....................24

C.  EPA's Final Guidance represented a binding
change to the applicable water quality standards ..........26

D.  The Government's restrictive view of finality lacks
merit and is contrary to Circuit precedent ....................28

IV.  THE DISTRICT COURT PROPERLY FOUND IT HAD
JURISDICTION TO REVIEW THE FINAL
GUIDANCE'S RPA PROVISION ...........................................30

A.  The Final Guidance's RPA Requirement Is Not an
"Effluent Limitation or Other Limitation" ....................32

B.  The RPA 'Rule' Was Neither Promulgated Nor
Approved .......................................................................37

CONCLUSION ...................................................................................39

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Am. Bar Ass'n v. FTC*,
  430 F.3d 457 (D.C. Cir. 2005)........................................................................12

*Am. Iron & Steel Inst.*,
  115 F.3d 979 (D.C. Cir. 1997).................................................................. 30, 37

*Am. Paper Inst. v. EPA*,
  890 F.2d 869 (7th Cir. 1989) .....................................................................33, 35

*Am. Paper Inst. v. EPA*,
  996 F.2d 346 (D.C. Cir. 1993)........................................................................15

*Am. Petroleum Inst. v. EPA*,
  216 F.3d 50 (D.C. Cir. 2000).........................................................................12

*Am. Petroleum Inst. v. SEC*,
  714 F.3d 1329 (D.C. Cir. 2013)......................................................................30

*Appalachian Energy Group v. EPA*,
  33 F.3d 319 (4th Cir. 1994) ...........................................................................31

*Appalachian Power Co. v. EPA*,
  208 F.3d 1015 (D.C. Cir. 2000)................................. 21, 23-24, 26, 27, 28, 29

*Arkansas Poultry Fed'n v. EPA*,
  852 F.2d 324 (8th Cir. 1988) .........................................................................31

*AstraZeneca Pharms. LP v. FDA*,
  713 F.3d 1134 (D.C. Cir. 2013).....................................................................11

*Bennett v. Spear*,
  520 U.S. 154 (1997)..........................................................................24, 25, 26

*Bethlehem Steel Corp. v. EPA*,
  538 F.2d 513 (2d Cir. 1976) ............................................................... 31, 38-39

*Center for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
452 F.3d 798 (D.C. Cir. 2006)........................................................29

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,
467 U.S. 837 (1984)........................................................................12

*Circuit City Stores, Inc. v. Adams*,
532 U.S. 105 (2001).......................................................................34

*City of Baton Rouge v. EPA*,
620 F.2d 478 (5th Cir. 1980)........................................................31

*Crop Life Am. v. EPA*,
329 F.3d 876 (D.C. Cir. 2003)..................................................21, 28

*E.I. du Pont de Nemours & Co. v. Train*,
430 U.S. 112 (1977)..............................................................35, 36, 37

*EPA v. California*,
426 U.S. 200 (1976).......................................................................32

*Friends of the Earth v. EPA*,
333 F.3d 184 (D.C. Cir. 2003)................................................31, 33, 34

*Friends of the Everglades v. EPA*,
699 F.3d 1280 (11th Cir. 2012)...................................................31

*FTC v. Standard Oil Co.*,
449 U.S. 232 (1980)......................................................................29

*Gen. Elec. Co. v. EPA*,
290 F.3d 377 (D.C. Cir. 2002).....................................................28

*Horsehead Res. Dev. Co. v. EPA*,
130 F.3d 1090 (D.C. Cir. 1997) ..................................................38

*Lake Cumberland Trust, Inc. v. EPA*,
954 F.2d 1219 (6th Cir. 1992) .....................................................31

*Longview Fibre Co. v. Rasmussen*,
980 F.2d 1307 (9th Cir. 1992) .....................................................34

*McLouth Steel Prods. Corp. v. Thomas*,
  838 F.2d 1317 (D.C. Cir. 1988)...................................................27

*Narragansett Elec. Co. v. EPA*,
  407 F.3d 1 (1st Cir. 2005)........................................................31

*Nat'l Ass'n of Home Builders v. Norton*,
  415 F.3d 8 (D.C. Cir. 2005)......................................................21

*Nat'l Grain & Feed Ass'n, Inc., v. OSHA*,
  845 F.2d 345 (D.C. Cir. 1988) ..................................................38

*Natural Res. Def. Council v. EPA*, ("*NRDC I*")
  22 F.3d 1125 (D.C. Cir. 1994)...............................................25-26

*\*Natural Res. Def. Council v. EPA*, ("*NRDC II*")
  643 F.3d 311 (D.C. Cir. 2011).....................................20, 22, 23, 24

*NRDC v. EPA*,
  673 F.2d 400 (D.C. Cir. 1982)...................................................34

*Nw. Envtl. Advocates v. EPA*,
  537 F.3d 1006 (9th Cir. 2008) ..................................................31

*Ohio Valley Envtl. Coal v. Aracoma Coal Co.*,
  556 F.3d 177 (4th Cir. 2009) ....................................................24

*Public Citizen, Inc. v. FAA*,
  988 F.2d 186 (D.C. Cir. 1993)...................................................20

*Ramaprakash v. FAA*,
  346 F.3d 1121 (D.C. Cir. 2003)..................................................27

*Reckitt Benckiser, Inc. v. EPA*,
  613 F.3d 1131 (D.C. Cir. 2010)..................................................25

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*,
  324 F.3d 726 (D.C. Cir. 2003)...................................................29

*St. Mark's Housing Co., Inc. v. HUD*,
  610 F.3d 75 (D.C. Cir. 2010).....................................................16

*Thomas Jefferson Univ. v. Shalala*,
    512 U.S. 504 (1994)................................................................16

*United Techs. Corp. v. OSHA*,
    836 F.2d 52 (2nd Cir. 1987) .....................................................38

**Statutes:**

5 U.S.C. § 706(2)(A)...................................................................11

33 U.S.C. § 1251(b) .....................................................................4

*33 U.S.C. § 1311 ...............................................................31, 33, 34, 37

33 U.S.C. § 1311(b)(1)(C) ............................................................33

33 U.S.C. § 1312 ......................................................................5, 31

*33 U.S.C. § 1313 ............................................................30, 33, 34, 36

33 U.S.C. § 1313(c)(3)–(4) ...........................................................15

33 U.S.C. § 1314 ......................................................................36, 37

33 U.S.C. § 1316 ......................................................................31, 32

33 U.S.C. § 1342(d) .....................................................................4

33 U.S.C. § 1342(d)(4)..................................................................4

33 U.S.C. § 1345 ........................................................................31

33 U.S.C. § 1362(11) ...................................................................32

33 U.S.C. § 1369 ........................................................................30

33 U.S.C. § 1369(b)(1)..................................................................31

33 U.S.C. § 1369(b)(1)(E) .............................................................32

42 U.S.C. § 7607(b)(1).................................................................38

W. Va. Code § 22-11-2...................................................................................7

W. Va. Code § 22-11-7b (as amended by S.B. 562)...........................................7, 13

W. Va. Code R. § 47-2-1 *et seq.*......................................................................7

**Acts:**

Administrative Procedures Act (APA) ................................................................2, 19

    APA § 706 ......................................................................................20

Clean Water Act (CWA)................................... 1, 2, 3, 9, 10, 11, 12, 13, 15, 16, 17, 20, 22, 24, 25, 26, 30, 31, 32, 33, 35-36, 37, 38

    *CWA § 301 ...................................................................................32, 35, 37

    *CWA § 303 ...................................................................................10, 30, 33, 35

    CWA § 402 ................................................................... 2, 4, 5, 10, 23, 35, 36

    CWA Title V..................................................................................28

    CWA § 509 ...................................................................................30, 31, 35

    CWA § 509(b)(1).............................................................................30, 31, 37

    *CWA § 509(b)(1)(E) ......................................................... 31, 33, 34, 35, 36, 37, 38

Surface Mining Control and Reclamation Act ("SMCRA") .........1, 2, 11, 24, 25, 26

**Rule:**

Fed. R. App. P. 28(i) ...................................................................................2

**Regulations:**

40 C.F.R. § 122.44 ................................................................4

*40 C.F.R. § 122.44(d) ......................................................5, 34

40 C.F.R. § 122.44(d)(1)................................................. 16-17

40 C.F.R. § 122.44(d)(1)(i) .......................................18, 19, 22

40 C.F.R. § 122.44(d)(1)(ii)............................................18, 22

40 C.F.R. § 122.44(d)(1)(iii)....................................18, 19, 20

40 C.F.R. § 122.44(d)(1)(iv) ...............................................18

40 C.F.R. § 122.44(d)(1)(v) ................................................18

40 C.F.R. § 122.44(d)(1)(vi) ..................................................5

40 C.F.R. § 420.14(a)(2) ......................................................32

401 KY. ADMIN. REGS. 10:031 ...........................................7

**Other Authorities:**

75 Fed. Reg. 18,500 (Apr. 12, 2010) .....................................5

D.C. Cir. Handbook of Practice and Internal Procedures..........................................2

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Corps | U.S. Army Corps of Engineers |
| CWA | Clean Water Act |
| EPA | U.S. Environmental Protection Agency |
| Interim Guidance | Memorandum from Peter S. Silva to Regions 3, 4, and 5, "Detailed Guidance: Improving EPA's Review of Appalachian Surface Coal Mining Operations under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order" (Apr. 1, 2010), JA934–964 |
| Industry Appellees' Br. | Proof Brief of NMA and KCA in this appeal (filed on June 24, 2013) (Case No. 12-5310, Document No. 1442996) |
| Intervenors' Br. | Proof Brief of Environmental Intervenor-Appellants (filed on May 6, 2013) (Case No. 12-5310, Document No. 1434537) |
| Final Guidance | Memorandum from Nancy K. Stoner to Regions 3, 4, and 5, "Improving EPA Review of Appalachian Surface Coal Mining Operations Under the Clean Water Act, National Environmental Policy Act, and the Environmental Justice Executive Order" (July 21, 2011), JA1052–1112 |
| JA | Joint Appendix |
| KCA | Kentucky Coal Association |
| NMA | National Mining Association |
| NPDES | National Pollutant Discharge Elimination System |
| OSM | U.S. Department of Interior, Office of Surface Mining Reclamation and Enforcement |

SMCRA                    Surface Mining Control and Reclamation Act

U.S. Br.                 Final Brief of the United States of America (to be filed on
                         Oct. 25, 2013)

## INTRODUCTION

These consolidated appeals concern EPA's attempt to upend the system of cooperative federalism that dictates how different federal agencies and their state regulatory partners share responsibility for regulating coal mining. By taking the agency actions challenged in this case, EPA greatly exceeded its authority under the Clean Water Act and attempted to arrogate to itself power that it simply does not possess under the Surface Mining Control and Reclamation Act ("SMCRA"). In doing so, EPA also ignored the role of the states as the primary protectors of their waters under the Clean Water Act and as the primary regulators of surface mining under SMCRA.

The agency action addressed in this brief is EPA's issuance of a lengthy "guidance" document—first as "interim" guidance in April 2010, and then as "final" guidance in July 2011. Like the other challenged agency actions discussed more fully by the Industry Appellees in their brief, EPA's "Final Guidance" has radically reshaped the entire surface mine permitting process in Appalachia. Although the "Final Guidance" is loaded with disclaimers denying that any of its "recommendations" carry binding effect, the district court saw through that veil. The Government's suggestion that the sixty-page, single-spaced document was intended only to provide "guidance" has been proven otherwise by EPA's

implementation of the Final Guidance.  As the district court correctly concluded,

EPA's Final Guidance improperly:

- o Imposed a new *de facto* water quality standard on the states, without following the Clean Water Act's established processes for promulgation of a federal water quality standard;

- o Superseded the proper role of state regulatory authorities in issuing permits under Section 402 of the Clean Water Act; and

- o As explained by the Industry Appellees, invaded the SMCRA permitting process, over which Congress gave EPA very limited authority.

For these reasons, and for those expressed by the Industry Appellees, the

district court correctly set aside EPA's unlawful actions under the Administrative

Procedure Act.  This Court should affirm that judgment.

## STATEMENT OF ISSUES

This response brief, filed by West Virginia, the Commonwealth of

Kentucky, and the City of Pikeville (the "Government Appellees"), addresses

issues concerning EPA's Final Guidance.[1]

I.    In the Final Guidance, EPA set forth a purported numeric

"benchmark" for conductivity (*i.e.*, the ability of water to conduct electricity) that

EPA then treated as binding on state permitting authorities.  Did EPA exceed its

---

[1] In accordance with Federal Rule of Appellate Procedure 28(i) and this Court's Handbook of Practice and Internal Procedures (at p. 37), Appellees have sought to avoid filing duplicative briefs by dividing the issues.  The Government Appellees adopt and incorporate by reference all arguments presented in the opening brief filed by the NMA and the KCA in this appeal ("Industry Appellees' Br.").

authority under the Clean Water Act by imposing what is essentially a *de facto*, region-wide water quality standard for conductivity on the states?

II.     Did EPA exceed its authority under the Clean Water Act and its implementing regulations by dictating in the Final Guidance that state permitting authorities conduct a "reasonable potential analysis" prior to permit issuance, when it is state permitting authorities—not EPA—that are empowered by the Clean Water Act to perform reasonable potential analyses?

III.     Did EPA's issuance of the Final Guidance constitute "final agency action," when EPA announced new, definitive interpretations of its statutory authority and the scope of existing regulations, and then implemented the Final Guidance in practice to require the states and regulated entities to comply with its requirements under threat of permit objections and program disruption?

IV.     Did the district court properly determine that it possessed jurisdiction to consider Appellees' challenge to the "reasonable potential analysis" aspect of the Final Guidance?

## STATUTES AND REGULATIONS

Except for the statutes and regulations reproduced in a separate addendum, all applicable statutes and regulations are set forth in addenda filed by the Appellants and the Industry Appellees.

3

## STATEMENT OF FACTS AND STATEMENT OF THE CASE

To avoid unnecessary duplication, Appellees adopt and incorporate the factual and legal background set forth in the Industry Appellees' Brief. The statement below supplements that background only as it relates to the issues presented in this brief. In particular, one overarching fact bears emphasis: how all of the EPA actions at issue in this case changed the regulatory regime in unprecedented fashion and thereby dramatically upended the careful system of cooperative federalism that governs the environmental regulation of surface coal mining.

Section 402 of the Clean Water Act allocates primary responsibility for water pollution control to the states, chiefly through permits issued pursuant to the National Pollutant Discharge Elimination System ("NPDES permits"). 33 U.S.C. § 1251(b). Once EPA has approved a proposed state NPDES program, the state has authority to implement that program within its boundaries.[2] EPA retains authority to object to NPDES permits on an individual permit basis, but only under specified circumstances. *See* 33 U.S.C. § 1342(d); 40 C.F.R. § 122.44. If the state does not respond adequately to the objection, then EPA assumes authority to issue the permit. *See* 33 U.S.C. § 1342(d)(4). If EPA does not object to a permit in accordance with the specified procedures, the state may issue the permit.

---

[2] West Virginia and Kentucky have approved NPDES programs.

4

Under existing regulations, the state permitting authority determines in the first instance whether a proposed discharge will, after complying with technology-based effluent limitations, have a "reasonable potential" to cause an in-stream excursion above a numeric or narrative criterion within an applicable water quality standard. *See* 33 U.S.C. § 1312; 40 C.F.R. § 122.44(d). This analysis is called a "reasonable potential analysis" ("RPA"). If the discharge has such a reasonable potential, the state must develop permit limitations to ensure compliance with the water quality standard. States may use either numeric or narrative permit limits. *See* 40 C.F.R. § 122.44(d)(1)(vi).

On April 1, 2010, EPA issued a thirty-page document known as the "Interim Guidance." Although EPA invited public comment on the Interim Guidance, it nevertheless declared that the document was "effective immediately." 75 Fed. Reg. 18,500 (Apr. 12, 2010).

The Interim Guidance altered the states' permitting procedures by instructing them precisely *when* in the permitting process the RPA must be performed. Specifically, the Interim Guidance disallowed for the first time post-permit RPAs in the context of Section 402 permitting in two specific areas in Kentucky and West Virginia—even though EPA's regulations do not prescribe the timing of RPAs. The Interim Guidance also instructed those states to conduct pre-permit RPAs using data from adjacent watersheds. JA942. This marked a sea

5

change, particularly in Kentucky, which had long-established procedures allowing

RPAs to be conducted *after* a permit issues in cases of new discharges for which

there would be no site-specific information.  Instead, prior to the Interim Guidance,

Kentucky allowed permits to require monitoring either before or after permit

issuance.[3]  Kentucky's EPA-approved procedures authorized it to issue a permit for

a new or expanded surface coal mine, gather site-specific data from the new or

expanded discharge, and then conduct an RPA to determine if the permit's *actual*

discharge exceeded Kentucky's water quality standards.  If it did, then Kentucky

would re-open the permit and impose numerical effluent limits for those pollutants

for which the reasonable potential was demonstrated.  *See* JA579.  EPA approved

those procedures in 2000.  *Id.*

The Interim Guidance did away with the prior practice, disrupting

Kentucky's EPA-approved procedure and interfering with the issuance of NPDES

permits for surface coal mining in the state.  The impact was immediate and

calamitous to the coal industry.  Prior to the Interim Guidance, EPA had never

---

[3] As noted in EPA's own *Technical Support Document for Water Quality-Based Toxics Control* for new discharges (where no discharge has yet occurred and thus no site-specific data exists), "the regulatory authority [*i.e.*, the state]  may find it protective of water quality to include a permit reopener for the imposition of an effluent limit should the effluent testing establish that the discharge causes, has the reasonable potential to cause, or contributes to excursion above a water quality criteria."  *See* JA927.

6

before questioned the propriety of a post-permit RPA under Kentucky's approach.[4]
JA579; *see also* JA584.

The Interim Guidance also announced what was essentially a new *de facto*
water quality standard.  The Interim Guidance established a new conductivity
"benchmark" of 500 µg/L.  JA941, JA945.  Both Kentucky and West Virginia have
EPA-approved numeric and narrative water quality criteria, but neither has a
numeric criterion for conductivity.  *See* W. VA. CODE § 22-11-2; W. VA. CODE R.
§ 47-2-1 *et seq.*; 401 KY. ADMIN. REGS. 10:031.  Moreover, West Virginia has
explicitly rejected conductivity as an adequate measure of water quality.  W. VA.
CODE § 22-11-7b (as amended by S.B. 562).  Nonetheless, beginning with the
Interim Guidance, EPA treated its conductivity "benchmark" as a binding new
standard for NPDES permitting.

While Appellees' legal challenges to the Interim Guidance were pending,
EPA issued its Final Guidance.  The Final Guidance is loaded with repeated
disclaimers characterizing the "guidance" as a non-mandatory document.  *See, e.g.,*
JA1052–1054.  But EPA's disclaimers are a façade.  First, following the Final
Guidance, EPA has continued to treat the Final Guidance's announced

---

[4] The impact of the Final Guidance's requirements concerning the timing of the
RPA was limited to Kentucky, as West Virginia's procedures governing its
NPDES program require it to perform an RPA prior to permit issuance.  *See*
JA1041–1048.  Nevertheless, West Virginia fully joins Kentucky, as it did in the
district court, in challenging the RPA aspect of the Final Guidance.

conductivity "benchmark" as a *de facto* water quality standard that is binding on the state permitting authorities and regulated entities.  And as with the Interim Guidance, EPA has continued to impose the Final Guidance's conductivity "benchmark" on West Virginia and Kentucky even though neither state recognizes a numeric water quality criterion for conductivity.  *See, e.g.*, JA554–558 (describing how, in West Virginia, EPA has treated the conductivity limits in the Final Guidance as binding); JA579–581 ("[T]he experience of Kentucky is that EPA . . . will object to each and every proposed . . . individual permit for new or expanded surface coal mining in Eastern Kentucky which does not provide for . . . numerical conductivity limits.").

Second, the Final Guidance, like the Interim Guidance, expressly requires that state permitting authorities perform the RPA *prior* to permit issuance—based on scientific evidence that EPA collected from studies conducted in West Virginia, not Kentucky.  JA1065–1068.  Moreover, for new or expanded surface coal mines, the permitting authorities are instructed to either utilize data from "adjacent watersheds" to conduct a pre-permit RPA (as opposed to site-specific data from the discharge itself) or, the authorities can use "best available science" to establish reasonable potential to violate state water quality standards; in either instance, the Final Guidance instructs that RPAs shall be performed prior to permit issuance. *See id.*  The Final Guidance contains no exceptions to this directive, and provides

8

no discretion for EPA field offices to approve permits for new or expanded surface coal mines that provide for the performance of an RPA after issuance of a NPDES permit.

## SUMMARY OF ARGUMENT

EPA must not be allowed to flout the clear statutory limits on its authority and upend the system of cooperative federalism that Congress put in place for regulating coal mining. As shown more fully below, EPA's Final Guidance exceeds it authority under the Clean Water Act in at least two ways: by adopting a new *de facto* water quality standard for conductivity in disregard of the states' own promulgation of water quality standards and mandating that state permitting authorities conduct a reasonable potential analysis before issuing a NPDES permit. In defending these actions, EPA primarily attempts to avoid judicial review altogether, but its arguments fall short. This Court should affirm the district court's judgment that EPA's Final Guidance constitutes final agency action that exceeded EPA's authority under the Clean Water Act and its implementing regulations.

I.    EPA exceeded its Clean Water Act authority by effectively promulgating a water quality standard in the Final Guidance without notice-and-comment rulemaking. The Clean Water Act recognizes the central role of the

states as the key protectors of the waters within their borders.  Section 303 of the

Clean Water Act places the primary responsibility for promulgating water quality

standards in the hands of the states, leaving EPA with only the limited function of

approving and, under certain circumstances, promulgating federal water quality

standards.  Instead of following those Section 303 procedures, EPA attempted in

the Final Guidance to backdoor a new *de facto* water quality standard for

conductivity that it then applied as binding for Appalachian surface mining

permits.

II.     EPA also unlawfully attempted to mandate in the Final Guidance that

state permitting authorities conduct a "reasonable potential analysis" prior to

permit issuance.  As currently constituted, the Clean Water Act regulations

governing the Section 402 permitting process do not mandate that state permitting

authorities conduct a pre-issuance reasonable potential analysis.  But in the Interim

and then the Final Guidance, EPA improperly insisted for the first time that the

Commonwealth of Kentucky reverse course by mandating that this reasonable

potential analysis be conducted *prior* to permit issuance.  EPA cannot alter that

legal framework without notice-and-comment rulemaking.

III.    This Court should easily reject EPA's self-serving suggestion that no

court can review its naked power grab.  Contrary to EPA's assertion, the Final

Guidance set forth binding changes in the law and thus constitutes reviewable

"final agency action."  The Final Guidance reflects EPA's new, definitive interpretations of (1) the Clean Water Act permitting regulations concerning the timing of RPAs performed by state permitting authorities; (2) EPA's limited role under SMCRA's regulatory scheme; and (3) EPA's authority to impose a new binding water quality standard for conductivity on state permitting authorities. Because the Final Guidance altered the legal regime governing surface coal mining permitting under the Clean Water Act and SMCRA, its issuance by EPA constitutes final agency action properly subject to a challenge by the affected state permitting authorities and regulated entities.

IV.    This Court also need not tarry long with the Government's last-ditch attempt to avoid review of the challenge to the RPA aspect of the Final Guidance. The district court properly concluded that it possessed jurisdiction to consider the challenge to the Final Guidance's new RPA requirement.  The Clean Water Act does not confer exclusive jurisdiction on this Court to consider that challenge.

## ARGUMENT

### STANDARD OF REVIEW

This Court reviews *de novo* a district court's summary judgment and jurisdictional rulings.  *AstraZeneca Pharms. LP v. FDA*, 713 F.3d 1134, 1138–39 (D.C. Cir. 2013).  In addition, this Court reviews agency actions to determine

whether they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.  5 U.S.C. § 706(2)(A).

When reviewing an agency's interpretation of its authority, this Court must "give effect to the unambiguously expressed intent of Congress."  *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).  "[W]hether there is [a statutory] ambiguity, is for the court [to decide], and we owe the agency no deference on the existence of ambiguity."  *Am. Bar Ass'n v. FTC*, 430 F.3d 457, 468 (D.C. Cir. 2005).  If the statute is silent or ambiguous, the Court then must determine whether the agency's answer is based on a permissible statutory construction.  *Chevron*, 467 U.S. at 843.  If an agency's interpretation of a statute survives analysis under *Chevron*, it can nevertheless be invalidated as arbitrary and capricious.  *See Am. Petroleum Inst. v. EPA*, 216 F.3d 50, 57–58 (D.C. Cir. 2000).

## DISCUSSION OF THE ISSUES

## I.    THE FINAL GUIDANCE EXCEEDED EPA'S AUTHORITY UNDER THE CLEAN WATER ACT BY ESTABLISHING A NEW *DE FACTO* WATER QUALITY STANDARD.

In issuing the Final Guidance, EPA violated the Clean Water Act by interfering with the states' role as the primary protectors of the waters within their borders.  In particular, the Final Guidance represents a direct affront to the states' ability to interpret and implement their own water quality standards.  EPA in the Final Guidance impermissibly established a new region-wide water quality

12

"benchmark" criterion for conductivity—a numeric criterion that none of the six Appalachian states targeted by the Final Guidance has adopted.

With the exception of Ohio, which has a numeric conductivity criterion of 2400 µg/L—far higher than the Final Guidance's 300 to 500 µg/L "benchmark"— none of the states subject to the Final Guidance have numeric water quality standards for conductivity. Applicable standards in four of the six states do not even mention conductivity. *See* JA1103–1105. Kentucky has a *narrative*, but not a numeric water quality criterion for conductivity. West Virginia, specifically, passed legislation rejecting reliance on a conductivity criterion as an appropriate measure of compliance with its narrative water quality standards. W. VA. CODE § 22-11-7b (as amended by S.B. 562).

Yet, EPA has sought to require numeric conductivity limits through the Interim and Final Guidance. Importantly, EPA has not determined that applicable water quality standards in any of the states subject to the Final Guidance are deficient or fail to meet the requirements of the Clean Water Act because they lack numeric conductivity limits. Rather, EPA has relied on the Final Guidance to simply override state determinations as to how best to interpret narrative water quality standards. In doing so, EPA has effectively dismissed, for example, West Virginia's repeated rejection of reliance on particular numeric conductivity limits. *See, e.g.*, W. VA. CODE § 22-11-7b; JA1041–1048; JA758–765.

13

The Government's attempt to characterize the conductivity "benchmark" as a mere "recommendation" is based largely on the multitude of self-serving disclaimers loaded into the text of the Final Guidance itself. But the conductivity benchmark set by the Final Guidance was not applied as a "recommendation" by EPA in practice. Instead, EPA treated the Final Guidance's conductivity criterion as binding. *See, e.g.*, JA554–558 (detailing how, in the West Virginia Department of Environmental Protection's experience, EPA has treated the conductivity limits in the Final Guidance as binding); JA579–581 ("[T]he experience of Kentucky is that EPA . . . will object to each and every proposed . . . individual permit for new or expanded surface coal mining in Eastern Kentucky which does not provide for . . . numerical conductivity limits."); JA565–567 (referencing how EPA demands to a permit applicant regarding conductivity date back to the Interim Guidance and that EPA refuses to change those demands following the Final Guidance). States either had to comply with EPA's conductivity benchmark or risk permit objections and resulting program disruption.

The Appellants' claim that EPA studied the "best available science" allegedly linking elevated conductivity to biological impairment of Appalachian streams, Intervenors' Br. 16–19, misses the point entirely. Whether EPA believes conductivity limits were justified under the best available science is a dispute that remains for another day. Instead, the simple fact remains in this case that EPA

never properly promulgated the conductivity limits as a water quality standard. Instead, in adopting the criterion, EPA skipped two essential prerequisites to promulgating a federal water quality standard.  It did not determine (1) that any state's proposed, new, or revised water quality standard failed to satisfy the Clean Water Act; or (2) that any state refused to accept EPA-proposed revisions to its standards.  *See* 33 U.S.C. § 1313(c)(3)–(4); *see also Am. Paper Inst. v. EPA*, 996 F.2d 346, 349 (D.C. Cir. 1993).  Accordingly, EPA simply failed to follow its statutory constraints on federal promulgation of water quality criterion.  *Id.*

Because EPA failed to properly promulgate conductivity limits as a water quality criterion, the district court had no occasion to consider whether it *would* have been justified in doing so had EPA followed the strictures of the Clean Water Act.  Instead, the court properly concluded that EPA exceeded its authority under the Clean Water Act in attempting to impose a new, binding water quality standard for an entire region.  That was the sole question before the district court, not the merits of a hypothetical federal water quality standard assuming it had been properly promulgated.  Accordingly, the district court's conclusion that EPA exceeded its authority under the Clean Water Act, and infringed on the authority of state permitting authorities in the process, should be affirmed.

## II.   EPA EXCEEDED ITS AUTHORITY IN THE FINAL GUIDANCE BY DICTATING THE TIMING OF THE REASONABLE POTENTIAL ANALYSIS.

The Final Guidance's new RPA standard dictating that "permitting authorities should not defer reasonable potential analyses until after a permit issuance," JA1065, also exceeds EPA's authority under the Clean Water Act and its implementing regulations.  No reading of the Act and its regulatory scheme allows EPA to strip from the state permitting authorities the right Congress granted them to perform their own reasonable potential determinations.  The district court was correct in holding that EPA erred by forcing the states, especially Kentucky, to perform RPAs prior to permit issuance.

It is true that courts must "'give substantial deference to an agency's interpretation of its own regulations.'"  *St. Mark's Housing Co., Inc. v. HUD*, 610 F.3d 75, 82 (D.C. Cir. 2010) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)).  But an agency's interpretation does not control if "'it is plainly erroneous or inconsistent with the regulation.'"  *St. Mark's Housing Co.*, 610 F.3d at 82 (quoting *Thomas Jefferson Univ.*, 512 U.S. at 512).  That is the case here.

EPA's regulations unambiguously provide that states with approved NPDES programs, not EPA, perform the reasonable potential determination.  EPA's implementing regulations under the Clean Water Act require the permitting authority to conduct an RPA using the procedures identified in 40 C.F.R.

16

§ 122.44(d)(1).  That provision states that when using those procedures, the

*permitting authority* (the Kentucky Division of Water, for example)—*not EPA*—

makes the determination of whether there is a reasonable probability that the

discharge will exceed narrative state water quality standards.

The key regulatory provision at issue, 40 C.F.R. § 122.44(d)(1), dictates how

state permitting authorities ensure that the NPDES permits they issue satisfy the

Clean Water Act's water quality standards:

> (i) Limitations must control all pollutants or pollutant parameters (either conventional, nonconventional, or toxic pollutants) *which the Director determines are or may be* discharged at a level which will cause, have the reasonable potential to cause, or contribute to an excursion above any State water quality standard, including State narrative criteria for water quality.

> (ii) *When determining whether a discharge causes, has the reasonable potential to cause, or contributes to* an in-stream excursion above a narrative or numeric criteria w/in a State water quality standard, *the permitting authority* shall use procedures which account for existing controls on point and nonpoint sources of pollution, the variability of the pollutant or pollutant parameter in the effluent, the sensitivity of the species to toxicity testing (when evaluating whole effluent toxicity), and where appropriate, the dilution of the effluent in the receiving water.

> (iii) *When the permitting authority determines*, using the procedures in paragraph (d)(1)(ii) of this section, that a discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion above the allowable ambient concentration of a State numeric criteria w/in a State water quality standard for an individual pollutant, the permit must contain effluent limits for that pollutant.

> (iv) *When the permitting authority determines*, using the procedures in paragraph (d)(1)(ii) of this section, that a discharge causes, has the

reasonable potential to cause, or contributes to an in-stream excursion above the numeric criterion for whole effluent toxicity, the permit must contain effluent limits for whole effluent toxicity.

(v) Except as provided in this subparagraph, *when the permitting authority determines*, using the procedures in paragraph (d)(1)(ii) of this section, toxicity testing data, or other information, that a discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion above a narrative criterion w/in an applicable State water quality standard, the permit must contain effluent limits for whole effluent toxicity.  Limits on whole effluent toxicity are not necessary where the permitting authority demonstrates in the fact sheet or statement of basis of the NPDES permit, using the procedures in paragraph (d)(1)(ii) of this section, that chemical-specific limits for the effluent are sufficient to attain and maintain applicable numeric and narrative State water quality standards.

40 C.F.R. § 122.44(d)(1)(i)-(v) (emphasis added).

This regulation is clear and unambiguous.  There is no dispute that the "permitting authority" referenced in the regulation is the relevant state.  It is also clear from the text of the regulation that the permitting authority is afforded the authority to determine whether a discharge "causes, has the reasonable potential to cause, or contributes to" an excursion of water quality standards.  It follows, therefore, that EPA overstepped its authority in the Final Guidance by usurping this power from the state permitting authorities without amending the regulation.

Appellants argue that the district court "misinterpreted" the language of 40 C.F.R. § 122.44(d)(1)(i)-(v), such that the court's interpretation of the regulation was unreasonable.  *See* Intervenors' Br. 22.  The text of the regulation, however, does not mandate *when* the state permitting authority must conduct its RPA.

18

Rather, a straight-forward reading of the relevant portion of the regulation reveals that EPA meant to allow for post-permit RPAs, as EPA provided that "[l]imitations must control all toxic pollutants which the Director determines . . . *are* or may be discharged . . . ." 40 C.F.R. § 122.44(d)(1)(i) (emphasis added).  The present-tense verb suggests that the pollutants could already have been discharged at the time the Director makes the RPA determination, signifying that the RPA may be completed post-permit.  Present-tense verbs are also found in subsection (iii): state permitting authorities are "determining whether a discharge *causes*, has the reasonable potential to cause, or *contributes to* an in-stream excursion. . . ."  40 C.F.R. § 122.44(d)(1)(iii) (emphasis added).   Therefore, the district court was correct in holding that it was EPA's unambiguous intent in drafting that regulation to allow both pre- and post-permit RPAs to be conducted, without specifying preference for one over the other.  The Appellants' assertion otherwise is thus a plainly erroneous and inconsistent interpretation of the regulation.

As the district court also correctly pointed out, should EPA wish to alter the manner by which an RPA is conducted, it is free to go through the formal process and amend the regulation in a manner consistent with the APA and its own statutory authority.  EPA simply has not done so.  Instead, EPA tried a backdoor approach:  attempting to amend the regulation by issuing a "guidance" document.

19

Until EPA engages in notice-and-comment rulemaking, however, it cannot usurp the states' power and determine the timing of reasonable potential analyses.

Accordingly, this Court should affirm the district court's holding that EPA exceeded its authority under the Clean Water Act and 40 C.F.R. § 122.44(d)(1)(iii) in taking the RPA determination out of the state realm and mandating that state permitting authorities conduct RPAs prior to issuance of the permit.[5]

## III.   EPA'S FINAL GUIDANCE REPRESENTS FINAL AGENCY ACTION.

Confronted with evidence of its clearly *ultra vires* action, EPA attempts to escape judicial review altogether by claiming that the *Final* Guidance was not final agency action.  But that argument cannot withstand scrutiny.  Whether EPA's Final Guidance was final agency action "turn[s] on a [single] question:  whether [it] announces a binding change in the law."  *Natural Res. Def. Council v. EPA*, ("*NRDC II*") 643 F.3d 311, 319 (D.C. Cir. 2011).  It did, as the district court correctly recognized.

---

[5] The district court's holding on the RPA issue may also be affirmed on alternative grounds:  that EPA's new RPA mandate in the Final Guidance was arbitrary and capricious and thus contravened Section 706 of the APA.  *See Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result . . . .").  At no point did EPA fulfill its obligation to articulate a satisfactory explanation for the necessity of NPDES permits to a pre-permit issuance RPA.  Nor did EPA satisfactorily explain its extraordinary usurpation of the state permitting authorities' authority to perform their own RPAs and dictate the point in the permitting process at which RPAs would be performed.

The Government acknowledges, as it must, that boilerplate disclaimers within the Final Guidance are not dispositive; instead, this Court looks "to how the agency has implemented the [challenged] action in practice."[6]  U.S. Br. 46, 48 (citing *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005)).

Circuit precedent makes clear that EPA's "characterization of its own action is not controlling if it self-servingly disclaims any intention to create a rule . . . but the record indicates otherwise."  *Crop Life Am. v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003); *see also Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022–23 (D.C. Cir. 2000) (D.C. Cir. 2000) (invalidating EPA guidance that proclaimed that it was "intended solely as guidance" and that it "cannot be relied upon to create any rights enforceable by any party").  Thus, finality can result "from the practical effect of an ostensibly non-binding agency proclamation."  *Home Builders*, 415 F.3d at 15.

Despite its many disclaimers, the effect of EPA's action is clear:  the Final Guidance changed the regulatory framework governing surface coal mining in multiple ways.

---

[6] In analyzing finality, the district court considered declarations submitted by Plaintiffs-Appellees and the Government after denying the Government's motion to strike Plaintiffs-Appellees' declarations.  JA88–93.  Because the Government has not contested that aspect of the district court's ruling on the Final Guidance in its opening brief on appeal, it cannot do so for the first time in its reply.

21

### A.     EPA's Final Guidance represented a binding change to the Clean Water Act permitting regulations.

The Final Guidance dramatically changed Clean Water Act permitting in Kentucky.  Prior to its issuance, EPA did not object to the Commonwealth's issuance of NPDES permits that allowed for post-permit RPAs and the reopening of permits, nor did EPA contend that pre-permit RPAs were required.  JA579–580, JA584–588.  This is unsurprising, as EPA's governing regulations do not dictate the timing of RPAs, and indeed recognize that the discharge of pollutants may be ongoing at the time an RPA is conducted.  *See* 40 C.F.R. § 122.44(d)(1)(i) (requiring limits to control pollutants that "*are* or may be discharged at a level which will cause, have the reasonable potential to cause, or contribute to" a violation of state water quality standards); *see also id.* § 122.44(d)(1)(ii) (setting forth procedures for permitting authorities to use "when determining whether a discharge *causes*, has the reasonable potential to cause, or contributes to" a violation of state standards) (emphasis added).

Kentucky's ability to defer RPAs until after permit issuance, however, has been "withdrawn by the [Final] Guidance."  *NRDC II*, 643 F.3d at 319.  That "guidance" states that "permitting authorities should not defer [RPAs] until after permit issuance."  *See* JA1065.  This so-called "recommendation," *see* U.S. Br. 47, is being treated as mandatory.  *See* JA580 ("EPA has drawn a line in the sand in the use of the . . . Final Guidance and as a result will object to each and every

22

proposed KPDES Section 402 CWA permit for new or expanded surface coal
mining in Eastern Kentucky which does not provide for a pre-permit RPA and
numerical conductivity limits"); JA586–588 ("mandate" for pre-permit RPAs "has
caused a complete cessation of individual permits for new or expanded surface
coal mining activities in Eastern Kentucky").  Under the Final Guidance, "[t]he
permissibility of [post-permit RPAs] is now a closed question." *NRDC II*, 643
F.3d at 320.

The Government's purported evidence to the contrary is unavailing.  The
Government cites a single comment letter pertaining to a draft permit in Kentucky
as evidence that EPA is allowing the issuance of permits that do not require pre-
permit RPAs.  *See* U.S. Br. 50 (citing JA608–612).  But the cited letter does not
even support EPA's position.  As counsel explained to the district court at oral
argument, the issuance of the Phoenix Resources permit was the result of
extraordinary circumstances.  JA164.  The permit in question was for an existing
facility that, when faced with being shut down, obtained a state court order
enjoining Kentucky and the federal Office of Surface Mining from taking
enforcement action.  *Id.*  Due to those special circumstances, a compromise was
reached to issue the permit and avoid putting several hundred employees out of
work.  *Id.*  Those anomalous circumstances simply do not support EPA's attempt
to characterize the Final Guidance as non-binding.  *See Appalachian Power Co. v.*

23

*EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) ("EPA has given the States their 'marching orders' and expects the States to fall in line, as all have done, save perhaps Florida and Texas.").  The Government also cites an EPA letter commenting on a draft permit in *West Virginia* to suggest that EPA was insisting on pre-permit RPAs in December 2009, long before the Final Guidance.  *See* U.S. Br. 51 (citing JA1123).  But that misses the point.  As discussed above, the Final Guidance announced a binding change in NPDES permitting in *Kentucky*.  By practically and legally affecting such permitting in Kentucky, the Final Guidance represents final agency action.

> **B.     EPA's Final Guidance represented a binding change to the SMCRA regulatory scheme.**

The Final Guidance "alter[ed] the legal regime" governing surface coal mine permitting by unlawfully expanding EPA's authority under SMCRA and the Clean Water Act.  *See Bennett v. Spear*, 520 U.S. 154, 178 (1997).  Before the Final Guidance, "neither [SMCRA nor the Clean Water Act] nor EPA regulations nor case law authorized EPA regional directors" to regulate mine design and planning upland from waters of the United States.  *NRDC II*, 643 F.3d at 319.  Such aspects of mining were the exclusive provinces of the states (or OSM) under SMCRA, which Congress enacted to fill a regulatory gap in the environmental regulation of surface coal mining.  *See Ohio Valley Envtl. Coal v. Aracoma Coal Co.*, 556 F.3d 177, 195 (4th Cir. 2009).  In filling that gap, Congress deliberately excluded EPA

from SMCRA permitting and refused to delegate to any federal agency the authority to veto state-issued SMCRA permits in SMCRA primacy states.  *Id.*

The Final Guidance, however, announces that EPA now has a role in SMCRA permitting and that EPA has authority over mine design and upland planning.  *See, e.g.*, JA1081 (instructing EPA regions to interject in SMCRA permitting); JA1087 (same); JA1106–1107 (substituting EPA's preferred management practices for mine design in place of the states' or OSM's).  Thus, EPA has "made an authoritative interpretation of its . . . authority [under SMCRA and the Clean Water Act] that has practical and significant legal effects."  *Reckitt Benckiser, Inc. v. EPA*, 613 F.3d 1131, 1138 (D.C. Cir. 2010).  That interpretation has impacted state regulators and mine operators.  *See, e.g.*, JA559–561 (EPA has attempted to "control and enforce aspects of upland mine design" and interfere with West Virginia's SMCRA program); JA569–571 (EPA's novel attempt to address activities covered by existing SMCRA permits threatens regulatory certainty and imposes "additional costs of complying with EPA's demands").

EPA's new interpretation has "alter[ed] the legal regime" governing coal mine permitting and thus the Final Guidance is final agency action.  *See Bennett*, 520 U.S. at 178.  The agency cannot "avoid judicial review merely by choosing the form of a [guidance document] to express its definitive position on a general question of statutory interpretation."  *Natural Res. Def. Council v. EPA* ("*NRDC*

*I*'), 22 F.3d 1125, 1133 (D.C. Cir. 1994). Nor can it avoid review by framing that definitive position as mere "recommendations." U.S. Br. 47. Those "recommendations" reveal that EPA now interprets SMCRA and the Clean Water Act to provide it with authority over mine design and over SMCRA permitting.

### C.    EPA's Final Guidance represented a binding change to the applicable water quality standards.

Because EPA has treated the conductivity "benchmark" in the Final Guidance as a binding requirement, the Final Guidance represents "final agency action, reflecting a settled agency position which has legal consequences" for the Corps, state regulators, and mine operators. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000).

EPA's coercive imposition of a numeric conductivity "benchmark" in the Final Guidance mirrors the Agency's demands for compliance with new requirements in the challenged guidance in *Appalachian Power*, where this Court found final agency action. *See* 208 F.3d at 1022–24. By consistently demanding compliance with that benchmark and threatening to object to permits that do not conform to EPA's demands, *see* JA555–560, EPA has implemented the Final Guidance in a manner that has "legal consequences" within the meaning of *Bennett*. *See id.*; *see also Bennett*, 520 U.S. at 178.

The Government unconvincingly points to a few examples where it claims that certain EPA Regions departed from the Final Guidance's conductivity

pronouncements. *See* U.S. Br. 50, 52. That there are a few instances of permits issued without numeric conductivity limits does not negate finality. *See, e.g.*, *Appalachian Power*, 208 F.3d at 1023; *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1321 (D.C. Cir. 1988). Moreover, that EPA has demanded the use of a conductivity limit *more stringent* than the levels set forth in the Final Guidance hardly demonstrates that the Final Guidance is not being applied in a binding manner. *See* JA625.

The Government also asserts that because EPA began recommending the inclusion of conductivity limits in permits in early 2010, it had "preexisting legal authority" to demand compliance with such limits. *See* U.S. Br. 50–51. But EPA cannot insulate the Final Guidance from judicial review merely because it began making unlawful demands prior to memorializing its new conductivity requirements in "final" form. If that were the case, an agency could always evade review by first announcing changes in regulatory requirements in unchallengeable documents (*e.g.*, "comment" letters that operate as *de facto* permit objections), and then effect the same change in a "guidance" document applied broadly as a binding rule. This Court should not decline to review the Final Guidance on the basis of such "ad hocery." *Ramaprakash v. FAA*, 346 F.3d 1121, 1130 (D.C. Cir. 2003).

**D.    The Government's restrictive view of finality lacks merit and is contrary to Circuit precedent.**

Moreover, the Government's position on finality conflicts with Circuit precedent.  The Government faults the district court for not citing examples of final permit denials, as opposed to permit objections, based on the Final Guidance.  *See* U.S. Br. 49–50 & n.6, 55–56.  The Government attempts to shift the framework of the finality analysis by ignoring the district court's approach and misreading Circuit precedent.  The Final Guidance *itself* is final agency action subject to judicial review.  Appellees are not confined to challenging final permit-specific decisions.  *See, e.g.*, *Crop Life Am. v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003) (invalidating EPA press release governing case-by-case determinations of pesticide safety); *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 385 (D.C. Cir. 2002) (invalidating EPA guidance governing applications to use alternative methods for handling remediation waste); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000). (invalidating EPA guidance governing Clean Air Act Title V permit applications filed with states).  That judicial review of final permit decisions would also have been available in any of those cases did not make the challenges to the "guidance" documents themselves any less final.  So too here.

The Government also wrongly downplays the significance of EPA's insistence that states adhere to the Final Guidance.  *See* U.S. Br. 53–55.  Contrary to the Government's suggestion, U.S. Br. 54, EPA has not merely requested

28

"voluntary compliance" with the Final Guidance; it has demanded such

compliance under threat of permit objections and has prohibited states from issuing

permits that are not in compliance.  *See, e.g.*, JA548–549, JA554–557.  Nothing

more is required to establish finality.  *See Appalachian Power*, 208 F.3d at 1023–

24 (emphasizing, *inter alia*, "with the Guidance in place, regional EPA offices

have solid legal grounds for objecting to state-issued permits if state authorities

refuse to bend to EPA's will").  Unlike in *Center for Auto Safety v. Nat'l Highway*

*Traffic Safety Admin.*, 452 F.3d 798, 811 (D.C. Cir. 2006)[7] where the challenged

action merely had the practical effect of spurring voluntary compliance, EPA's

coercive implementation of the Final Guidance has had legal consequences and is

therefore final agency action.

---

[7] The Government also cites *Reliable Automatic Sprinkler Co. v. Consumer Prod.
Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003), and *FTC v. Standard Oil Co.*,
449 U.S. 232, 242 (1980), in arguing that the Final Guidance does not impose legal
obligations on state authorities.  Those cases are inapposite.  The former involved
an agency's preliminary investigation of a company's products, and the agency had
not yet complied with a statutory requirement to "bring an administrative
proceeding before it [could] make any legally binding determination."  *Reliable
Automatic Sprinkler Co.*, 324 F.3d at 732, 734.  The latter examined whether the
filing of an administrative complaint at the outset of enforcement proceedings was
final agency action.  *FTC v. Standard Oil Co.*, 449 U.S. at 242, 244.  Neither of
those cases involved an agency's application of an ostensibly non-binding
document as a mandatory rule.

## IV.  THE DISTRICT COURT PROPERLY FOUND IT HAD JURISDICTION TO REVIEW THE FINAL GUIDANCE'S RPA PROVISION.

In a last-ditch effort to avoid judicial review, EPA attempts to carve out just one part of this case on jurisdictional grounds.  But this effort fails, too.[8]  "In this circuit, the normal default rule is that persons seeking review of agency action go first to district court rather than to a court of appeals . . . [unless] a direct-review statute specifically gives the court of appeals subject-matter jurisdiction to directly review agency action."  *Am. Petroleum Inst. v. SEC*, 714 F.3d 1329, 1332 (D.C. Cir. 2013).  This circuit's "normal default rule" applies here as the direct-review statute, Section 509 of the Clean Water Act, 33 U.S.C. § 1369, does not specifically give the court of appeals subject matter jurisdiction to review the EPA action challenged here by Appellees under Section 303 of the Clean Water Act, 33 U.S.C. § 1313.

Section 509 of the Clean Water Act, the jurisdictional statute invoked by the Government, cross-references six specific categories of agency action for which a challenge must be brought as an original proceeding in a court of appeals, and

---

[8] Should this Court conclude otherwise, such a holding should not affect the remainder of the claims in this appeal.  This is not a case like *American Iron & Steel Institute*, 115 F.3d 979, 986 (D.C. Cir. 1997), where "most of the case" falls within Section 509(b)(1) jurisdiction.  Thus, any suggestion that all of the claims in this case should have been subject to this Court's ancillary jurisdiction must be rejected.  In any event, the Government did not argue ancillary jurisdiction below or in its opening brief on appeal and thus cannot do so on reply.

federal courts have long agreed that Congress intended in Section 509 to limit

judicial review of EPA action to those enumerated categories. *See Friends of the*

*Earth v. EPA,* 333 F.3d 184, 189 (D.C. Cir. 2003) ("We agree with our sister

circuits: original jurisdiction over EPA actions not expressly listed in section

1369(b)(1) lies not with us, but with the district court."); *accord Friends of the*

*Everglades v. EPA*, 699 F.3d 1280, 1286–88 (11th Cir. 2012); *Nw. Envtl.*

*Advocates v. EPA*, 537 F.3d 1006, 1015 (9th Cir. 2008); *Narragansett Elec. Co. v.*

*EPA*, 407 F.3d 1, 5 (1st Cir. 2005); *Appalachian Energy Group v. EPA*, 33 F.3d

319, 322 (4th Cir. 1994); *Lake Cumberland Trust, Inc. v. EPA*, 954 F.2d 1219,

1222 (6th Cir. 1992); *Arkansas Poultry Fed'n v. EPA*, 852 F.2d 324, 325 (8th Cir.

1988); *City of Baton Rouge v. EPA*, 620 F.2d 478, 480 (5th Cir. 1980). "The

complexity and specificity of [Section 509(b)(1)] in identifying what actions of

EPA under the [CWA] would be reviewable in the courts of appeals suggests that

not all such actions are so reviewable." *Bethlehem Steel Corp. v. EPA*, 538 F.2d

513, 517 (2d Cir. 1976).

The Government argues that review of the Final Guidance's new RPA

requirement lies exclusively in the courts of appeals under Section 509(b)(1)(E),

which provides that review of EPA action "in approving or promulgating any

effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of

this title . . . may be had . . . in the [appropriate] Circuit Court of Appeals of the

31

United States[.]"  33 U.S.C. § 1369(b)(1)(E).  As explained below, the text of the

statute and relevant precedent show otherwise.

### A.   The Final Guidance's RPA Requirement Is Not an "Effluent Limitation or Other Limitation."

The Government claims that, if the district court is correct that the RPA

requirement in the Final Guidance is final agency action, then review of it may be

had only in a court of appeals, because any "effluent limitation or other limitation

stemming from a finding of reasonable potential is imposed under Section 301 of

the Act."  U.S. Br. 58.  This claim is wrong on multiple fronts, as the district court

properly recognized.  JA114.

The Supreme Court has interpreted the term "effluent limitation" to refer

specifically to "*direct* restrictions on discharges."  *EPA v. California*, 426 U.S.

200, 204 (1976) (emphasis added).  Congress carefully defined the term "effluent

limitation" as "any restriction . . . on quantities, rates, and concentrations of

chemical, physical, biological, and other constituents which are discharged from

point sources into navigable waters[.]"  33 U.S.C. § 1362(11).  It also covers new

source performance standards promulgated under Section 1316 of the Clean Water

Act.  *See, e.g.*, 40 C.F.R. § 420.14(a)(2) (standards for "regulated parameters," *e.g.*,

cyanide, resulting from cokemaking described as pounds per thousand pounds of

product).

32

Thus, the types of EPA actions subject to direct review under Section 509(b)(1)(E) "dictate in specific and technical terms the amount of each pollutant that a point source may emit." *Am. Paper Inst. v. EPA*, 890 F.2d 869, 876–77 (7th Cir. 1989). By contrast, the RPA provisions in the Final Guidance do not limit the "quantities, rates, and concentrations" of particular pollutants, nor do they speak in "technical terms" as to the "amount of each pollutant" a source may discharge. *Id.*

In support of its position, the Government relies on an overbroad interpretation of a cross-reference in Section 509(b)(1)(E). The Government admits that any "effluent limit" stemming from an RPA would derive from water quality standards established under Section 303 of the Clean Water Act. Nevertheless, it maintains that the RPA requirement in the Final Guidance falls under Section 509(b)(1)(E), because that jurisdictional provision contains a cross-reference to Section 1311. *See* U.S. Br. 58.

The Government's interpretation is mistaken. In its most recent analysis on the scope of Section 509(b)(1)(E), this Court rejected such an expansive interpretation. *See Friends of the Earth*, 333 F.3d at 189–90. Instead, this Court emphasized the Clean Water Act's distinction between Section *1313* effluent limitations and Section *1311* effluent limitations. *See id.* In particular, it found that the "oblique reference to section 1313" within 33 U.S.C. § 1311(b)(1)(C)—the very provision that the Government invokes here—is insufficient to bring a Section

33

*1313* effluent limitation into Section 509(b)(1)(E)'s reach.  *Friends of the Earth*, 333 F.3d at 189.  The *Friends of the Earth* holding applies with equal force to agency pronouncements such as the Final Guidance's RPA requirement, which govern the establishment of effluent limitations based on state water quality standards established under Section 1313.[9]  The specific holding of *Friends of the Earth*—not the broad assertion of Section 509(b)(1)(E) jurisdiction over the consolidated NPDES permitting regulations in *NRDC v. EPA*, 673 F.2d 400, 402–05 (D.C. Cir. 1982)—controls the outcome in this case.

For the same reasons, the Final Guidance's RPA requirement is not an "other limitation" under section 509(b)(1)(E).  As the Supreme Court has long recognized, "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001).  Here, "other limitation" follows the precisely defined term "effluent limitation" and should be interpreted to cover only limitations similar to "effluent limitations"—namely, restrictions on quantities, rates, and concentrations of constituents discharged from point sources.  *See Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1310–11 (9th Cir. 1992)

---

[9] EPA's RPA regulations further underscore the distinction between effluent limitations promulgated under Section 1311 and limits that stem from RPAs for the purpose of achieving water quality standards established under Section 1313.  *See* 40 C.F.R. § 122.44(d).

(applying *ejusdem generis* canon to Section 509(b)(1)(E) and concluding that "[p]lainly an 'other limitation' must fall under one of the listed statutes" enumerated in Section 509(b)(1)(E)).   Any other interpretation of "other limitation" would swallow the lines Congress drew in Section 509.  The Government's interpretation would treat any EPA pronouncements regarding the issuance of Section 402 permits, or the analyses conducted to determine whether effluent limitations based on Section 303 water quality standards might be necessary, as an "other limitation."  That "would in effect allow the term 'other limitation' to swallow up the distinctions that Congress made between effluent limitations and other types of EPA regulations."  *Am. Paper Inst.*, 890 F.2d at 876–77.

Much of the Government's overbroad interpretation of Section 509(b)(1)(E) rests on a single sentence from the Supreme Court's decision in *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 129 (1977), which the Government emphasizes in its opening brief.  U.S. Br. 57–58.  But that sentence must be read in the context of the narrow holding.  That case involved whether exclusive jurisdiction lies in the courts of appeals for challenges to "industry-wide regulations imposing . . . precise limitations" on existing discharges.  *See E.I. du Pont*, 430 U.S. at 115.  Once the Supreme Court held that EPA had authority to promulgate effluent limitation regulations under Section 301 of the Clean Water

Act, the jurisdictional question was a simple one: the regulations at issue fell

squarely within Section 509(b)(1)(E). The Supreme Court then rejected the

argument that the court of appeals lacked jurisdiction and, in that context, noted

that such a view would result in a "truly perverse situation in which the court of

appeals would review the numerous individual actions issuing or denying permits

pursuant to [Section] 402 but would have no power of direct review of the basic

regulations governing those individual actions." *Id.* at 136. But the "basic

regulations" that the Court was referring to (the regulations at issue in that case)

were the *very* type of regulations identified in Section 509(b)(1)(E), *i.e.*,

regulations promulgating effluent limitations.

Viewed in its proper context, the statement from *E.I. du Pont* should not be

interpreted so broadly as to mean that *all* regulations pertaining to NPDES permits

or *all* regulations relating generally to the setting of effluent limitations must be

challenged in the courts of appeals. In fact, the Supreme Court even appeared to

recognize in *E.I. du Pont* that not all EPA actions relating to the setting of effluent

limitations are subject to direct review by a court of appeals. The Court noted that

"[i]f industry is correct that the regulations can only be considered [Section 1314]

[effluent limitation] guidelines, suit to review the regulations could probably be

brought only in the District Court, if anywhere." *Id.* at 125. This is because

Section 1314 (like Section 1313) is not specifically enumerated in Section

36

509(b)(1).  Therefore, even though the issuance of Section 1314 effluent limitation guidelines are closely intertwined with the promulgation of Section 1311 effluent limitations, the former is not swept into Section 509(b)(1)(E).  The same is true here with respect to the RPA provisions in the Final Guidance.[10]

In sum, the RPA provisions in the Final Guidance are not "effluent limitations" or "other limitations" as those terms are used in Section 509(b)(1)(E).  Accordingly, they are not subject to direct review by a court of appeals.

## B.  The RPA 'Rule' Was Neither Promulgated Nor Approved.

The RPA requirement is also not subject to exclusive review by the courts of appeals because it was not "promulgated" within the meaning of Section 509(b)(1)(E).  *See E.I. du Pont*, 430 U.S. at 129 ("[T]he language of the statute supports the view that section 301 limitations are to be adopted by the Administrator . . . and that they are to take the form of regulations.").  Because the term "promulgating" is not defined in the CWA or by EPA regulation, the district court properly held that the Final Guidance's RPA requirement was not

---

[10] The Government's reliance on *Am. Iron & Steel Inst.*, 115 F.3d 979, 999 (D.C. Cir. 1997), is also misplaced.  In that case, this Court noted that "most of the case" was within its jurisdiction by operation of Section 509(b)(1)(E) and thus, it exercised ancillary jurisdiction over other parts of the challenged action that were not specified for direct court of appeals review under Section509(b)(1).  *Id.* at 986.  Importantly, the RPA requirements in that case were *not* among the provisions that this Court identified as being subject to direct review under Section 509(b)(1)(E).  *See id.*

"promulgat[ed]" under Section 509(b)(1)(E) because it was never published in the Federal Register and thus, is not subject to direct review by a court of appeals.

Neither the Supreme Court nor this Court has directly addressed the meaning of "promulgating" within Section 509(b)(1)(E). But as this Court has previously held, "[i]f the agency does not define the term by regulation and if the statute supports (or at least does not foreclose) the interpretation, 'promulgation' is accorded its 'ordinary meaning'—i.e., publication in the *Federal Register*." JA114 (*citing Horsehead Res. Dev. Co. v. EPA*, 130 F. 3d 1090, 1093 (D.C. Cir. 1997)); *see also Nat'l Grain & Feed Ass'n, Inc., v. OSHA*, 845 F.2d 345, 346 (D.C. Cir. 1988) (OSHA standard is "promulgated" for purposes of judicial review on the date it is published in the Federal Register").[11]

Notably, Congress is well aware of how to include "catch-all" provisions in a direct review statute. It did so in the Clean Air Act by designating "any other final action of the Administrator" for review by direct appellate review. *See* 42 U.S.C. § 7607(b)(1). Congress chose not to include a comparable "catch-all" provision in the Clean Water Act; thus, the term "promulgating" must be given its ordinary meaning, *i.e.*, publication in the Federal Register. *Cf. Bethlehem Steel*

---

[11] Although the Government, U.S. Br. 60, cites to a Second Circuit case to suggest otherwise, that case actually held that a petition to review agency amendments to a regulation was timely because filed within 60 days of the date the regulations were published in the Federal Register. *United Techs. Corp. v. OSHA*, 836 F.2d 52, 53–54 (2nd Cir. 1987).

*Corp. v. EPA*, 538 F.2d 513, 517 (2d Cir. 1976).  ("If Congress had so intended, it could have simply provided that all EPA action under the statute would be subject to review in the courts of appeals, rather than specifying particular actions and leaving out others.").

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

October 11, 2013                          Respectfully submitted,

                                          /s/ Benjamin L. Bailey
                                          Benjamin L. Bailey
                                          Michael B. Hissam
                                          BAILEY & GLASSER LLP
                                          209 Capitol Street
                                          Charleston, WV 25301
                                          (304) 345-6555

                                          Patrick Morrisey
                                              *Attorney General*
                                          Elbert Lin
                                              *Solicitor General*
                                          Office of the Attorney General
                                          1900 Kanawha Boulevard, East
                                          Room 26-E
                                          Charleston, WV 25305
                                          (304) 558-2021

                                          *Counsel for Randy Huffman, in his official capacity as Cabinet Secretary of the West Virginia Department of Environmental Protection, and the State of West Virginia*

39

Mary Stephens
Office of General Counsel
200 Fair Oaks Lane, First Floor
Frankfort, KY 40601
(502) 564-3410

*Counsel for Commonwealth of Kentucky*
*Energy and Environment Cabinet*

Mindy G. Barfield
Sadhna G. True
DINSMORE & SHOHL, LLP
250 West Main Street
Suite 1400
Lexington, KY 40507
(859) 425-1000

*Counsel for City of Pikeville*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS,
## AND TYPE STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

     this brief contains 9,182 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

     this brief has been prepared in a proportionally-spaced typeface using Microsoft Word in 14 point Times New Roman font.

                    /s/ Benjamin L. Bailey
                    Benjamin L. Bailey
                    *Counsel for Randy C. Huffman and*
                      *State of West Virginia*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 11th day of October, 2013, I caused this

Corrected Brief of Appellees Randy C. Huffman, Cabinet Secretary of the West

Virginia Department of Environmental Protection; State of West Virginia;

Commonwealth of Kentucky; and City of Pikeville, Kentucky, to be filed

electronically with the Clerk of the Court using the CM/ECF System, which will

send notice of such filing to all registered CM/ECF users.

/s/ Benjamin L. Bailey
Benjamin L. Bailey

*Counsel for Randy C. Huffman and*
*State of West Virginia*

ADDENDUM

## TABLE OF CONTENTS
## STATUTORY AND REGULATORY ADDENDUM
## OF GOVERNMENT APPELLEES[1]

### FEDERAL STATUTES

Administrative Procedure Act (APA)

5 U.S.C. § 706 ................................................................................................A6

Clean Water Act

33 U.S.C. § 1251 ...........................................................................................A15

33 U.S.C. § 1311............................................................................................A17

33 U.S.C. § 1312.............................................................................. ADD-IA015

33 U.S.C. § 1313............................................................................................A25

33 U.S.C. § 1314............................................................................................A28

33 U.S.C. § 1342............................................................................................A34

33 U.S.C. § 1362............................................................................................A46

33 U.S.C. § 1369............................................................................................A49

Clean Air Act

42 U.S.C. 7607 ................................................................... ADD GA000001

---

[1] Pursuant to Circuit Rule 28(a)(5), Appellees hereby incorporate by reference certain of the statutes and regulations reproduced by the Federal Defendants-Appellants (designated with bates numbers A1-A128) and Industry Appellees (designated with bates numbers ADD-IA001 through ADD-IA116.). The materials reproduced for the first time in Government Appellees' Addendum will be designated with bates numbers ADD GA000001-000013.

# FEDERAL REGULATIONS

U.S. Environmental Protection Agency

40 C.F.R. § 122.44 ...................................................................................A79

40 C.F.R. § 420.14 ............................................................ ADD GA 000007

75 Fed. Reg. 18,500 (Apr. 12, 2010) ........................................ ADD-IA053

# STATE STATUTES

W. Va. Code § 22-11-2 ...................................................... ADD GA000009

W. Va. Code § 22-11-7b ................................................... ADD GA000010

# STATE REGULATIONS

401 Ky. Admin. Regs. 10:031 ...............................................................A105

W. Va. Code R. § 47-2-1 *et seq.* ...................................... ADD GA000011



emption shall (A) promptly notify the Administrator of such exemption and the justification therefor; (B) review the necessity for each such exemption annually; and (C) report to the Administrator annually all such exemptions in effect. Exemptions granted pursuant to this section shall be for a period not to exceed one year. Additional exemptions may be granted for periods not to exceed one year upon the making of a new determination by the head of the Federal agency concerned.

(2) The Administrator may, by rule or regulation, exempt any or all Federal agencies from any or all of the provisions of this Order with respect to any class or classes of contracts, grants, or loans, which (A) involve less than specified dollar amounts, or (B) have a minimal potential impact upon the environment, or (C) involve persons who are not prime contractors or direct recipients of Federal assistance by way of contracts, grants, or loans.

(b) Federal agencies shall reconsider any exemption granted under subsection (a) whenever requested to do so by the Administrator.

(c) The Administrator shall annually notify the President and the Congress of all exemptions granted, or in effect, under this Order during the preceding year.

SEC. 9. *Related Actions.* The imposition of any sanction or penalty under or pursuant to this Order shall not relieve any person of any legal duty to comply with any provisions of the Air Act or the Water Act.

SEC. 10. *Applicability.* This Order shall not apply to contracts, grants, or loans involving the use of facilities located outside the United States.

SEC. 11. *Uniformity.* Rules, regulations, standards, and guidelines issued pursuant to this order and section 508 of the Water Act [33 U.S.C. 1368] shall, to the maximum extent feasible, be uniform with regulations issued pursuant to this order, Executive Order No. 11602 of June 29, 1971 [formerly set above], and section 306 of the Air Act [this section].

SEC. 12. *Order Superseded.* Executive Order No. 11602 of June 29, 1971, is hereby superseded.

RICHARD NIXON.

## § 7607. Administrative proceedings and judicial review

### (a) Administrative subpenas; confidentiality; witnesses

In connection with any determination under section 7410(f) of this title, or for purposes of obtaining information under section 7521(b)(4)[1] or 7545(c)(3) of this title, any investigation, monitoring, reporting requirement, entry, compliance inspection, or administrative enforcement proceeding under the[2] chapter (including but not limited to section 7413, section 7414, section 7420, section 7429, section 7477, section 7524, section 7525, section 7542, section 7603, or section 7606 of this title),[3] the Administrator may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and he may administer oaths. Except for emission data, upon a showing satisfactory to the Administrator by such owner or operator that such papers, books, documents, or information or particular part thereof, if made public, would divulge trade secrets or secret processes of such owner or operator, the Administrator shall consider such record, report, or information or particular portion thereof confidential in accordance with the purposes of section 1905 of title 18, except that such paper, book, document, or information may be dis-

closed to other officers, employees, or authorized representatives of the Administrator concerned with carrying out this chapter, to persons carrying out the National Academy of Sciences' study and investigation provided for in section 7521(c) of this title, or when relevant in any proceeding under this chapter. Witnesses summoned shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person under this subparagraph,[4] the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Administrator to appear and produce papers, books, and documents before the Administrator, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

### (b) Judicial review

(1) A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 7412 of this title, any standard of performance or requirement under section 7411 of this title,[3] any standard under section 7521 of this title (other than a standard required to be prescribed under section 7521(b)(1) of this title), any determination under section 7521(b)(5)[1] of this title, any control or prohibition under section 7545 of this title, any standard under section 7571 of this title, any rule issued under section 7413, 7419, or under section 7420 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411(d) of this title, any order under section 7411(j) of this title, under section 7412 of this title, under section 7419 of this title, or under section 7420 of this title, or his action under section 1857c–10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977) or under regulations thereunder, or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title, or any other final action of the Administrator under this chapter (including any denial or disapproval by the Administrator under subchapter I of this chapter) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and pub-

---

[1] See References in Text note below.
[2] So in original. Probably should be "this".
[3] So in original.

[4] So in original. Probably should be "subsection.".

lishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise. The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.

(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement. Where a final decision by the Administrator defers performance of any nondiscretionary statutory action to a later time, any person may challenge the deferral pursuant to paragraph (1).

**(c) Additional evidence**

In any judicial proceeding in which review is sought of a determination under this chapter required to be made on the record after notice and opportunity for hearing, if any party applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as to[5] the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

**(d) Rulemaking**

(1) This subsection applies to—

(A) the promulgation or revision of any national ambient air quality standard under section 7409 of this title,

(B) the promulgation or revision of an implementation plan by the Administrator under section 7410(c) of this title,

(C) the promulgation or revision of any standard of performance under section 7411 of this title, or emission standard or limitation under section 7412(d) of this title, any standard under section 7412(f) of this title, or any regulation under section 7412(g)(1)(D) and (F) of this title, or any regulation under section 7412(m) or (n) of this title,

(D) the promulgation of any requirement for solid waste combustion under section 7429 of this title,

(E) the promulgation or revision of any regulation pertaining to any fuel or fuel additive under section 7545 of this title,

(F) the promulgation or revision of any aircraft emission standard under section 7571 of this title,

(G) the promulgation or revision of any regulation under subchapter IV–A of this chapter (relating to control of acid deposition),

(H) promulgation or revision of regulations pertaining to primary nonferrous smelter orders under section 7419 of this title (but not including the granting or denying of any such order),

(I) promulgation or revision of regulations under subchapter VI of this chapter (relating to stratosphere and ozone protection),

(J) promulgation or revision of regulations under part C of subchapter I of this chapter (relating to prevention of significant deterioration of air quality and protection of visibility),

(K) promulgation or revision of regulations under section 7521 of this title and test procedures for new motor vehicles or engines under section 7525 of this title, and the revision of a standard under section 7521(a)(3) of this title,

(L) promulgation or revision of regulations for noncompliance penalties under section 7420 of this title,

(M) promulgation or revision of any regulations promulgated under section 7541 of this title (relating to warranties and compliance by vehicles in actual use),

(N) action of the Administrator under section 7426 of this title (relating to interstate pollution abatement),

(O) the promulgation or revision of any regulation pertaining to consumer and commercial products under section 7511b(e) of this title,

(P) the promulgation or revision of any regulation pertaining to field citations under section 7413(d)(3) of this title,

(Q) the promulgation or revision of any regulation pertaining to urban buses or the clean-fuel vehicle, clean-fuel fleet, and clean fuel programs under part C of subchapter II of this chapter,

(R) the promulgation or revision of any regulation pertaining to nonroad engines or nonroad vehicles under section 7547 of this title,

(S) the promulgation or revision of any regulation relating to motor vehicle compliance program fees under section 7552 of this title,

(T) the promulgation or revision of any regulation under subchapter IV–A of this chapter (relating to acid deposition),

(U) the promulgation or revision of any regulation under section 7511b(f) of this title pertaining to marine vessels, and

(V) such other actions as the Administrator may determine.

The provisions of section 553 through 557 and section 706 of title 5 shall not, except as expressly provided in this subsection, apply to actions to which this subsection applies. This subsection shall not apply in the case of any rule or circumstance referred to in subparagraphs (A) or (B) of subsection 553(b) of title 5.

---

[5] So in original. The word "to" probably should not appear.

(2) Not later than the date of proposal of any action to which this subsection applies, the Administrator shall establish a rulemaking docket for such action (hereinafter in this subsection referred to as a "rule"). Whenever a rule applies only within a particular State, a second (identical) docket shall be simultaneously established in the appropriate regional office of the Environmental Protection Agency.

(3) In the case of any rule to which this subsection applies, notice of proposed rulemaking shall be published in the Federal Register, as provided under section 553(b) of title 5, shall be accompanied by a statement of its basis and purpose and shall specify the period available for public comment (hereinafter referred to as the "comment period"). The notice of proposed rulemaking shall also state the docket number, the location or locations of the docket, and the times it will be open to public inspection. The statement of basis and purpose shall include a summary of—

(A) the factual data on which the proposed rule is based;

(B) the methodology used in obtaining the data and in analyzing the data; and

(C) the major legal interpretations and policy considerations underlying the proposed rule.

The statement shall also set forth or summarize and provide a reference to any pertinent findings, recommendations, and comments by the Scientific Review Committee established under section 7409(d) of this title and the National Academy of Sciences, and, if the proposal differs in any important respect from any of these recommendations, an explanation of the reasons for such differences. All data, information, and documents referred to in this paragraph on which the proposed rule relies shall be included in the docket on the date of publication of the proposed rule.

(4)(A) The rulemaking docket required under paragraph (2) shall be open for inspection by the public at reasonable times specified in the notice of proposed rulemaking. Any person may copy documents contained in the docket. The Administrator shall provide copying facilities which may be used at the expense of the person seeking copies, but the Administrator may waive or reduce such expenses in such instances as the public interest requires. Any person may request copies by mail if the person pays the expenses, including personnel costs to do the copying.

(B)(i) Promptly upon receipt by the agency, all written comments and documentary information on the proposed rule received from any person for inclusion in the docket during the comment period shall be placed in the docket. The transcript of public hearings, if any, on the proposed rule shall also be included in the docket promptly upon receipt from the person who transcribed such hearings. All documents which become available after the proposed rule has been published and which the Administrator determines are of central relevance to the rulemaking shall be placed in the docket as soon as possible after their availability.

(ii) The drafts of proposed rules submitted by the Administrator to the Office of Management and Budget for any interagency review process prior to proposal of any such rule, all documents accompanying such drafts, and all written comments thereon by other agencies and all written responses to such written comments by the Administrator shall be placed in the docket no later than the date of proposal of the rule. The drafts of the final rule submitted for such review process prior to promulgation and all such written comments thereon, all documents accompanying such drafts, and written responses thereto shall be placed in the docket no later than the date of promulgation.

(5) In promulgating a rule to which this subsection applies (i) the Administrator shall allow any person to submit written comments, data, or documentary information; (ii) the Administrator shall give interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written submissions; (iii) a transcript shall be kept of any oral presentation; and (iv) the Administrator shall keep the record of such proceeding open for thirty days after completion of the proceeding to provide an opportunity for submission of rebuttal and supplementary information.

(6)(A) The promulgated rule shall be accompanied by (i) a statement of basis and purpose like that referred to in paragraph (3) with respect to a proposed rule and (ii) an explanation of the reasons for any major changes in the promulgated rule from the proposed rule.

(B) The promulgated rule shall also be accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period.

(C) The promulgated rule may not be based (in part or whole) on any information or data which has not been placed in the docket as of the date of such promulgation.

(7)(A) The record for judicial review shall consist exclusively of the material referred to in paragraph (3), clause (i) of paragraph (4)(B), and subparagraphs (A) and (B) of paragraph (6).

(B) Only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review. If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed. If the Administrator refuses to convene such a proceeding, such person may seek review of such refusal in the United States court of appeals for the appropriate circuit (as provided in subsection (b) of this section). Such reconsideration shall not postpone the effectiveness of the rule. The effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a period not to exceed three months.

(8) The sole forum for challenging procedural determinations made by the Administrator under this subsection shall be in the United States court of appeals for the appropriate circuit (as provided in subsection (b) of this section) at the time of the substantive review of the rule. No interlocutory appeals shall be permitted with respect to such procedural determinations. In reviewing alleged procedural errors, the court may invalidate the rule only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made.

(9) In the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be—

    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

    (B) contrary to constitutional right, power, privilege, or immunity;

    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or

    (D) without observance of procedure required by law, if (i) such failure to observe such procedure is arbitrary or capricious, (ii) the requirement of paragraph (7)(B) has been met, and (iii) the condition of the last sentence of paragraph (8) is met.

(10) Each statutory deadline for promulgation of rules to which this subsection applies which requires promulgation less than six months after date of proposal may be extended to not more than six months after date of proposal by the Administrator upon a determination that such extension is necessary to afford the public, and the agency, adequate opportunity to carry out the purposes of this subsection.

(11) The requirements of this subsection shall take effect with respect to any rule the proposal of which occurs after ninety days after August 7, 1977.

**(e) Other methods of judicial review not authorized**

Nothing in this chapter shall be construed to authorize judicial review of regulations or orders of the Administrator under this chapter, except as provided in this section.

**(f) Costs**

In any judicial proceeding under this section, the court may award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such award is appropriate.

**(g) Stay, injunction, or similar relief in proceedings relating to noncompliance penalties**

In any action respecting the promulgation of regulations under section 7420 of this title or the administration or enforcement of section 7420 of this title no court shall grant any stay, injunctive, or similar relief before final judgment by such court in such action.

**(h) Public participation**

It is the intent of Congress that, consistent with the policy of subchapter II of chapter 5 of

title 5, the Administrator in promulgating any regulation under this chapter, including a regulation subject to a deadline, shall ensure a reasonable period for public participation of at least 30 days, except as otherwise expressly provided in section[6] 7407(d), 7502(a), 7511(a) and (b), and 7512(a) and (b) of this title.

(July 14, 1955, ch. 360, title III, § 307, as added Pub. L. 91–604, § 12(a), Dec. 31, 1970, 84 Stat. 1707; amended Pub. L. 92–157, title III, § 302(a), Nov. 18, 1971, 85 Stat. 464; Pub. L. 93–319, § 6(c), June 22, 1974, 88 Stat. 259; Pub. L. 95–95, title III, §§ 303(d), 305(a), (c), (f)–(h), Aug. 7, 1977, 91 Stat. 772, 776, 777; Pub. L. 95–190, § 14(a)(79), (80), Nov. 16, 1977, 91 Stat. 1404; Pub. L. 101–549, title I, §§ 108(p), 110(5), title III, § 302(g), (h), title VII, §§ 702(c), 703, 706, 707(h), 710(b), Nov. 15, 1990, 104 Stat. 2469, 2470, 2574, 2681–2684.)

REFERENCES IN TEXT

Section 7521(b)(4) of this title, referred to in subsec. (a), was repealed by Pub. L. 101–549, title II, § 230(2), Nov. 15, 1990, 104 Stat. 2529.

Section 7521(b)(5) of this title, referred to in subsec. (b)(1), was repealed by Pub. L. 101–549, title II, § 230(3), Nov. 15, 1990, 104 Stat. 2529.

Section 1857c–10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977), referred to in subsec. (b)(1), was in the original "section 119(c)(2)(A), (B), or (C) (as in effect before the date of enactment of the Clean Air Act Amendments of 1977)", meaning section 119 of act July 14, 1955, ch. 360, title I, as added June 22, 1974, Pub. L. 93–319, § 3, 88 Stat. 248, (which was classified to section 1857c–10 of this title) as in effect prior to the enactment of Pub. L. 95–95. Aug. 7, 1977, 91 Stat. 691, effective Aug. 7, 1977. Section 112(b)(1) of Pub. L. 95–95 repealed section 119 of act July 14, 1955, ch. 360, title I, as added by Pub. L. 93–319, and provided that all references to such section 119 in any subsequent enactment which supersedes Pub. L. 93–319 shall be construed to refer to section 113(d) of the Clean Air Act and to paragraph (5) thereof in particular which is classified to subsec. (d)(5) of section 7413 of this title. Section 7413(d) of this title was subsequently amended generally by Pub. L. 101–549, title VII, § 701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, no longer relates to final compliance orders. Section 117(b) of Pub. L. 95–95 added a new section 119 of act July 14, 1955, which is classified to section 7419 of this title.

Part C of subchapter I of this chapter, referred to in subsec. (d)(1)(J), was in the original "subtitle C of title I", and was translated as reading "part C of title I" to reflect the probable intent of Congress, because title I does not contain subtitles.

CODIFICATION

In subsec. (h), "subchapter II of chapter 5 of title 5" was substituted for "the Administrative Procedures Act" on authority of Pub. L. 89–554, § 7(b), Sept. 6, 1966, 80 Stat. 631, the first section of which enacted Title 5, Government Organization and Employees.

Section was formerly classified to section 1857h–5 of this title.

PRIOR PROVISIONS

A prior section 307 of act July 14, 1955, was renumbered section 314 by Pub. L. 91–604 and is classified to section 7614 of this title.

Another prior section 307 of act July 14, 1955, ch. 360, title III, formerly § 14, as added Dec. 17, 1963, Pub. L. 88–206, § 1, 77 Stat. 401, was renumbered section 307 by Pub. L. 89–272, renumbered section 310 by Pub. L. 90–148, and renumbered section 317 by Pub. L. 91–604, and is set out as a Short Title note under section 7401 of this title.

---

[6] So in original. Probably should be "sections".

## AMENDMENTS

1990—Subsec. (a). Pub. L. 101–549, §703, struck out par. (1) designation at beginning, inserted provisions authorizing issuance of subpoenas and administration of oaths for purposes of investigations, monitoring, reporting requirements, entries, compliance inspections, or administrative enforcement proceedings under this chapter, and struck out "or section 7521(b)(5)" after "section 7410(f)".

Subsec. (b)(1). Pub. L. 101–549, §706(2), which directed amendment of second sentence by striking "under section 7413(d) of this title" immediately before "under section 7419 of this title", was executed by striking "under section 7413(d) of this title," before "under section 7419 of this title", to reflect the probable intent of Congress.

Pub. L. 101–549, §706(1), inserted at end: "The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action."

Pub. L. 101–549, §702(c), inserted "or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title," before "or any other final action of the Administrator".

Pub. L. 101–549, §302(g), substituted "section 7412" for "section 7412(c)".

Subsec. (b)(2). Pub. L. 101–549, §707(h), inserted sentence at end authorizing challenge to deferrals of performance of nondiscretionary statutory actions.

Subsec. (d)(1)(C). Pub. L. 101–549, §110(5)(A), amended subpar. (C) generally. Prior to amendment, subpar. (C) read as follows: "the promulgation or revision of any standard of performance under section 7411 of this title or emission standard under section 7412 of this title,".

Subsec. (d)(1)(D), (E). Pub. L. 101–549, §302(h), added subpar. (D) and redesignated former subpar. (D) as (E). Former subpar. (E) redesignated (F).

Subsec. (d)(1)(F). Pub. L. 101–549, §302(h), redesignated subpar. (E) as (F). Former subpar. (F) redesignated (G).

Pub. L. 101–549, §110(5)(B), amended subpar. (F) generally. Prior to amendment, subpar. (F) read as follows: "promulgation or revision of regulations pertaining to orders for coal conversion under section 7413(d)(5) of this title (but not including orders granting or denying any such orders),".

Subsec. (d)(1)(G), (H). Pub. L. 101–549, §302(h), redesignated subpars. (F) and (G) as (G) and (H), respectively. Former subpar. (H) redesignated (I).

Subsec. (d)(1)(I). Pub. L. 101–549, §710(b), which directed that subpar. (H) be amended by substituting "subchapter VI of this chapter" for "part B of subchapter I of this chapter", was executed by making the substitution in subpar. (I), to reflect the probable intent of Congress and the intervening redesignation of subpar. (H) as (I) by Pub. L. 101–549, §302(h), see below.

Pub. L. 101–549, §302(h), redesignated subpar. (H) as (I). Former subpar. (I) redesignated (J).

Subsec. (d)(1)(J) to (M). Pub. L. 101–549, §302(h), redesignated subpars. (I) to (L) as (J) to (M), respectively. Former subpar. (M) redesignated (N).

Subsec. (d)(1)(N). Pub. L. 101–549, §302(h), redesignated subpar. (M) as (N). Former subpar. (N) redesignated (O).

Pub. L. 101–549, §110(5)(C), added subpar. (N) and redesignated former subpar. (N) as (U).

Subsec. (d)(1)(O) to (T). Pub. L. 101–549, §302(h), redesignated subpars. (N) to (S) as (O) to (T), respectively. Former subpar. (T) redesignated (U).

Pub. L. 101–549, §110(5)(C), added subpars. (O) to (T).

Subsec. (d)(1)(U). Pub. L. 101–549, §302(h), redesignated subpar. (T) as (U). Former subpar. (U) redesignated (V).

Pub. L. 101–549, §110(5)(C), redesignated former subpar. (N) as (U).

Subsec. (d)(1)(V). Pub. L. 101–549, §302(h), redesignated subpar. (U) as (V).

Subsec. (h). Pub. L. 101–549, §108(p), added subsec. (h).

1977—Subsec. (b)(1). Pub. L. 95–190 in text relating to filing of petitions for review in the United States Court of Appeals for the District of Columbia inserted provision respecting requirements under sections 7411 and 7412 of this title, and substituted provisions authorizing review of any rule issued under section 7413, 7419, or 7420 of this title, for provisions authorizing review of any rule or order issued under section 7420 of this title, relating to noncompliance penalties, and in text relating to filing of petitions for review in the United States Court of Appeals for the appropriate circuit inserted provision respecting review under section 7411(j), 7412(c), 7413(d), or 7419 of this title, provision authorizing review under section 1857c–10(c)(2)(A), (B), or (C) to the period prior to Aug. 7, 1977, and provisions authorizing review of denials or disapprovals by the Administrator under subchapter I of this chapter.

Pub. L. 95–95, §305(c), (h), inserted rules or orders issued under section 7420 of this title (relating to noncompliance penalties) and any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter to the enumeration of actions of the Administrator for which a petition for review may be filed only in the United States Court of Appeals for the District of Columbia, added the approval or promulgation by the Administrator of orders under section 7420 of this title, or any other final action of the Administrator under this chapter which is locally or regionally applicable to the enumeration of actions by the Administrator for which a petition for review may be filed only in the United States Court of Appeals for the appropriate circuit, inserted provision that petitions otherwise capable of being filed in the Court of Appeals for the appropriate circuit may be filed only in the Court of Appeals for the District of Columbia if the action is based on a determination of nationwide scope, and increased from 30 days to 60 days the period during which the petition must be filed.

Subsec. (d). Pub. L. 95–95, §305(a), added subsec. (d).

Subsec. (e). Pub. L. 95–95, §303(d), added subsec. (e).

Subsec. (f). Pub. L. 95–95, §305(f), added subsec. (f).

Subsec. (g). Pub. L. 95–95, §305(g), added subsec. (g).

1974—Subsec. (b)(1). Pub. L. 93–319 inserted reference to the Administrator's action under section 1857c–10(c)(2)(A), (B), or (C) of this title or under regulations thereunder and substituted reference to the filing of a petition within 30 days from the date of promulgation, approval, or action for reference to the filing of a petition within 30 days from the date of promulgation or approval.

1971—Subsec. (a)(1). Pub. L. 92–157 substituted reference to section "7545(c)(3)" for "7545(c)(4)" of this title.

## EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

## TERMINATION OF ADVISORY COMMITTEES

Advisory committees established after Jan. 5, 1973, to terminate not later than the expiration of the 2-year period beginning on the date of their establishment, unless, in the case of a committee established by the President or an officer of the Federal Government, such committee is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a committee established by the Congress, its duration is otherwise provided for by law. See section 14 of Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 776, set out in the Appendix to Title 5, Government Organization and Employees.

## PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other

USCA Case #12-5310     Document #1460877     Filed: 10/11/2013     Page 63 of 71

officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## § 7608. Mandatory licensing

Whenever the Attorney General determines, upon application of the Administrator—

(1) that—

(A) in the implementation of the requirements of section 7411, 7412, or 7521 of this title, a right under any United States letters patent, which is being used or intended for public or commercial use and not otherwise reasonably available, is necessary to enable any person required to comply with such limitation to so comply, and

(B) there are no reasonable alternative methods to accomplish such purpose, and

(2) that the unavailability of such right may result in a substantial lessening of competition or tendency to create a monopoly in any line of commerce in any section of the country,

the Attorney General may so certify to a district court of the United States, which may issue an order requiring the person who owns such patent to license it on such reasonable terms and conditions as the court, after hearing, may determine. Such certification may be made to the district court for the district in which the person owning the patent resides, does business, or is found.

(July 14, 1955, ch. 360, title III, § 308, as added Pub. L. 91–604, § 12(a), Dec. 31, 1970, 84 Stat. 1708.)

CODIFICATION

Section was formerly classified to section 1857h–6 of this title.

PRIOR PROVISIONS

A prior section 308 of act July 14, 1955, was renumbered section 315 by Pub. L. 91–604 and is classified to section 7615 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect

immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## § 7609. Policy review

### (a) Environmental impact

The Administrator shall review and comment in writing on the environmental impact of any matter relating to duties and responsibilities granted pursuant to this chapter or other provisions of the authority of the Administrator, contained in any (1) legislation proposed by any Federal department or agency, (2) newly authorized Federal projects for construction and any major Federal agency action (other than a project for construction) to which section 4332(2)(C) of this title applies, and (3) proposed regulations published by any department or agency of the Federal Government. Such written comment shall be made public at the conclusion of any such review.

### (b) Unsatisfactory legislation, action, or regulation

In the event the Administrator determines that any such legislation, action, or regulation is unsatisfactory from the standpoint of public health or welfare or environmental quality, he shall publish his determination and the matter shall be referred to the Council on Environmental Quality.

(July 14, 1955, ch. 360, title III, § 309, as added Pub. L. 91–604, § 12(a), Dec. 31, 1970, 84 Stat. 1709.)

CODIFICATION

Section was formerly classified to section 1857h–7 of this title.

PRIOR PROVISIONS

A prior section 309 of act July 14, 1955, ch. 360, title III, formerly § 13, as added Dec. 17, 1963, Pub. L. 88–206, § 1, 77 Stat. 401; renumbered § 306, Oct. 20, 1965, Pub. L. 89–272, title I, § 101(4), 79 Stat. 992; renumbered § 309, Nov. 21, 1967, Pub. L. 90–148, § 2, 81 Stat. 506; renumbered § 316, Dec. 31, 1970, Pub. L. 91–604, § 12(a), 84 Stat. 1705, related to appropriations and was classified to section 1857l of this title, prior to repeal by section 306 of Pub. L. 95–95. See section 7626 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## § 7610. Other authority

### (a) Authority and responsibilities under other laws not affected

Except as provided in subsection (b) of this section, this chapter shall not be construed as

SUBPART A

| Pollutant or pollutant property | BAT effluent limitations | |
| --- | --- | --- |
| | Maximum for any 1 day | Average of daily values for 30 consecutive days |
| | Kg/kkg (pounds per 1,000 lb) of product | |
| Ammonia-N ........................... | 0.0603 | 0.0177 |
| Cyanide ................................ | 0.00709 | 0.00390 |
| Phenols (4AAP) .................... | 0.0000709 | 0.0000355 |
| Benzene ............................... | 0.0000355 | ........................ |
| Naphthalene ......................... | 0.0000355 | ........................ |
| Benzo(a)pyrene .................... | 0.0000355 | ........................ |

(1) Increased loadings, not to exceed 15 percent of the above limitations, are allowed for by-product coke plants which have wet desulfurization systems but only to the extent such systems generate an increased effluent volume.

(2) Increased loadings, not to exceed 35 percent of the above limitations, are allowed for by-product coke plants which include indirect ammonia recovery systems but only to the extent such systems generate an increased effluent volume.

(3) The following BAT effluent limitations shall be applicable to by-product coke plants with physical chemical treatment systems:

SUBPART A

| Pollutant or pollutant property | BAT effluent limitations | |
| --- | --- | --- |
| | Maximum for any 1 day | Average of daily values for 30 consecutive days |
| | Kg/kkg (pounds per 1,000 lb) of product | |
| Ammonia-N ........................... | 0.0751 | 0.0375 |
| Phenols(4AAP) ..................... | 0.000100 | 0.0000501 |
| Benzene ............................... | 0.0000250 | ........................ |
| Naphthalene ......................... | 0.0000250 | ........................ |
| Benzo(a)pyrene .................... | 0.0000250 | ........................ |

Increased loadings, not to exceed 21 percent of the above limitations, are allowed for by-product coke plants with physical chemical treatment systems which have wet desulfurization systems but only to the extent such systems generate an increased effluent volume.

(c) *Beehive cokemaking.* No discharge of process wastewater pollutants to navigable waters.

§ 420.14 New source performance standards (NSPS).

The discharge of wastewater pollutants from any new source subject to this subpart shall not exceed the standards set forth below.

(a) *By-product cokemaking—iron and steel.*

SUBPART A

| Pollutant or pollutant property | New source performance standards | |
| --- | --- | --- |
| | Maximum for any 1 day | Average of daily values for 30 consecutive days |
| | Kg/kkg (pounds per 1,000 lb) of product | |
| TSS ..................................... | 0.172 | 0.0894 |
| O&G .................................... | 0.00638 | ........................ |
| Ammonia-N ........................... | 0.0543 | 0.0160 |
| Cyanide ................................ | 0.00638 | 0.00351 |
| Phenols (4AAP) .................... | 0.0000638 | 0.0000319 |
| Benzene ............................... | 0.0000319 | ........................ |
| Naphthalene ......................... | 0.0000319 | ........................ |
| Benzo(a)pyrene .................... | 0.0000319 | ........................ |
| pH ...................................... | (1) | (1) |

[1] Within the range of 6.0 to 9.0.

(1) Increased loadings, not to exceed 16 percent of the above standards, are allowed for by-product coke plants which have wet desulfurization systems but only to the extent such systems generate an increased effluent volume.

(2) Increased loadings, not to exceed 39 percent of the above standards, are allowed for by-product coke plants which include indirect ammonia recovery systems but only to the extent such systems generate an increased effluent volume.

(b) *By-product cokemaking—merchant.*

SUBPART A

| Pollutant or pollutant property | New source performance standards | |
| --- | --- | --- |
| | Maximum for any 1 day | Average of daily values for 30 consecutive days |
| | Kg/kkg (pounds per 1,000 lb) of product | |
| TSS ..................................... | 0.192 | 0.0993 |
| O&G .................................... | 0.00709 | ........................ |
| Ammonia-N ........................... | 0.0603 | 0.0177 |
| Cyanide ................................ | 0.00709 | 0.00390 |
| Phenols (4AAP) .................... | 0.0000709 | 0.0000355 |
| Benzene ............................... | 0.0000355 | ........................ |
| Naphthalene ......................... | 0.0000355 | ........................ |
| Benzo(a)pyrene .................... | 0.0000355 | ........................ |

390

**Environmental Protection Agency**                    **§ 420.16**

SUBPART A—Continued

| Pollutant or pollutant property | New source performance standards | |
| --- | --- | --- |
| | Maximum for any 1 day | Average of daily values for 30 consecutive days |
| pH ............................................ | (¹) | (¹) |

¹ Within the range of 6.0 to 9.0.

(1) Increased loadings, not to exceed 15 percent of the above standards, are allowed for by-product coke plants which have wet desulfurization systems but only to the extent such systems generate an increased effluent volume.

(2) Increased loadings, not to exceed 35 percent of the above standards, are allowed for by-product coke plants which include indirect ammonia recovery systems but only to the extent such systems generate an increased effluent volume.

(c) *Beehive cokemaking.* No discharge of process wastewater pollutants to navigable waters.

**§ 420.15 Pretreatment standards for existing sources (PSES).**

Except as provided in 40 CFR 403.7 and 403.13, any existing source subject to this subpart which introduces pollutants into a publicly owned treatment works must comply with 40 CFR part 403 and achieve the following pretreatment standards for existing sources.

(a) *By-product cokemaking—iron and steel.*

SUBPART A

| Pollutant or pollutant property | Pretreatment standards for existing sources | |
| --- | --- | --- |
| | Maximum for any 1 day | Average of daily values for 30 consecutive days |
| | Kg/kkg (pounds per 1,000 lb) of product | |
| Ammonia-N ................................ | 0.0645 | 0.0322 |
| Cyanide ..................................... | 0.0172 | 0.00859 |
| Phenols (4AAP) .......................... | 0.0430 | 0.0215 |

(1) Increased loadings, not to exceed 24 percent of the above standards, are

allowed for by-product coke plants which have wet desulfurization systems but only to the extent such systems generate an increased effluent volume.

(2) Increased loadings, not to exceed 58 percent of the above standards, are allowed for by-product coke plants which include indirect ammonia recovery systems but only to the extent such systems generate an increased effluent volume.

(b) *By-product cokemaking—merchant.*

SUBPART A

| Pollutant or pollutant property | Pretreatment standards for existing sources | |
| --- | --- | --- |
| | Maximum for any 1 day | Average of daily values for 30 consecutive days |
| | Kg/kkg (pounds per 1,000 lb) of product | |
| Ammonia-N ................................ | 0.0751 | 0.0375 |
| Cyanide ..................................... | 0.0200 | 0.0100 |
| Phenols (4AAP) .......................... | 0.0501 | 0.0250 |

(1) Increased loadings, not to exceed 21 percent of the above standards, are allowed for by-product coke plants which have wet desulfurization systems but only to the extent such systems generate an increased effluent volume.

(2) Increased loadings, not to exceed 50 percent of the above standards, are allowed for by-product coke plants which include indirect ammonia recovery systems but only to the extent such systems generate an increased effluent volume.

(c) *Beehive cokemaking.* [Reserved]

**§ 420.16 Pretreatment standards for new sources (PSNS).**

Except as provided in 40 CFR 403.7, any new source subject to this subpart which introduces pollutants into a publicly owned treatment works must comply with 40 CFR part 403 and achieve the following pretreatment standards for new sources.

(a) *By-product cokemaking—iron and steel.*

USCA Case #12-5310    Document #1460877    Filed: 10/11/2013    Page 67 of 71

**§22-11-2. Declaration of policy.**

(a) It is declared to be the public policy of the state of West Virginia to maintain reasonable standards of purity and quality of the water of the state consistent with (1) public health and public enjoyment thereof; (2) the propagation and protection of animal, bird, fish, aquatic and plant life; and (3) the expansion of employment opportunities, maintenance and expansion of agriculture and the provision of a permanent foundation for healthy industrial development.

(b) It is also the public policy of the state of West Virginia that the water resources of this state with respect to the quantity thereof be available for reasonable use by all of the citizens of this state.

*Note: WV Code updated with legislation passed through the 2012 1st Special Session*

USCA Case #12-5310     Document #1460877          Filed: 10/11/2013     Page 68 of 71

**§22-11-7b. Water quality standards; implementation of antidegradation procedures; procedure to determine comp1iance with the biologic component of the narrative water quality standard.**

(a) All authority to promulgate rules and implement water quality standards is vested in the Secretary of the Department of Environmental Protection.

(b) All meetings with the secretary or any employee of the department and any interested party which are convened for the purpose of making a decision or deliberating toward a decision as to the form and substance of the rule governing water quality standards or variances thereto shall be held in accordance with the provisions of article nine-a, chapter six of this code. When the secretary is considering the form and substance of the rules governing water quality standards, the following are not meetings pursuant to article nine-a, chapter six of this code: (i) Consultations between the department's employees or its consultants, contractors or agents; (ii) consultations with other state or federal agencies and the department's employees or its consultants, contractors or agents; or (iii) consultations between the secretary, the department's employees or its consultants, contractors or agents with any interested party for the purpose of collecting facts and explaining state and federal requirements relating to a site specific change or variance.

(c) In order to carry out the purposes of this chapter, the secretary shall promulgate legislative rules in accordance with the provisions of article three, chapter twenty-nine-a of this code setting standards of water quality applicable to both the surface waters and groundwaters of this state. Standards of quality with respect to surface waters shall protect the public health and welfare, wildlife, fish and aquatic life and the present and prospective future uses of the water for domestic, agricultural, industrial, recreational, scenic and other legitimate beneficial uses thereof. The water quality standards of the secretary may not specify the design of equipment, type of construction or particular method which a person shall use to reduce the discharge of a pollutant.

(d) The secretary shall establish the antidegradation implementation procedures as required by 40 C. F. R. 131.12(a) which apply to regulated activities that have the potential to affect water quality. The secretary shall propose for legislative approval, pursuant to article three, chapter twenty-nine-a of the code, legislative rules to establish implementation procedures which include specifics of the review depending upon the existing uses of the water body segment that would be affected, the level of protection or "tier" assigned to the applicable water body segment, the nature of the activity and the extent to which existing water quality would be degraded. Any final classification determination of a water as a Tier 2.5 water (Water of Special Concern) does not become effective until that determination is approved by the Legislature through the legislative rule-making process as provided in article three, chapter twenty-nine-a of the code.

(e) All remining variances shall be applied for and considered by the secretary and any variance granted shall be consistent with 33 U. S. C. Section 1311(p) of the Federal Water Control Act. At a minimum, when considering an application for a remining variance the secretary shall consider the data and information submitted by the applicant for the variance; and comments received at a public comment period and public hearing. The secretary may not grant a variance without requiring the applicant to improve the instream water quality as much as is reasonably possible by applying best available technology economically achievable using best professional judgment. Any such requirement will be included as a permit condition. The secretary may not grant a variance without a demonstration by the applicant that the coal remining operation will result in the potential for improved instream water quality as a result of the remining operation. The secretary may not grant a variance where he or she determines that degradation of the instream water quality will result from the remining operation.

(f) The secretary shall propose rules measuring compliance with the biologic component of West Virginia's narrative water quality standard requires evaluation of the holistic health of the aquatic ecosystem and a determination that the stream: (i) Supports a balanced aquatic community that is diverse in species composition; (ii) contains appropriate trophic levels of fish, in streams that have flows sufficient to support fish populations; and (iii) the aquatic community is composed of benthic invertebrate assemblages sufficient to perform the biological functions necessary to support fish communities within the assessed reach, or, if the assessed reach has insufficient flows to support a fish community, in those downstream reaches where fish are present. The secretary shall propose rules for legislative approval in accordance with the provisions of article three, chapter twenty-nine-a of this code that implement the provisions of this subsection. Rules promulgated pursuant to this subsection may not establish measurements for biologic components of West Virginia's narrative water quality standards that would establish standards less protective than requirements that exist at the time of enactment of the amendments to this subsection by the Legislature during the 2012 regular session. *Note: WV Code updated with legislation passed through the 2012 1st Special Session*

TITLE 47
LEGISLATIVE RULE
DEPARTMENT OF ENVIRONMENTAL PROTECTION
WATER RESOURCES

SERIES 2
REQUIREMENTS GOVERNING WATER QUALITY STANDARDS

§47-2-1. General.

1.1. Scope. -- These rules establish requirements governing the discharge or deposit of sewage, industrial wastes and other wastes into the waters of the state and establish water quality standards for the waters of the State standing or flowing over the surface of the State. It is declared to be the public policy of the State of West Virginia to maintain reasonable standards of purity and quality of the water of the State consistent with (1) public health and public enjoyment thereof; (2) the propagation and protection of animal, bird, fish, and other aquatic and plant life; and (3) the expansion of employment opportunities, maintenance and expansion of agriculture and the provision of a permanent foundation for healthy industrial development. (See W. Va. Code §22-11-2.)

1.2. Authority. -- W. Va. Code §§22-11-4(a)(16); 22-11-7b.

1.3. Filing Date. -- April 11, 2008.

1.4. Effective Date. -- July 1, 2008.

§47-2-2. Definitions.

The following definitions in addition to those set forth in W. Va. Code §22-11-3, shall apply to these rules unless otherwise specified herein, or unless the context in which used clearly requires a different meaning:

2.1. "Conventional treatment" is the treatment of water as approved by the West Virginia Bureau for Public Health to assure that the water is safe for human consumption.

2.2. "Cool water lakes" are lakes managed by the West Virginia Division of Natural Resources for cool water fisheries, with summer residence times greater than 14 days.

2.3. "Cumulative" means a pollutant which increases in concentration in an organism by successive additions at different times or in different ways (bio-accumulation).

2.4. "Designated uses" are those uses specified in water quality standards for each water or segment whether or not they are being attained. (See sections 6.2 - 6.6, herein)

2.5. "Dissolved metal" is operationally defined as that portion of metal which passes through a 0.45 micron filter.

2.6. "Existing uses" are those uses actually attained in a water on or after November 28, 1975, whether or not they are included in the water quality standards.

2.7. The "Federal Act" means the Clean Water Act (also known as the Federal Water Pollution Control Act) 33 U.S.C. §1251 - 1387.

2.8. "High quality waters" are those waters whose quality is equal to or better than the minimum levels necessary to achieve the national water quality goal uses.

2.9. "Intermittent streams" are streams which have no flow during sustained periods of no precipitation and which do not support aquatic life whose life history requires residence in flowing waters for a continuous period of at least six (6) months.

2.10. "Outstanding national resource waters" are those waters whose unique character, ecological or recreational value or

1

pristine nature constitutes a valuable national or State resource.

2.11. "Natural" or "naturally occurring" values or "natural temperature" shall mean for all of the waters of the state:

2.11.a. Those water quality values which exist unaffected by -- or unaffected as a consequence of -- any water use by any person; and

2.11.b. Those water quality values which exist unaffected by the discharge, or direct or indirect deposit of, any solid, liquid or gaseous substance from any point source or non-point source.

2.12. "Non-point source" shall mean any source other than a point source from which pollutants may reach the waters of the state.

2.13. "Persistent" shall mean a pollutant and its transformation products which under natural conditions degrade slowly in an aquatic environment.

2.14. "Point source" shall mean any discernible, confined and discrete conveyance, including, but not limited to, any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.

2.15. "Representative important species of aquatic life" shall mean those species of aquatic life whose protection and propagation will assure the sustained presence of a balanced aquatic community. Such species are representative in the sense that maintenance of water quality criteria will assure both the natural completion of the species' life cycles and the overall protection and sustained propagation of the balanced aquatic community.

2.16. "Secretary" shall mean the Secretary of the Department of Environmental Protection or such other person to whom the Secretary has

delegated authority or duties pursuant to W. Va. Code §§22-1-6 or 22-1-8.

2.17. The "State Act" or "State Law" shall mean the West Virginia Water Pollution Control Act, W. Va. Code §22-11-1 et seq.

2.18. "Total recoverable" refers to the digestion procedure for certain heavy metals as referenced in 40 CFR 136, as amended June 15, 1990 and March 26, 2007, Guidelines Establishing Test Procedures for the Analysis of Pollutants Under the Clean Water Act.

2.19. "Trout waters" are waters which sustain year-round trout populations. Excluded are those waters which receive annual stockings of trout but which do not support year-round trout populations.

2.20. "Water quality criteria" shall mean levels of parameters or stream conditions that are required to be maintained by these regulations. Criteria may be expressed as a constituent concentration, levels, or narrative statement, representing a quality of water that supports a designated use or uses.

2.21. "Water quality standards" means the combination of water uses to be protected and the water quality criteria to be maintained by these rules.

2.22. "Wetlands" are those areas that are inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas.

2.23. "Wet weather streams" are streams that flow only in direct response to precipitation or whose channels are at all times above the water table.

§47-2-3. Conditions Not Allowable In State Waters.

3.1. Certain characteristics of sewage, industrial wastes and other wastes cause

2

pollution and are objectionable in all waters of the state. Therefore, the Secretary does hereby proclaim that the following general conditions are not to be allowed in any of the waters of the state.

3.2. No sewage, industrial wastes or other wastes present in any of the waters of the state shall cause therein or materially contribute to any of the following conditions thereof:

3.2.a. Distinctly visible floating or settleable solids, suspended solids, scum, foam or oily slicks;

3.2.b. Deposits or sludge banks on the bottom;

3.2.c. Odors in the vicinity of the waters;

3.2.d. Taste or odor that would adversely affect the designated uses of the affected waters;

3.2.e. Materials in concentrations which are harmful, hazardous or toxic to man, animal or aquatic life;

3.2.f. Distinctly visible color;

3.2.g. Concentrations of bacteria which may impair or interfere with the designated uses of the affected waters;

3.2.h. Requiring an unreasonable degree of treatment for the production of potable water by modern water treatment processes as commonly employed; and

3.2.i. Any other condition, including radiological exposure, which adversely alters the integrity of the waters of the State including wetlands; no significant adverse impact to the chemical, physical, hydrologic, or biological components of aquatic ecosystems shall be allowed.

§47-2-4. Antidegradation Policy.

4.1. It is the policy of the State of West Virginia that the waters of the state shall be maintained and protected as follows:

4.1.a. Tier 1 Protection. Existing water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected. Existing uses are those uses actually attained in a water on or after November 28, 1975, whether or not they are included as designated uses within these water quality standards.

4.1.b. Tier 2 Protection. The existing high quality waters of the state must be maintained at their existing high quality unless it is determined after satisfaction of the intergovernmental coordination of the state's continuing planning process and opportunity for public comment and hearing that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located. If limited degradation is allowed, it shall not result in injury or interference with existing stream water uses or in violation of state or federal water quality criteria that describe the base levels necessary to sustain the national water quality goal uses of protection and propagation of fish, shellfish and wildlife and recreating in and on the water.

In addition, the Secretary shall assure that all new and existing point sources shall achieve the highest established statutory and regulatory requirements applicable to them and shall assure the achievement of cost-effective and reasonable best management practices (BMPs) for non-point source control. If BMPs are demonstrated to be inadequate to reduce or minimize water quality impacts, the Secretary may require that more appropriate BMPs be developed and applied.

4.1.b.1. High quality waters are those waters meeting the definition at section 2.8 herein.

4.1.b.2. High quality waters may include but are not limited to the following:

3